**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------
                                                    :
Securities and Exchange Commission,                 :
                        Plaintiff,                  :        **Filed Electronically**
                v.                                  :        **No. 09 Civ. 6829 (JSR)**
                                                    :
Bank of America Corporation,                        :
                        Defendant.                  :
-------------------------------------------------------

**MEMORANDUM OF LAW ON BEHALF OF BANK OF AMERICA CORPORATION**

Lewis J. Liman
Shawn J. Chen
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY  10006-1470
Tel.: (212) 225-2000
Fax: (212) 225-3999

Dated: August 24, 2009

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... ii

INTRODUCTION ...................................................................................... 1

STATEMENT OF FACTS ............................................................................ 3

    A.    The Merger ......................................................................... 3

    B.    The Merger Agreement .............................................................. 4

    C.    Merrill Lynch's Intention to Pay 2008 Incentive
          Compensation Was Disclosed..................................................... 6

    D.    The Proxy Statement ................................................................ 9

    E.    It Was Widely Understood From Merrill Lynch's
          Public Disclosures that Merrill Lynch Intended to
          Pay Multi-Billions of Dollars in Year-End Incentive
          Compensation......................................................................... 13

    F.    Shareholders Approve the Merger ............................................. 16

    G.    Merrill Lynch's MDCC Approves the 2008 VICP Awards ...... 17

    H.    The Merger Closes .................................................................. 18

    I.    The SEC's Complaint and the Proposed Settlement.................. 18

ARGUMENT .............................................................................................. 20

    A.    The Court Should Approve the Proposed Settlement ................ 20

    B.    The Settlement Should Be Approved Under Any
          Legal Standard....................................................................... 29

CONCLUSION ........................................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

15 U.S.C. § 16(e) ............................................................................ 30

17 C.F.R. § 240.14a-101 ................................................................. 13, 24

Fed. R. Civ. P. 23(e) ...................................................................... 30

Rule 14a-9...................................................................................... 18, 20, 24, 27


**Cases**

Adams v. Bell,
711 F.2d 161 (D.C. Cir. 1983) ....................................................... 29, 30

Beissinger v. Rockwood Computer Corp.,
529 F. Supp. 770 (E.D. Pa. 1981) .................................................. 25, 26

Donovan v. Robbins,
752 F.2d 1170 (7th Cir. 1985) ........................................................ 29

GAF Corp. v. Heyman,
724 F.2d 727 (2d Cir. 1983)............................................................ 26

Gerstle v. Gamble-Skogmo, Inc.,
478 F.2d 1281 (2d Cir. 1973).......................................................... 27

In re Browning-Ferris Indus., Inc. S'holder Derivative Litig.,
830 F. Supp. 361 (S.D. Tex. 1993) ................................................ 25

In re Keyspan Co. Sec. Litig.,
383 F. Supp. 2d 358 (E.D.N.Y. 2003) ........................................... 25

In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,
272 F. Supp. 2d 243 (S.D.N.Y. 2003).............................................. 26

Janus Films v. Miller,
801 F.2d 578 (2d Cir. 1986)............................................................ 29, 30

Resnick v. Swartz,
303 F.3d 147 (2d Cir. 2002)............................................................ 20

Rodman v. The Grant Foundation,
608 F.2d 64 (2d Cir. 1979)..................................................................................     26

SEC v. Bear Stearns,
2003 WL 22466156 (S.D.N.Y. 2003)..................................................................     30

SEC v. Hughes Capital Corp.,
124 F.3d 449 (3d Cir. 1997)................................................................................     27

SEC v. Lowy,
396 F. Supp. 2d 225 (E.D.N.Y. 2003) ...............................................................     27

SEC v. Randolph,
736 F.2d 525 (9th Cir. 1984) ..............................................................................     30

Seibert v. Sperry Rand Corp.,
586 F.2d 949 (2d Cir. 1978)................................................................................     26

Seinfeld v. Gray,
404 F.3d 645 (2d Cir. 2005)................................................................................     24

TSC Indus. v. Northway,
426 U.S. 438 (1976)....................................................................................... 24, 28

## Other Authorities

James Freund, Anatomy of a Merger  (2009) .....................................................     27

Lou R. Kling & Eileen Nugent, Negotiated Acquisitions of Companies, Subsidiaries and
Divisions (1992)..................................................................................................     27

Richard Langan & Daniel McAvoy, The Integrated Disclosure System, Registration and
Periodic Reports Under the Securities Exchange Act of 1934, 1690 PLI/Corp 367 (2008)      9

Securities Act Release No. 6676, 36 SEC Docket 1203 (Nov. 10, 1986) .........................     25

Securities Act Release No. 6235, [1980 Transfer Binder] Fed. Sec. L. Rep. (CCH)
82,649, at 83,484 (Sept. 2, 1980)........................................................................     25

## INTRODUCTION

This memorandum is respectfully submitted by Bank of America Corporation ("Bank of America") pursuant to the Court's direction on August 10, 2009.  On that date, the Court held a hearing to determine whether the proposed settlement, consented to by both the Securities and Exchange Commission ("SEC") and Bank of America, was "fair and reasonable." The Court found itself in the difficult position, however, of trying to assess the proposed settlement based solely on the SEC's side of the story.  The Court had before it only the SEC's complaint, the proposed consent judgment, and Bank of America's consent thereto.  Therefore, the Court asked for a "detailed recitation from each side" addressing the facts and legal issues presented by the consent judgment.  This memorandum demonstrates that the proposed settlement should be approved.  If this case were to be litigated to judgment, Bank of America would have powerful and successful defenses, based on the following:

First:  There was no false or misleading statement or omission in the Proxy Statement.  The Proxy Statement accurately described the terms of the pertinent forbearance or "negative covenant" in the Merger Agreement.  That provision was *not* – as the SEC alleges, see Compl. ¶ 3 – a "representation that Merrill was prohibited from making [year-end] bonus payments."

Second:  The intention of Merrill Lynch & Co., Inc. ("Merrill Lynch") to pay incentive compensation for 2008 was disclosed and was part of the "total mix" of information available to shareholders.  In each of the quarterly reports publicly filed by Merrill Lynch in 2008 – which were part of the Proxy Statement, as incorporated by reference under the SEC rules – Merrill Lynch disclosed in both its financial statements and the accompanying discussion and analysis that it was accruing compensation and benefits expenses of roughly $3.5 billion each quarter.

1

These accruals did not change after the Merger Agreement was signed, and they were only slightly below the accruals for 2007 – a year in which Merrill Lynch paid over $6 billion in year-end incentive compensation (notwithstanding the fact that it had suffered a net loss of $8.6 billion). Merrill Lynch's then-Chief Financial Officer even announced during an October 16, 2008 earnings call that the company was continuing to accrue for compensation expenses at a rate only "down slightly from comparable 2007 levels."

Third: It was widely understood from Merrill Lynch's public disclosures that Merrill Lynch intended to pay multi-billions of dollars in year-end incentive compensation. In the seven weeks from the signing of the Merger Agreement to the December 5 shareholder vote, both before and after the Proxy Statement was sent to shareholders, there was an extensive amount of media coverage in major newspapers, on television, and over the internet concerning Merrill Lynch's year-end incentive compensation. Those media – ranging from The New York Times to Bloomberg News to NBC's Today Show to Fox News – all uniformly reported that Merrill Lynch was expected to pay multi-billions of dollars in year-end incentive compensation. There were *no* media or analyst reports to the contrary. In fact, the incentive compensation that Merrill Lynch actually paid for 2008 was precisely in line with its quarterly accruals and with this widespread and uniform market expectation.

Fourth: The proposed settlement, including a $33 million civil penalty, represents a constructive conclusion to this matter. As shown below and in the accompanying Affidavit of Stanford Law School professor and former SEC Commissioner Joseph Grundfest, had there been no settlement here, and were this case to be litigated to judgment, Bank of America would have powerful defenses to the SEC's claims. Nevertheless, Bank of America determined to reach a settlement with the SEC, so that the company would not face the unnecessary distraction of a

protracted dispute with one of its principal regulators at a time of uncertain and difficult market conditions. The proposed settlement should be approved.

## STATEMENT OF FACTS

**A.      The Merger**

The merger between Bank of America and Merrill Lynch was negotiated over the weekend of September 13 and 14, 2008, following a tumultuous week in the financial markets. On September 15, Bank of America announced that it had agreed to acquire Merrill Lynch in a stock-for-stock transaction whereby each share of Merrill Lynch stock would be exchanged for 0.8595 shares of Bank of America stock. See Agreement and Plan of Merger (the "Merger Agreement"), Appendix A to Bank of America Corp., Joint Definitive Proxy Statement (Schedule 14A) (Nov. 3, 2008) and Merrill Lynch & Co., Inc., Joint Definitive Proxy Statement (Schedule 14A) (Nov. 3, 2008) (Joint Definitive Proxy Statement filed by both companies) (together, the "Proxy Statement"), § 1.4, at A-2 (Ex. 11).[1]

Prior to the execution of the Merger Agreement, the parties had reached a basic understanding regarding Merrill Lynch's right to make payments under its Variable Incentive Compensation Program ("VICP"), which covered approximately 40,000 Merrill Lynch employees (not including its financial advisors). The parties agreed that Merrill Lynch would have the right to pay 2008 VICP up to a level equivalent to 2007, as calculated on a "same-store" basis (*i.e.*, as if the total number of employees remained constant from 2007 to 2008).

The Merrill Lynch Management Development and Compensation Committee ("MDCC"), a committee of the Board consisting entirely of independent directors, generally had

---

[1]      Unless otherwise indicated, exhibits referenced in this memorandum are attached to the Declaration of Melissa K. Marler, dated August 23, 2009, submitted herewith.

the authority to determine on an annual basis how much to allocate for VICP payments.  In the

latter half of 2008, the MDCC consisted of five independent directors, including Aulana Peters, a

former Commissioner of the SEC.[2]

## B.     The Merger Agreement

The Merger Agreement was executed as of Monday, September 15, 2008, and

was publicly announced that morning.  The parties were represented throughout the process by

two law firms with preeminent experience in the field of mergers and acquisitions:  Wachtell,

Lipton, Rosen & Katz represented Bank of America, and Shearman & Sterling LLP represented

Merrill Lynch.

Insofar as is relevant to this matter, the Merger Agreement contained a number of

affirmative covenants that Merrill Lynch was obligated to perform, including to "(a) *conduct its*

*business in the ordinary course* in all material respects," and "(b) *use reasonable best efforts to*

maintain and preserve intact its business organization and advantageous business relationships

and *retain the services of key officers and key employees . . . .*"  Merger Agreement § 5.1, at A-31

(Ex. 11) (emphases added).  In the very next section, Section 5.2 of the Merger Agreement also

contained a series of "forbearances" (*i.e.*, negative covenants) that placed certain limitations on

Merrill Lynch's conduct of its business prior to the closing.  Section 5.2(c)(ii) provided that –

"except as set forth in . . . Section 5.2 of the Company Disclosure Schedule or . . . without the

prior written consent of [Bank of America]" – Merrill Lynch would not "pay any amounts to

---

[2]     The other independent directors on the MDCC were: John Finnegan, Chairman,
President, and Chief Executive Officer of The Chubb Corporation; Armando Codina, President
and Chief Executive Officer of the Flagler Development Group; Virgis Colbert, Senior Advisor
to Miller Brewing Company; and Alberto Cribiore, Founder and Managing Principal of Brera
Capital Partners LLC.  See Merrill Lynch & Co., Inc. Definitive Proxy Statement (Schedule
14A) (Mar. 14, 2008) at 6-8, 17-18 (Ex. 3).

Employees not required by any current plan or agreement (other than base salary in the ordinary course of business)." Merger Agreement § 5.2(c)(ii), at A-31 to A-32 (Ex. 11).

As shown in the accompanying Affidavit of Morton A. Pierce, Chairman of the Mergers & Acquisitions Group at Dewey & LeBoeuf LLP and a highly experienced practitioner in the field, negative covenants such as those found in Section 5.2 are a customary feature of merger agreements. A negative covenant with respect to the payment of discretionary compensation is typically one of the many "forbearances" in a merger agreement, included as a means of protecting the buyer against the unilateral dissipation of value by the seller prior to closing. See Expert Affidavit of Morton A. Pierce, dated Aug. 21, 2009 ("Pierce Aff."), ¶¶ 11-12.

As noted above, the negative covenants in Section 5.2 were expressly subject to exceptions – including those "set forth in . . . Section 5.2 of the Company Disclosure Schedule" and Bank of America's "written consent." Merger Agreement § 5.2, at A-31 (Ex. 11). Again, as Mr. Pierce explains, the manner in which this Merger Agreement was drafted is consistent with the custom and practice among corporate and securities lawyers. Pierce Aff. ¶¶ 11-13; 16-17. In recognition of the fact that it is in the buyer's interest for the seller to retain key employees – particularly where the transaction involves the purchase of a company whose value consists largely of human capital – the negative covenant against paying discretionary compensation will typically be subject to certain exceptions. As Mr. Pierce further explains, given the competitively sensitive nature of such matters, the incentive compensation arrangements to which the buyer agrees are customarily set forth in a separate disclosure schedule, which is neither annexed to the publicly disclosed merger agreement nor described in the proxy statement. Id. ¶¶ 12-13.

-5-

In this case, the Disclosure Schedule reflected the parties' basic understanding that Merrill Lynch could award 2008 VICP up to the same level as in 2007. Specifically, Merrill Lynch could award up to $5.8 billion in aggregate value and incur up to $4.5 billion in 2008 VICP expense, including any contractually guaranteed VICP awards.[3]

## C.    Merrill Lynch's Intention to Pay 2008 Incentive Compensation Was Disclosed

Throughout 2008 – both before and *after* the Merger Agreement was signed – Merrill Lynch consistently disclosed its intention to pay incentive compensation in the range of multi-billions of dollars. Thus:

>    (1)    In its Form 10-Q for the first quarter of 2008, Merrill Lynch disclosed in both its financial statements and the text of the accompanying discussion and analysis that it had accrued compensation and benefits expenses for

---

[3]    Sections 5.2(b)(iii), 5.2(c)(i), and 5.2(c)(ii) of the Company Disclosure Schedule state:

> "Variable Incentive Compensation Program ('<u>VICP</u>') in respect of 2008 (including without limitation any guaranteed VICP awards for 2008 or any other pro rata or other 2008 VICP awards payable, paid or provided to terminating or former employees) may be awarded at levels that (i) do not exceed $5.8 billion in aggregate value (inclusive of cash bonuses and the grant date value of long-term incentive awards) . . . , and (ii) do not result in 2008 VICP-related expense exceeding $4.5 billion . . . . Sixty percent of the overall 2008 VICP shall be awarded as a current cash bonus and forty percent of the overall 2008 VICP shall be awarded as a long-term incentive award either in the form of equity or long-term cash awards. The form (*i.e.*, equity v. long-term cash) and terms and conditions of the long-term incentive awards shall be determined by [Merrill] in consultation with [Bank of America] . . . . The allocation of the 2008 VICP among eligible employees shall be determined by [Merrill] in consultation with [Bank of America]." <u>See</u> Compl. ¶ 12.

The distinction between aggregate value and expense is a function of accounting principles, as any stock used to pay year-end incentive compensation to non-retirement-eligible employees is generally not expensed until the award vests.

the first three months of $4.196 billion – compared with $4.854 billion for the same period in 2007.[4]

(2)    In its Form 10-Q for the second quarter of 2008, Merrill Lynch disclosed in both its financial statements and the text of the accompanying discussion and analysis that it had accrued compensation and benefits expenses for the first six months of $7.687 billion – compared with $9.585 billion for the same period in 2007.[5]

(3)    In the Proxy Statement itself, the parties included an unaudited *pro forma* income statement for the first six months of 2008, disclosing that Merrill Lynch had accrued $7.687 billion in "personnel" expenses through June 30, 2008.[6]

Even after entering into the Merger Agreement during the third quarter of 2008, Merrill Lynch continued to make clear that its compensation accruals were running at levels only "slightly" below those in 2007.  In an earnings release issued on October 16, 2008 – under the heading "Compensation Expenses" – Merrill Lynch announced compensation and benefits expenses of $3.5 billion for the third quarter of 2008.  This brought its total accrued

---

[4]    Merrill Lynch & Co., Inc., Quarterly Report (Form 10-Q) at 4, 73 (Mar. 28, 2008, dated as of May 6, 2008) (Ex. 4).

[5]    Merrill Lynch & Co., Inc., Quarterly Report (Form 10-Q) at 5, 83 (June 27, 2008, dated as of Aug. 5, 2008) (Ex. 6).

[6]    Proxy Statement at 40 (Ex. 11).  Compare Ex. 6 at 5, 83 (Merrill Lynch & Co., Inc., Quarterly Report (Form 10-Q) (June 27, 2008, dated as of Aug. 5, 2008)) (disclosing identical number for compensation and benefits expenses).

compensation for the first nine months of 2008 to $11.170 billion – down only 3% from $11.564

billion for the same period in 2007.[7]

Moreover, in a conference call that same day, Merrill Lynch's then-Chief

Financial Officer highlighted the fact that "compensation expenses for the quarter . . . were $3.5

billion" and "on a year-to-date basis, comp expense is down slightly from comparable 2007

levels."  Final Transcript, MER-Q3 2008 Merrill Lynch Earnings Conference Call, at 5 (Oct. 16,

2008) (Ex. 10).  And three weeks later, in its Form 10-Q for the third quarter of 2008, filed with

the SEC on November 5, Merrill Lynch reiterated those numbers in both its financial statements

and the text of the accompanying discussion and analysis.[8]

In disclosing its accrued compensation expenses, Merrill Lynch did not

distinguish among base salary, incentive compensation, and other benefits and compensation-

related expenses, other than for its most senior executive officers.  In doing so, Merrill Lynch

followed the SEC rules, which do not require any such breakdown.  Merrill Lynch had

previously disclosed, however, in its proxy statement for its regular 2008 annual meeting –

which was incorporated as part of the Proxy Statement here – that a large percentage of its

compensation expense was in the form of year-end incentive compensation.[9]  This is consistent

with how Merrill Lynch and its competitors traditionally paid their employees.  See, e.g., Jenny

---

[7]        Merrill Lynch & Co., Inc. Form 8-K, Exhibit 99.1 (Oct. 16, 2008) (Ex. 9).

[8]        Merrill Lynch & Co., Inc., Quarterly Report (Form 10-Q) at 5, 86 (Sept. 26, 2008, dated
as of Nov. 5, 2008) (Ex. 12).

[9]        See Merrill Lynch & Co., Inc. Definitive 2008 Proxy Statement (Schedule 14A), at 29
(March 14, 2008) (Ex. 3) ("Base pay [for executive officers] normally represents a *small
percentage* of total compensation.") (emphasis added); id. ("In general, our compensation
framework emphasizes variable pay, uses substantial stock-based compensation to support
alignment with stockholders and retention of key employees and ensures that compensation
opportunities are competitive in the markets where we operate.").

Anderson & Landon Thomas Jr., *The Number Wall St. Crunches the Most*, N.Y. TIMES, Nov. 29,

2004, at C1 (Ex. 1) ("Bonuses typically make up the majority of compensation for professional

employees.").  Indeed, Merrill Lynch's 2008 compensation accruals were near (but slightly

below) the accruals made during the same period in 2007 – a year in which it was widely known

that Merrill Lynch had paid over $6 billion in year-end incentive compensation (notwithstanding

a net loss of $8.6 billion).[10]  Thus, shareholders at both Merrill Lynch and Bank of America were

able to understand the level of Merrill Lynch's 2008 compensation expenses, including its year-

end incentive compensation, from the company's public disclosures.

**D.     The Proxy Statement**

On November 3, 2008, Bank of America and Merrill Lynch sent their joint Proxy

Statement to their respective shareholders.  The Proxy Statement annexed the Merger Agreement

as an exhibit, Proxy Statement at A-1 to A-46, and, consistent with SEC rules, described the

material terms of the Merger Agreement, id. at 76-90 (Ex. 11).  The Proxy Statement also

incorporated both companies' SEC filings for 2008, id. at 123-25 – a practice encouraged by the

SEC.  See Proxy Rules – Comprehensive Review, SEC Release No. 6592, at *2 (July 1, 1985)

("applying *incorporation by reference* to the proxy statement context . . . *enhance[s] investor*

*protection*"); Richard Langan & Daniel McAvoy, The Integrated Disclosure System,

Registration and Periodic Reports Under the Securities Exchange Act of 1934, 1690 PLI/Corp

367, 370-71 (2008) ("By permitting the incorporation by reference of information into filings

with the Commission under specified circumstances, the Commission *eliminated unnecessary*

*duplication*, reduced issuer compliance expenses and *simplified reporting*.") (emphases added).

---

[10]     See, e.g., Christine Harper, *Goldman, Lehman, Morgan Lift Bonuses; Bear Cuts Them*,
BLOOMBERG, Dec. 20, 2007 (Ex. 2) (estimating 2007 Merrill Lynch bonuses would total $7.3
billion).

The Proxy Statement accurately described that Merrill Lynch had "undertaken customary covenants . . . to (1) conduct its business in the ordinary course in all material respects, [and] (2) use reasonable best efforts to maintain and preserve intact its business organization and advantageous business relationships, including retaining the services of key officers and employees." Proxy Statement at 83 (Ex. 11). That same paragraph of the Proxy Statement went on to state that Merrill Lynch had agreed "*with certain exceptions* or *except with Bank of America's prior written consent*" to refrain from taking certain actions, including "pay[ing] any current or former directors, officers or employees any amounts not required by existing plan or agreements." Id. at 83-84 (emphasis added).

Thus, this section of the Proxy Statement appropriately summarized the terms contained in Sections 5.1 and 5.2 of the Merger Agreement – including the fact that Merrill Lynch's negative covenants were subject to "certain exceptions." Id. And, as noted above, the Merger Agreement itself was annexed as part of the Proxy Statement and stated that the exceptions included those "set forth in . . . Section 5.2 of the Company Disclosure Schedule" or Bank of America's "written consent." Merger Agreement § 5.2, at A-31 (Ex. 11).[11]

Contrary to the gravamen of the SEC's complaint, see Compl. ¶ 3, in no way can the plain language of the Proxy Statement be read as a representation that Merrill Lynch would

---

[11]    The Proxy Statement's description of the Merger Agreement was headed by an italicized legend stating:

> *The following describes certain aspects of the merger, including material provisions of the merger agreement. The following description of the merger agreement is subject to, and qualified in its entirety by reference to, the merger agreement, which is attached to this document as Appendix A and is incorporated by reference in this document. We urge you to read the merger agreement carefully and in its entirety, as it is the legal document governing the merger.*

Proxy Statement at 76 (emphasis in original) (Ex. 11).

not pay any discretionary incentive compensation to its employees.  To the contrary, the Proxy

Statement and Merger Agreement made clear that their covenants were subject to certain

exceptions, including those set forth in a separate Disclosure Schedule.  Proxy Statement at 83,

A-31 (Ex. 11).

In addition, the Proxy Statement included specific SEC filings that were

incorporated by reference, which were described as containing "important information about the

companies and their financial condition." Id. at 123.  These included Merrill Lynch's Form 10-

Qs for the first three quarters of 2008 – which, as described above, consistently disclosed that the

company was accruing compensation and benefits for 2008, and was doing so at levels near (but

slightly below) those for the same time period in 2007.  Most notably, the information contained

in Merrill Lynch's October 16 earnings release and its Form 10-Q for the third quarter of 2008 –

both of which *post-dated* the Merger Agreement – disclosed that Merrill Lynch was continuing

to maintain the same pace of compensation accruals near 2007 levels.  Accordingly, the Proxy

Statement contained no representation that Merrill Lynch was prohibited from paying year-end

incentive compensation.  In fact, it contained information that showed the precise opposite.

Because the negative covenants and other provisions of the Merger Agreement

were subject to confidential exceptions made for the purpose of allocating risk between the

parties, both Bank of America and Merrill Lynch repeatedly warned shareholders *not* to read the

Merger Agreement or the Proxy Statement's description thereof as a source of factual

information.  Proxy Statement at 83, 125 (Ex. 11).  The Proxy Statement cautioned that

contractual representations and warranties "may be subject to important qualifications and

limitations agreed to by Bank of America and Merrill Lynch" and "may have been included in

the merger agreement for the purpose of allocating risk between Bank of America and Merrill Lynch rather than to establish matters as facts." Id. at 83; see also id. at 125.

The Proxy Statement further warned: "The merger agreement is described in, and included as an appendix to, this document only to provide you with information regarding its terms and conditions and *not to provide any other factual information regarding Merrill Lynch*, Bank of America or their respective businesses. Accordingly, the representations and warranties and other provisions of the merger agreement should not be read alone, but instead should be read only in conjunction with the information provided elsewhere in this document and in the documents incorporated by reference into this document." Id. at 83 (emphasis added).

As Mr. Pierce explains, because merger agreements customarily include confidential disclosure schedules that qualify their terms, cautionary language of this sort is commonly included in merger proxy statements to warn shareholders not to rely on the disclosed terms of the merger agreement as factual representations regarding the parties. Pierce Aff. ¶¶ 16-17. Similarly, the Merrill Lynch Form 8-K pertaining to events on September 15 (filed on September 18), which originally accompanied the Merger Agreement and was incorporated by reference into the Proxy Statement, alerted shareholders that the "representations, warranties, and covenants" contained in the Merger Agreement:

- "were made . . . solely for the benefit of the parties to the Merger Agreement"; and

- "may be *subject to limitations* agreed upon by the contracting parties, *including being qualified by confidential disclosures* made for the purposes of allocating contractual risk between the parties to the Merger Agreement instead of establishing these matters as facts . . . ."

Merrill Lynch & Co., Inc., Current Report (Form 8-K), at 2 (Sept. 18, 2008) (Ex. 7) (emphases added).[12]

**E.     It Was Widely Understood From Merrill Lynch's Public Disclosures that Merrill Lynch Intended to Pay Multi-Billions of Dollars in Year-End Incentive Compensation.**

As a result of Merrill Lynch's public disclosures, a broad array of media reports – ranging from The New York Times to Bloomberg News to CNN to NBC's Today Show to the Fox News Network – uniformly reported that Merrill Lynch intended to pay billions of dollars in year-end incentive compensation despite suffering billions of dollars in losses.  This steady drumbeat of news reports in the fall of 2008 – after the Merger Agreement was made public and for over a month and a half before the December 5 shareholder vote – included the following:

- On October 18, 2008, the day after Merrill Lynch issued its third quarter earnings release, The Guardian reported that Merrill Lynch had accrued $11.7 billion for staff salaries and bonuses through the first nine months of the year. Noting that "[p]ay plans for bankers have been disclosed in recent corporate statements," the article stated that for Merrill – "which was on the point of going bust last month before being taken over by Bank of America" – the "total accrued in the last quarter grew 76% to $3.49bn."  Affidavit of Joseph

---

[12]     In compliance with the SEC rules requiring additional proxy disclosure where the interests of directors and executive officers in a merger are different from the interests of shareholders generally, see 17 C.F.R. § 240.14a-101, Item 5, the Proxy Statement also contained three pages of detailed disclosures under the heading "Merrill Lynch's Officers and Directors Have Financial Interests in the Merger."  Proxy Statement at 73-75 (Ex. 11).  That section set forth the financial interests that Merrill Lynch's executive officers and directors had in the merger that were "different from, or in addition to, those of Merrill Lynch stockholders generally."  Id. at 73.  It included a discussion of any compensation arrangements (e.g., accelerated vesting of unvested options at closing) that were tied in some way to completion of the merger and therefore could be viewed to have potentially influenced the decision to pursue the merger.  Id. at 73-75.

A. Grundfest, dated Aug. 21, 2009 ("Grundfest Aff."), Ex. B.

- Five days later, on October 23, 2008, CNN's <u>The Situation Room</u> reported that Merrill Lynch had set aside $11.2 billion for compensation through the third quarter of 2008.  Grundfest Aff. Ex. C.

- Four days later, on October 27, 2008, <u>The New York Times</u> and <u>Bloomberg News</u> both reported that Merrill Lynch was "allocating about *$6.7 billion to pay bonuses*."  Grundfest Aff. Exs. D, E (emphasis added).  Those reports also stated that a Merrill Lynch spokeswoman had confirmed that "the firm's accrued bonuses aren't down as much as those at Goldman and Morgan Stanley because the firm reduced expenses last year."  <u>Id.</u>  The news reports added that "the money Merrill has set aside for bonuses equates to an average $110,000 for each of its 60,900 people, up from $108,000 a year ago . . . . The bonus figures are based on estimates that about 60 percent of the compensation and benefits expenses reported by the companies will be paid in year-end bonuses, as occurred in past years."  <u>Id.</u>

- The next day, NBC's <u>Today Show</u> reported that "at Merrill Lynch, Bloomberg estimates *$6.7 billion [was] set aside for bonuses*, $110,000 on average, higher than a year ago because 3,000 jobs have been cut."  Grundfest Aff. Ex. F (emphasis added).

- Just two days later, on October 30, 2008, <u>Bloomberg News</u> reported that Merrill Lynch and its competitors Goldman Sachs and Morgan Stanley had "already set aside $20 billion to pay for bonuses this year."  Grundfest Aff. Ex. G.  That report noted that "industry veterans" had said that the Wall Street

-14-

firms "will . . . pay bonuses this year," that bonuses "typically account for about two-thirds of compensation at the biggest Wall Street firms," and that "bonuses are accrued throughout the year." Id. The report further quoted John Gutfreund, the former CEO of Salomon Brothers, as saying that: "Odds that Wall Street will forgo the [year-end bonus] payouts are 'slim to none.'" Id.

- The very next day, on October 31, 2008, The Financial Times similarly reported that Merrill Lynch, Goldman Sachs, and Morgan Stanley had "already set aside $20 billion to pay bonuses this year." Grundfest Aff. Ex. H. The Financial Times also reiterated Mr. Gutfreund's observation of the "slim to none" chance that Wall Street would "forgo the payouts." Id.

- Less than two weeks later, on November 13, 2008, the Fox News Network on its 6 p.m. television news show Fox Special Report with Brit Hume reported that, notwithstanding "five straight quarters of losses," Merrill Lynch "has allocated *$6.7 billion*" for year-end bonuses. Grundfest Aff. Ex. I (emphasis added). Mr. Hume went on to say: "Workers at Merrill Lynch will actually receive larger bonuses than last year" because the total number of Merrill employees had decreased from the prior year so "the bonus money will be divided among fewer people." Id.

- Finally, on December 3, 2008, just two days before the shareholder vote, Bloomberg News reported yet again that Merrill Lynch would be paying billions of dollars in year-end bonuses. This Bloomberg report specifically noted that Merrill Lynch was "plan[ning] to cut year end bonuses" by "about

50%" compared to 2007.  Grundfest Aff. Ex. J.  This would have equated to 2008 year-end incentive compensation payments of over $3 billion.  Id.  A similar report was issued the same day by MarketWatch.com.  Grundfest Aff. Ex. K.

While these news reports differed somewhat as to their precise estimates of how much year-end incentive compensation Merrill Lynch was expected to pay – ranging from a low of about $3 billion to a high of $6.7 billion – *all of them* uniformly reported that Merrill Lynch's 2008 year-end incentive compensation was expected to be in the multi-billions of dollars.  And the 2008 VICP that Merrill Lynch ultimately paid (approximately $3.6 billion) fell squarely within that range; indeed, it was towards the low end of that range.

There was not a single news report to the contrary.  Given the significance that year-end compensation has for Wall Street, had *anyone* concluded (erroneously) from the Proxy Statement or the Merger Agreement that Merrill Lynch did not intend or was not allowed to pay year-end bonuses, that would have been front-page news.  The absence of any such media report speaks volumes.[13]

## F.    Shareholders Approve the Merger

On December 5, 2008, the shareholders of both Bank of America and Merrill Lynch approved the merger.  See Bank of America Corp., Current Report  (Form 8-K), Exhibit

---

[13]    Based on the accrued expenses disclosed by Merrill Lynch in its financial statements, stock market analysts likewise forecasted correctly that the company's annual 2008 expenses for compensation and benefits would be down only slightly from 2007, notwithstanding Merrill Lynch's significant losses.  See Grundfest Aff. ¶ 31 & Exs. L-R thereto.  Indeed, as explained by Professor Grundfest, these analysts all predicted compensation expenses within 3.22% of the actual number that was eventually reported by Merrill.  Grundfest Aff. ¶ 31.

99.1 (Dec. 5, 2008) (Ex. 13); Merrill Lynch & Co., Inc., Current Report (Form 8-K), Exhibit

99.1 (Dec. 5, 2008) (Ex. 14).

**G.      Merrill Lynch's MDCC Approves the 2008 VICP Awards**

As noted above, decisions with respect to Merrill Lynch's VICP awards were

generally entrusted to a committee of the company's independent directors.  The MDCC met on

December 8, 2008, and reviewed the proposed VICP pools, which totaled $3.62 billion in

aggregate value and $3.37 billion in VICP expense.  The pools were then approved by the

MDCC and reported to Merrill Lynch's full Board of Directors.[14]

Approximately 39,400 employees at Merrill Lynch received VICP awards.  The

final VICP amount of $3.6 billion reflected a 41% reduction in aggregate value compared to

2007.  Approximately $695 million represented awards that Merrill Lynch was contractually

---

[14]      The notion that Merrill Lynch could have retained its key employees without paying
incentive compensation is without basis.  Competition to hire talented investment bankers was –
and is – intense.  See, e.g., Heidi N. Moore, *Deutsche Bank's Hiring Spree*, THE WALL ST.
JOURNAL, Mar. 4, 2009 (Ex. 17) (reporting on "hiring spree" by Deutsche Bank, which "has hired
25 senior bankers from . . . rivals in the past six months," including 12 from Bank of America);
see also Chris Blackhurst, *Eat What You Kill: Why Bonuses Never Went Away*, EVENING
STANDARD, June 26, 2009 (Ex. 18) ("Bonuses have been inflated by a poaching war as firms that
have survived in good shape, such as Barclays, Credit Suisse and Deutsche Bank, snaffle top
talent."); James Mackintosh and Chris Hughes, *Hedge Funds Hit Troubled Banks With A Hiring
Binge*, THE FINANCIAL TIMES, July 7, 2008 (Ex. 5) (reporting that, in mid-2008, hedge funds were
"on a hiring binge, taking advantage of cutbacks at investment banks to recruit star traders, senior
executives and whole teams to help them expand").

Merrill Lynch disclosed this market reality in its proxy statement for the 2008 annual
meeting.  See Merrill Lynch & Co., Inc., Definitive 2008 Proxy Statement (Schedule 14A) (Ex.
3), at 28 (March 14, 2008) ("The long-term success of the Company depends on its ability to
attract and retain high-performing employees; therefore, the emphasis on annual performance has
to be balanced against the Company's recruiting and retention objectives.  For performance year
2007, we faced the challenge of maintaining this balance in an environment where the Company's
overall performance was disproportionately affected by significant losses in one area of our
business, while performance in most other areas remained strong.  Within this context, it was
essential that the Company pay many key employees at market levels in order to retain them and
avoid long-term damage to the franchise.").

obliged to pay to certain key employees. Thus, roughly $2.9 billion of 2008 VICP represented discretionary compensation. The cash portion of those awards was paid on December 31, 2008. None of Merrill Lynch's five senior executives – including the CEO – received any discretionary incentive compensation.

## H.    The Merger Closes

The merger closed on January 1, 2009. <u>See</u> Bank of America Corp., Current Report (Form 8-K), at 1 (Jan. 2, 2009) (Ex. 15). On February 24, 2009, Merrill Lynch filed its Form 10-K for 2008, reporting a net loss for the year of $27.6 billion. <u>See</u> Merrill Lynch & Co., Inc., Current Report (Form 10-K), at 22 (Feb. 24, 2009) (Ex. 16). For the first six months of 2009, however, following the merger, Merrill Lynch has contributed $1.8 billion to the combined company's net income. <u>See</u> Bank of America Corp., Quarterly Report (Form 10-Q), at 12 (Aug. 7, 2009) (Ex. 19).

## I.    The SEC's Complaint and the Proposed Settlement

On August 3, 2009, the SEC filed a settled complaint and proposed consent judgment, providing for the entry of an injunction against Bank of America and the payment of a $33 million civil penalty. The SEC's complaint alleges violations of Section 14(a) of the Securities Exchange Act and Rule 14a-9 thereunder. Bank of America has agreed to settle the matter without confirming or denying the allegations.

The complaint does not allege (nor could it) that Bank of America acted with scienter; there is no claim of intentional, knowing, or even reckless conduct on the part of Bank of America. Rather, the complaint asserts that Bank of America supposedly made "representations that Merrill was prohibited from making [year-end] bonus payments," and that such purported "representations" were "materially false and misleading because the contractual

prohibition on such payments was nullified by [an] undisclosed contractual provision expressly permitting them." Compl. ¶ 3.[15]

Notwithstanding the availability of significant defenses – ones that, as shown below, and as Professor Grundfest has concluded, are "powerful" – Bank of America determined to reach a settlement with the SEC, so that Bank of America would not face the unnecessary distraction of a protracted dispute with one of its principal regulators at a time when the financial industry continues to face difficult challenges stemming from uncertain and turbulent market conditions.

Consistent with its typical practice involving settled actions, the SEC put before the Court in connection with the settlement a presentation consisting only of its complaint, the form of consent judgment, and Bank of America's consent thereto, while Bank of America was constrained in its ability to set forth the facts and the law that would have supported its defenses to the SEC's claims. <u>See</u> Grundfest Aff. ¶¶ 2, 8-14.[16]

---

[15]    The SEC's complaint also contains allegations concerning events unrelated to the joint proxy disclosures. Compl. ¶¶ 19-21, 24. With respect to the allegations about Merrill Lynch's accelerated schedule for its 2008 VICP process, as the SEC has stated, no misconduct can be inferred from that. Transcript of Hearing before The Honorable Jed Rakoff, August 10, 2009, at 15 (Ex. 20). As for alleged discussions regarding potential year-end incentive compensation for five of the most senior executive officers at Merrill Lynch, as the complaint acknowledges, no such compensation was ever paid. Again, there is no inference of any misconduct by Bank of America here.

[16]    Bank of America is filing this memorandum pursuant to the Court's direction. Consistent with the settlement to which it agreed, however, Bank of America's position remains that it neither admits nor denies the SEC's allegations. This submission is provided only so that the Court can – as it has requested – assess the basis for the SEC's allegations and the strength of the defenses that Bank of America would be prepared to present, if there had been no settlement and this action were to be litigated to judgment.

**ARGUMENT**

Before turning to the legal issues that are presented by the complaint and proposed settlement, it is important to keep in mind what this case is *not* about.  The SEC's complaint alleges violations of the federal proxy laws.  The underlying "merits" of this case thus concern whether or not the Proxy Statement made false or misleading statements or omissions. This case is *not* about the decision by Merrill Lynch's Board to award the incentive compensation that it did.  Bank of America recognizes that decision has been the subject of controversy and also recognizes the difficulty of weighing properly the various factors that go into determinations about compensation, including judgments about the need to retain employees in unprecedented market conditions.  Nevertheless, those matters are entirely irrelevant to the legal issues presented by the SEC's complaint or the consent judgment.

**A.      The Court Should Approve the Proposed Settlement.**

If there had been no settlement here and this case were to be litigated to judgment, Bank of America would have presented powerful and successful factual and legal defenses to the SEC's claims.

**1.      The SEC Would Be Unable To Prove a Violation of Section 14(a) or Rule 14a-9.**

In order to demonstrate a violation of Section 14(a) or Rule 14a-9, the SEC would have the burden of proving that Bank of America (a) made a false or misleading statement or omission in a proxy statement, (b) with respect to a material fact, and (c) acted negligently in so doing.  See Resnick v. Swartz, 303 F.3d 147, 151 (2d Cir. 2002).

**a.  There Was No False or Misleading Statement or Omission in the Proxy Statement.**

The gravamen of the SEC's complaint is that Bank of America made "representations that Merrill was prohibited from making [year-end] bonus payments" and that

-20-

those purported "representations" were "materially false and misleading because the contractual prohibition on such payments was nullified by [an] undisclosed contractual provision expressly permitting them." Compl. ¶ 3.

Yet the very premise of the SEC's complaint – that there were supposed "representations" that "Merrill was prohibited from making [year-end] bonus payments" – is fundamentally in error. The plain language of the Proxy Statement made no such representation. The Proxy Statement correctly described Section 5.2 of the Merger Agreement by stating that Merrill Lynch had agreed "*with certain exceptions*" or "*except with Bank of America's prior written consent*" to refrain from "pay[ing] any current or former directors, officers or employees any amounts not required by existing plans or agreements." Proxy Statement at 83-84 (emphases added) (Ex. 11). And the Merger Agreement itself, which was annexed to the Proxy Statement, made clear that Merrill Lynch's covenant not to pay such amounts was subject to exceptions – "except as set forth in . . . Section 5.2 of the Company Disclosure Schedule" or with Bank of America's "prior written consent." Merger Agreement at A-31 (Ex. 11).[17]

Nowhere did the Proxy Statement or the Merger Agreement represent that "Merrill was prohibited from making [year-end bonus] payments." Cf. Compl. ¶ 3. The SEC reads Section 5.2(c) of the Merger Agreement and the Proxy Statement's description thereof as if it contained a flat prohibition against paying year-end incentive compensation. It does not. As discussed above, and explained in more detail by Mr. Pierce, the Merger Agreement and Proxy Statement were drafted consistently with the custom and practice among corporate and securities

---

[17]     The Proxy Statement accurately conveyed the purpose of that clause in the Merger Agreement, namely, to inform Bank of America shareholders, who might have been concerned about the potential dissipation of value before closing, that Merrill Lynch would not be able to pay discretionary compensation without either having received the prior consent of the buyer (through the Disclosure Schedule) or receiving written consent at some other time.

lawyers.  See pp. 4-6, supra; Pierce Aff. ¶¶ 11-13; 16-17.  The Proxy Statement made clear that

the negative covenants were subject to "exceptions" or to Bank of America's "consent"; and the

Merger Agreement made clear that those exceptions were set forth in the Disclosure Schedule.

       The SEC also ignores the fact that the Proxy Statement accurately disclosed

Section 5.1 of the Merger Agreement, which required Merrill Lynch to conduct its business in

the "ordinary course" and to "use reasonable best efforts to maintain and preserve intact its

business organization and advantageous business relationships, *including retaining the services*

*of key officers and employees*."  Proxy Statement at 83 (Ex. 11) (emphasis added).

       Moreover, because the negative covenants and other provisions of the Merger

Agreement were subject to confidential exceptions made for the purpose of allocating risk

between the parties, both Bank of America and Merrill Lynch repeatedly alerted their

shareholders that the covenants in the Merger Agreement were *not* representations of fact and

should *not* be relied on as such.  See pp. 11-12, supra.

       On the very same page where the negative covenants are described, the Proxy

Statement advises that the Merger Agreement is being described "only to provide you with

information regarding its terms and conditions, and not to provide any other factual information

regarding Merrill Lynch."  Proxy Statement at 83 (Ex. 11).  And as the Merrill Lynch Form 8-K

accompanying the Merger Agreement made clear (as incorporated into the Proxy Statement), the

covenants in the Merger Agreement were "solely for the benefit of the [contracting] parties" and

were subject to "being qualified by confidential disclosures . . . instead of establishing these

matters as facts."  Merrill Lynch & Co., Inc., Current Report (Form 8-K), at 5 (Sept. 18, 2008)

(Ex. 7).  The Proxy Statement thus directed shareholders to look for "important information

about the companies and their financial condition" in the companies' public filings with the SEC, which were also incorporated as part of the Proxy Statement.  Proxy Statement at 123 (Ex. 11).

There was no misleading omission in the Proxy Statement.  Indeed, the SEC filings that were incorporated into the Proxy Statement – including Merrill Lynch's Form 10-Qs, both before and *after* the Merger Agreement, as well as the October 16 earnings release filed as an exhibit to Form 8-K – indicated that Merrill Lynch was continuing to accrue multi-billions of dollars in incentive compensation for 2008 and properly disclosed those compensation expenses.

Under these circumstances, no reasonable shareholder reading the Proxy Statement *as a whole* would have understood the negative covenant as the SEC alleges, *i.e.*, as a *prohibition* against paying year-end incentive compensation.  Rather, readers would have (and apparently did) understand that language as it actually reads, *i.e.*, as an accurate description of a contractual provision designed to protect Bank of America against the unilateral dissipation of value by Merrill Lynch by limiting the amount of incentive compensation that Merrill Lynch could pay by virtue of "exceptions" contained in a disclosure schedule or through "written consent."[18]

---

[18]    The SEC also alleges that the Proxy Statement "create[s] the impression that Bank of America had not given its written consent . . . when, in fact, by the time the proxy statement was prepared and distributed to shareholders, Bank of America had already given its written consent."  Compl. ¶ 18(b).  The Proxy Statement and the Merger Agreement expressly refer, however, to "certain exceptions" and exceptions contained in "Section 5.2 of the Company Disclosure Schedule."  Proxy Statement at 83, A-31 (Ex. 11).  Nothing in that language could lead a shareholder to infer anything about the timing of when the exception was granted.  In any event, it is wholly immaterial whether the exception had been given on September 14 or September 16 or November 3 or any other date.  The relevant point is that, as was disclosed, Merrill Lynch could pay discretionary incentive compensation with Bank of America's agreement or consent.

Thus, the SEC's claim fails at the threshold for the lack of a misleading statement or omission.[19]

### b. The SEC's Claims Also Fail for Lack of Materiality

Even if there had been an alleged misstatement or misleading omission in the Proxy Statement – which there was *not* – the SEC's claim would also fail for lack of materiality. A fact is material for the purposes of Rule 14a-9 if there is a "substantial likelihood that a reasonable shareholder would consider [the fact at issue] important in deciding how to vote." TSC Indus. v. Northway, 426 U.S. 438, 449 (1976).  In other words, the alleged misstatement or misleading omission must have "significantly altered the 'total mix' of information available" to a reasonable investor.  Id.; see also Seinfeld v. Gray, 404 F.3d 645, 650 (2d Cir. 2005).

The SEC's complaint seizes upon a single sentence fragment in the Proxy Statement to assert that Bank of America supposedly misrepresented that Merrill Lynch was "prohibited from paying discretionary year-end bonuses."  Compl. ¶ 18(a).  But it is the "total mix" of information that matters; and here, that total mix included Merrill Lynch's repeated disclosures in its Form 10-Qs and other filings incorporated into the Proxy Statement – both before and after the Merger Agreement – that it was accruing for compensation and benefits at

---

[19]    The SEC does not even claim (nor could it) that the disclosure of a "cap" on discretionary compensation was required by Schedule 14A of the proxy rules.  Pursuant to Item 5 of Schedule 14A, see 17 C.F.R. § 240.14a-101, Item 5, Bank of America and Merrill Lynch disclosed the interests of their respective directors and executive officers regarding the treatment of any Merrill Lynch equity awards, as well as the fact that, for some of the executive officers, there were certain contractual commitments, including with respect to guaranteed compensation for 2008.  Proxy Statement at 73-75 (Ex 11).  Beyond that requirement, which is limited to directors and executive officers, no other items in Schedule 14A require a discussion in a proxy statement of company-wide compensation not triggered by or otherwise related to the subject transaction, let alone disclosure of a negotiated *limit* on discretionary compensation.  See Schedule 14A, Item 14.  Thus, the Proxy Statement here fully satisfied the line-item requirements of the SEC's proxy rules.  And the SEC does not contend otherwise; *nothing* in the SEC's complaint alleges that Bank of America failed to include particular line-item information required by the proxy rules.

nearly the same level as the year before.  See pp. 6-9, supra.  See, e.g., In re Browning-Ferris

Indus., Inc. S'holder Derivative Litig., 830 F. Supp. 361, 367 n.2 (S.D. Tex. 1993) (holding that

plaintiffs' claim that proxy statement violated Section 14(a) was "precluded as a matter of law by

the disclosures in the Annual Reports and Form 10-Ks"); In re Keyspan Co. Sec. Litig., 383 F.

Supp. 2d 358, 373-74 & n.6 (E.D.N.Y. 2003) (stating that shareholders were charged with

knowledge of information in company's SEC filings, including "documents electronically

available on the SEC website"); Beissinger v. Rockwood Computer Corp., 529 F. Supp. 770

(E.D. Pa. 1981) (holding that misrepresentation was immaterial where uncertain future of

company was previously disclosed in Form 10-K "which was filed as a public record with the

SEC").[20]

        Moreover, the widespread and uniform news reports discussed above, see pp. 13-

16, supra, announcing that Merrill Lynch was expected to pay multi-billions of dollars in year-

end incentive compensation, demonstrate beyond doubt that the public well understood that

Merrill Lynch could – and would – make such payments to its employees.  These reports were

based on the accrual information disclosed in Merrill Lynch's public filings, which were made

part of the Proxy Statement, and were likewise part of the "total mix" of information available to

---

[20]        It would be inconsistent with the SEC's entire integrated disclosure regime *not* to
consider other documents publicly filed with the SEC, especially where those documents are
incorporated by reference into a proxy statement, the company offers to mail those documents to
shareholders, and they are readily and instantaneously available on the SEC's internet website.
See Securities Act Release No. 6235, [1980 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 82,649,
at 83,484 (Sept. 2, 1980) (adopting incorporation by reference rules and noting that "the concept
of integration also proceeds from the observation that information is regularly being furnished to
the market through periodic reports under the Exchange Act.  This information is evaluated by
professional analysts and other sophisticated users, is available to the financial press and is
obtainable by any other person who seeks it for free or at nominal cost . . . . [T]here seems little
need to reiterate this information in a prospectus in the context of a distribution."); see also
Securities Act Release No. 6676, 36 SEC Docket 1203 (Nov. 10, 1986) (adopting incorporation
by reference rules for proxy statements).

shareholders. See GAF Corp. v. Heyman, 724 F.2d 727, 729 (2d Cir. 1983) (stating that "total

mix" of information available at time of proxy contest "included the many news stories that the

closely watched contest had generated"); Seibert v. Sperry Rand Corp., 586 F.2d 949, 952 (2d

Cir. 1978) (dismissing Section 14(a) and Rule 14a-9 allegations because alleged omissions in

proxy statement "were matters of general public knowledge" and "were reported countrywide in

the press and on radio and television, were discussed in Congress, and were analyzed in

published administrative and judicial opinions"); Rodman v. The Grant Foundation, 608 F.2d 64,

70 (2d Cir. 1979) (stating that district court "properly took into account information already in

the public domain and facts known or reasonably available to the shareholders"); In re Merrill

Lynch & Co., Inc. Research Reports Secs. Litig., 272 F. Supp. 2d 243, 250-51 (S.D.N.Y. 2003)

(finding no duty to disclose conflict of interest where "the information regarding the alleged

conflict of interest was public knowledge" and citing numerous newspaper articles); Beissinger,

529 F. Supp. at 781 (finding that misrepresentation was immaterial where "all of the information

concerning improved cost/performance ratio was well publicized and widely known in the

computer industry").

       In short, as Professor Grundfest concludes in his Affidavit, had this matter been

litigated to judgment, Bank of America would have been able to present a "powerful" defense

that "any misrepresentation or omission, even if one was found to exist, was immaterial and

hence not actionable." Grundfest Aff. ¶ 6.

### c. There Was No Negligence

       As counsel for the SEC acknowledged at the August 10 hearing, the SEC did not

have any basis to charge Bank of America with any intentional, knowing, or even reckless

misconduct. Transcript of Hearing before The Honorable Jed S. Rakoff, August 10, 2009, at 38

(Ex. 20). Rather, the SEC's claim arises under Section 14(a) and Rule 14a-9, which require a showing of negligence. Id. There is no strict liability. Id.

Negligence is the failure to exercise reasonable care or competence. Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281 (2d Cir. 1973); see also SEC v. Hughes Capital Corp., 124 F.3d 449, 453-54 (3d Cir. 1997); SEC v. Lowy, 396 F. Supp. 2d 225, 250 (E.D.N.Y. 2003). In this case, Bank of America and Merrill Lynch acted both reasonably and competently.

The Proxy Statement was drafted by expert counsel for both Bank of America and Merrill Lynch. It followed the state-of-the-art custom and practice in the legal industry. As discussed above, and as explained by Mr. Pierce, the Merger Agreement and Proxy Statement were drafted consistently with the custom and practice among corporate and securities lawyers. See pp. 4-6, supra; Pierce Aff. ¶¶ 11-13; 16-17.[21]

Moreover, as shown above, the Proxy Statement itself disclosed that, through the first six months of 2008, Merrill Lynch had accrued billions of dollars in compensation expenses, even while it was reporting billions of dollars in losses. By the time of the shareholder vote, Merrill Lynch had issued its third quarter earnings release and filed its Form 10-Q for the third quarter, which disclosed to the investing public its compensation accruals through the first nine

---

[21]     See also James Freund, Anatomy of a Merger § 7.21 (2009) ("Aside from its use in streamlining the acquisition agreement, the device of the referenced disclosure schedule sometimes serves the incidental purpose of enabling the parties to avoid baring their souls in public. If the seller is publicly-held, a copy of the agreement is annexed to the Proxy Statement which seller sends to its stockholders, but the disclosure schedule is almost never included."); Lou R. Kling & Eileen Nugent, Negotiated Acquisitions of Companies, Subsidiaries and Divisions § 10.02 n.3 (1992) ("Use of disclosure schedules can avoid setting forth non-public, sensitive information . . . in an agreement which may become publicly available, either under the federal securities laws or otherwise. Even non-public acquisition agreements often find a way of falling into the wrong hands . . . Disclosure schedules, by comparison, are virtually never attached to proxy statements or similar disclosure documents, are often not filed with the [SEC], even if the agreements are, and, generally are not, in the Author's experience, subject to the same risk of unauthorized circulation as agreements.").

-27-

months of 2008.  These disclosures confirmed Merrill Lynch's continued intention to pay

billions of dollars in year-end compensation, notwithstanding the execution of the Merger

Agreement.  Indeed, those public filings showed that Merrill Lynch was continuing to accrue for

compensation and benefits at a rate near (but slightly below) that in 2007.  And the news and

financial media and market analysts clearly recognized this to be the case.  Since proper

disclosure is assessed with regard to the "total mix" of information available to shareholders, see

TSC Indus., 426 U.S. at 449, a finder of fact would be unable to conclude that Bank of America

was negligent for (supposedly) failing to disclose that Merrill Lynch intended to pay billions of

dollars in year-end incentive compensation, especially given that the marketplace understood that

Merrill Lynch intended to pay billions of dollars in such compensation – as it long had done in

the ordinary course.

        In light of these facts, the SEC would be unable to prove that Bank of America

acted negligently in any way.

### 2.       The Civil Penalty

        Given the powerful defenses that would have been available to Bank of America

had this matter been litigated, Bank of America respectfully submits that the Court should

approve the settlement.

        At the August 10 hearing – based solely on the limited and one-sided record that

was before it – the Court questioned the size of the $33 million civil penalty in comparison to the

$3.62 billion that Merrill Lynch's Board awarded in variable incentive compensation to some

40,000 employees (not including, as noted, Merrill Lynch's top five executives, who did not

receive any such award).  See Transcript of Hearing before The Honorable Jed S. Rakoff, August

10, 2009, at 18 (Ex. 20).  Bank of America respectfully submits that this is not the relevant

criterion.  The question put to Bank of America's shareholders was *not* whether customary

incentive compensation should or should not be paid, and there is no claim that Bank of America

or any of its executives derived any improper gain from the decision of the Merrill Lynch Board

ultimately to pay such compensation.

   Unlike other settlements where higher civil penalties were imposed, this is not a

case where there is any allegation of intentional wrongdoing, such as sham transactions or

cooked books.  And given the widespread media reports that Merrill Lynch intended to pay

anywhere from $3 billion to $6.7 billion in year-end incentive compensation for 2008, any

supposed harm to the marketplace from the alleged violation was illusory.  Accordingly, as set

forth below, this Court should defer to the SEC's determination on the amount of the proposed

civil penalty.

**B.**    **The Settlement Should Be Approved Under Any Legal Standard**

   At the August 10 hearing, the Court also asked the parties to address the issue of

what legal standard governs the settlement, referring to Janus Films v. Miller, 801 F.2d 578 (2d

Cir. 1986).  Janus Films prescribed two levels of review a district court may apply in considering

a proposed settlement embodied in a consent judgment.  In the vast majority of cases, "a court

normally has only a limited role," which is to ensure that the proposed settlement is "appropriate

to be accorded the status of a judicially enforceable decree."  Id. at 582; see also Donovan v.

Robbins, 752 F.2d 1170, 1176 (7th Cir. 1985).  Courts are to assume a "larger role" and evaluate

the "fairness" of a proposed settlement in "class actions, shareholder derivative suits, bankruptcy

claims, antitrust suits brought by the United States, and any suits 'affecting the public interest.'"

Janus Films, 801 F.2d at 582 (quoting Adams v. Bell, 711 F.2d 161, 170 n.40 (D.C. Cir. 1983)).

As shown above, the settlement here should be approved under either of these standards. But in response to the Court's request that the parties address the applicable standard, Bank of America respectfully submits that it is the first of these two that should apply.[22]  In any event, regardless of the standard, substantial deference should be accorded to the SEC's judgment in such matters, including with respect to the size of the proposed civil penalty. <u>See</u> <u>SEC v. Randolph</u>, 736 F.2d 525, 530 (9th Cir. 1984) ("The initial determination whether the consent decree is in the public interest is best left to the SEC and its decision deserves our deference."); <u>SEC v. Bear Stearns</u>, 2003 WL 22466156, at *3 (S.D.N.Y. 2003) (court's review of settlement is "particularly deferential" where SEC is settling party).

Thus, regardless of which standard applies, this Court should exercise deference to the SEC and approve the proposed settlement.

---

[22]     In each instance where <u>Janus Films</u> provides for a "larger role," that role is necessary either because Congress or the Federal Rules of Civil Procedure call for it, <u>see</u> 15 U.S.C. § 16(e) (settlement of antitrust suits); Fed. R. Civ. P. 23(e) (class actions), or because the legal rights of third parties not before the court could be affected. Accordingly, in <u>Janus Films</u> and <u>Adams</u>, as well as later cases falling within the "public interest" category, the court's "larger role" was warranted by a concern about affecting the rights of such third parties. <u>See</u> <u>Janus Films</u>, 801 F.2d at 585 (proposed judgment included secret settlement terms potentially detrimental to third parties, since plaintiff might "seek to induce others to settle similar disputes on terms exactly like or at least similar to the terms of the [disclosed] judgment"); <u>Adams</u>, 711 F.2d at 163 (proposed settlement requiring state government to implement structural reforms to desegregate higher education system would affect numerous students and other third parties). Here, no third party rights are adversely affected by the proposed settlement. And, as the Court noted, the settlement does not impair the U.S. Treasury's ability to recover its investment under TARP in Bank of America. <u>See</u> Transcript of Hearing before the Honorable Jed Rakoff, August 10, 2009, at 36: 13-15 (Ex. 20) (The Court: "If there is a public interest it does not rest upon the notion that the government's present investment is somehow jeopardized.").

# CONCLUSION

As shown above, had this matter been litigated, Bank of America would have been able to present powerful and successful defenses on the merits.  For the foregoing reasons, this Court should enter the proposed consent judgment.

Respectfully submitted,

/s/ Lewis J. Liman

Lewis J. Liman
Shawn J. Chen
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY  10006-1470

Dated:  August 24, 2009