UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

-against-

BANK OF AMERICA CORPORATION,

Defendant.

09-Civ. 6829

EXPERT AFFIDAVIT
OF MORTON A. PIERCE

STATE OF NEW YORK   )
                    : ss.:
COUNTY OF NEW YORK  )

MORTON A. PIERCE, being duly sworn, deposes and says:

I.   QUALIFICATIONS

1. I am the chairman of Dewey & LeBoeuf LLP's Mergers and Acquisitions Group, a role I assumed at a predecessor firm, Dewey Ballantine LLP in 1991, and a member of the firm's global Executive Committee. Dewey & LeBoeuf's Mergers and Acquisitions Group consists of more than 180 lawyers based in New York, Los Angeles, Silicon Valley, Houston, London, Frankfurt, Milan, Rome, Warsaw, Moscow, Almaty, Dubai, Johannesburg, Beijing and Hong Kong. As the head of the M&A Group, I have represented acquirors, targets, financial advisors, leveraged buyout firms, independent board committees, shareholder groups, equity investors, and subordinated and senior lenders in both domestic and cross-border mergers and acquisitions, leveraged buyouts and other forms of business combinations, acquisitions and divestitures. I have participated in many public company acquisitions, including The Walt Disney Company's acquisition of Pixar, Inc., AXA Financial, Inc.'s acquisition of

The MONY Group, Inc., Omnicare, Inc.'s acquisition of NCS Healthcare, Inc., Fortis AG's acquisition of American Bankers Insurance Group Inc., Starwood Hotels & Resorts' acquisition of ITT Corporation, The Walt Disney Company's acquisition of Capital Cities/ABC, Inc., Zimmer Holdings' acquisition of Centerpulse AG, the Guinness/GrandMet merger and HCA Healthcare Corp.'s acquisition of Healthtrust Inc. I have served on numerous securities and mergers and acquisitions related task forces and committees, including: the American Bar Association ("ABA") Task Force on Review of the Federal Securities Laws; the Advisory Committee to the ABA Federal Regulation of Securities Committee; as the Chairman of the Subcommittee on International Securities Matters, a subcommittee of the ABA Section of Business Law's Committee on Federal Regulation of Securities; the Subcommittee on Proxy Statements and Business Combinations, a subcommittee of the ABA Section of Business Law's Committee on Federal Regulation Securities; the Association of the Bar of the City of New York ("ABCNY") Securities Regulation Committee; and as the Chairman of the Subcommittee on Securities and Exchange Commission Enforcement Matters, a subcommittee of the ABCNY Securities Regulation Committee. I was recognized last year in the Best Lawyers in America and in Chambers USA as a leader in the field of mergers and acquisitions law. My biography, which is attached as Exhibit A, lists my publications and other professional accomplishments.

  2. I am being compensated at my normal hourly rate of $1,090 per hour for my time on this matter. I reserve the right, if necessary, to supplement or amend my analyses in light of any new information that becomes available throughout this proceeding, including but not limited to through discovery or reports submitted by any

other expert witness designated by any party to this proceeding, and/or the testimony of any designated expert witness.

3. From time to time, Dewey & LeBoeuf and its predecessor firms have provided legal services to Bank of America Corp. ("Bank of America") and Merrill Lynch & Co. ("Merrill Lynch"). During the period from January 1, 2007 through the present, we have billed Bank of America $7,706,153.03 and Merrill Lynch $3,862,390.68.

## II.   INTRODUCTION AND SUMMARY OF CONCLUSIONS

4. On September 15, 2008, Bank of America announced that it had entered into a merger agreement with Merrill Lynch (the "Merger Agreement"). The acquisition was structured as a stock-for-stock transaction in which Merrill Lynch stockholders would receive .8595 Bank of America shares for each Merrill Lynch share, representing a value of $29 per Merrill Lynch share as of the last trading day before public announcement of the merger (a significant premium to the then-trading price of $17 per share). Based on the share price of Bank of America shares at closing, the transaction was valued at $50 billion.

5. The Merger Agreement contained a so-called "Forbearance Provision" that provided that Merrill Lynch would not, among other things, "pay any amounts to Employees not required by any current plan or agreement (other than base salary in the ordinary course of business)" without Bank of America's consent, except as set forth in the disclosure schedule to the Merger Agreement (the "Disclosure Schedule"). I understand that the Disclosure Schedule, in turn, provided that Merrill Lynch would not pay variable incentive compensation awards in any amount exceeding $5.8 billion in

aggregate value and $4.5 billion in aggregate expense. The merger was subject to approval by both Bank of America's and Merrill Lynch's stockholders.

6. On November 3, 2008, Bank of America and Merrill Lynch mailed to their stockholders a joint definitive proxy statement and prospectus soliciting their respective stockholders' votes in favor of the Merger Agreement (the "Proxy Statement"). The Proxy Statement stated that it incorporated by reference important business and financial information about Bank of America and Merrill Lynch from documents not included or delivered with the Proxy Statement and described how that information could be obtained. The Proxy Statement also summarized the relevant provisions of the Merger Agreement (including the Forbearance Provision), attached the Merger Agreement and cautioned stockholders to review it in its entirety in considering whether to vote in favor of the merger. Consistent with industry practice, the Proxy Statement did not attach or summarize the Disclosure Schedule.

7. The merger was approved by a majority of Bank of America's and Merrill Lynch's stockholders and closed on January 1, 2009. It is my understanding that prior to the closing of the merger, Merrill Lynch paid $3.6 billion of variable incentive compensation awards (taking into account the value of long term incentive awards in the form of equity or long-term cash awards), which was less than the amount permitted by the Disclosure Schedule.

8. On August 3, 2009, the Securities and Exchange Commission (the "SEC") filed a complaint (the "Complaint") in this Court against Bank of America, alleging that the Proxy Statement was false and misleading insofar as it stated that Merrill Lynch had "agreed not to pay year-end performance bonuses or other discretionary

4

incentive compensation to its executives prior to the closing of the merger without Bank of America's consent" (Complaint, ¶2), without disclosing that the Disclosure Schedule permitted for such payments up to the amounts specified therein. Based on such allegations, the SEC asserted that Bank of America violated Section 14(a) of the Securities Exchange Act of 1934 and Rule 14a-9 promulgated thereunder, and sought an injunction against further violations as well as an order for civil monetary damages.

9. On the same day the Complaint was filed, Bank of America agreed to settle the SEC's charges for $33 million without admitting or denying the allegations in the Complaint.

10. In support of the parties' proposed settlement, I have been asked by counsel for Bank of America to analyze how compensation disclosures of the type that are the subject of the Complaint are customarily made in transaction documents of this nature. In support of this report, I have reviewed certain publicly available documents pertaining to comparable financial industry mergers and acquisitions transactions. The documents are listed on Exhibit B hereto. The comparable transactions to which the documents relate were identified in either (i) the "Comparable Transaction Analysis" table on page 9 of the "Bank of America Corporation Fairness Opinion Presentation," dated September 2008, prepared by J.C. Flowers & Co. LLC and Fox-Pitt Kelton Cochran Caronia Waller (USA) LLC, which was presented to the board of directors of Bank of America on September 14, 2008, or (ii) Figure 1 of the Deutsche Bank research report on Bank of America Corp. entitled "Acquiring Merrill Lynch - Post Conf. Call Analysis," dated September 16, 2008. Based on my review of such documents, my

analysis thereof, and my general background and expertise in mergers and acquisitions practice, I have reached the following principal conclusions:

- Confidential, sensitive and certain other information is often placed in schedules to the merger agreement as a means of, among other things, protecting the business interests of the parties and allocating the risk of non-consummation between them.

- It is customary for the type of compensation-related information which is the subject of the Complaint to be placed in the disclosure schedules and omitted from the merger agreement attached to the proxy statement.

- The Proxy Statement's disclosures regarding Merrill Lynch's ability to pay employee compensation, including incentive compensation, between signing and closing, based upon the terms of the Merger Agreement, were consistent with custom and practice in the mergers and acquisition industry.

The conclusions expressed herein are limited to the issue of whether the parties to the Merger Agreement employed standard, customary practices with respect to the compensation matters which are the subject of the Complaint in the Merger Agreement and Proxy Statement. I express no view as to whether the Proxy Statement contained a misstatement or omission, whether any alleged misstatement or omission was material, or whether the Proxy Statement complied with the Securities Exchange Act of 1934 (including, without limitation, the disclosures required in response to Item 5 of Schedule 14A), the Securities Act of 1933, Regulation S-K or other applicable law or regulation. The bases for my conclusions are set forth below.

### III. THE MANNER AND METHOD OF DISCLOSING BONUS AND OTHER COMPENSATION WAS IN ACCORD WITH CUSTOM AND PRACTICE

    **A. The Provisions of the Merger Agreement and the Disclosure of the Covenant Relating to Bonuses**

11. The Merger Agreement contains a number of covenants by Merrill Lynch which restrict the conduct of its business between the signing of the Merger

Agreement and the closing. Such covenants are customary in acquisition agreements and are intended to prevent a dissipation of value by the target in the period between the signing of the merger agreement and the closing of the merger by preventing the target from engaging in certain activities that might otherwise result in such dissipation of value without the agreement or consent of the buyer. One of the activities that is commonly the subject of such a covenant is the payment of discretionary compensation. Any exceptions to such a covenant would typically be negotiated by the parties and set forth in the disclosure schedules. In this connection, the Merger Agreement provides that:

> 5.2 <u>Company Forbearances</u>. During the period from the date of this Agreement to the Effective Time except as set forth in this Section 5.2 of the Company Disclosure Schedule or except as expressly contemplated or permitted by this Agreement, Company shall not, and shall not permit any of its Subsidiaries to, without the prior written consent of Parent.
>
> \*   \*   \*
>
> (c) except as required under applicable law or the terms of any Company Benefit Plan existing as of the date hereof, (i) increase in any manner the compensation or benefits of any of the current or former directors, officers or employees of Company or its Subsidiaries (collectively, "<u>Employees</u>"), (ii) pay any amounts to Employees not required by any current plan or agreement (other than base salary in the ordinary course of business) . . .

12. As was the case in the Merger Agreement and as noted above, parties to a merger agreement customarily qualify the covenants restricting the target's activities by a general reference to a schedule of exceptions to such covenants in the disclosure schedules. Such schedule of exceptions often contains non-public information (such as descriptions of the future plans of the target, such as a planned acquisition), and confidential or competitively sensitive information (such as information on the amount of

7

certain types of employee compensation, including incentive compensation, that the target plans to pay between signing and closing). Because they are viewed by the parties as containing non-public, confidential or competitively sensitive information, disclosure schedules are not intended to be made public.

13. Again as is customary, the Merger Agreement that was forwarded to stockholders and attached to the Proxy Statement did not include the Disclosure Schedule which modifies or qualifies the representations, warranties and covenants contained in the Merger Agreement. In particular, it did not attach the disclosure schedule relating to incentive compensation payments which the parties agreed could be made by Merrill Lynch to its employees.

14. As part of the description of the Merger Agreement here, the parties summarized the covenants in the Proxy Statement (on pages 82 through 85), including the following:

> Each of Merrill Lynch and Bank of America has undertaken customary covenants that place restrictions on it and its subsidiaries until completion of the merger. In general, each of Bank of America and Merrill Lynch agreed to (1) conduct its business in the ordinary course in all material respects, (2) use reasonable best efforts to maintain and preserve intact its business organization and advantageous business relationships, including retaining the services of key officers and employees, and (3) take no action that would reasonably be expected to adversely affect or materially delay its ability to obtain any necessary regulatory and governmental approvals, perform its covenants or complete the merger. Merrill Lynch further agreed that, with certain exceptions or except with Bank of America's prior written consent (which consent will not be unreasonably withheld or delayed with respect to certain of the actions described below), Merrill Lynch will not, and will not permit any of its subsidiaries to, among other things, undertake the following extraordinary actions.

* * *

> Except as required under applicable law or the terms of any Merrill Lynch benefit plan, (i) increase the compensation or benefits of any current or former directors, officers or employees; (ii) pay any current or former directors, officers or employees any amounts not required by existing plans or agreements . . .

**B.     The Parties Used Standard, Customary Language to Warn Stockholders Regarding the Extent to Which They Could Rely on the Description of the Merger Agreement and/or Its Terms in the Proxy Statement**

15. The Proxy Statement contains (on pages 76 through 90) an extensive description of the Merger Agreement. Although it is detailed, it is prefaced by the following standard disclaimer:

> The following describes certain aspects of the merger, including material provisions of the merger agreement. The following description of the merger agreement is subject to, and qualified in its entirety by reference to, the merger agreement, which is attached to this document as Appendix A and is incorporated by reference in this document. We urge you to read the merger agreement carefully and in its entirety, as it is the legal document governing the merger.

16. In addition to such disclaimers, practitioners then commonly warn stockholders against interpreting the description of the merger agreement or its terms as establishing the existence or non-existence of any fact concerning the business or financial condition of either party.

17. That practice was followed here. The Merger Agreement was first disclosed to stockholders shortly after it was executed in Form 8-Ks filed with the SEC

9

by both Bank of America and Merrill Lynch. Both Form 8-Ks contained customary warnings and disclaimers described immediately below.

18. Bank of America's Form 8-K dated September 18, 2008 reporting on the filing of the Merger Agreement executed on September 15, 2009[1] contained, among others, the following warnings and disclaimers:

> The Merger Agreement should not be read alone, but should instead be read in conjunction with the other information regarding the companies and the Merger that will be contained in, or incorporated by reference into, the proxy statement/prospectus that the parties will be filing in connection with the Merger, as well as in the Forms 10-K, Forms 10-Q and other filings that each of Bank of America and Merrill Lynch make with the Securities and Exchange Commission ("SEC").

19. Similarly, Merrill Lynch's Form 8-K dated September 18, 2008[2] contained similar warnings and disclaimers, such as:

> The Merger Agreement has been included to provide investors and security holders with information regarding its terms. It is not intended to provide any other factual information about Merrill Lynch or Bank of America. The representations, warranties and covenants contained in the Merger Agreement were made only for purposes of that agreement and as of specific dates, were solely for the benefit of the parties to the Merger Agreement, may be subject to limitations agreed upon by the contracting parties, including being qualified by confidential disclosures made for the purposes of allocating contractual risk between the parties to the Merger Agreement instead of establishing these matters as facts, and may be subject to standards of materiality applicable to the contracting parties that differ from those applicable to investors. Investors are not third-party beneficiaries under the Merger Agreement and should not rely on the representations, warranties and covenants or any descriptions thereof as characterizations

---

[1] This Form 8-K was specifically incorporated by reference into the Proxy Statement. *See* page 123 of the Proxy Statement.

[2] The Form 8-K was specifically incorporated by reference into the Proxy Statement. *See* Page 124 of the Proxy Statement.

of the actual state of facts or condition of Merrill Lynch or Bank of America or any of their respective subsidiaries or affiliates.

20. Consistent with the foregoing, at page 83 of the Proxy Statement, the following warning and disclaimer appeared:

> The merger agreement is described in, and included as an appendix to, this document only to provide you with information regarding its terms and conditions, and not to provide any other factual information regarding Merrill Lynch, Bank of America or their respective businesses. Accordingly, the representations and warranties *and other provisions of the Merger Agreement* should not be read alone, but instead should be read only in conjunction with the information provided elsewhere in this document and in the documents incorporated by reference into this document. *See* "Where You Can Find More Information" on page 123.

(Emphasis added).

21. Also, the following disclaimer was made on page 125 of the Proxy Statement:

> These materials are included or incorporated by reference only to provide you with information regarding the terms and conditions of the agreements, and not to provide any other factual information regarding Merrill Lynch, Bank of America or their respective businesses. Accordingly, the representations and warranties *and other provisions of the merger agreement* should not be read alone, but instead should be read only in conjunction with the other information provided elsewhere in this document or incorporated by reference into this document.

(Emphasis added).

  **C.** **The Parties' Use of Incorporation by Reference Is a Standard and Customary Device to Make Required Disclosures to Stockholders**

  22. I understand that Bank of America contends that, in addition to warning stockholders against interpreting the merger agreement or its terms as establishing the existence or non-existence of any fact, the Proxy Statement made adequate disclosure of Merrill Lynch's expectation that it would pay substantial bonuses and other incentive compensation through the use of documents incorporated by reference.

  23. In addition to the Form 8-Ks referred to above, the Form 10-Q filed by Merrill Lynch for the quarter ended September 26, 2008 was specifically incorporated by reference in the Proxy Statement and the description of the Merger Agreement. *See* pages 83 and 123 of the Proxy Statement.

  24. While I express no view as to the legal sufficiency or adequacy of the disclosure therein, I note that Merrill Lynch's Form 10-Q for the quarter ended September 28, 2008 contains on pages 4 and 5 unaudited Condensed Consolidated Statements of (Loss)/Earnings for the three and nine month periods ended September 26, 2008 and September 28, 2007, respectively. For the three month periods reflected in the Form 10-Q, it shows $3,483,000,000 and $1,979,000,000, respectively, in compensation and benefits expenses. For the nine month periods reflected in the Form 10-Q, it shows $11,170,000,000 and $11,564,000,000, respectively, in compensation and benefits expenses. On page 13 of the Form 10-Q, management of Merrill Lynch disclosed that, in presenting the Consolidated Financial Statements for such periods, it made estimates of accruals for incentive-based compensation.

  25. Incorporation by reference in the manner it was done here is a customary device to simplify and streamline documents like the Proxy Statement.

26. The SEC encourages issuers and others to make required disclosures by incorporating documents. Incorporation by reference is helpful because proxy statements, as well as other written disclosure documents, are lengthy and complex. This is so, notwithstanding the SEC's attempt to make them more user-friendly, because they describe complex transactions and corporations. The body of the Proxy Statement here is 125 pages long and attaches several appendices, including the Merger Agreement, which brings the total length of the Proxy Statement and Appendices to over 225 pages. The documents incorporated by reference by the parties are hundreds of pages in length.

Signature of Affiant: _____
Print Name: Morton A. Pierce

Sworn to and subscribed before me this 21st day of August, 2009.

STEPHANIE N. P. PHAM QUANG
NOTARY PUBLIC, State of New York
No. 02PH6187158
Qualified in New York County
Commission Expires May 29, 2011

Notary: _____ #02PH6167158
Print Name: STEPHANIE N.-P. PHAM-QUANG
[NOTARY SEAL]     Notary Public, State of New York
My Commission Expires: 5/29/11

Affiant Morton A. Pierce is personally known to Notary Public, or Affiant Morton A. Pierce produced driver's license as identification.

# Morton A. Pierce
Partner

Morton Pierce is chairman of Dewey & LeBoeuf's Mergers and Acquisitions Group, a role he assumed at Dewey Ballantine in 1991, and he is a member of the firm's global Executive Committee  The M&A group consists of more than 180 lawyers based in New York, Los Angeles, Silicon Valley, Houston, London, Frankfurt, Milan, Rome, Warsaw, Moscow, Almaty, Dubai, Johannesburg, Beijing and Hong Kong  Mr Pierce has participated in numerous merger and acquisition matters and related financings  He has represented acquirers, targets, investment bankers and investors in numerous acquisitions, including the acquisition of Pixar by The Walt Disney Company, the acquisition of The MONY Group by AXA Financial, the Omnicare acquisition of NCS Healthcare, the Fortis acquisition of American Bankers, the Starwood acquisition of ITT, The Walt Disney Company acquisition of Capital Cities/ABC and the HCA acquisition of Healthtrust  Mr Pierce also has extensive experience in cross-border merger and acquisition transactions  These include the acquisition of GTECH by Lottomatica, the Zimmer Holdings acquisition of Centerpulse AG, the Burns, Philp acquisition of Goodman Fielder, the Guinness/GrandMet merger, the Luxottica Group S p A  acquisition of The United States Shoe Corporation, the Eridania Béghin-Say S A  acquisition of American Maize-Products Company and the Cable & Wireless acquisition of NYNEX CableComms.

Mr  Pierce is recognized in *Best Lawyers in America* (2008) and *Chambers USA* (2008) as a leader in the field of Mergers & Acquisitions Law.

**Bar Associations, Memberships and Activities**

- American Bar Association
    - Task Force on Review of the Federal Securities Laws (1991-2000)
    - Advisory Committee to the Federal Regulation of Securities Committee (1991-2000)
    - Chairman, Subcommittee on International Securities Matters (1985-1991) (Section of Business Law), current member
    - Member, Subcommittee on Proxy Statements and Business Transactions (Section of Business Law)
- Association of the Bar of the City of New York
    - Member, Securities Regulation Committee (1988-1991)
    - Chairman, Subcommittee on Securities and Exchange Commission Enforcement Matters (1990-1991)

**Board Memberships**

- Board Member, GAR Foundation (2002-Present)
- Board Member, Legal Aid Society (2003-2005)
- Board Member, UJA Lawyers Division (2005-Present)
- Board of Advisors, Institute for Law and Economics, University of Pennsylvania (2006-Present)

**Education**

- University of Pennsylvania Law School, 1974, J D.
- University of Oxford, 1974-1975
- Yale University, 1970, B A.

**Bar Admissions**

- New York

<u>Exhibit A</u>

**Bibliography**

Morton A. Pierce, Chang-Do Gong & Gregory R Daddario, *Fiduciary Duties of Corporate Directors – 2009 Update* in CONTESTS FOR CORPORATE CONTROL 2009 CURRENT OFFENSIVE & DEFENSIVE STRATEGIES IN M&A TRANSACTIONS 233 (PLI Corp Law & Practice Course Handbook Series No 18756, 2009)

Morton A. Pierce, Chang-Do Gong & Rebecca Reilly, *Directors' Fiduciary Duties When Allocating Transaction Consideration*, 237 N Y.L.J. NO 72, 15 (2007)

Morton A. Pierce, Michael J Aiello & Matthew J Gilroy, *Taking a Hard Look at "Poison Pills,"* 234 N Y L.J No. 89, 9 (2005).

Morton A. Pierce, *While You Were Sleeping: Lessons from Hollinger's "Inert" Audit Committee*, 2 D&O Advisor (Winter 2005)

Sanford W Morehouse & Morton A. Pierce, *The Risks and Rewards of International Expansion* N Y L J Mag., Oct 2004, 14.

Morton A. Pierce, Michael J. Aiello & Matthew J. Gilroy, *Fiduciary Duties of Corporate Directors – 2003 Update* in CONTESTS FOR CORPORATE CONTROL: CURRENT OFFENSIVE & DEFENSIVE STRATEGIES IN M&A TRANSACTIONS 2004 359 (PLI Corp. Law & Practice Course Handbook Series No B0-026K, 2004)

Morton A. Pierce, Michael J Aiello & Matthew J Gilroy, *Federal Courts Split Over How to Apply the All-Holders Rule*, 229 N Y L.J No 40, 7 (2003).

Morton A. Pierce & Michael J. Aiello, *Fiduciary Duties of Corporate Directors – 2002 Update* in NEW STRATEGIES IN CONTESTS FOR CORPORATE CONTROL CURRENT OFFENSIVE & DEFENSIVE STRATEGIES IN M&A TRANSACTIONS 2003 455 (PLI Corp. Law & Practice Course Handbook Series No B0-01S4, 2003)

Morton A. Pierce, *Fiduciary Duties of Corporate Directors* in CONTESTS FOR CORPORATE CONTROL: CURRENT OFFENSIVE & DEFENSIVE STRATEGIES IN M&A TRANSACTIONS 2002 551 (PLI Corp Law & Practice Course Handbook Series No B0-0180, 2002).

Morton A. Pierce, Michael J. Aiello & Matthew J Gilroy, *Fiduciary Duties of Corporate Directors Recent Developments in Deal Protection and Corporate Defensive Measures – 2000* in NEW STRATEGIES IN CONTESTS FOR CORPORATE CONTROL: CURRENT OFFENSIVE & DEFENSIVE STRATEGIES IN M&A 551 (PLI Corp Law & Practice Course Handbook Series No B0-00ZH, 2001).

Morton A. Pierce, M. Adel Aslani-Far & Matthew J Gilroy, *Delaware Court: 'No Talk' Provisions No Good*, 224 N.Y.L.J No. 92 (2000).

Morton A. Pierce & Michael J. Aiello, *Fiduciary Duties of Corporate Directors –1999* in NEW STRATEGIES IN CONTESTS FOR CORPORATE CONTROL 2000 145 (PLI Corp. Law & Practice Course Handbook Series No. B0-00GL, 2000)

Morton A. Pierce, Michael J. Aiello & Stephen R LaSala, *Fiduciary Duties of Corporate Directors – 1998* in NEW STRATEGIES IN CONTESTS FOR CORPORATE CONTROL 1998 213 (PLI Corp Law & Practice Course Handbook Series No B0-007H, 1999)

Morton A. Pierce, *Mergers and Acquisitions in the 80's and 90's* in CONTESTS FOR CORPORATE CONTROL 1998 THE NEW ENVIRONMENT 279 (PLI Corp Law & Practice Course Handbook Series No. B-1030, 1998)

Morton A. Pierce, *Mergers and Acquisitions in the 80's and 90's* in CONTESTS FOR CORPORATE CONTROL 1997 279 (PLI Corp. Law & Practice Course Handbook Series No B4-7175, 1997)

Morton A. Pierce, Robert M. Smith & Matthew I. Roslin, *The Recent Acquisition of the U S. Shoe Corp. by an*

<u>Exhibit A</u>

*Italian Company May Prompt Other Foreign Bidders to Wage Takeover Battles in American Courts*, 18 THE NATIONAL LAW JOURNAL B5 (1995).

Morton A. Pierce, *SEC Looks at Multinationals. Encouraging International Offers to U.S. Security Holders*, 204 N Y L J No 49, 5 (1990)

Morton A. Pierce & Robert M. Smith, *Delaware Clarifies Board's Duty to Maximize Shareholder Value*, 12 THE NATIONAL LAW JOURNAL 24 (1990)

Morton A. Pierce, Robert M. Smith & Michael J Kunz, *The Poison Pill: Shareholders Sometimes Face Legal Battles Over Rights*, 200 N Y.L.J No 107, 39 (1988)

Morton A. Pierce, *The Regulation of the Issuance and Trading of Securities in the United States and the European Economic Community: A Comparison*, 3 J COMP CORP L. & SEC REG. 129 (1981)

Morton A. Pierce, *Recent United States Securities and Exchange Commission Releases Relevant to Foreign Issuers*, 8 INTERNATIONAL BUSINESS LAWYER 293 (1980).

Morton A. Pierce, *The Shareholders' Rights Bill: Too Much Power to the People?*, 2 THE NATIONAL LAW JOURNAL 24 (1980).

Morton A. Pierce, *Should the FCPA Be Amended or Repealed?*, 2 LEGAL TIMES OF WASHINGTON 12 (1980)

Morton A. Pierce, *The Foreign Corrupt Practices Act of 1977*, 8 INTERNATIONAL BUSINESS LAWYER 13 (1980).

Morton A. Pierce, *Current and Recurrent Section 5 Gun-Jumping Problems*, 26 CASE W RES L. REV 370 (1976)

<u>Exhibit B</u>

### Filings with the Securities and Exchange Commission

Schedule 14A filed on December 8, 2000 by Dain Rauscher Corporation.

Schedule TO-T, filed on September 8, 2000 by Credit Suisse Group.

Form S-4, filed on April 11, 2008 by JPMorgan Chase & Co.

Form F-4, filed on September 21, 2000 by UBS AG.

Form S-4/A, filed on August 28, 2007 by Wachovia Corporation.

Form S-4, filed on July 10, 1997 by Bankers Trust New York Corporation.

Form S-4, filed on June 30, 1999 by First Union Corporation.

Schedule 14D-1, filed on October 4, 1999 by Hambrecht & Quist Group.

Schedule 14A, filed on November 22, 2000 by J.P. Morgan & Co. Incorporated.

Form S-4/A, filed on August 12, 1998 by KeyCorp.

Form 424B3, filed on March 1, 2001 by Regions Financial Corporation.

Schedule 14A, filed on March 24, 1998 by Piper Jaffray Companies Inc.

Form S-4/A, filed on December 17, 1997 by First Union Corporation.

Schedule 14A, filed on September 6, 2001 by Tucker Anthony Sutro.

### Publicly Filed Merger Agreements

Agreement and Plan of Merger, dated as of September 28, 2000, by and among Dain Rauscher Corporation, Royal Bank of Canada and Viking Merger Subsidiary, Inc.

Agreement and Plan of Merger, dated as of August 30, 2000, by and among Credit Suisse Group, Diamond Acquisition Corp. and Donaldson, Lufkin & Jenrette, Inc.

Agreement and Plan of Merger, dated as of March 16, 2008, by and between The Bear Stearns Companies Inc. and JPMorgan Chase & Co.

Agreement and Plan of Merger, dated as of July 12, 2000, by and among Paine Webber Group Inc., UBS AG and Neptune Merger Subsidiary, Inc.

Agreement and Plan of Merger, dated as of May 30, 2007, by and among Wachovia Corporation, White Bird Holdings, Inc. and A.G. Edwards, Inc.

Agreement and Plan of Merger, dated as of April 6, 1997, by and among Bankers Trust New York Corporation, Voyager Merger Corporation and Alex. Brown Incorporated.

Amended and Restated Agreement and Plan of Merger, dated as of April 25, 1999, by and among EVEREN Capital Corporation, First Union Corporation and First Union Delaware, Inc.

Agreement and Plan of Merger, dated as of September 27, 1999, by and among The Chase Manhattan Corporation, Bridge Acquisition Corporation and Hambrecht & Quist Group.

Agreement and Plan of Merger, dated as of September 12, 2000, by and between The Chase Manhattan Corporation and J.P. Morgan & Co. Incorporated.

**Exhibit B**

Agreement and Plan of Merger, dated as of June 15, 1998, by and between McDonald & Company Investments, Inc. and KeyCorp.

Agreement and Plan of Merger, dated as of December 17, 2000, by and between Morgan Keegan, Inc. and Regions Financial Corporation.

Agreement and Plan of Merger, dated as of December 14, 1997, by and among Piper Jaffray Companies Inc., U.S. Bancorp and Cub Acquisition Corporation.

Amended and Restated Agreement and Plan of Merger, dated as of August 20, 1997, by and among Wheat First Butcher Singer, Inc., First Union Corporation and First Union Virginia, Inc.

Agreement and Plan of Merger, dated as of August 1, 2001, by and between Tucker Anthony Sutro and Royal Bank of Canada.