UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,          :
                                                                        :
                        Plaintiff,                              :
                                                                        :
            vs.                                                 :        Case No. 09-CV-6829 (JSR)
                                                                        :
BANK OF AMERICA CORPORATION,                    :
                                                                        :
                        Defendant.                         :
------------------------------------------------------------------------x

## AFFIDAVIT OF JOSEPH A. GRUNDFEST

STATE OF CALIFORNIA           )
                                              )      ss.:
COUNTY OF SANTA CLARA     )

JOSEPH A. GRUNDFEST, being duly sworn, deposes and says:

**I.      Qualifications**

      1.      I am the William A. Franke Professor of Law and Business at Stanford Law

School, where I also co-direct the Rock Center on Corporate Governance.  I joined Stanford's

faculty in 1990 after serving as a Commissioner of the United States Securities and Exchange

Commission ("SEC" or "Commission") from November of 1985.  I am an economist and

attorney, and have completed all requirements for a Ph.D. in economics from Stanford

University, but for the dissertation. My scholarship has been published in the Harvard and

Stanford Law Reviews and the Yale Law Journal.  The National Law Journal listed me as among

the 100 most influential attorneys in the United States in 1997, 2000 and 2006, and Directorship

Magazine has listed me as among the 100 most influential leaders in the field of corporate

governance for the last two years. I established and serve as principal investigator for the

Stanford Class Action Securities Clearinghouse, a leading on-line resource that monitors federal

class action securities fraud litigation activity, including the settlement of those claims. My biography and publication list are attached as Exhibit ("Ex.") A.

2.      I have personal knowledge of the procedures involved in settling SEC enforcement actions.  As a Commissioner, I participated in the review and approval of hundreds of settled administrative and injunctive enforcement proceedings.  Through deliberations and consultations with the Commission's staff in these hundreds of cases, and through the review and comparison of information contained in Wells Submissions and in complaints filed in settled actions, I became familiar with considerations that cause the Commission and defendants to settle disputes by having the Commission file complaints that do not describe legitimate defenses available to the settling defendants, and having defendants consent to the filing of such complaints. The complaints filed in these settled matters also commonly omit facts that, if proven at trial, would exonerate defendants or mitigate penalties to which they might be exposed. In the private practice of law, both prior and subsequent to my service as a Commissioner, I gained further personal knowledge of factors that cause the Commission and respondents to settle actions on such terms and conditions.

3.      Settlement dynamics are also a focus of my current scholarship. I have recently published an article that applies real option theory to the analysis of settlement behavior. Real option theory, among other analytic contributions, explains how and why risk neutral defendants rationally pay substantial amounts to settle lawsuits that have negative expected value to plaintiffs (i.e., lawsuits that plaintiffs are either likely to lose or that will generate expected costs in excess of expected benefits). Joseph A. Grundfest & Peter H. Huang, *The Unexpected Value of Litigation: A Real Options Perspective*, 58 Stanford L. Rev. 1267 (2006).

4.      Because of the significant public policy concerns raised by this Court in connection with its review of the pending settlement in this proceeding, and because of the implication of those concerns for the Commission's and respondents' ability to settle disputes over alleged violations of federal securities law, I am providing my services in this matter on a *pro bono* basis. Bank of America Corporation ("Defendant" or "Bank of America") has agreed to reimburse expenses, if any, incurred in conjunction with my participation in this proceeding.

II.    **Summary of Opinion**

5.      It is common practice in settled proceedings for the Commission to file complaints that cast defendants' actions in a harsh light and then to prohibit defendants from challenging the Commission's rendition of facts and law as articulated in the complaint. These complaints typically omit mention of valid defenses and of countervailing facts or mitigating circumstances that, if proven at trial, could cause the Commission to (i) lose its case against some or all defendants, (ii) prevail on grounds narrower than those alleged, or (iii) obtain relief less onerous than imposed through the settled action. The relevant literature, summarized in Part III below, confirms this conclusion.

6.      Publicly available information, including filings with the Commission, establishes that there is substantial risk to the Commission that it would not prevail if this matter were litigated to judgment because a court or a fact-finder could readily conclude that Bank of America did not violate the federal securities laws.   More precisely, as explained in Part IV, Defendant has a powerful claim that it engaged in no misrepresentation or omission.  Defendant has a further powerful claim that any misrepresentation or omission, even if one was found to exist, was immaterial and hence not actionable.

7.      Notwithstanding the existence of multiple significant defenses, and a high probability that the Commission would not prevail if the matter were pursued to judgment, it can be entirely rational for defendants to settle disputes with the Commission, as explained in Part V.

**III.    SEC Settlement Practices**

8.      At the August 10 hearing in this action, the Court requested that the parties address whether the settlement in this action is "fair and reasonable."  8/10/09 Tr. 45:1-4.

9.      Complaints filed by the Commission are prosecutorial documents. They typically do not set forth the full set of facts and circumstances relevant to the Commission's allegations. They commonly omit reference to valid legal defenses. They often fail to mention evidence inconsistent with the Commission's allegations. They usually do not mention exonerating or exculpating factors. Commission policy also generally prohibits settling defendants from publicly presenting facts or theories of law that undercut the Commission's complaint. The natural result of the combination of these Commission policies is a one-sided record in which the Commission asserts its version of the facts and the law, and the settling defendants commit not to challenge that rendition. This is part of the price of settling with the Commission.

10.     At the August 10 hearing, the Court thus found itself in the difficult position of trying to assess the fairness of a settlement based only on the SEC's side of the story as reflected in the SEC's complaint, a form of consent judgment, and Bank of America's consent.  None of these documents addressed any weaknesses in the SEC's case, and none set forth the defenses that Bank of America could mount if the action were litigated to judgment.

11.     This reality regarding SEC settlement practice is well documented:

(a)     "The Commission and its Staff ordinarily—although not uniformly—have resisted attempts to include mitigating or exculpatory language in orders issued in settled cases. This resistance most likely stems from the view that discussion of

4

mitigating facts could be interpreted as indicative of a weakness in the case against the respondent, as negating a finding of scienter, or as contradictory to the fact that the respondent neither admits nor denies the matters contained in the Order." American Bar Association Report of the Task Force on SEC Settlements, 47 Bus. Law. 1083, 1169 (1992). "The divergence in the parties' marginal propensity towards settlement creates uneven bargaining power, with the Commission holding the upper hand. Short of an unacceptable sanction or inflammatory language, many respondents will consent to the violation(s) the Commission wants to allege, including an expansive enunciation of the applicable legal principles, in return for a few cosmetic changes in the settlement documents." *Id.* at 1094.

(b)     "It is sometimes possible to obtain some recognition of exculpatory or mitigating facts in the settlement papers and the litigation release or press release. Such recognition usually is extremely limited.  It seldom, if ever, converts a prosecutorial document into an objectively bland statement, much less an articulation of the defense's perception of the case.  Indeed, it is very difficult at the time of a public announcement of a Commission enforcement action to obtain substantial press recognition of the defense's side of the story.  Moreover, any statement by the defendant that could be interpreted as a denial of the Commission's allegations carries a risk that the staff will view the statement as a repudiation of the settlement and will take action to vacate it." The Securities Enforcement Manual (American Bar Association 2d ed. 2007), at 273.

(c)    "Typically, the SEC presents respondents with draft orders and settlement

conditions that are nonnegotiable. If a respondent elects not to settle, the SEC

initiates an action almost immediately and seeks penalties even greater than those

offered in the settlement. As a practical matter, respondents confront a Hobbesian

choice: to accept whatever severe penalties are being imposed to conclude the

matter or to face the uncertainty and expense that will result from a decision to

resist. Consequently, the SEC has tremendous leverage in fashioning the final

outcome of the case." Anne Flannery, *Time for Change:  A Re-Examination of the*

*Settlement Policies of the Securities and Exchange Commission*, 51 Wash. & Lee

L. Rev. 1015, 1018 (1994).

12.    SEC policy is also "not to permit a defendant or respondent to consent to a

judgment or order that imposes a sanction while denying the allegations in the complaint or order

for proceedings." 17 C.F.R. § 202.5(e).  Consistent with this requirement, and as is the case in

every matter settled with the Commission, the terms of the consent to which Bank of America

agreed in this action contains an express prohibition against making "any public statement

denying, directly or indirectly, any allegation in the complaint or creating the impression that the

Complaint is without factual basis." Proposed Final Consent Judgment as to Defendant Bank of

America Corporation, at ¶ 10.

13.    The literature is again consistent with this observation.  As explained in The

Securities Enforcement Manual, at 267, "The SEC takes the position that subsequent statements

by defendants denying the charges or otherwise asserting innocence constitutes a repudiation of

the settlement." Thus, "In SEC v. Angelos, 1996 SEC LEXIS 744 (D. Md. Mar. 20, 1996), the

SEC moved to vacate a consent agreement based on the defendant's denial of culpability; the

motion was withdrawn after the defendant withdrew his denial; *see also*, Litig. Release No.

14886, 1996 SEC LEXIS 1172 (Apr. 22, 1996).  In another settlement, SEC v. Tyson, Litig.

Release No. 15115, 1996 SEC LEXIS 2856 (Oct. 9, 1996), the defendant made comments

through a representative that were construed by the SEC as denying the allegations of the

complaint.  To prevent the SEC from withdrawing its consent to the settlement, the defendant

retracted the comments. *See also* SEC v. Manion, Litig. Release No. 16228, 1999 SEC LEXIS

1502 (Aug. 2, 1999)." *Id.* at 267, n.17.

14.    Therefore, until this Court's order directing that the parties set forth the basis for

this settlement, the consent precluded Bank of America from presenting facts and legal

arguments supporting the conclusion that the Commission's complaint has no merit, and that

Bank of America did not violate federal securities laws.

**IV.    The Commission Faces a Very Significant Risk that it will not Prevail if it Litigates this Matter Through to Judgment**

15.    The Commission faces a very significant risk that it will not prevail if this matter

is litigated to judgment. Defendant has a powerful claim that neither it nor Merrill Lynch & Co.,

Inc. ("Merrill") ever represented that bonuses would not be paid to Merrill employees.

Accordingly, there is no actionable misrepresentation or omission.  Further, even if one

concludes that there was a misrepresentation or omission, irrefutable facts in the public record

establish that shareholders, investors, analysts, and the press understood that Merrill employees

would be paid billions of dollars in bonuses. These facts include: (i) express provisions of the

Merger Agreement[1] and Proxy Statement[2]; (ii) filings with the Commission that are part of the

Proxy Statement itself by being incorporated by reference; and (iii) information in the press and

---

[1] Agreement and Plan of Merger by and between Merrill Lynch & Co., Inc. and Bank of America Corporation (Sept. 15, 2008) ("Merger Agreement").

[2] Joint Definitive Proxy Statement (Schedule 14A) (Nov. 3, 2008) ("Proxy Statement").

analyst reports establishing that the market correctly understood that Merrill would be paying billions of dollars in 2008 year-end bonuses. The alleged misrepresentation or omission is therefore immaterial, even if it existed.

16.     The Commission's complaint, however, makes no mention of any of this publicly available information. The Complaint is thus, in no sense, a fair or accurate rendition of the total mix of information available to investors in connection with the alleged violation. It is an advocacy document containing allegations of misrepresentation, omission, and materiality that can be powerfully refuted.

    A.     **Materiality**

17.     A misrepresentation or omission must be material in order to violate Section 14(a). 3 Thomas Lee Hazen, Treatise on the Law of Securities Regulation (6th ed. 2009), at 100. Materiality is a "mixed question of law and fact" and is determined with reference to the "total mix" of information available to investors. *Basic v. Levinson*, 485 U.S. 224, 231-32 (1988); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449-50 (1976); *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999).

18.     A determination of materiality often requires a "highly factual" inquiry that cannot be limited to a cherry-picked subset of information carefully edited by a plaintiff; it requires consideration of the full text of all relevant documents. Hazen, at 101-02 ("In assessing materiality courts should not focus alone on one particular sentence that is part of a larger statement without considering the entirety of the statements in question"); *In re Avon Prods.*, 2009 U.S. Dist. LEXIS 34564, at *6 (S.D.N.Y. Feb. 23, 2009). Filings made with the Commission, especially when incorporated by reference, are properly considered. *See Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991). Press reports and securities analyst materials indicating the market's

awareness of relevant information also enters into the calculus. *See, e.g., Beleson v. Schwartz*, 599 F. Supp. 2d 519, 525 (S.D.N.Y. 2009) (considering securities analysts' reports); *In re Yukos Oil Co.*, 2006 U.S. Dist. LEXIS 78067, at \*66-68 (S.D.N.Y. Oct. 25, 2006) (considering newspaper articles); *see also Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978). Moreover, "[m]ateriality depends not upon the literal truth of statements, but upon the ability of reasonable investors to become accurately informed." Hazen, at 101 (citing *United States v. Berger*, 473 F.3d 1080, 1098-99 (9th Cir. 2007) ("[M]ateriality should be assessed, not from the SEC's perspective, but from the investor's perspective.")).

19.     It is therefore significant to observe that Merrill's own filings with the Commission, several of which are incorporated by reference into the Proxy Statement,[3] clearly indicate that billions of dollars in compensation and benefits would be paid in 2008.

20.     Merrill's Form 10-Q for the first quarter filed on May 6, 2008, states at 73 that "Compensation and benefits expenses were $4.2 billion for the first quarter of 2008, down 14% from $4.9 billion in the year-ago quarter due to a decline in compensation expense accruals reflecting lower net revenues."

21.     Merrill's Form 10-Q for the second quarter filed on August 5, 2008, states at 82 that "Compensation and benefits expenses were $3.5 billion for the second quarter of 2008, down 26% from $4.7 billion in the year-ago quarter due to a decline in the current year accruals reflecting lower net revenues and reductions in headcount."

---

[3] The Proxy Statement incorporates by reference Merrill's Annual Report on Form 10-K for the year ended December 28, 2007, Proxy Statement dated March 14, 2008, 59 Current Reports on Form 8-K of various dates (other than the portions of those documents not deemed to be filed), and Quarterly Reports on Form 10-Q for the quarters ended March 28, 2008, and June 27, 2008, as well as all public filings made between the November 3, 2008 Proxy Statement mailing date and the date of the shareholder vote, on December 5, 2008, including Merrill's Form 10-Q for the third quarter of 2008, which was filed on November 5, 2008.  Proxy Statement at 124.

22.    On October 16, 2008, Merrill's earnings release for the third quarter stated at 8

that, "[c]ompensation and benefits expenses were $3.5 billion for the third quarter of 2008, up

76% from $2.0 billion in the third quarter of 2007, primarily due to the reversal of compensation

expense accruals in the prior-year quarter.  Compensation and benefits expenses were $11.2

billion for the first nine months of 2008, down 3% from $11.6 billion in the first nine months of

2007 primarily due to a decline in compensation expense accruals reflecting lower net revenues

and reductions in headcount."  Merrill's preliminary unaudited earnings summary, annexed

thereto as Attachment II, also disclosed nine months accrued compensation and benefits of

$11.170 billion.  *Id.* at 14.

23.    In the accompanying earnings call on the same day, Nelson Chai, then Merrill's

Chief Financial Officer, stated as follows:

> "I'll start with the Compensation Expenses for the quarter, which were $3.5
> billion, flat from the second quarter, but up versus the prior-period quarter.  The
> increase was due largely to timing of compensation accruals as we reduced
> incentive compensation accruals in the third quarter of 2007 that had been taken
> during the first half of the record year last year.  In fact, on a year-to-date basis,
> comp expense is down slightly from comparable 2007 levels."

24.    Consistent with the earlier earnings release and earnings call, Merrill's Form 10-Q

for the third quarter filed on November 5, 2008, states at 86 that "Compensation and benefits

expenses were $3.5 billion for the third quarter of 2008. In the third quarter of 2007, primarily as

a result of a reversal of previously accrued 2007 compensation costs, compensation and benefits

expenses were $2.0 billion. The quarterly year over year increase reflects the reversal of the

accruals in 2007, partially offset by lower costs in 2008 as a result of reduced headcount levels."

25.    Significantly, Merrill's earnings release, earnings call, and filing of its Form 10-Q

for its third quarter of 2008 all occurred after announcement of the merger.  These documents all

reflected that Merrill continued to accrue for compensation and benefits, and at roughly the same

rate as in earlier quarters. These accruals thus show that even after the Merger Agreement was

signed Merrill was publicly on track to pay billions of dollars in bonuses.

26.     Total compensation and benefits expense for the first three quarters of 2008 was

thus clearly disclosed as $11.170 billion, precisely the sum that would be derived from simple

addition of the prior disclosures, with a small adjustment for rounding. Merrill Lynch & Co.,

Quarterly Report (Form 10-Q), at 5 (Nov. 5, 2008). Simply annualizing accruals for the first

three quarter leads to an estimate that Merrill was on track to pay $14.893 billion in

compensation and benefits for the year.[4]

27.     In fact, actual compensation and benefits closely tracked those that could be

derived from this mathematical calculation. Merrill's Form 10-K for 2008, filed with the SEC

on February 25, 2009, reported at 24 that actual compensation and benefits paid by Merrill "were

$14.8 billion in 2008 and $15.9 billion in 2007. The year over year decrease primarily reflects

lower incentive-based compensation costs as a result of lower net revenues and net earnings, as

well as reduced headcount levels. The overall decrease in compensation and benefits expense

was driven by a 30% decline in incentive-based compensation, partially offset by increased

---

[4] Under GAAP standards, bonus accruals are considered current liabilities for accounting
purposes and thus the best estimate of such amounts must be disclosed. *See* Barry J. Epstein, et
al., *GAAP Codification Enhanced* 718-19 (Wiley 2009); ASC 210-10-45-6 (Financial
Accounting Standards Board 2009); *see also* FAS 5 ¶ 11 ("[T]he financial statements shall . . .
give an estimate of the amount or range of loss or possible loss or state that such an estimate
cannot be made."); ASC 450-20-30-1 ("When no amount within the range is a better estimate
than any other amount, however, the minimum amount in the range shall be accrued."). Thus,
continued accruals for compensation throughout 2008 — and the lack of any reversal or
reduction of such accruals — manifested an intent to pay annual compensation, including year-
end bonuses, of at least the amounts already accrued. Moreover, assuming fourth quarter
accruals at the average of the prior three reported quarterly amounts yields a fourth quarter
accrual of $3.723 billion ($11.170 billion divided by 3) and a total 2008 expected compensation
and benefits expense of $14.893 billion ($11.170 billion plus $3.723 billion).

amortization of prior year stock compensation awards." *See id.* at 52 (reporting 2008 compensation and benefits expenses of $14.763 billion).

28.    A reasonable investor reviewing the Proxy Statement, including Merrill's financial statements, thus would have been able to determine with a high degree of accuracy Merrill's 2008 compensation expenses, including bonuses. The actual payment of $14.763 billion was lower than the annualized projection of $14.893 billion by $130 million, or less than one percent.[5]  The anticipated amount of Merrill's actual annual compensation and benefits expense had been clearly telegraphed to the investment community through the quarterly accruals, all in accordance with GAAP.

29.    Consistent with Merrill's disclosures, my review of information in the public domain in the period between the date of the Merger Agreement (September 15, 2008) and the date of the shareholder vote (December 5, 2008), indicates that there is irrefutable evidence that investors, analysts, and the press also understood and anticipated that Merrill would pay billions of dollars in bonuses.

(a)    On October 18, 2008, two days after the third quarter earnings release, *The Guardian* reported that Merrill had accrued $11.7 billion for staff salaries and bonuses through the first nine months of the year.  Noting that "[p]ay plans for bankers have been disclosed in recent corporate statements," the article stated that "[a]t Merrill, which was on the point of going bust last month before being taken over by Bank of America, the total accrued in the last quarter grew 76% to $3.49bn."  Ex. B at 1-2.

---

[5] The variance from the annualized estimate is 0.87% ($130 million divided by $14.893 billion).

(b)    Within five days, the topic of Wall Street bonuses was being discussed on cable news networks.  On October 23, 2008, CNN's Situation Room reported that Merrill had set aside $11.2 billion for pay packages through the third quarter of 2008.  Ex. C at 10.

(c)    Four days later, on October 27, 2008, *The New York Times* reported that Merrill was "allocating about $6.7 billion to pay bonuses."  Ex. D at 1.  That report added:  "The money Merrill has set aside for bonuses equates to an average $110,000 for each of its 60,900 people, up from $108,000 a year ago …. The bonus figures are based on estimates that about 60 percent of the compensation and benefits expenses reported by the companies will be paid in year-end bonuses, as occurred in past years."  *Id.* The report further quoted a Merrill spokeswoman as follows:  "the firm's accrued bonuses were not down as much as those at Goldman and Morgan Stanley because Merrill cut expenses last year." *Id.* at 1-2.  An essentially identical report appeared in Bloomberg on the same date.  Ex. E.

(d)    The next day, NBC's Today Show reported that "at Merrill Lynch, Bloomberg estimates $6.7 billion [was] set aside for bonuses, $110,000 on average, higher than a year ago because 3,000 jobs have been cut."  Ex. F at 1.

(e)    Two days later, on October 30, 2008, Bloomberg reported that Merrill and its competitors Goldman Sachs and Morgan Stanley had "already set aside $20 billion to pay bonuses this year."  Ex. G at 1.  That report noted that "industry veterans" had said that the Wall Street firms "will …pay bonuses this year;" that bonuses "typically account for about two-thirds of compensation at the biggest

Wall Street firms;" and that "bonuses are accrued throughout the year." *Id.* The report further quoted John Gutfreund, the former CEO of Salomon Brothers, explaining that: "Odds that Wall Street will forgo the [year-end bonus] payouts are 'slim to none.'" *Id.*

(f)    The very next day, on October 31, 2008, the *Financial Times* similarly reported that Merrill, Goldman Sachs, and Morgan Stanley had "already set aside $20 billion to pay bonuses this year," and reiterated Mr. Gutfreund's observation that "odds that Wall Street will forgo the payouts are 'slim to none.'" Ex. H at 1.

(g)    On November 13, 2008, the Fox News Network on its 6 p.m. television news show "Fox Special Report with Brit Hume" reported that, notwithstanding "five straight quarters of losses," Merrill "has allocated $6.7 billion" for year-end bonuses. Ex. I at 8. Mr. Hume went on to say: "Workers at Merrill Lynch will actually receive larger bonuses than last year," because the total number of Merrill employees had decreased from the prior year so "the bonus money will be divided among fewer people." *Id.*

(h)    On December 3, 2008, two days prior to the shareholder vote, Bloomberg reported yet again that Merrill would be paying billions of dollars in year-end bonuses. This Bloomberg report very specifically noted that Merrill "plans to cut year-end bonuses" by "about 50 percent" compared to the prior year. Ex. J at 1. An essentially similar report was issued the same day by Market Watch. Ex. K. *See also* Ex. E at 4 (estimating Merrill's 2007 bonuses at $6.94 billion).

30.    Media reports thus clearly indicate a broad-based awareness by prominent news sources that billions of dollars of bonuses were expected to be paid by Merrill.

14

31.    Consistent with Merrill's disclosures, Wall Street analysts also forecast that Merrill would pay billions in compensation and benefits.  On September 15, 2008, the day the merger was announced, analysts at Bernstein Research projected Merrill's 2008 compensation and benefits expense at $14.287 billion.  Ex. L at 7.  In October, Bernstein Research *increased* its projection to $14.470 billion.  Ex. M at 16.  Other analysts shared that view.  At Wachovia the estimate was $14.363 billion.  Ex. N at 2.  Buckingham Research Group projected $14.3 billion.  Ex. O at 4.  Morgan Stanley projected $14.420 billion.  Ex. P at 4.  JP Morgan projected $14.336 billion.  Ex. Q at 3.  The same was true in November, when analysts at Oppenheimer & Co. projected Merrill's compensation and benefits expense at $14.874 billion.  Ex. R at 6.  It is particularly valuable to observe that all of these analyst forecasts fall within 3.22% of the actual annual compensation and benefits result reported by Merrill, see ¶ 27, supra.[6]

32.    I have also reviewed the available media information to determine whether there is any indication suggesting any expectation that Merrill would pay no bonus to its employees in 2008.  There is no such indication.

(a)    There were approximately 1200 news articles and other published reports filed during the period from September 1, 2008 (before the merger was announced) through December 6, 2008 (after the vote of the shareholders took place) that resulted from searches reasonably designed to identify reports on this topic.  The search results included all reports available on the Bloomberg and

---

[6] The widest divergence from the $14.763 billion in actual compensation costs was the initial estimate from Bernstein Research of $14.287 billion.  The $476 million difference ($14.763 billion minus $14.287 billion) is only 3.22% of the actual compensation and benefits expense reported for 2008 ($476 million divided by $14.763 billion).  Bernstein's revised estimate of $14.470 billion, like many of the other analyst projections, was even closer to the actual results.

Factiva databases[7] that referenced "Merrill" and contained any of the following terms: "bonus," "variable incentive compensation" or "VICP." None of the media reports that were located in those searches suggested that Merrill would not pay year-end bonuses in 2008.

(b)    I have also reviewed numerous analyst reports published during the period between the announcement of the merger and the shareholder vote. Such reports were filed by analysts at prominent firms, including, JP Morgan, Morgan Stanley, Oppenheimer & Co., Bernstein Research, Wachovia and Buckingham Research Group, among others. None of those analyst reports suggested any expectation that Merrill would not pay year-end bonuses in 2008.

33.    The public record regarding the content of press reports, analyst reports, and Merrill's own filings with the Commission, therefore establishes a significant risk that if this matter were litigated to judgment the Commission would not be able to establish that any misrepresentation or omission was material, even if it existed.

**B.    Misrepresentations and Omissions**

34.    The Complaint alleges that Bank of America made "representations that Merrill was prohibited from making [year-end bonus] payments." Complaint ¶ 3. Defendant, however, has a powerful argument that there was no such representation, and hence no misrepresentation or actionable omission – and most certainly no material misrepresentation or omission.

35.    The Merger Agreement states that Merrill "shall not … without the prior written consent of" Bank of America "pay any amounts to Employees not required by any current plan

---

[7] These databases contain news articles and press reports from leading publishers, including Dow Jones Newswire, Reuters, Barron's, Bloomberg, The Wall Street Journal, The New York Times, USA Today, The Financial Times, Newsweek, BusinessWeek, Time, The Economist and many others, as well as transcripts of news programs on major radio and television networks, including ABC, NBC, CBS, Fox, CNN, NPR and the BBC, among others.

or agreement (other than base salary in the ordinary course of business)."  Merger Agreement §§ 5.2 and 5.2(c)(ii).  The Merger Agreement in that same section 5.2 also makes clear that this language regarding the payment of bonuses is subject to a specific exception "set forth in . . . the Company Disclosure Schedule" which, as alleged in the Complaint, provides discretion for Merrill to pay "up to $5.8 billion" in year-end bonus compensation.  Complaint ¶ 2; Merger Agreement § 5.2.  The plain language of this commitment allows Merrill to pay any amount whatsoever – even many billions of dollars – provided that Bank of America provides its prior written consent.  There is, simply put, no promise not to pay bonuses.

36.     Because the Merger Agreement never represents that bonuses would not be paid, nor does it ever make any representation as to the amount of bonuses that would be paid, Defendant can reasonably assert that there is no representation that can be alleged to be false. Because there is no representation that bonuses would not be paid, and no representation as to the amount of the bonuses that would, or would not, be paid, Defendant can further reasonably claim that there is no omission of a "material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9(a).

37.     Indeed, in Section 5.1 of the Merger Agreement, the parties covenant that they "shall" conduct their respective businesses "in the ordinary course in all material respects" and "use reasonable best efforts to maintain and preserve intact its business organization and advantageous business relationships and retain the services of its key officers and key employees."  Merger Agreement § 5.1.  As explained in detail, it was well understood by investors, analysts, and the press that the ordinary course of business for Merrill — just like its competitors — would involve the payment of bonuses.  Thus, contrary to the suggestion that Defendant engaged in a material misrepresentation or omission by representing that Merrill

17

would not pay bonuses, the Merger Agreement contains language clearly indicating that investors should expect that bonuses would be paid.

38.    Additional disclosures contained in Merrill's filing with the Commission on Form 8-K, dated September 18, 2008, at 4, which was part of the Proxy Statement, having been incorporated therein by reference at page 124 of that document, further supports the conclusion that there was no misrepresentation or omission.

> "The Merger Agreement has been included to provide investors and security holders with information regarding its terms. It is not intended to provide any other factual information about Merrill Lynch or Bank of America. The representations, warranties and covenants contained in the Merger Agreement were made only for purposes of that agreement and as of specific dates, were solely for the benefit of the parties to the Merger Agreement, may be subject to limitations agreed upon by the contracting parties, including being qualified by confidential disclosures made for the purposes of allocating contractual risk between the parties to the Merger Agreement instead of establishing these matters as facts, and may be subject to standards of materiality applicable to the contracting parties that differ from those applicable to investors. Investors are not third-party beneficiaries under the Merger Agreement and should not rely on the representations, warranties and covenants or any descriptions thereof as characterizations of the actual state of facts or condition of Merrill Lynch or Bank of America or any of their respective subsidiaries or affiliates. Moreover, information concerning the subject matter of the representations and warranties may change after the date of the Merger Agreement, which subsequent information may or may not be fully reflected in Merrill Lynch's public disclosures."

39.    These disclosures buttress the conclusion that Defendant engaged in no misrepresentation or omission. They inform investors that the Merger Agreement contains no "factual information about Merrill Lynch or Bank of America." Accordingly, no factual representation is made regarding the payment of 2008 bonuses for Merrill employees.  Because there is no representation, it follows that there can be no misrepresentation or omission related to a representation that was not made. Instead, factual information regarding Merrill's 2008 compensation and benefits is to be found in Merrill's disclosures filed in its quarterly reports, which, as described above, were incorporated into the Proxy Statement by reference and clearly

18

placed the market on notice that Merrill would be paying billions of dollars in 2008 bonuses to its employees.

40.    None of the information contained in the Proxy Statement is to the contrary.

41.    This discussion of Defendant's ability to demonstrate that its disclosures contained no misrepresentations or omissions, and that if there were any disclosures or omissions they were immaterial, is not intended as an encyclopedic inventory of all defenses that could be raised or of all facts relevant to the matter pending before this Court.

## V.    Incentives to Settle Notwithstanding the Existence of Powerful Defenses

42.    For the reasons stated above, there is a significant risk to the Commission that, if this matter were litigated to judgment, the Commission would not prevail, and that a fact-finder would conclude that Bank of America did not violate any federal securities law.

43.    It is nonetheless rational for a defendant in Bank of America's position to settle the Commission's allegations.  I have no personal knowledge of the considerations that caused Bank of America to consent to the terms and conditions of the settlement, but observe that the following factors are often relevant to settlement decisions by defendants.

44.    First, Bank of America is a highly regulated entity.  It can be imprudent for regulated entities to engage in protracted litigation with their regulators.  Second, Bank of America is active in the retail market and relies on access to financial markets for capital funding.  Reputational capital is valuable in these markets.  Quickly resolving disputes that have the potential to impair brand value can be a rational strategy.  Third, Congress and the Administration have an ongoing interest in financial services regulatory reform. There can be value in resolving disputes that can influence the course of this public policy debate. Fourth, as is the case in every major potential lawsuit that presents a risk of significant litigation costs or material management distraction, it can be prudent to resolve the matter so as to minimize these

costs and allow management to focus on forward-looking concerns likely to generate greater

shareholder value.

     45.     I have no personal knowledge as to whether any of these factors were relevant to

Bank of America's decision to settle this proceeding.  These factors could, however, alone or in

combination, be more than sufficient to support a decision to settle with the Commission,

notwithstanding powerful arguments that Bank of America did not violate the federal securities

laws.


                                                 Joseph A. Grundfest

Sworn to before me this
21st day of August, 2009



Notary Public

ELSIE M. WILLHALM
Commission # 1753190
Notary Public - California
Santa Clara County
My Comm. Expires Jun 25, 2011