UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : | |
| : | |
| Plaintiff, : | |
| : | No. 09-Civ.-6829 (JSR) |
| -against- : | |
| : | |
| BANK OF AMERICA CORPORATION, : | |
| : | |
| Defendant. : | |

**MEMORANDUM OF PLAINTIFF**
**SECURITIES AND EXCHANGE COMMISSION IN**
**SUPPORT OF ENTRY OF THE PROPOSED CONSENT JUDGMENT**

David Rosenfeld
Associate Regional Director
Attorney for Plaintiff
Securities and Exchange Commission
New York Regional Office
Three World Financial Center, Suite 400
New York, New York 10281
Tel: (212) 336-0153

Of Counsel:

George N. Stepaniuk
Maureen F. Lewis
Joseph O. Boryshansky

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

PRELIMINARY STATEMENT ......................................................................................... 2

STATEMENT OF FACTS .................................................................................................. 6

    A.    The Commission's Investigation ................................................................. 6

    B.    The Merger Negotiations .............................................................................. 7

    C.    The Proxy Statement ..................................................................................... 11

    D.    The Accelerated Bonus Process ................................................................... 13

    E.    Merrill's Compensation Accrual and Press Speculation About Bonuses .................... 15

    F.    Approval and Payment of The Bonuses ...................................................... 16

    G.    TARP Investments ......................................................................................... 16

BANK OF AMERICA'S LIABILITY FOR VIOLATING THE PROXY
SOLICITATION RULES .................................................................................................... 18

OBSTACLES TO ADDITIONAL CHARGES AND INDIVIDUAL LIABILITY .................... 23

THE PROPOSED SETTLEMENT TERMS ...................................................................... 26

ARGUMENT ...................................................................................................................... 28

I.   THE REASONABLENESS STANDARD GOVERNING JUDICIAL REVIEW
    OF PROPOSED SEC SETTLEMENTS APPLIES IN THIS CASE ................................... 28

II.  THE PROPOSED SETTLEMENT SHOULD BE APPROVED WITHOUT
    HOLDING AN EVIDENTIARY HEARING BECAUSE IT IS REASONABLE
    AND IN THE PUBLIC INTEREST ................................................................................... 33

CONCLUSION .................................................................................................................... 38

# TABLE OF AUTHORITIES

## Cases

*ATSI Comms., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ........................................... 24

*Beck v. Dobrowski*, 559 F.3d 680 (7th Cir. 2009) .................................................... 19, 25

*Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281 (2d Cir. 1973) .................................... 19

*Glazer Cap. Mgmt., LP v. Magistri*, 547 F.3d 736 (9th Cir. 2008) .............................. 20

*Howard v. SEC*, 376 F.3d 1136 (D.C. Cir. 2004) ......................................................... 25

*In re Metex Corp. Sec. Litig.*, No. 89-cv-0571, 1993 WL 330596 (E.D.N.Y. 1993) ................... 22

*In the Matter of Krupp Corp.*, AP File No. 3-7705, 1992 WL 77698 (Apr. 8, 1992) ................. 34

*In the Matter of Medisys Tech., Inc.*, AP File No. 3-9920, 1999 WL 418000 (June 24, 1999).... 34

*Janus Films, Inc. v. Miller*, 801 F.2d 578 (2d Cir. 1986) ................................................ 30

*John Doe Co. v. United States.*, 350 F.3d 299 (2d Cir. 2003) ....................................... 26

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) .............................................................. 24

*Ravens v. Republic New York Corp.*, No. 99-cv-4981, 2002 WL 1969651 (E.D. Pa. Apr. 24, 2002) ............................................................................................................ 20

*Resnik v. Swartz*, 303 F.3d 147 (2d Cir. 2002) .............................................................. 18

*SEC v. Banc of America Securities, LLC.*, Civ. A. No. 09-5170, SEC Rel. No. 21066 (S.D.N.Y. June 9, 2009) ............................................................................................. 31

*SEC v. Bear, Stearns & Co., Inc.*, No. 03 Civ. 2937 (WHP), 2003 WL 22466156 (S.D.N.Y. Oct. 31, 2003) .......................................................................................... 30

*SEC v. Broadcom Corp.*, SEC Rel. No. 2811, 2008 WL 1805663 (C.D. Ca. Apr. 22, 2008) ...... 36

*SEC v. Caserta*, 75 F. Supp. 2d 79 (E.D.N.Y. 1999) ..................................................... 25

*SEC v. Citigroup Global Markets, Inc.*, Civ. A. No. 08-10753, SEC Rel. No. 2824 (S.D.N.Y. Dec. 12, 2008) ........................................................................................... 31

*SEC v. Clifton*, 700 F.2d 744 (D.C. Cir. 1983) ............................................................ 30

*SEC v. Coates*, 137 F. Supp. 2d 413 (S.D.N.Y. 2001) .................................................. 35

*SEC v. Doral Financial Corp*, SEC Lit. Rel. No. 19837, 2006 WL 2682459 (S.D.N.Y. Sept 19, 2006) .................................................................................................................. 36

*SEC v. Espuelas*, 579 F. Supp. 2d 461 (S.D.N.Y. 2008) .............................................. 24

*SEC v. First Bancorp*, SEC Rel. No. 2664, 2007 WL 2254469 (S.D.N.Y. Aug. 7, 2007)........... 36

*SEC v. Monster Worldwide, Inc.*, SEC Rel. No. 2970, 2009 WL 1373128 (S.D.N.Y. May 18, 2009).................................................................................................................. 36

*SEC v. Tenet Healthcare Corp., et al.*, SEC Rel. No. 2591, 2007 WL 981544 (C.D. Cal. Apr. 2, 2007)....................................................................................................................... 36

*SEC v. Wachovia Corp.*, Civ. Act. No. 04-1911, SEC Rel. No. 2004-152 (D.D.C. Nov. 4, 2004) .................................................................................................... 28, 34

*SEC v. Wachovia Securities, LLC*, Civ. A. No. 09-743, SEC Rel. No. 20885 (N.D. Ill. Feb. 17, 2009) ................................................................................................................ 31

*SEC v. Wang*, 944 F.2d 80 (2d Cir. 1991) ..................................................................... 29

*SEC v. WorldCom*, 273 F. Supp. 2d 431 (S.D.N.Y. 2003) ...................................... 29, 32

*Swift & Co. v. United States*, 276 U.S. 311 (1928)........................................................ 29

*United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190 (2d Cir. 1993). ............ 19, 23

*United States v. Armour & Co.*, 402 U.S. 673 (1971) .................................................... 29

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991)............................... 19, 22

*Wilson v. Great Am. Ind., Inc.*, 855 F.2d 987 (2d Cir. 1988) ....................................... 19

## Statutes

Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a) .......................... passim

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ........................... 21, 24

Section 20 of the Securities Exchange Act of 1934, 15 U.S.C. § 78t........................................... 24

Section 21(d)(3) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u(d)(3) ....................... 26

Section 302 of the Sarbanes Oxley Act of 2002, 15 U.S.C. § 7241 ............................................ 11

Section 2(e) of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(e)............................. 37

## Rules and Regulations

Rule 14a-9, 17 C.F.R. § 240.14a-9 ........................................................................................ passim

Rule 10b-5, 17 C.F.R. § 240.10b-5 ....................................................................................... 5, 24

17 C.F.R. § 202.5(e) ................................................................................................................ 28

Item 601(b)(2) of Regulation S-K, 17 C.F.R. § 229.602(b)(2) ...................................................... 21

## Other Authorities

*Consent Decrees in Judicial or Administrative Proceedings*, Securities Act Rel. No. 33-5337
   (Nov. 28, 1972) ....................................................................................................................... 28

*Report of Investigation Pursuant to Section 21(a) of the Exchange Act of 1934 and Commission
   Statement on Potential Exchange Act Section 10(b) and Section 14(a) Liability*, Exchange Act
   Rel. No. 34-51283 (Mar. 1, 2005) ......................................................................................... 21

*Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934 and
   Commission Statement on the Relationship of Cooperation to Agency Enforcement Decisions*,
   SEC Rel. No. 44969 (Oct. 23, 2001) ...................................................................................... 27

*Statement of the Securities and Exchange Commission Concerning Financial Penalties*, SEC
   Rel. No. 2006-4 (Jan. 4, 2006) ................................................................................................ 27

As directed by the Court at the hearing held on August 10, 2009, the Securities and Exchange Commission ("SEC" or "Commission") respectfully submits this memorandum in support of the proposed consent judgment.

## INTRODUCTION

On August 3, 2009, the Commission filed a complaint ("Complaint") alleging that Bank of America Corporation ("Bank of America") violated Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 14a-9 thereunder. The Complaint alleges that Bank of America made materially false and misleading statements in the joint proxy statement that it filed with Merrill Lynch & Co, Inc. ("Merrill") in connection with the $50 billion merger of Bank of America with Merrill that closed on January 1, 2009. Together with the Complaint, the Commission submitted for the Court's consideration a proposed final consent judgment that, if entered, would permanently enjoin Bank of America from violating Section 14(a) of the Exchange Act and Rule 14a-9 and impose a monetary penalty in the amount of $33 million. Bank of America consented to the entry of the proposed judgment without admitting or denying the allegations of the Complaint.

On August 5, 2009, the Court issued an order scheduling a hearing for August 10 to address the proposed settlement. At the conclusion of the August 10 hearing, the Court requested written submissions: (i) detailing the specific facts relating to the proxy violations alleged in the Complaint and related matters; (ii) addressing legal issues identified by the Court with respect to the standard governing the Court's review of the proposed settlement, and any other relevant legal issues identified by the parties; and (iii) addressing whether it is necessary or appropriate for the Court to hold an evidentiary hearing.

## PRELIMINARY STATEMENT

This action concerns Bank of America's failure to disclose to its shareholders an agreement to allow Merrill to pay discretionary bonuses while, at the same time, representing in the proxy statement that no such bonuses would be paid without Bank of America's consent. The size of the agreed bonus pool was large -- up to $5.8 billion -- and the existence of the agreement was material information that reasonable shareholders would have considered important in advance of the vote. After the Commission staff conducted an investigation of the facts surrounding the disclosure failures, the parties negotiated a proposed disposition that includes injunctive relief against future violations and the payment of a $33 million civil penalty. The Commission respectfully submits that the proposed settlement is fair, reasonable, adequate and squarely in the public interest. The charges comport with the evidence as applied against the appropriate legal standard, and the penalty fully takes account of the seriousness of the misconduct and the need for deterrence, while giving due consideration to the protection of innocent shareholders.

As in all enforcement actions involving monetary penalties against public companies, the Commission must carefully balance various factors when determining the appropriate penalty to pursue. These factors include the deterrent effect of monetary sanctions and the potential harm to current shareholders that could result from their imposition. A $33 million penalty, in the Commission's assessment, strikes the right balance between the goals of deterrence and the need to avoid unnecessary harm to innocent shareholders. The penalty amount also is consistent with the most relevant prior precedent, a settled Commission action imposing a $37 million penalty against a large bank for violating the proxy solicitation and periodic corporate reporting rules in connection with its acquisition of another large financial institution.

The proposed resolution of this case is the result of an arms-length negotiation between the federal regulator responsible for enforcing the federal securities laws and the nation's largest bank, represented by sophisticated, experienced counsel. The level of evidentiary detail in the Complaint, the relationship between the amount of the bonuses and the amount of the penalty, and the parties' differing views on liability, do not furnish a basis for overriding the negotiated disposition or the Commission's assessment of the public interest. Under governing law, that determination should be accorded substantial deference in the context of a proposed consent decree.

All Commission enforcement actions implicate the public interest to some degree, and the extensive publicity surrounding certain of the underlying issues here does not elevate the standard of review beyond the level otherwise prescribed for Commission settlements. Nor does the government's investment of capital in Bank of America through the Troubled Asset Relief Program ("TARP") alter the applicable standard. The gravamen of the violation alleged in the Complaint is Bank of America's failure to disclose bonus arrangements to its shareholders, not misappropriation or misuse of government funds. While Bank of America failed to disclose to its shareholders the agreement to allow Merrill to pay bonuses, information on the payment of the bonuses by Merrill was subsequently provided to the Federal Reserve Bank and the Treasury Department in connection with the infusion of TARP funds. Although the extent to which taxpayer money was used indirectly to pay these bonuses plainly is a matter of public importance, it does not, in and of itself, give rise to a federal securities law violation. It was not Merrill's payment of $3.6 billion in bonuses that violated the federal securities laws, but rather Bank of America's misstatements and omissions in the proxy statement. As such, neither the amount of the bonuses paid by Merrill nor the source of those bonus payments is a proper gauge

of the nature or severity of the federal securities law violation for which the penalty at issue is being imposed.

The Complaint is concise because the disclosure violation here is straightforward. In the joint proxy statement, Bank of America represented that Merrill had agreed not to pay year-end performance bonuses or other discretionary incentive compensation to its executives prior to the closing of the merger without Bank of America's consent. In fact, Bank of America already had agreed that Merrill *could* pay a material amount of discretionary year-end and other bonuses to Merrill executives for 2008. Although the merger agreement was included as an exhibit and discussed in detail in the joint proxy statement, Bank of America's agreement allowing Merrill to pay discretionary bonuses was memorialized in a separate "disclosure" schedule that was omitted from the proxy statement and the contents of which were not disclosed prior to the shareholder vote on December 5, 2008. These three documents -- the joint proxy statement, the merger agreement, and the undisclosed "disclosure" schedule -- together form the basis for the Commission's charges here and, since the parties' factual differences arise primarily from their respective interpretations of the relevant language, for any defenses that Bank of America is likely to assert if this case is litigated.

Although the Commission's investigation uncovered a number of additional facts, the investigative record did not support additional corporate charges against Bank of America or charges against individuals. As discussed at the hearing, senior executives at Bank of America and Merrill negotiated the business terms of the merger transaction, including Merrill's right to pay discretionary incentive compensation before closing, but the relevant witnesses all stated that the disclosure documents at issue were prepared by outside counsel for the two companies. Bank of America did not waive the attorney-client privilege, and the Commission therefore did not

4

receive evidence of the communications between corporate officers and counsel concerning

disclosure issues. The uncontroverted evidence, however, established that Bank of America

relied extensively on counsel in connection with the disclosure materials at issue and that outside

counsel was primarily responsible for drafting the materials and developing the form of

presentation in the proxy statement. These factors contributed significantly to the Commission's

view of the appropriate disposition of this matter.

To sustain a fraud charge under Rule 10b-5 or to impose secondary liability on an

individual for the proxy violation, the Commission would have the burden of establishing

scienter or, for aiding and abetting or control person liability, its functional equivalent. It was

the Commission's judgment that the investigative record did not support a finding of scienter. In

particular, counsel's prominent, if not exclusive, role in the matter at issue and the absence of a

waiver of the attorney-client privilege presented significant legal hurdles to sustaining such

charges. Although a defendant must waive the privilege in order to maintain an advice of

counsel defense, there is no need to assert that or any other defense unless the complaint alleges

a *prima facie* case sufficient to survive a motion to dismiss, which typically requires pleading

specific facts showing that the defendant acted with the requisite scienter.

For the foregoing reasons, an evidentiary hearing is unnecessary, as it is unlikely that any

additional facts materially affecting the disposition of the proposed settlement would be elicited.

Absent a waiver of the attorney-client privilege, it will be difficult to further explore individual

responsibility for the disclosure decisions at issue in this case. In any event, an evidentiary

hearing into the merits of the Commission's claim would undercut the principal purpose of

entering into a settlement, *i.e.*, to avoid the costs and risks of litigation in favor of a negotiated

disposition.

The Commission has a solid proxy violation claim -- indeed, one that is potentially susceptible of summary judgment -- but the proffered defenses, while unavailing, are not facially frivolous. There is litigation risk on both sides, and that is why parties choose to settle rather than litigate, and why the terms of a reasonable settlement do not necessarily reflect the triumph of one party's position over the other. Nor is it unusual for the Commission and a defendant to have divergent views about the merits of a case or for the Commission to accept a settlement without requiring an admission of liability. In fact, the latter practice is longstanding Commission policy and is codified in the Code of Federal Regulations.

The Commission respectfully submits that, considering all of the relevant facts and circumstances, the proposed disposition should be approved because it is fair, reasonable and in the public interest.

## STATEMENT OF FACTS

### A. The Commission's Investigation

In January 2009, the Commission's staff began investigating, among other matters arising from the Bank of America-Merrill merger, disclosure issues surrounding the payment of year-end bonuses at Merrill and, in particular, the adequacy of proxy disclosures made to the shareholders who had voted to approve the merger. Among other investigative steps, the Commission's staff issued subpoenas and received a vast amount of documentary evidence from Bank of America and Merrill. The staff reviewed tens of thousands of emails relating to the merger and the decision-making process that led to the payment of the bonuses by Merrill, as well as thousands of pages of other documents, such as Board minutes, corporate presentations, meeting notes, financial analyses, employee benefit plans, and internal forecasts and projections.

In addition to reviewing documents, the staff took the testimony of or interviewed eleven senior executives from Bank of America and Merrill who had been involved in the merger

6

negotiations and the process that led to the bonus payments. From Bank of America, the staff

interviewed or took the testimony of: (i) Kenneth Lewis, Chief Executive Officer; (ii) Steele

Alphin, Chief Administrative Officer; (iii) Neil Cotty, Chief Accounting Officer; (iv) Andrea

Smith, Head of Human Resources; and (v) Mark Behnke, Head of Compensation and Benefits.

From Merrill, the staff interviewed or took the testimony of (i) John Thain, former Chairman and

Chief Executive Officer; (ii) Greg Fleming, former President and Chief Operating Officer; (iii)

Nancy Meloth, former First Vice President of Corporate Planning; (iv) Peter Kraus, former

Executive Vice President for Business Strategy and Investments; (v) Peter Stingi, former Global

Head of Human Resources; and (vi) Michael Ross, former Head of Global Compensation and

Benefits. In addition, the Commission obtained the transcripts of the testimony of certain of

these, as well as other, witnesses taken by other government regulators investigating the Merrill

bonus issues.

Set forth below is a detailed description of the relevant facts that were gathered in the

course of the Commission's investigation.[1]

## B.    The Merger Negotiations

On September 12, 2008, in the wake of Lehman Brothers' rumored bankruptcy and the

shockwaves those rumors sent throughout the financial markets, senior management at Merrill

began exploring the possibility of being acquired by a commercial bank. That week, Merrill's

share price had decreased 36 percent. Bank of America was among the candidates that Merrill's

management considered as a potential acquirer. Before approaching Bank of America, Merrill's

---

[1]    While detailed, this description is not an exhaustive report of all of the information that
the Commission has learned during the investigation. For the Court's convenience, attached
hereto are the key documents supporting the charges alleged in the Commission's Complaint.

then-President and Chief Operating Officer, Greg Fleming, placed an initial call to Edward

Herlihy, a partner and co-Chairman of the Executive Committee at Wachtell, Lipton, Rosen &

Katz ("Wachtell") who had a close relationship with senior management at Bank of America.

The following day, at Herlihy's suggestion, Merrill's then-Chairman and Chief Executive

Officer, John Thain, contacted Bank of America's then-Chairman and Chief Executive Officer,

Kenneth Lewis, to discuss a proposed business combination. After Lewis expressed an interest

in acquiring Merrill, teams from both firms began conducting due diligence and negotiating the

terms of a possible merger.

The principal terms of the merger transaction were negotiated over Saturday, September

13, and Sunday, September 14, by teams headed by Fleming for Merrill and by Gregory Curl,

Vice Chairman for Corporate Planning and Strategy, for Bank of America. According to

Fleming and Curl, the negotiations focused on several key topics: 1) the price that Bank of

America would pay for Merrill stock, which was ultimately agreed on $29 per share;[2] 2) the

payment of retention bonuses to Merrill financial advisors; 3) the scope of the material adverse

change clause in the merger agreement; 4) the number of Merrill directors who would join the

board of directors of the combined entity; and 5) Merrill's ability to pay year-end bonuses to its

executives and employees pursuant to its Variable Incentive Compensation Program ("VICP"),

the firm's annual bonus program.

On the issue of VICP bonuses, a term sheet prepared on September 14, 2008 reflected

that Bank of America had agreed in principle that Merrill would be authorized to pay a bonus

---

[2]     The merger was a stock-swap transaction in which Bank of America paid 0.8595 of its
shares to Merrill shareholders for each of their shares. The $29 share price represented a 70
percent premium to the trading price of Merrill's stock on the last trading day before the merger
was announced and reflected a total deal value of around $50 billion.

pool that would, at most, be "flat to last year" -- *i.e.*, would not exceed the amount of bonuses Merrill paid in 2007, taking into account fluctuations in headcount -- with a maximum recorded expense of $4.5 billion.[3] The two firms also agreed that 60 percent of Merrill's year-end bonuses would be paid in cash and 40 percent in stock, the same cash/stock split Merrill used in 2007, and that bonus allocations would be made in consultation with Bank of America. Throughout the course of the weekend, Curl and Fleming reported to Lewis and Thain, respectively, on the status of this and other aspects of the negotiations.

The bonus pool amount that was "flat" to 2007, taking into consideration headcount changes at Merrill, amounted to $5.8 billion. However, meeting minutes of Merrill's Management Development and Compensation Committee ("Compensation Committee") show that Merrill previously had cut back its anticipated bonus pool by 16.5 percent due to Merrill's poor performance in the first half of 2008. Prior to the negotiations, Merrill had projected a total VICP pool of only $5.1 billion with a recorded expense of, at most, $3.5 billion. Thus, the agreement with Bank of America permitted Merrill to pay a bonus pool that was greater than the amount Merrill had previously projected by up to $700 million and that carried a recorded expense that was larger by $1 billion.

On the evening of September 14, 2008, the terms of the proposed merger transaction were presented to the Boards of Directors of Bank of America and Merrill.[4] The respective boards unanimously approved the merger, which was publicly announced the following day.

---

[3]     The annual financial statement expense for the bonuses reflects the cash portion of the total bonus pool and any stock grants awarded to employees in the same year in which the cash bonuses are paid.

[4]     Each Board of Directors met separately to consider the merger. For Bank of America, the directors present at the Board meeting were William Barnet, Frank Bramble, John Collins,

(continued on the next page)

In the days following the merger announcement, counsel for Bank of America and Merrill prepared the transactional and disclosure documents relating to the merger. Although business executives at both companies had negotiated the business terms of the transaction, the negotiation and preparation of all of the relevant legal documents was handled by the law firms that had advised Bank of America and Merrill in connection with the merger. Bank of America was represented by Wachtell. Herlihy led a team of lawyers including Nicholas Demmo, Jeannemarie O'Brien, and Matthew Guest. Merrill was represented by Shearman & Sterling LLP ("Shearman"). Shearman's lawyers included John Madden, John Marzulli, Scott Petepiece and Linda Rappaport.

The agreement that the negotiating teams led by Fleming and Curl had reached during the weekend negotiations concerning the payment of VICP bonuses by Merrill was memorialized by Wachtell and Shearman in a so-called "disclosure" schedule to the merger agreement. The relevant provision provided as follows:

> 5.2(b)(iii), 5.2(c)(i), and 5.2(c)(ii) – Variable Incentive Compensation Program ("VICP") in respect of 2008 (including without limitation any guaranteed VICP awards for 2008 or any other pro rata or other 2008 VICP awards payable, paid or provided to terminating or former employees) may be awarded at levels that (i) do not exceed $5.8 billion in aggregate value (inclusive of cash bonuses and the grant date value of long-term incentive awards) … and (ii) do not result in 2008 VICP-related expense exceeding $4.5 billion … Sixty percent of the overall 2008 VICP shall be awarded as a current cash bonus and forty percent of the overall 2008 VICP shall be awarded as a long-term incentive award either in the form of equity or long-term cash awards. The form (i.e., equity v. long-term cash) and terms and conditions of the long-term incentive awards shall be determined by [Merrill]

Gary Countryman, Tommy Franks, Charles Gifford, Ken Lewis, Walter Massey, Thomas May, Thomas Ryan, O. Temple Sloan, Robert Tillman, Monica Lozano, Patricia Mitchell, Meredith Spangler, and Jackie Ward. For Merrill, the directors present at the Board meeting were John Thain, Carol Christ, Virgis Colbert, Armando Codina, John Finnegan, Judith Mayhew Jonas, Aulana Peters, Joseph Prueher, Ann Reese, and Charles Rossotti.

> in consultation with [Bank of America] ... The allocation of the 2008 VICP
> among eligible employees shall be determined by [Merrill] in consultation
> with [Bank of America].

Disclosure Schedule to Agreement and Plan of Merger, dated as of Sept. 15, 2008 (Exhibit A), at

14. Lewis, Thain and Fleming were all asked by Commission staff why this information was set

forth in a disclosure schedule as opposed to the text of the merger agreement itself, but none of

them could provide an answer. According to Lewis, Thain, Fleming, Curl and Stingi that issue

was determined by lawyers at Wachtell, Shearman and one or more of several lawyers who

worked in Bank of America's in-house legal department, which included, among others,

Timothy Mayopoulos, Bank of America's then-General Counsel, and Teresa Brenner.

## C.    The Proxy Statement

On November 3, 2008, Bank of America and Merrill filed a joint definitive proxy

statement, spanning a total of 125 pages and an additional 100 pages in exhibits, soliciting their

respective shareholders' votes for the approval of the merger.[5]   The shareholder meetings for

both firms were scheduled for December 5, 2008.

The proxy statement included, as an attachment, the full text of the merger agreement,

but it omitted the disclosure schedule setting forth the firms' agreement about Merrill's payment

of VICP bonuses. Neither the disclosure schedule nor anything about its contents was publicly

---

[5]      At the August 10 hearing, Commission staff mistakenly recalled that Lewis and Thain
had signed the proxy statement. In fact, what Lewis and Thain signed was a brief cover letter to
the stockholders that accompanied the proxy statement, as there is no signature requirement in
the proxy rules. Unlike Section 302 of the Sarbanes Oxley Act of 2002, which applies only to
annual and quarterly periodic reports, the proxy rules do not require any individual to sign and
thereby certify the truthfulness of the information contained in the proxy materials. Lewis, Joe
Price, Bank of America's Chief Financial Officer, Neil Cotty, Bank of America's Chief
Accounting Officer, and the members of Bank of America's Board all signed the S-4
Registration Statements that were filed in connection with the merger and which included drafts
of the Proxy Statement.

disclosed at any time prior to the December 5 shareholder meetings. According to Lewis, Thain,

Curl and Fleming, the preparation of the joint proxy statement, including the decision not to

attach the disclosure schedule setting forth the agreement on VICP bonuses or otherwise disclose

its contents in the proxy statement, was made by the lawyers at Wachtell, Shearman, Bank of

America and Merrill.

Not only did the proxy materials fail to disclose that Bank of America had authorized

Merrill to pay up to $5.8 billion in discretionary and other year-end bonuses, a provision from

the merger agreement, which was disclosed, indicated the contrary, *i.e.*, that Merrill had no

authority to, and would not, pay discretionary bonuses to its employees without Bank of

America's prior consent. That provision stated, in pertinent part:

> 5.2 <u>Company Forbearances.</u> During the period from the date of this Agreement to the
> Effective Time [the closing of the merger], except as set forth in this Section 5.2 of
> the Company Disclosure Schedule or except as expressly contemplated or permitted
> by this Agreement, [Merrill Lynch] shall not, and shall not permit any of its
> Subsidiaries to, without the prior written consent of [Bank of America]:
>
> . . . .
>
>> (c) except as required under applicable law or the terms of any [Merrill
>> Lynch] Benefit Plan existing as of the date hereof, (i) increase in any
>> manner the compensation or benefits of any of the current or former
>> directors, officers or employees of [Merrill Lynch] or its Subsidiaries
>> (collectively, "<u>Employees</u>"), (ii) pay any amounts to Employees not
>> required by any current plan or agreement (other than base salary in the
>> ordinary course of business), . . .

Bank of America Corp., Joint Definitive Proxy Statement (Schedule 14A) ("Proxy Statement"),

filed Nov. 3, 2008 (Exhibit B), Appendix A, at A-31 – A-32. The sub-paragraph quoted above

regarding incentive compensation described merely one of approximately eighteen enumerated

actions that, as recited in this forbearance provision, Merrill purportedly agreed to refrain from

taking before the closing of the merger. Since the reference to an exception applies to the entire

provision, there is no way to tell to what extent, if any, the unspecified exception applied to any particular action that Merrill was prohibited from taking.

The text of the proxy statement, in a section describing the principal terms of the merger agreement, paraphrased the Forbearance Provision and listed the eighteen "extraordinary" actions Merrill had agreed not to take before the closing of the merger, including the payment of discretionary compensation. The relevant passage in the proxy statement qualified the discussion of the forbearance provision only by referring to "certain exceptions," which were left unspecified, and by stating that Merrill was prohibited from taking the "extraordinary" actions without "Bank of America's prior written consent," as follows:

> Merrill Lynch further agreed that, with certain exceptions or except with Bank of America's prior written consent (which consent will not be unreasonably withheld or delayed with respect to certain of the actions described below), Merrill Lynch will not, and will not permit any of its subsidiaries to, among other things, undertake the following extraordinary actions ....except as required under applicable law or the terms of any Merrill Lynch benefit plan, (i) increase the compensation or benefits of any current or former directors, officers or employees; (ii) pay any current or former directors, officers or employees any amounts not required by existing plans or agreements...

Proxy Statement at 83-84.[6]

On December 5, 2008, the shareholders of Bank of America and Merrill approved the merger.

**D.  The Accelerated Bonus Process**

Shortly after announcing the merger, Merrill executives Peter Kraus, Stingi and Michael

---

[6]      While Bank of America did not disclose its agreement authorizing Merrill to pay VICP bonuses to its bankers, traders, and executives, Bank of America publicly disclosed, in October 2008, a separate retention bonus program for Merrill financial advisors (*i.e.*, Merrill's so-called "thundering herd" of retail brokers), whom Lewis described as Merrill's "crown jewel." According to Bank of America's management, these awards were necessary to retain Merrill's high-producing brokers.

Ross began putting together an accelerated VICP bonus schedule for 2008. In prior years, Merrill had decided on the VICP bonus pool in January following the year for which bonuses were paid to allow the firm to consider the full-year's financial performance. Under the accelerated schedule the executives prepared, Merrill's Compensation Committee was slated to approve the bonus pool in early December. According to Kraus, Stingi and Ross, the acceleration of the VICP process was intended to allow the firm to retain control over the decision-making process, ensure the retention of Merrill employees, and complete the process in time for the merger so that it would not distract management's attention from the integration with Bank of America.

On November 11, 2008, Thain, Stingi, Ross and others held a conference call with the Compensation Committee. During the call, Thain recommended that the Committee adopt the accelerated schedule, which contemplated approving the bonus pool on December 8, informing employees about their bonuses on December 22, and paying the cash awards on December 31. Stock awards were to be made in early 2009, after the anticipated closing of the merger. Merrill's Compensation Committee approved the accelerated schedule, and on the following day, Thain informed Bank of America's Steele Alphin of the new schedule.[7]

---

[7]    During the merger negotiations, no specific agreement was reached with respect to bonuses for Merrill's top five executives -- Thain, Fleming, Nelson Chai (the Chief Financial Officer), Robert McCann (Vice Chairman and the head of Merrill's brokerage division), and Rosemary Berkery (the General Counsel). Merrill's top five executives did not receive year-end bonuses in 2007 because of the firm's poor performance ($7.8 billion in net losses), as was disclosed in Merrill's annual proxy for that year. By September 2008, Merrill's performance in the first nine months of 2008 declined even further, as the firm had already sustained approximately $12 billion in net losses. Nevertheless, Merrill's management proceeded with plans to pay more than $130 million in bonuses to its top five executives. Bank of America was made aware of Merrill's plans and its senior executives discussed the amount of these bonuses with Merrill's top management throughout the fall of 2008. In the end, partly as a result of public outcry about Wall street bonuses, the proposal to pay substantial bonuses to Merrill's top five executives was withdrawn and none of them received a bonus for 2008.

14

**E.    Merrill's Compensation Accrual and Press Speculation About Bonuses**

The joint proxy statement incorporated by reference Merrill's quarterly reports for the first, second, and third quarters of 2008. Merrill's report for the third quarter of 2008 disclosed that Merrill had accrued $11.2 billion for "compensation and benefits" in the first nine months of 2008 compared with $11.6 billion for the same period in 2007.

The quarterly reports, however, provided no detail on the components of the aggregate "compensation and benefits" accrual and did not otherwise explain what was set aside for year-end bonuses as opposed to salaries, benefits, retirement payments, or other compensation-related expenses. The amount that Merrill actually planned to pay in year-end bonuses could not be discerned from the aggregate "compensation and benefits" accrual that Merrill disclosed in its quarterly filings. Indeed, Merrill's most senior human resources executive, Peter Stingi, whose responsibilities included monitoring the annual bonus plans of Merrill's competitors, readily acknowledged that a compensation accrual is an inadequate indicator of a firm's bonus plans. In his testimony, Stingi stated, "[w]e would not be able to see what our competitors quarterly accruals were because they like us would report their compensation and benefits expense [as an aggregate] ... [Y]ou really couldn't make a very exact guess about what the impact on the annual bonus funding was because there are so many other line items that go into the aggregate expense." According to Stingi, instead of examining competitors' compensation accruals, Merrill's management retained consultants who, for a fee, confidentially surveyed major financial services firms and then provided Merrill with a report on bonus trends at competing firms.

Several media reports during this period speculated about Merrill's bonus plans for 2008. Some reports surmised that Merrill planned to pay larger bonuses than it had paid in 2007 -- as much as $6.7 billion. Other reports speculated that Merrill might reduce its bonus pool for 2008

by as much as 50 percent. A few of the reports were based on anonymous sources. However, we are unaware of any media report published in the fall of 2008 which revealed that Bank of America had already authorized Merrill to pay up to $5.8 billion in year-end bonuses. The published reports were based either on speculation or on non-public information that was not available to shareholders and was, in any event, not disclosed in the proxy statement.

F.     **Approval and Payment of The Bonuses**

Throughout the fall of 2008, the size of Merrill's proposed bonus pool was gradually reduced due to various factors. On December 8, 2008, Merrill's Compensation Committee, headed by John Finnegan, approved a final VICP pool of $3.6 billion.[8] Merrill's employees were notified about their 2008 VICP bonus on December 19, 2008 and received the cash payment on December 31, 2008, a day before the merger with Bank of America closed. VICP stock awards were made to Merrill employees in early 2009.

On January 16, 2009, Bank of America announced that Merrill had sustained net losses of more than $15 billion in the fourth quarter of 2008, and that the Treasury Department had agreed to provide an additional $20 billion capital infusion to Bank of America under TARP.[9]

G.     **TARP Investments**

The Department of the Treasury has invested $45 billion in Bank of America and Merrill under TARP, a program in which the U.S. government purchases the assets or equity of financial institutions in order to increase liquidity in the financial markets or, in some cases, to strengthen

---

[8]     Nearly $700 million of the total VICP pool was for bonuses that had been contractually guaranteed earlier in 2008.

[9]     In addition to the disclosure issues arising from Bank of America's agreement authorizing Merrill to pay VICP bonuses, the Commission's investigation in this matter includes other issues arising from the merger. That investigation is ongoing.

the balance sheets of those institutions. Under an agreement with the Department of Treasury that was reached in October 2008, the federal government invested $15 billion in Bank of America and $10 billion in Merrill pursuant to the Capital Purchase Program ("CPP").[10] Under the CPP, the Treasury Department may invest up to $25 billion per firm in viable, healthy banks in order to stabilize them and provide lending capital. The agreement to invest in Bank of America and Merrill with CPP funds was reached during a meeting in Washington, D.C. between senior officials of the Treasury Department and the Federal Reserve Bank and the heads of the nation's nine largest financial institutions, including Lewis and Thain. According to both Thain and Lewis, they were instructed by the federal officials to accept the CPP funds. The CPP investment was made in the form of preferred shares, with an annual dividend of six percent, and was provided subject to no restrictions on the payment of incentive compensation.[11]

The Department of Treasury invested an additional $20 billion in Bank of America in January 2009 pursuant to the Targeted Investment Program ("TIP"), which is designed to provide funds to institutions critical to the functioning of the financial system. The TIP investment was made following discussions Lewis and Joe Price, Bank of America's Chief Financial Officer, held in mid-December 2008 with senior officials from the Federal Reserve and the Department of Treasury concerning Merrill's losses in the fourth quarter of 2008. According to Bank of America, during those discussions Bank of America provided the Federal Reserve and Treasury officials with a Merrill financial document that included the expected VICP

---

[10]    Treasury invested $15 billion in CPP funds in Bank of America on October 28, 2008. Pursuant to the terms of Treasury's agreement with Merrill, the Merrill investment was delayed until after the merger was completed and was ultimately made on January 9, 2009.

[11]    Certain other restrictions were imposed, including a prohibition on the payment of golden parachutes, and there was a "claw-back" feature for executive compensation based on materially inaccurate financial statements or criteria.

expense of $3.373 billion for 2008 as a separate line item. The TIP investments were made in the form of preferred shares, with an annual dividend of eight percent, and carried certain restrictions, including limits on the payment of executive compensation and the funding of certain corporate expenses, such as lobbying. Because Merrill had already paid the VICP bonuses by the time Bank of America received the TIP funds in January 2009, these restrictions did not apply to the Merrill bonuses.

## BANK OF AMERICA'S LIABILITY FOR
## VIOLATING THE PROXY SOLICITATION RULES

The facts set forth above and alleged in the Complaint demonstrate that Bank of America violated the Exchange Act's proxy solicitation rules. Section 14(a) of the Exchange Act makes it unlawful to solicit proxies "in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78n(a). Rule 14a-9 prohibits proxy solicitation of shareholders' votes "by means of any proxy statement … containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a). Omission of information from a proxy statement is actionable if "either the SEC regulations specifically require disclosure of the omitted information in a proxy statement, or the omission makes other statements in the proxy statement materially false or misleading." *Resnik v. Swartz*, 303 F.3d 147, 151 (2d Cir. 2002). To establish a material omission under Rule 14a-9, the Commission "must show that there was a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1198 (2d Cir.

1993). In the proxy context, a fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1090 (1991).

There is no scienter requirement for a violation of Section 14(a) of the Exchange Act and Rule 14a-9. A misleading proxy statement violates these provisions even if the company filing the statement "believed in perfect good faith that there was nothing misleading in the proxy materials." *Beck v. Dobrowski,* 559 F.3d 680, 682 (7th Cir. 2009) (citing *Gerstle v. Gamble-Skogmo, Inc.,* 478 F.2d 1281, 1300-01 (2d Cir. 1973)). Liability may be imposed based on negligent conduct. *See Wilson v. Great Am. Ind., Inc.,* 855 F.2d 987, 995 (2d Cir. 1988) (misstatements need not have "resulted from knowing conduct" and "[l]iability can be imposed for negligently drafting a proxy statement"). As the Seventh Circuit explained in a recent case, negligence in this context simply describes the issuer's failure to comply with the law: "Section 14(a) requires proof only that the proxy solicitation was misleading, implying at worst negligence by the issuer. And negligence is not a state of mind; it is a failure, whether conscious or even unavoidable . . . to come up to the specified standard of care." *Beck,* 559 F.3d at 682.

Bank of America's failure to disclose the fact that it had agreed to allow Merrill to pay up to $5.8 billion in discretionary bonuses before the merger closed violated Section 14(a) of the Exchange Act and Rule 14a-9 because this omission made statements in Bank of America's proxy materials materially false and misleading. As discussed above, the merger agreement, which was attached to the proxy statement, contained a provision stating that Merrill, "except as set forth [in the omitted disclosure schedule,]" will not "pay any amounts to Employees not required by any current plan or agreement (other than base salary in the ordinary course of business)." The proxy statement also included a description of this provision paraphrasing its

19

language. The inclusion of this provision and a description of it in the proxy materials

constituted a statement to investors and triggered Bank of America's duty under Rule 14a-9 to

disclose any material information that was necessary to make that statement not misleading. *See*

*Ravens v. Republic New York Corp.*, No. 99-cv-4981, 2002 WL 1969651, at \*7-10 (E.D. Pa.

Apr. 24, 2002) ("Having made affirmative representations in the Merger Agreement [attached to

the proxy statement] that were misleading, Republic Corp. was under a duty to disclose

information necessary to make its statements not misleading").

      Bank of America's statement was materially false and misleading because it indicated to

shareholders that Merrill would only make "required" payments to its employees, such as salary

and benefits, but would not pay discretionary year-end bonuses. In fact, Bank of America

expressly had agreed to allow Merrill to pay up to $5.8 billion in discretionary year-end bonuses.

A shareholder could not have known from reading the proxy statement that Bank of America had

already authorized Merrill to do precisely that which the proxy statement indicated Merrill could

not do, *i.e.*, pay discretionary year-end bonuses. The statements in the merger agreement

regarding the non-payment of bonuses were thus false and misleading without the information

set forth in the omitted disclosure schedule.

      The fact that the statement in the proxy materials was qualified by a generic reference to

an omitted disclosure schedule does not insulate Bank of America from liability. *See Glazer*

*Cap. Mgmt., LP v. Magistri*, 547 F.3d 736, 741 (9th Cir. 2008) ("[T]hat the merger agreement …

included reference to a non-public disclosure schedule would not, as a matter of law, prevent a

reasonable investor from relying on its terms"). As a matter of logic, an otherwise false or

misleading statement cannot be made truthful or not misleading by reference to a document that

is not in fact disclosed. The proxy rules would be ineffectual if an issuer could avoid disclosing

adverse material facts by purporting to qualify, and thus render meaningless, unequivocal statements in proxy documents with generic references to undisclosed documents that contradict those statements. *See Report of Investigation Pursuant to Section 21(a) of the Exchange Act of 1934 and Commission Statement on Potential Exchange Act Section 10(b) and Section 14(a) Liability*, Exchange Act Rel. No. 34-51283 (Mar. 1, 2005) ("where a document containing [a contractual] representation is disclosed, if additional material facts exist, such as those contradicting or qualifying . . . the original representation, . . . omission of which makes that disclosure misleading, a company would also be required to disclose those facts").

In addition, the proxy materials conveyed the false impression that Bank of America had not yet given its consent to the payment of discretionary year-end bonuses at Merrill. The proxy materials stated that any payments "not required by plan or agreement" were contingent on the "written consent" of Bank of America which, according to the proxy statement, "will not be unreasonably withheld or delayed." This language could only have indicated to investors that no consent had yet been given. In fact, by the time of the proxy statement, Bank of America had already given its consent to Merrill to pay up to $5.8 billion in discretionary and other bonuses.

Moreover, Item 601(b)(2) of Regulation S-K provides that schedules to a "plan of acquisition" must be filed with the Commission if "such schedules contain information which is material to an investment decision and which is not otherwise disclosed in the agreement or the disclosure document." Under the proxy rules, this requirement applied to the proxy statement that Bank of America filed to solicit the votes of shareholders for approval of its acquisition of Merrill, because the merger involved an exchange of securities. Thus, Bank of America's omission of the disclosure schedule from the proxy statement violated Section 14(a) for this reason as well.

Given the amount of the bonuses authorized by Bank of America together with the financial crisis at Merrill and in the overall market, the omitted information clearly was material. The $5.8 billion in bonuses that Bank of America authorized Merrill to pay constituted nearly 12 percent of the $50 billion that Bank of America had agreed to pay to acquire Merrill. It also amounted to nearly 30 percent of Merrill's total stockholder equity. Such an amount was sufficiently large to be material to shareholders deciding whether to vote in favor of the merger. *See In re Metex Corp. Sec. Litig.*, No. 89-cv-0571, 1993 WL 330596, at *11 (E.D.N.Y. 1993) (finding that failure to disclose $765,000 bonus in proxy statement could be material where bonus was 9 percent of company's working capital).

Although tidbits of information relevant to the issue of year-end compensation at Merrill were available to the public at the time that the proxy materials were disseminated, none of that information disclosed Merrill's plan to pay billions of dollars in discretionary bonuses and, more importantly, Bank of America's consent to that plan in connection with the proposed merger. Merrill's quarterly filings disclosing accruals for "compensation and benefits" did not provide any breakdown for the components of that aggregate accrual. An investor could not have known what portion was being accrued for year-end bonuses as opposed to salaries, benefits, or other expenses. In any event, investors are entitled to full disclosure of material facts within the four corners of the proxy statement and are not required to puzzle through reams of other data from which they may or may not be able to infer those material facts. As the Supreme Court has recognized, the purpose of a proxy statement "should be to inform, not to challenge the reader's critical wits." *Virginia Bankshares,* 501 U.S. at 1098. "[N]ot every mixture with the true will neutralize the deceptive. If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow." *Id.*

While Merrill's plan to pay bonuses was discussed to some extent in the media before the

December 5, 2008 shareholders' meetings, these reports do not negate Bank of America's

liability for its misleading proxy statement. As an initial matter, the media reports consisted of

speculation and some of the reports were based on anonymous sources. Moreover, none of the

reports stated that Bank of America had contractually consented to the payment of the Merrill

bonuses before the merger closed. In any event, investors were not required to ignore Bank of

America's *express representations* in its proxy materials and rely instead on sporadic media

speculation that was inconsistent with those representations. *See United Paperworkers*, 985 F.2d

at 1200 ("sporadic news reports" do not give shareholders "sufficient notice that proxy

solicitation statements directly sent to them by the company may be misleading" or "place in

proper context the company's representations in its proxy materials"). We have found no

authority that suggests, let alone holds, that a company is insulated by speculative media reports

for its materially misleading statements to the contrary in a proxy statement.

## OBSTACLES TO ADDITIONAL
## CHARGES AND INDIVIDUAL LIABILITY

The Commission believes that the charges and remedies incorporated in the proposed

consent judgment represent a serious and significant disposition that is consistent with governing

authority and the Commission's policies with respect to the imposition of corporate penalties.

As described above, the Commission investigated the relevant roles played by various senior

officials and other individuals in the events surrounding Merrill's payment of year-end bonuses

and the related proxy disclosures. The Commission duly considered whether to allege additional

charges against Bank of America and charges against individuals but determined that such

charges were not sufficiently supported by the investigative record. In particular, the

uncontroverted evidence established that Bank of America relied extensively on counsel in

connection with the disclosure materials at issue and that counsel was primarily responsible for drafting the materials and developing the form of presentation in the proxy statement. The applicable scienter requirements and counsel's role in preparing and approving the relevant materials present substantial obstacles to pursuing a securities fraud charge under Section 10(b) of the Exchange Act and Rule 10b-5 or charging individuals for aiding and abetting, or with control person liability for, Bank of America's proxy violation. Section 14(a) applies to the party that is soliciting the proxy or in whose name the proxy is solicited, in this case Bank of America and Merrill. None of the relevant individuals solicited proxies in their own name, and none of them signed the proxy statement.

Under Rule 10b-5, the Commission would have the burden of proving scienter, *i.e.*, "an intent to deceive, manipulate, or defraud." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001). For aiding and abetting claims against individuals, the Commission would also need to show that the individuals acted knowingly or, at the least, recklessly. *See* 15 U.S.C. § 78t(e); *SEC v. Espuelas*, 579 F. Supp. 2d 461, 470-471 (S.D.N.Y. 2008). With respect to control person liability, a defendant cannot be held liable if he or she "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). In the Second Circuit, the Commission would also have to show that the defendant "was, in some meaningful sense, a culpable participant in the controlled person's" violation. *ATSI Comms., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

The evidence obtained by the Commission in its investigation established that the determination of whether to include the "disclosure" schedule in the proxy statement or otherwise to disclose that Bank of America had authorized Merrill to pay up to $5.8 billion in year-end bonuses was either made by, or at least based on the advice of, in-house and outside

counsel for Bank of America and Merrill. All the relevant witnesses stated that the written merger agreement, the "disclosure" schedule, and the proxy statement were negotiated and prepared by counsel for the two companies. The witnesses also stated that they relied entirely on counsel to decide what was or was not disclosed in the proxy statement. The Commission found no evidence to the contrary. Nor did the Commission find any evidence of internal deliberations or discussions, aside from consultations with in-house counsel, concerning the disclosures at issue in this case. Bank of America has not waived the attorney-client privilege.[12] As a result, the investigative record does not include any specific rationale as to why the disclosure schedule or its contents were not disclosed in the proxy statement. Counsel for Bank of America has asserted that the method and format of disclosure was consistent with standard practice and undertaken in good faith.

The extensive involvement of counsel in the disclosure materials at issue would present significant hurdles in connection with establishing scienter as would be required in a contested Section 10(b) or a secondary liability action. *See, e.g., Howard v. SEC*, 376 F.3d 1136, 1147-1148 (D.C. Cir. 2004) (law firm's drafting of operative securities offering and approval of transactions at issue constituted "powerful evidence" that defendant's actions did not amount to recklessness); *SEC v. Caserta*, 75 F. Supp. 2d 79, 94 (E.D.N.Y. 1999) (good faith reliance on counsel is well recognized as relevant to scienter determination).[13]

While the attorney-client privilege must be waived in order to assert an advice of counsel defense at trial, the defense need not be asserted, and there is no implied waiver, until a scienter-

---

[12] To date, Bank of America has asserted the privilege with respect to numerous documents as well as during testimony, and has provided the Commission with a 550-page privilege log.

[13] By contrast, under Section 14(a) of the Exchange Act and Rule 14a-9, a defendant's good faith reliance on counsel is immaterial. *See Beck*, 559 F.3d at 682.

based action is commenced. The Commission must first allege, in good faith, a *prima facie* case sufficient to survive a motion to dismiss, which ordinarily requires pleading specific facts showing that the defendant acted with the requisite scienter. As described above, such facts are not established in the investigative record of this case. The assertion by Bank of America and individuals during the Commission's investigation that they relied on counsel did not constitute or require a waiver of the attorney-client privilege. *See John Doe Co. v. United States*, 350 F.3d 299, 306 (2d Cir. 2003) (reliance on counsel during investigative phase did not require waiver of privilege because it lacks "the type of unfairness to the adversary that results in litigation circumstances when a party uses an assertion of fact to influence the decision maker while denying its adversary access to privileged material potentially capable of rebutting the assertion"). The Commission cannot compel Bank of America to waive the attorney-client privilege in connection with its investigation.

## THE PROPOSED SETTLEMENT TERMS

At the conclusion of the Commission's investigation into the bonus disclosure issue, the parties negotiated a disposition whereby Bank of America would consent, without admitting or denying the allegations of the Complaint, to the entry of a final judgment that: (i) permanently enjoins it from violating Section 14(a) of the Exchange Act and Rule 14a-9, and (ii) imposes a civil penalty in the amount of $33 million. The Commission believes that this proposed disposition, including the penalty component, is reasonable and appropriate under governing authority and the applicable Commission policies and precedent.

Under Section 21(d)(3) of the Exchange Act, the Commission may seek a monetary penalty in federal district court from a defendant that has violated the Exchange Act. As a matter of policy, however, the Commission does not automatically seek a monetary penalty in every case involving violations committed by public companies and other corporate issuers. Instead,

the Commission examines various factors in addition to those set forth in Section 21(d)(3) and attempts to strike an appropriate balance among the relevant factors and, to the extent feasible and appropriate, maintain consistency with penalty amounts previously imposed in similar situations. In *Statement of the Securities and Exchange Commission Concerning Financial Penalties* ("Penalty Statement"), SEC Rel. No. 2006-4 (Jan. 4, 2006), the Commission identified nine specific factors relevant to an assessment of whether to impose penalties against a corporation and, if so, in what amount. These are (i) corporate benefits from the violation; (ii) impact on injured investors and current shareholders; (iii) need for deterrence; (iv) pervasiveness of the conduct; (v) degree of scienter; (vi) extent of the harm to investors; (vii) difficulty of detecting the violations; (viii) voluntary remedial measures; and (ix) extent of the cooperation, if any, with the Commission and other law enforcement agencies. *See also Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934 and Commission Statement on the Relationship of Cooperation to Agency Enforcement Decisions*, SEC Rel. No. 44969 (Oct. 23, 2001).

Not every factor will apply in each case, and in certain cases, some of the factors will carry more weight than others. There is no mathematical formula for weighing competing factors to calculate a single "correct" penalty amount. Assessing the extent of the sanction that will best serve the interests of investors and the public is a matter of judgment and discretion. For the reasons discussed below, the Commission believes that the proposed penalty is an appropriate sanction for Bank of America's proxy disclosure violation, because it strikes an appropriate balance among many relevant factors. In addition, the proposed penalty is consistent with the most comparable prior precedent involving a proxy violation case against a large financial institution. *See SEC v. Wachovia Corp.*, SEC Rel. No. 2004-152 (D.D.C. Nov. 4, 2004)

(imposing $37 million penalty in case in a case involving inadequate disclosures in connection

with banking merger).

The Commission did not require Bank of America to admit liability in conjunction with

the settlement because the Commission has a longstanding policy of settling cases on the basis of

neither requiring an admission nor permitting a denial by the defendant. Since 1972,

Commission settlement documents have routinely included language to the effect that the

defendant neither admits nor denies the allegations of the Commission's complaint. *See Consent*

*Decrees in Judicial or Administrative Proceedings*, Securities Act Rel. No. 33-5337 (Nov. 28,

1972). This policy is codified in the Commission's Rules of Practice, published in the Code of

Federal Regulations. *See* 17 C.F.R. § 202.5(e).[14] We are unaware of any federal agency that

requires admissions in conjunction with settlements of civil enforcement actions.

### ARGUMENT

### I.

### THE REASONABLENESS STANDARD
### GOVERNING JUDICIAL REVIEW OF PROPOSED
### SEC SETTLEMENTS APPLIES IN THIS CASE

The Supreme Court has long endorsed the propriety of the use and entry of consent

judgments. *See, e.g., United States v. Armour & Co.*, 402 U.S. 673, 681 (1971); *Swift & Co. v.*

---

[14]     The full text states as follows: "The Commission has adopted the policy that in any civil
lawsuit brought by it or in any administrative proceeding of an accusatory nature pending before
it, it is important to avoid creating, or permitting to be created, an impression that a decree is
being entered or a sanction imposed, when the conduct alleged did not, in fact, occur.
Accordingly, it hereby announces its policy not to permit a defendant or respondent to consent to
a judgment or order that imposes a sanction while denying the allegations in the complaint or
order for proceedings. In this regard, the Commission believes that a refusal to admit the
allegations is equivalent to a denial, unless the defendant or respondent states that he neither
admits nor denies the allegations." We are unaware of any federal agency that requires
admissions in conjunction with settlements of civil enforcement actions.

*United States*, 276 U.S. 311, 325-26 (1928). The use of consent decrees "encourages informal resolution of disputes, thereby lessening the risks and costs of litigation." *SEC v. Randolph*, 736 F.2d 525, 528 (9th Cir. 1984). The standard for the judicial review and approval of proposed consent judgments in Commission enforcement actions is well-established. In contrast to purely private actions, where only private interests ordinarily are implicated, actions brought by the Commission seek to enforce the federal securities laws and should therefore "serve the public interest." *Id.* at 529. To ensure that the public interest is served, the Court must be satisfied, when reviewing a proposed SEC settlement, that the settlement is "fair, reasonable, and adequate." *SEC v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991); *SEC v. WorldCom*, 273 F. Supp. 2d 431, 436 (S.D.N.Y. 2003) (Rakoff, J.). "Unless a consent decree is unfair, inadequate, or unreasonable, it ought to be approved." *Randolph*, 736 F.2d at 529.

In applying this standard, courts have held that where a settling party is a public agency like the Commission, the agency's "determinations as to why and to what degree the settlement advances the public interest are entitled to substantial deference." *WorldCom*, 273 F. Supp. 2d at 436; *see also Randolph,* 736 F.2d at 529-30. Thus, when assessing the public interest, a district court should "simply ensure[ ] that the proposed judgment is reasonable." *Randolph,* 736 F.2d at 529. This deference is appropriate because it is the Commission's responsibility to enforce the federal securities laws and the Commission is "presumed to represent the interests of the investing public aggressively and adequately." *SEC v. Bear, Stearns & Co., Inc.*, No. 03 Civ. 2937 (WHP), 2003 WL 22466156, at *1 (S.D.N.Y. Oct. 31, 2003); *see also Randolph,* 736 F.2d at 529-530. Commission decisions are part of a careful, deliberative and extensive agency process. Courts also have recognized that consent judgments are vital to the Commission's ability to enforce the securities laws efficiently and effectively. *See Randolph*, 736 F.2d at 536;

*SEC v. Clifton*, 700 F.2d 744, 748 (D.C. Cir. 1983) ("Because of its limited resources, the SEC has traditionally entered into consent decrees to settle most of its injunctive actions" and is "thus able to conserve its own and judicial resources").[15]

The foregoing standard of review is applicable in Commission enforcement actions irrespective of the relief contemplated by the proposed settlement or the seriousness of the underlying violations. *See, e.g., WorldCom*, 273 F. Supp. 2d at 431 (applying "fair, reasonable, and adequate" standard to SEC settlement proposing $500 million penalty in case involving "perhaps the largest accounting fraud in history"). While the public interest in some SEC cases may be greater than others, all SEC cases implicate the public interest to some degree and there is no indication in the case law that the standard of review fluctuates in accordance with the prominence of or publicity surrounding the case. The Second Circuit's decision in *Janus Films, Inc. v. Miller*, 801 F.2d 578, 582 (2d Cir. 1986), does not suggest otherwise. In *Janus Films*, the Second Circuit vacated a consent judgment in a private copyright action because the judgment concealed the true terms of the parties' settlement, which instead were contained in a sealed document. In vacating the judgment, the Court observed that, even in private actions, the public has an interest "in full disclosure of the true effect of judgments." *Id.* at 584. The Court did not articulate a heightened standard requiring greater scrutiny of settlements depending on the prominence of a case. Rather, the Court simply held that when reviewing settlements in cases "affecting the public interest," the court "must be satisfied of the fairness of the settlement." *Id.* at 582. Since not all actions between private parties affect the public interest, the *Janus Films*

---

[15]     Settlements are an important tool for the Commission's enforcement program and enable the Commission to leverage and efficiently maximize the impact of its limited resources. During the last three years, for example, at least 75 percent of the Commission's enforcement actions were concluded with some form of settlement at the time they were filed.

Court was applying a more rigorous standard than would otherwise apply in a purely private action. That "fairness" standard, although qualifying as a heightened standard in a purely private action, is the same standard that already applies to all SEC settlements, as all SEC cases affect the public interest.

The fact that a defendant in an SEC action previously received TARP funds also should not give rise to a different standard of review.[16] The terms of the Treasury Department's investment of capital in Bank of America through TARP and the proper uses of those funds are not governed by the federal securities laws. Whether Bank of America or Merrill misused TARP funds by paying bonuses is a matter over which the Treasury Department, the Federal Reserve, Congress and possibly other law enforcement agencies may have jurisdiction, but not the Commission. The federal securities laws require disclosure of material facts in a variety of contexts, but they do not directly regulate an issuer's use of assets. As such, the gravamen of the violation alleged in the Complaint is a failure to disclose, not misappropriation. While the possible misuse of TARP funds is a matter of great public importance, it does not, in and of itself, give rise to a federal securities law violation. Bank of America did not violate the federal securities laws because it agreed to allow Merrill to pay substantial bonuses before the merger closed, but because it failed to disclose that agreement in the proxy statement. The source of the funds used by Merrill to pay those bonuses is a separate matter and does not affect Bank of

---

[16]     Several courts have recently approved settlements in SEC cases providing for substantial monetary relief against recipients of TARP funds without either holding a hearing or suggesting that a stricter standard applied. *See, e.g., SEC v. Banc of America Securities, LLC.*, SEC Rel. No. 21066 (S.D.N.Y. June 9, 2009) (consent decree entered requiring recipient of TARP funds to redeem billions of dollars worth of auction rate securities from investors); *SEC v. Citigroup Global Markets, Inc.*, SEC Rel. No. 2824 (S.D.N.Y. Dec. 12, 2008) (same); *SEC v. Wachovia Securities, LLC*, SEC Rel. No. 20885 (N.D. Ill. Feb. 17, 2009) (same).

America's liability under the proxy rules and, as a result, should not be relevant in determining the appropriate penalty amount for the disclosure violation.

The fact that the proposed consent judgment includes a monetary penalty also does not directly alter the standard of review that ordinarily applies in SEC enforcement actions. Where a penalty is included, the court's review of the penalty under the reasonableness standard will, of course, extend to those factors that ordinarily inform the imposition of a penalty in an SEC case. Thus, in assessing the reasonableness of an SEC settlement that includes a penalty, a court should be satisfied that the proposed penalty reflects an adequate consideration of the relevant penalty factors. *See WorldCom*, 273 F. Supp. 2d at 434. The factors that the Commission considers in deciding whether to seek penalties against public companies and other corporations are discussed above. Courts typically consider similar factors, including the need for punishment and deterrence, the magnitude of the violations, and the defendant's cooperation with the government. *Id.* at 436. In addition, as this Court has recognized, the degree to which a proposed penalty amount is consistent with penalties previously imposed in comparable cases is an important indicator of the settlement's fairness and reasonableness. *Id.* at 434 ("[T]he Commission has wisely chosen, in formulating a penalty proposal in this case, to look to the penalties it has imposed in prior cases and the factors there considered"). Although the circumstances of a given case may justify a departure from precedent, reliance by the Commission, and by courts, on relevant prior cases helps ensure that defendants are treated fairly and provides notice to future violators.

For the reasons stated herein, the Commission believes that the proposed settlement in this case reflects an appropriate balance of the relevant penalty factors and represents a fair and

reasonable resolution of the Commission's action against Bank of America for its violations of the proxy solicitation rules.

## II.

### THE PROPOSED SETTLEMENT SHOULD BE APPROVED WITHOUT HOLDING AN EVIDENTIARY HEARING BECAUSE IT IS REASONABLE AND IN THE PUBLIC INTEREST

As discussed above, the Commission's determination of an appropriate penalty amount in a case alleging violations by a corporate issuer is guided by a number of factors in addition to the basic statutory criteria authorizing the Court to impose penalties. The Commission's consideration of those factors is particularly significant in a case involving a large public company such as Bank of America, which has many thousands of individual shareholders. Although the most relevant factor here is deterrence -- particularly general deterrence -- the Commission undertook to balance fairly the need for deterrence with the need to avoid unnecessary harm to current Bank of America shareholders, and respectfully believes that the proposed penalty reflects an appropriate balance of these factors. Charging and penalizing individuals would not, of course, implicate the risk of causing unfair harm to innocent shareholders, but for the reasons described above, the investigative record did not provide a sufficient basis to pursue such charges under the applicable legal standards.

The amount of the proposed penalty is consistent with the civil penalty obtained by the Commission in an earlier case involving inadequate disclosures by an issuer in connection with a multi-billion dollar banking merger. *See SEC v. Wachovia Corp.*, SEC Rel. No. 2004-152 (D.D.C. Nov. 4, 2004). In that case, the Commission obtained a $37 million penalty for Wachovia's violations of both the proxy rules and corporate reporting provisions. Wachovia failed to disclose in its proxy statement and subsequent periodic reports that, after its merger with

33

First Union Corporation had been announced, Wachovia's management authorized the purchase of, and proceeded to purchase, over $500 million of First Union stock to prop up the stock price. Wachovia did so to keep the total value of the merger at a higher level and thereby fend off a hostile bid from another company. The facts here support a penalty in the same range as the Wachovia penalty, although there are factors that could justify a slightly higher or slightly lower amount. On the one hand, the joint proxy statement at issue here was sent to more shareholders, a total of 283,000, and the value of the Merrill-Bank of America transaction was greater, which could justify a higher penalty. On the other hand, Wachovia engaged in multiple violations of different Exchange Act provisions, and its conduct -- secretly influencing the market price of a security to thwart a competing offer for the company and artificially make the favored bid appear more attractive to shareholders -- was arguably more deliberate and more egregious. In addition, Wachovia unlawfully withheld documents during the course of the Commission's investigation, a fact that the Commission cited as another reason to impose an enhanced penalty against Wachovia. These factors offset any "inflation" in penalties and can be seen as supporting a slightly lower penalty here.[17]

Although the amount of the undisclosed bonuses paid by Merrill is much higher than the amount of First Union stock purchased by Wachovia, those amounts, while relevant, are not alone dispositive of the appropriate penalty amount in a proxy disclosure case. Bank of America's pecuniary gain from its disclosure violation was not $3.6 billion, and neither was the

---

[17] There are very few cases involving violations of only the proxy reporting provisions, and those cases involved no penalty because of the less significant nature of the violations. *See, e.g., In the Matter of Medisys Tech., Inc.*, 1999 WL 418000 (June 24, 1999); *In the Matter of Krupp Corp.*, 1992 WL 77698 (Apr. 8, 1992). Although the Wachovia case involved other violations, they were also non-scienter based and so the case is the closest on point. While the precedent pool is small, Commission guidance stresses consistency when determining penalty amounts.

harm inflicted on voting shareholders. The precise amount of any pecuniary gain and harm is extremely difficult to quantify in this instance. The situation here is not akin to an offering fraud case, for example, where the amount fraudulently raised from investors is a reliable measure of the extent and impact of the wrongdoing and, as such, sometimes drives the determination of the penalty amount in such cases.[18] While Bank of America clearly obtained a corporate benefit -- the merger with Merrill was approved -- the ultimate impact of the merger on its shareholders is far less certain and depends on a host of factors. The more relevant measure here is the impact of the violation at the time that the shareholders cast their proxies: they were not given material information that may have caused some of them to vote against the merger, an adverse impact regardless of whether the combined entity winds up flourishing or failing in the future. The monetary value of that impact is, however, equally unquantifiable at this time.

In any event, the $3.6 billion bonus figure is not a valid proxy for the nature and severity of Bank of America's misconduct, as the gravamen of the violation here is a failure to disclose, not misappropriation. Moreover, the qualitative nature and severity of the violation at issue is as, if not more, important in assessing an appropriate penalty amount, as other factors can mitigate the monetary impact of egregious misconduct or exacerbate the monetary impact of a marginal violation.[19] Indeed, there are numerous cases, arising in a variety of contexts, where the penalty is a small fraction of the amounts involved in the underlying facts, even where the misconduct is

---

[18]     However, even in offering fraud cases, the penalty imposed by the court is sometimes a small fraction of the total amount of money out of which the defendant defrauded investors. *See, e.g., SEC v. Coates*, 137 F. Supp. 2d 413, 430 (S.D.N.Y. 2001) ($40,000 penalty for defendant's multiple violations of Section 10(b) in a $6.5 million offering fraud).

[19]     Thus, in Wachovia, the fact that the bank's stock purchases accounted for over 50% of the trading volume on one of the days in question is probably a greater indicator of the severity of the violation in that case than the total amount of stock that was purchased over the course of the scheme.

egregious. Notable recent examples of such settlements include: *SEC v. Monster Worldwide,*
*Inc.*, 2009 WL 1373128 (S.D.N.Y. May 18, 2009)($2.5 million penalty for securities fraud
arising from options backdating that resulted in $339.5 million overstatement of financial
results); *SEC v. Broadcom Corp.*, 2008 WL 1805663 (C.D. Ca. Apr. 22, 2008)($12 million
penalty for securities fraud arising from options backdating that resulted $2 billion overstatement
of financial results); *SEC v. First Bancorp*, 2007 WL 2254469 (S.D.N.Y. Aug. 7, 2007)($8.5
million penalty for securities fraud arising from concealment of over $4 billion worth of
mortgage-related transactions); *SEC v. Tenet Healthcare Corp., et al.*, 2007 WL 981544 (C.D.
Cal. Apr. 2, 2007)($10 million penalty for securities fraud claims arising from unlawful
exploitation of a Medicare reimbursement loophole which resulted, upon public revelation, in
$11 billion decline in market capital); *SEC v. Doral Fin. Corp*, 2006 WL 2682459 (S.D.N.Y.
Sept 19, 2006)($25 million penalty for securities fraud claims arising from improper recording of
$3.9 billion gain).

     In light of all the relevant facts and circumstances, a substantially larger penalty in this
case, even one that does not approach the $3.6 billion range, could unjustifiably impact innocent
Bank of America shareholders. Reasonable people can debate whether the penalty should be
higher or lower, but it is squarely within an acceptable range. The Commission complied with
statutory authority and its own rigorous procedures in determining what is best to protect the
interests of investors and the public. There is no compelling reason to deviate from the strong
public and judicial policy favoring settlements or the general deference accorded the
Commission's judgment. The result is reasonable, and the standard for judicial approval is
therefore satisfied.

     In addition, the Court can determine whether to approve the settlement without
conducting an evidentiary hearing. As indicated above, there are no factual disputes that require

36

witness testimony. The relevant facts pertaining to Bank of America's violation of Section 14(a) of the Exchange Act and Rule 14a-9 are all found in the relevant documents -- the proxy materials, the merger agreement, and the undisclosed "disclosure" schedule -- and only the inferences raised by those documents are potentially at issue. To the extent the Court would be seeking to obtain additional information concerning the state of mind of individuals responsible for the proxy statement disclosures, an evidentiary hearing is unlikely to shed further light on that issue, as Bank of America is continuing to assert the attorney-client privilege.

Perhaps more importantly, an evidentiary hearing into the allegations of the complaint would be inconsistent with the fundamental purpose of a settlement: to avoid the risks and costs of an adjudication on the merits.[20] It is well established that public policy strongly favors the settlement of actions as a cost-efficient means of resolving disputes and conserving judicial resources. *See Randolph*, 736 F.2d at 529-530; *United States v. Cannons Eng. Corp.*, 899 F.2d 79, 84 (1st Cir. 1990) ("[T]he policy of the law [is] to encourage settlements" and "has particular force where, as here, a government actor committed to the protection of the public interest has pulled the laboring oar in constructing the proposed settlement"). Consent judgments, where appropriate, enable the Commission to enforce the federal securities laws efficiently while avoiding the risks and costs associated with adjudication on the merits, even where the Commission's case is compelling. As the Ninth Circuit observed in *Randolph*: "Compromise is the essence of a settlement. Even if the Commission's case ... is strong, proceeding to trial would still be costly." *Id.* at 529.

---

[20]  This is not a situation where an evidentiary hearing is mandated by statutory provision or rule. *See, e.g.*, Fed. R. Civ. P. 23(e)(1)(C) (class action settlements); 15 U.S.C. § 16(e) (antitrust consent decrees).

## CONCLUSION

For the foregoing reasons, the Commission respectfully requests that the Court enter the proposed final consent judgment.

Dated:   August 24, 2009
            New York, New York

                                Respectfully submitted,

                                  By:_____
                                  David Rosenfeld
                                  Associate Regional Director
                                  Attorney for Plaintiff
                                  Securities and Exchange Commission
                                  New York Regional Office
                                  Three World Financial Center, Suite 400
                                  New York, NY 10281
                                  Tel: (212) 336-0153

Of Counsel:

    George N. Stepaniuk
    Maureen F. Lewis
    Joseph O. Boryshansky