UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| -against- | : | No. 09-Civ.-6829 (JSR) |
| | : | |
| BANK OF AMERICA CORPORATION, | : | |
| | : | |
| Defendant. | : | |
| | : | |

# REPLY MEMORANDUM OF PLAINTIFF
## SECURITIES AND EXCHANGE COMMISSION IN
### SUPPORT OF ENTRY OF THE PROPOSED CONSENT JUDGMENT

David Rosenfeld
Associate Regional Director
Attorney for Plaintiff
Securities and Exchange Commission
New York Regional Office
Three World Financial Center, Suite 400
New York, New York 10281
Tel: (212) 336-0153

Of Counsel:

George N. Stepaniuk
Maureen F. Lewis
Joseph O. Boryshansky

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT........................................................................................................................ 4

I.  BANK OF AMERICA PLAINLY VIOLATED THE PROXY DISCLOSURE
    RULES............................................................................................................................ 4

II.  THE PROPOSED DISPOSITION IS REASONABLE AND PROPERLY
     BALANCES THE RELEVANT CONSIDERATIONS...................................................... 12

III.  BANK OF AMERICA HAS ASSERTED THE ATTORNEY-CLIENT
      PRIVILEGE AND HAS NOT WAIVED THE PRIVILEGE ............................................. 16

CONCLUSION..................................................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Beissinger v. Rockwood Comp. Corp.*, 529 F. Supp. 770 (E.D. Pa. 1981) ...................................... 9

*GAF Corp. v. Heyman*, 724 F.2d 727 (2d Cir. 1983) .................................................................. 10

*Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736 (9th Cir. 2008) ........................................ 5, 6, 7

*Heckler v. Chaney*, 470 U.S. 821 (1985) .................................................................................. 14

*In re Am. Skandia Investment*, SEC Rel. No. 2867, 2009 WL 1035191 (Apr. 17, 2009) ............ 15

*In re Ameriprise Fin. Servs., Inc.*, Exchange Act Rel. No. 34-60279, 2009 WL 2004359
    (July 10, 2009) ...................................................................................................................... 15

*In re Browning-Ferris Indus. Deriv. Litig.*, 830 F. Supp. 361 (S.D. Tex. 1993)............................ 9

*In re Grand Jury Proceedings*, 219 F.3d 175 (2d Cir. 2000) ...................................................... 18

*In re Keeper of Records*, 348 F.3d 16 (1st Cir. 2003) .......................................................... 17, 19

*In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358 (2003)........................................................ 9

*In re Lott*, 424 F.3d 446 (6th Cir. 2005) .................................................................................... 17

*John Doe Co. v. United States*, 350 F.3d 299 (2d Cir. 2003) ...................................................... 17

*Rodman v. Grant Foundation*, 608 F. 2d 64 (2d Cir. 1979) ........................................................ 10

*Sanofi-Synthelabo v. Apotex, Inc.*, 363 F. Supp. 2d 592 (S.D.N.Y. 2005) .................................. 19

*SEC v. AB Volvo*, No. 08-cv-00473, 2008 WL 746475 (D.D.C. Mar. 20, 2008) ......................... 15

*SEC v. Am. Int'l Grp., Inc.*, No. 06-cv-1000, 2006 WL 305791 (S.D.N.Y. Feb. 9, 2006) ........... 15

*SEC v. Biovail Corp.*, No. 08-cv-2979, 2008 WL 260474 (S.D.N.Y. Feb. 4, 2009).................... 16

*SEC v. Brant*, No. 07-cv-1075, 2007 WL 470385 (S.D.N.Y. Feb. 14, 2007) .............................. 16

*SEC v. Chevron Corp.*, No. 07-cv-10299, 2007 WL 3376128 (S.D.N.Y. Nov. 14, 2007)........... 15

*SEC v. Fiat S.P.A.*, No. 08-cv-0221, 2008 WL 5328787 (D.D.C. Dec. 22, 2008) ...................... 15

*SEC v. Greenberg*, No. 09-cv-6939, 2009 WL 2413951 (S.D.N.Y. Aug. 6, 2009) ..................... 15

*SEC v. HSBC Bank USA, N.A.*, No. 907-cv-22469, 2007 WL 2974201 (S.D. Fla.
    Oct. 12, 2007) ...................................................................................................................... 15

*SEC v. Mozilo*, No. 09-cv-03994, 2009 WL 2341660 (C.D. Cal. June 4, 2009) .......................... 15

*SEC v. Strauss*, No. 09-cv-4150, 2009 WL 1138823 (S.D.N.Y. Apr. 28, 2009) .......................... 15

*SEC v. Take-Two Interactive Software, Inc.*, No. 09-cv-03113, 2009 WL 858470
    (S.D.N.Y. Apr. 1, 2009) ......................................................................................................... 16

*SEC v. Wellcare Health Plans, Inc.*, No. 09-cv-910, 2009 WL 1373130 (M.D. Fla.
    May 18, 2009) ........................................................................................................................ 15

*SEC v. Zurich Fin. Servs.*, No. 08-cv-10760, 2008 WL 5189521 (S.D.N.Y. Dec. 11, 2008) ...... 15

*U.S. v. Microsoft Corp.*, 56 F.3d 1448 (D.C. Cir. 1995) .............................................................. 14

*United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190 (2d Cir. 1993) ................... 10

*United States v. White*, 887 F.2d 267 (D.C. Cir. 1989) ................................................................ 19

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991) ................................................. 9, 10

## Statutes

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ................................. 6, 7

Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a) .......................... 6, 7, 14

## Rules

Rule 10b-5, 17 C.F.R. § 240.10b-5 .................................................................................................. 7

Rule 14a-9, 17 C.F.R. § 240.14a-9 ............................................................................................. 7, 14

## Other Authorities

*Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934 and
    Commission Statement on Potential Exchange Act Section 10(b) and Section 14(a) Liability*,
    Exchange Act Rel. No. 34-51283 (Mar. 1, 2005) ...................................................................... 6

Securities and Exchange Commission Division of Enforcement, *Enforcement Manual*
    (Oct. 6, 2008) ......................................................................................................................... 16

## INTRODUCTION

As directed by the Court at the hearing on August 10, 2009, the Securities and Exchange Commission ("SEC" or "Commission") respectfully submits this reply memorandum in response to the submission of defendant Bank of America Corporation ("Bank of America") and in support of the entry of the proposed consent judgment. This reply memorandum also addresses the issues raised in the Court's Order dated August 25, 2009.

## PRELIMINARY STATEMENT

As set forth in our initial submission, the SEC believes that the proposed disposition is fair, reasonable, adequate and in the public interest. The charges comport with the evidence as applied against the applicable legal standard and the proposed relief, including the penalty amount, takes full account of the seriousness of the violation and the need for deterrence, while giving due consideration to all other relevant factors.

First, the Commission's Complaint alleges a clear and well-supported proxy violation claim against Bank of America. It is undisputed that the joint proxy statement represented to shareholders that Merrill was prohibited from paying discretionary bonuses before the merger closed without Bank of America's consent while failing to disclose that Bank of America already had agreed that Merrill could pay up to $5.8 billion in bonuses. That agreement, which existed at the time the proxy statement was filed, was never disclosed prior to the shareholder vote on December 5, 2008.

In its submission, Bank of America nevertheless contends that shareholders were not misled because (i) the representations were qualified by a general reference to an undisclosed schedule; (ii) the proxy presentation was consistent with common practice in merger disclosures; and (iii) shareholders, in any event, could have strung together relevant information from an

assortment of other sources, including media articles and a combination of prior practice and folk wisdom relating to Wall Street compensation.

These arguments, however, run counter to the fundamental principle that it is the responsibility of the issuer company to provide shareholders with an accurate and non-misleading proxy statement so that shareholders can exercise their vote in an informed manner. Shareholders are entitled to rely on the representations in the proxy itself, and are not required to puzzle out material information from a variety of external sources. Nor can representations in the proxy statement be qualified, contradicted or otherwise rendered misleadingly incomplete by nonpublic, confidential materials. Bank of America's proffered defense that the proxy presentation followed standard transactional practice is particularly unpersuasive in light of the guidance the Commission provided in 2005, warning issuers against using nonpublic schedules in merger agreements where the schedules contradict or qualify express representations made in proxy materials. Subsequent case law has upheld the same principle. In omitting the "disclosure" schedule and its contents from the proxy statement, Bank of America ignored those warnings at its peril.

Second, the proposed disposition properly balances relevant considerations including the need for corporate deterrence and avoiding undue burdens on innocent shareholders. Where, as here, a corporate issuer has not met its statutory obligations, the need for corporate deterrence is particularly strong. The penalty here will send a clear message that the failure to disclose the substance of a separate schedule that materially qualifies or contradicts representations in a proxy statement is unacceptable. The absence of individual charges does not diminish the appropriateness of the disposition with Bank of America. As demonstrated in our initial papers and below, in the view of the Commission, the investigative record does not provide a factual

2

predicate to charge individuals or to sustain corporate charges other than the proxy violation alleged in the Commission's Complaint. That result is entirely consistent with the Commission's penalties policy, including the policy of seeking penalties from culpable individual offenders acting for a corporation. In the end, relief can only be sought where it is supported by the evidence and the applicable legal standards. The absence of proof sufficient to assert individual charges, however, does not insulate a corporation from paying a penalty and there are important policy reasons to seek such relief. Indeed, the Commission often has sought, as here, substantial penalties from public companies in the absence of individual charges, where appropriate. Of course, the Commission will vigorously pursue individual charges where supported by the evidence and the law. The Commission is firmly committed to pursuing charges and the full scope of relief against individuals in such circumstances.

Third, the SEC does not believe that there has been a waiver of the attorney-client privilege by Bank of America. Although Bank of America has submitted an affidavit from an attorney not involved in the transactions at issue suggesting that compensation arrangements "customarily" are set forth in separate schedules and not described in proxy statements, Bank of America has asserted the attorney-client privilege with respect to communications with counsel regarding the disclosures at issue. While these privileged communications might shed light on the specific rationale for omitting the disclosure schedule and its contents from the proxy materials, under applicable Second Circuit precedent, assertions of reliance on counsel during the investigative process generally do not result in a forfeiture of the privilege. Forfeiture of the privilege generally has been limited to such assertions made during the course of judicial proceedings. Of course, the Commission will not credit an alleged advice of counsel defense absent a waiver, but in weighing the appropriate charges the Commission will carefully consider

the investigative record and its burden of alleging a *prima facie* case of a legal violation and facts to support such charges.

In bringing this action, the Commission duly considered the circumstances of this case, the relevant penalty factors, and the adequacy of the charges in light of the investigative record. The resulting consent judgment, we respectfully submit, is fair, reasonable, adequate, in the public interest and should be entered by the Court.

## ARGUMENT

### I.

## BANK OF AMERICA PLAINLY VIOLATED THE PROXY DISCLOSURE RULES

Bank of America's submission strives to portray its defenses as virtually bulletproof, but its memorandum, the two "expert" affidavits, and the reams of exhibits simply confirm the following: In the joint proxy statement, Bank of America represented that Merrill had agreed not to pay year-end performance bonuses prior to the closing of the merger without Bank of America's consent. By the time the proxy statement was filed, however, Bank of America already had granted – yet failed to disclose – its consent to the payment of up to $5.8 billion in such bonuses. The omission of that fact concealed from shareholders the true state of affairs – that Bank of America could not contractually prevent Merrill from paying bonuses and, in fact, Merrill had the contractual right to make such payments up to $5.8 billion. Bank of America's argument that the failure to disclose its already-granted consent did not render its proxy statement false or misleading flies in the face of the statement's plain meaning.

Bank of America places great weight on the fact that the misrepresentation at issue was included in one subparagraph of a multi-part recitation that was qualified in its entirety by a generic reference to an omitted disclosure schedule and unspecified "certain exceptions." It is

4

undisputed, however, that the proxy statement failed to tell shareholders anything at all about the substance of the omitted disclosure schedule, what those "certain exceptions" might be, or whether they even applied to the particular sub-paragraph at issue. As such, the use of those devices cannot insulate Bank of America from liability in this case. The Ninth Circuit recently considered and rejected a similar argument in *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736 (9th Cir. 2008). The defendant in that case argued, as Bank of America and its experts do here, that a reasonable investor cannot be misled by statements contained in a merger agreement that are qualified by reference to a disclosure schedule that is not itself disclosed. The Court disagreed, holding as follows: "[T]hat the merger agreement ... included reference to a non-public disclosure schedule would not, as a matter of law, prevent a reasonable investor from relying on its terms." *Id.* at 741. This is a matter of common sense, for it does an investor little good to be told that there may be exceptions or qualifications to some of the representations made in the proxy statement without being told the substance of those exceptions or qualifications, particularly when they materially alter the substance of other statements.[1]

Although Bank of America's expert, Mr. Pierce, maintains in his affidavit that this practice is perfectly proper and routinely used in documenting and disclosing merger transactions, the examples he cites underscore the weakness of the argument. Mr. Pierce's affidavit does not indicate the extent, if any, to which the undisclosed disclosure schedules in any of the transactions he references modified, superseded, or negated specific covenants or representations that were made elsewhere in the disclosed merger agreement or proxy statement.

---

[1] Similarly, the statement in Merrill's September 18, 2009 Form 8-K that the representations in the merger agreement "may be . . . qualified by confidential disclosures" is unavailing because it left shareholders entirely in the dark as to which representations, if any, might be so qualified or to what extent.

*And it is impossible for anyone to obtain this information from any publicly available source.*
Absent such information, it is impossible to assess the relevance of the examples Mr. Pierce uses to the disclosure documents at issue in this case. There is simply no way of knowing whether or to what extent the undisclosed schedules he references actually qualified any particular representation in the proxy statement. Like the shareholders voting on the Bank of America merger, the Commission and the Court are left in the dark.

Regardless of how often undisclosed schedules have been used in the past, the mergers and acquisitions ("M&A") and defense bar were well aware before the proxy statement was filed or the *Glazer* case was decided that the practice employed by Bank of America and now endorsed by its experts was not legally sound under the federal securities laws. In March 2005, the Commission issued a report pursuant to Section 21(a) of the Securities Exchange Act of 1934 ("Exchange Act") addressing similar proxy disclosure issues arising from a merger between The Titan Corporation and another entity. In that report, the Commission expressly warned issuers that "where a document containing [a contractual] representation is disclosed, if additional material facts exist, such as those contradicting or qualifying . . . the original representation, . . . omission of which makes that disclosure misleading, a company would also be required to disclose those facts." *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934 and Commission Statement on Potential Exchange Act Section 10(b) and Section 14(a) Liability*, Exchange Act Rel. No. 34-51283 (Mar. 1, 2005) ("Titan 21(a) Report").

The Titan 21(a) Report was well known in the M&A community and its unambiguous message was the subject of numerous panel discussions, practice newsletters and similar publications, including publications authored by attorneys at the two law firms that represented Bank of America and Merrill in their merger. *See, e.g.*, Patricia A. Vlahakis (Wachtell Lipton

partner), *Takeover Law and Practice*, 1516 PLI/Corp. 1273 (Nov. 2005) ("SEC warns that the standard practice of attaching a merger agreement to a proxy statement where the merger agreement contains representations that on their face are inconsistent with underlying facts could create potential Section 14(a) and Rule 14a-9 liability or even Section 10(b) and Rule 10b-5 liability. It has long been standard practice to include a copy of the merger agreement as an annex to the proxy statement that is mailed to shareholders in the context of a pending merger transaction, but to exclude the disclosure schedules that modify the representations made in the merger agreement."); Edward D. Herlihy (Wachtell Lipton partner), et al., *Financial Institutions M&A 2007: Continued Rich Diversity In An Active M&A Market - An Annual Review of Leading Developments*, 1638 PLI/Corp. 209 (Dec. 5, 2007) ("[T]he SEC's Section 21(a) report of investigation issued in 2005 relating to Titan Corporation cautions a careful approach."); Shearman & Sterling LLP, *SEC Highlights Potential Liability for Misleading Contractual Provisions in SEC Disclosure Documents*, Client Publication (Mar. 17, 2005) ("Issuers should recognize that when they publicly describe or disclose material contractual representations, they must also disclose any other information – such as material facts contradicting or qualifying the representation – necessary to make the disclosure not misleading. In particular, issuers should note that the SEC has warned that general disclaimers . . . may not be sufficient where an issuer has material information contradictory to representations it has made. . . . [I]ssuers should be sensitive to the SEC's heightened focus on this topic."). Bank of America's disclosures in the proxy statement were clearly misleading, and in light of the principles laid out in the Titan 21(a) Report and upheld in *Glazer*, the decision not to disclose the agreement allowing the bonus payments was improper and incorrect.

While Bank of America and its experts contend that Merrill's aggregate quarterly accrual for "compensation and benefits," which was disclosed in Merrill's quarterly reports in 2008, foretold Merrill's plans to pay billions of dollars in bonuses before the merger closed, it is undisputed that Merrill's quarterly reports said absolutely *nothing at all* about Bank of America having granted its consent to the payment of billions of dollars in bonuses notwithstanding the provision in the merger agreement that prohibited such payments without the consent of Bank of America. And given the unprecedented meltdown of the financial markets in the fall of 2008, a reasonable investor could easily have concluded that whatever Merrill had previously accrued for bonuses, any prior plans to pay billions of dollars in year-end bonuses would no longer be relevant.

It also is undisputed that the publicly-reported accrual aggregated multiple expense items and that Merrill's quarterly reports did not separately specify the amount that was being accrued for bonuses. While Bank of America and its experts contend that shareholders could have deduced the bonus component of the accrual by making certain assumptions and comparing the accrual to amounts accrued in prior years, Merrill's top compensation executives admitted in testimony that even sophisticated individuals in their position do not use aggregate compensation accruals to gauge what competitors might be planning with respect to year-end bonuses. For example, Peter Stingi, head of human resources at Merrill, acknowledged that the annual bonus funding could not be discerned from competitors' filings "because there are so many other line items that go into the aggregate [compensation] expense." Michael Ross, head of compensation at Merrill, similarly acknowledged that he did not review or rely on competitors' aggregate compensation accruals to assess the amount of bonuses that would be paid. Instead, Merrill hired private consultants to ferret out nonpublic information and other intelligence about

competitors' bonus plans – nonpublic information that is obviously unavailable to ordinary shareholders.[2]

For similar reasons, the press reports on which Bank of America and its experts so heavily rely are equally unavailing, and are irrelevant as a matter of law. The media reports during this period were speculative, unreliable, and never adopted by Bank of America or Merrill. Several reports conjectured that Merrill would pay larger bonuses than it had paid in 2007, as much as $6.7 billion; others speculated, based on anonymous sources, that Merrill might reduce its bonus pool for 2008 by as much as 50 percent; and still others suggested that there would be no bonuses at all on Wall Street.[3] While it is true that materiality is assessed in light of the total mix of information disclosed to investors, investors were not required to ignore Bank of America's express statements in the proxy materials and rely instead on media speculation that may have suggested that these statements were misleading. *See United Paperworkers Int'l*

---

[2]     Bank of America cites several cases to support its argument that disclosure of the compensation accruals in Merrill's quarterly filings was sufficient, but none of these cases suggests, let alone holds, that disclosure in an extrinsic filing is adequate where, as is the case here, "it would take a financial analyst to spot the tension" between that disclosure and statements made in a proxy statement. *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1098 (1991). Instead, the cited cases merely suggest that appropriate disclosures in public filings may form part of the information available to shareholders, a position the Commission does not dispute. *See In re Browning-Ferris Indus. Deriv. Litig.*, 830 F. Supp. 361, 366-367 (S.D. Tex. 1993) (no proxy violation where pending lawsuits appropriately mentioned in company's annual report and Form 10-K); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 372-375 (2003) (no misstatement in public releases where company's SEC application appropriately disclosed relevant facts); *Beissinger v. Rockwood Comp. Corp.*, 529 F. Supp. 770, 782 n. 4 (E.D. Pa. 1981) (no misstatement in annual report where company's Form 10-K appropriately contained relevant warnings).

[3]     *Hartford Courant*, Sept. 16, 2008 (quoting state budget director that in "most" financial companies "there will be no bonuses at all"); *Business Week Online*, Oct. 24, 2008 (reporting congressional calls for freeze on executive bonuses on Wall Street); *Evening Standard*, Dec. 8, 2008 ("Tens of thousands of Merrill staff are ultimately expected to lose their jobs while other banks, notably Goldman Sachs, say they will not be paying any bonuses for 2008.").

*Union v. Int'l Paper Co.*, 985 F.2d 1190, 1200 (2d Cir. 1993) ("sporadic news reports" do not

advise shareholders "that proxy solicitation statements directly sent to them by the company may

be misleading" or cure "the company's representations in its proxy materials"). None of the

cases cited by Bank of America suggest otherwise.[4] Speculative articles or reports based on

anonymous sources should not qualify as the equivalent of proper corporate disclosure, and for

good reason: They do not come from the issuer and they lack reliability. The Supreme Court

has held that investors are entitled to full disclosure of material facts within the four corners of

the proxy statement, and are not required to puzzle through reams of other data from which they

may or may not be able to infer those material facts. *Virginia Bankshares,* 501 U.S. at 1098.

The unreliability of the media reports that preceded the shareholder vote is evident from

the coverage that greeted the revelation, after the merger already closed, that Merrill had paid

billions of dollars in year-end bonuses on the eve of closing. This fact was reported as breaking

news, which contradicts the notion that the bonus plan had been widely known for months, and

the media focused in particular on Bank of America's previously-undisclosed knowledge and

role in approval of the bonus payments. *See, e.g., NPR Morning Edition*, Jan. 23, 2009 ("It came

out recently that Thain . . . slipped in big bonuses to Merrill Lynch employees before the

merger."); *Washington Post*, Jan. 24, 2009 ("Merrill Lynch . . . came under investigation for

possibly paying secret bonuses just days before its Jan. 1 merger with Bank of America."); *NBC*

---

[4]     The cases Bank of America cites did not involve, as here, speculative media reports that
were inconsistent with representations in a disclosure document; moreover, unlike here, some of
the cases found that the corporate disclosures at issue were adequate independently of media
reports. *See GAF Corp. v. Heyman*, 724 F.2d 727, 741 (2d Cir. 1983) (omission of director's
involvement in lawsuit not material where fact was disclosed in company's press release);
*Rodman v. Grant Foundation*, 608 F. 2d 64, 70 (2d Cir. 1979) (no proxy violation where
required information was "set out in a logical and comprehensive manner in [the] proxy
statements").

*Nightly News*, Jan. 22, 2009 ("A source familiar with the situation says Bank of America was aware of the Merrill bonuses."); *New York Times*, January 27, 2009 ("Thain appeared to challenge Bank of America's suggestion that Merrill alone was responsible for the earlier-than-usual bonuses. He said the timing, composition and size of the bonuses were all 'determined together with Bank of America.'"). These later reports show that even in January 2009, the press was unaware that months earlier, Bank of America expressly had authorized Merrill to pay up to $5.8 billion in bonuses before the merger closed, and underscore why press speculation is not – and should not be – treated as the functional equivalent of proxy disclosure.

The views expressed by Bank of America's experts are logically unsound for other reasons as well. There is a contradiction in their position that they neither acknowledge nor address. On the one hand, they claim that any "reasonable" shareholder knew that Merrill was going to pay billions of dollars in bonuses because "reasonable" investors all know that Wall Street firms pay huge year-end bonuses without regard to whether the firm made billions or lost billions that year and that, in any event, Merrill's actual year-end bonus plans and figures purportedly were right there for all to see in its periodic reports and plastered all over the newspapers. At the same time, however, they insist that this kind of information about incentive compensation is so highly sensitive and proprietary that firms have no reasonable choice but to conceal it in undisclosed "disclosure" schedules to avoid ruinous competitive harm to the merging parties. The experts cannot have it both ways, and this contradiction exists for a simple reason: Their position is incorrect.

In light of the foregoing, it should be clear that Bank of America and its experts greatly exaggerate the potency and appeal of its purported defenses. It is also clear, we respectfully submit, that Bank of America had ample motivation to settle this case and pay a substantial

penalty due to the merits of the Commission's claim. At the very least, Bank of America no doubt understood that their position carried significant litigation risk, which is a reason sophisticated parties often choose to settle rather than defend difficult claims. In light of all these factors, the Commission firmly believes that the proposed settlement is fair, reasonable and in the public interest.

## II.

### THE PROPOSED DISPOSITION IS REASONABLE AND PROPERLY BALANCES THE RELEVANT CONSIDERATIONS

The proposed disposition properly balances all of the relevant considerations, including the need for corporate deterrence and avoiding undue burden on innocent shareholders. In particular, the penalty amount of $33 million is consistent with SEC policy and prior precedent.

The Commission's Statement Concerning Financial Penalties lists a series of nine factors that guide its discretion when deciding whether to seek a penalty against a public company. *See Statement of the Securities and Exchange Commission Concerning Financial Penalties*, SEC Rel. No. 2006-4 (Jan. 4, 2006). Not all of these factors will apply in every case and the determination whether to seek a penalty, and the amount of such penalty, depends on the facts and circumstances of each case, and how the case compares with other similar cases. The statement describes the general framework employed by the Commission when determining the appropriateness of a corporate penalty; it does not purport to set forth a formula that can be applied with mathematical certainty. Moreover, the process of arriving at an appropriate penalty, as described in the statement, requires the Commission carefully to balance a number of sometimes conflicting interests.

These interests include, among other things, "the need to deter the particular type of offense." *Id.* This need for corporate deterrence is particularly strong where, as here, a corporate

12

issuer has specific statutory responsibilities that have not been met. A corporate penalty can serve as a "strong deterrent to others similarly situated" and such a deterrent impact "weighs in favor of a corporate penalty." *Id.* A corporate penalty also sends a strong signal to shareholders that unsatisfactory corporate conduct has occurred and allows shareholders to better assess the quality and performance of management.

At the same time, corporate penalties are indirectly borne by shareholders. Accordingly, where shareholders have been harmed by violations the Commission will "seek penalties from culpable individual offenders acting for a corporation."[5] *Id.* In the view of the Commission, however, the investigative record here does not provide an appropriate factual basis to charge individuals. The uncontroverted evidence in the investigative record is that lawyers for Bank of America and Merrill drafted the documents at issue and made the relevant decisions concerning disclosure of the bonuses. During the course of the investigation, key executives all stated that they delegated these decisions to counsel, who were aware of the relevant business terms of the transaction. There is no evidence that company executives separately discussed concealing compensation information and the executives questioned stated that there were no such

---

[5]     In this case, Bank of America's shareholders at the time of the proxy vote were harmed by the violative conduct because they were deprived of material information that would have been important to them in deciding how to vote. On the other hand, Merrill's shareholders at the time of the proxy vote – who became Bank of America shareholders by virtue of the merger – arguably benefitted from the violative conduct because they received a premium over the market price for their shares and, had the merger not been approved, Merrill might have ended up in bankruptcy. The extent of the respective harms and benefits are difficult, and perhaps impossible, to quantify. Moreover, Bank of America's stock is widely-traded and current Bank of America shareholders may not have been shareholders of either Bank of America or Merrill at the time of the proxy vote.

discussions. Although the Commission assigns no weight to assertions of reliance on counsel in assessing the state of mind of the executives, under these uncontroverted facts and circumstances – that it was the lawyers rather than the executives themselves who made the actual disclosure decisions – there is a lack of evidentiary support to establish the factual predicate that is necessary to allege scienter-based fraud charges against company executives.[6] Similarly, there is an insufficient evidentiary basis to establish a *prima facie* case of the requisite scienter with respect to the lawyers for purposes of alleging secondary liability under the securities laws.[7]

The absence of individual charges does not diminish the appropriateness of the proposed disposition with Bank of America. For the reasons described in our initial papers and herein, the proposed disposition is fully consistent with the Commission's penalties policy taking into account all of the relevant factors. Indeed, the Commission has sought and obtained penalties against public companies in numerous actions where individuals were not charged. *See, e.g., In re Ameriprise Fin. Servs., Inc.*, Exchange Act Rel. No. 34-60279, 2009 WL 2004359 (July 10,

---

[6]     Of course, the decision to not charge certain individuals, or to not bring certain charges, is left to the discretion of the Commission. *See, e.g., Heckler v. Chaney*, 470 U.S. 821, 831-832 (1985) ("This Court has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion. This recognition of the existence of discretion is attributable in no small part to the general unsuitability for judicial review of agency decisions to refuse enforcement."). Courts have held, moreover, that consent judgments should be assessed based on the allegations in the complaint independently of charges or allegations that could have been, but were not, made. *See U.S. v. Microsoft Corp.*, 56 F.3d 1448, 1459 (D.C. Cir. 1995) (mandate that proposed settlement be in the public interest does not authorize district court to "redraft the complaint" or "to seek ... information concerning the government's investigation and settlement negotiations").

[7]     Bank of America's counsel could not be charged with primary violations under Section 14(a) and Rule 14a-9 because they did not solicit the proxies in their name. *See* 15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a-9.

2009) ($8.65 million penalty for improper "revenue sharing" arrangement in marketing and sale of REIT investments; no individual charged); *SEC v. Wellcare Health Plans, Inc.*, No. 09-cv-910, 2009 WL 1373130 (May 18, 2009) ($10 million penalty for fraudulent overstatement of reported income; no individuals charged); *In re Am. Skandia Investment*, SEC Rel. No. 2867, 2009 WL 1035191 (Apr. 17, 2009) ($34 million penalty for participating in market timing scheme; no individuals charged); *SEC v. Zurich Fin. Servs.*, No. 08-cv-10760, 2008 WL 5189521 (S.D.N.Y. Dec. 11, 2008) ($25 million penalty for use of fraudulent finite reinsurance to enhance financials; no individuals charged); *SEC v. HSBC Bank USA, N.A.*, No. 907-cv-22469, 2007 WL 2974201 (S.D. Fla. Oct. 12, 2007) ($10 million corporate penalty for materially misleading disclosures in marketing of mutual funds; no individuals charged); *SEC v. AB Volvo*, No. 08-cv-00473, 2008 WL 746475 (D.D.C. Mar. 20, 2008) (no individual charges in action seeking multi-million dollar corporate penalty arising from improper kickbacks under Oil for Food Program); *SEC v. Fiat S.P.A.*, No. 08-cv-0221, 2008 WL 5328787 (D.D.C. Dec. 22, 2008) (same); *SEC v. Chevron Corp.*, No. 07-cv-10299, 2007 WL 3376128 (S.D.N.Y. Nov. 14, 2007) (same).[8]

---

[8]    Conversely, the Commission has not hesitated to charge individual corporate executives where appropriate. *See, e.g., SEC v. Greenberg*, No. 09-cv-6939, 2009 WL 2413951 (S.D.N.Y. Aug. 6, 2009) and *SEC v. Am. Int'l Grp., Inc.*, No. 06-cv-1000, 2006 WL 305791 (S.D.N.Y. Feb. 9, 2006) (corporate and individual charges for fraudulent accounting scheme); *SEC v. Mozilo,* No. 09-cv-03994, 2009 WL 2341660 (C.D. Cal. June 4, 2009) (charging individuals for knowingly misleading investors about company's condition); *SEC v. Strauss,* No. 09-cv-4150, 2009 WL 1138823 (S.D.N.Y. Apr. 28, 2009) (charging individuals for accounting fraud and for knowingly misleading investors about company's condition); *SEC v. Biovail Corp.,* No. 08-cv-2979, 2008 WL 260474 (S.D.N.Y. Feb. 4, 2009) (same); *SEC v. Take-Two Interactive Software, Inc.*, No. 09-cv-03113, 2009 WL 858470 (S.D.N.Y. Apr. 1, 2009) and *SEC v. Brant*, No. 07-cv-1075, 2007 WL 470385 (S.D.N.Y. Feb. 14, 2007) (corporate and individual charges for options backdating scheme). In all cases, charging decisions are made on the specific facts and circumstances of each matter.

As in all enforcement actions involving public companies, the Commission strives to achieve an appropriate balance between the need for deterrence and the desire to avoid harming innocent shareholders. The proposed $33 million penalty in this case strikes that balance. The penalty will have a meaningful deterrent effect on a corporation's future use of nonpublic documents to negate or qualify express disclosures that they make to investors. And it will achieve that effect without excessively burdening the shareholders of Bank of America.[9]

## III.

### BANK OF AMERICA HAS ASSERTED THE ATTORNEY-CLIENT PRIVILEGE AND HAS NOT WAIVED THE PRIVILEGE

Bank of America repeatedly has asserted the attorney-client privilege with respect to the production of documents and in regard to testimony or interviews of witnesses in the course of the staff's investigation. Bank of America has consistently declined to waive the privilege.

The Commission staff, as a matter of policy, will not credit an advice of counsel defense if a party in an investigation refuses to waive the privilege. *See Enforcement Manual*, Securities and Exchange Commission Division of Enforcement (Oct. 6, 2008) at 92 ("If a party asserts an advice-of-counsel defense, the party must waive the privilege, including testifying and/or producing documents, to the extent necessary to enable the staff to evaluate the validity of the defense."). At the same time, the Commission cannot compel a party to waive the privilege if it declines to do so, nor does the Commission believe it has a sound legal basis here to seek a court

---

[9]     Although Bank of America has received TARP funds under the Treasury Department's Capital Purchase Program and Targeted Investment Program, the payment of the proposed $33 million penalty would not affect Bank of America's obligation to repay TARP investments, with dividends. It is therefore highly unlikely that the payment of the penalty would have any impact on taxpayers.

order to compel a waiver.[10]  Under applicable Second Circuit precedent, the assertion by a party

in an investigative setting that they have relied on counsel, or that they may have a defense based

on such reliance, generally does not constitute a waiver of the attorney-client privilege.[11]  The

Commission believes that *John Doe Co. v. United States*, 350 F.3d 299 (2d Cir. 2003) is

controlling here.

In *John Doe,* the government sought to compel the production of a company's privileged

communications during a grand jury investigation on the ground that the company had waived

the privilege with respect to notes taken by its attorneys after it asserted, *inter alia*, that it had

believed in good faith in the lawfulness of its conduct.  *Id.* at 301.  The district court granted the

government's motion, reasoning that the company waived the privilege by "putting at issue [its]

good faith belief" and because it would be "unfair" to require the government to accept the

company's "selective disclosure" – *i.e.*, that it acted in good faith – without affording it "the

opportunity to examine all of the material on which the disclosure is based."  *Id.* at 302.  The

Second Circuit reversed, observing that the touchstone of "involuntary forfeiture" of privilege is

---

[10]    Because Bank of America did not expressly waive the attorney-client privilege, any waiver of the privilege would have to be implied.  In general, implied waivers are disfavored. *See In re Keeper of Records*, 348 F.3d 16, 23 (1st Cir. 2003) (the case law "reveals few genuine instances of implied waiver."); *In re Lott*, 424 F.3d 446, 453 (6th Cir. 2005) ("Implied waivers [of attorney-client privilege] are consistently construed narrowly.").

[11]    None of the witnesses nor Bank of America's lawyers disclosed to the Commission staff the substance or contents of any communications they had with counsel, or the substance of internal communications counsel may have had with respect to the disclosure issues.  Had such information been disclosed, it would have constituted a general waiver of the privilege at least with respect to the subject matter at issue.  *See In re Grand Jury Proceedings*, 219 F.3d 175, 183 (2d Cir. 2000) ("[O]ffer of ... testimony as to a specific communication to the attorney is a waiver as to all other communications to the attorney on the same matter.") (quoting 8 J. Wigmore, Evidence § 2327, at 638).

17

the "*unfairness* to [an] adversary of *having to defend* against the privilege holder's claim without access to pertinent privileged materials that might refute the claim." *Id.* at 304 (emphasis in original). "[M]erely by telling the prosecutor it believed its actions were within the law" outside a judicial proceeding, the Court held, the company did not create any such unfairness – the government was neither required to accept the company's representation nor suffered any prejudice since the representation did not sway an "independent decision-maker" such as a "court or jury." *Id.* at 302-303. In those circumstances, the Court found, the government did not "suffer[] any unfair prejudice" and the privilege was not waived. The Court further observed:

> [T]he offer of such trial testimony would, in all likelihood, cause forfeiture of Doe's . . . privilege . . . because permitting Doe to enforce its privilege would unfairly deprive the prosecutor of the means to refute Doe's testimony. But Doe did not offer such testimony at a trial. It told no one of its claims but the U.S. Attorney and it did that through a confidential communication. The district court said 'it would be unfair to require the government to accept what might be a selective disclosure.' But the government is not required to accept anything . . . If the U.S. Attorney determines that it cannot accept Doe's representations as to its innocent state of mind while Doe continues to shield its attorneys' notes from the U.S. Attorney's inspection, then the U.S. Attorney will refuse to credit those representations . . . [However,] the government . . . does not run the risk that some independent decisionmaker will accept Doe's representations without the government having adequate opportunity to rebut them. There is in short no unfairness to the government and therefore no basis for holding that Doe forfeited its privileges as the result of having placed its claims in issue.

*Id.* at 304-306; *see also In re Grand Jury Proceedings*, 219 F.3d 175, 183 (2d Cir. 2000) (for an implied waiver, the defendant must "raise[] the advice-of-counsel defense and [seek] to rely on privileged information in a judicial setting."); *Sanofi-Synthelabo v. Apotex Inc.*, 363 F. Supp. 2d 592, 595 (S.D.N.Y. 2005) (no waiver during deposition where witness "has not asserted facts to a decision maker, such as a judge or jury.").

Other circuits have reached similar conclusions. *See, e.g., In re Keeper of Records*, 348 F.3d 16, 23 (1st Cir. 2003) ("Virtually every reported instance of an implied waiver ... involves a judicial disclosure, that is, a disclosure made in the course of a judicial proceeding."); *United States v. White*, 887 F.2d 267, 270-271 (D.C. Cir. 1989) (holding that "general assertion ... that one's attorney has examined a certain matter" during a governmental investigation "is not sufficient to waive the attorney-client privilege."). We are not aware of any case that has held the contrary, namely that the assertion by a party in an investigative proceeding that they have relied on counsel, or that they have a reliance on counsel defense, constitutes a waiver of the attorney-client privilege.

Accordingly, when a party refuses to waive the attorney-client privilege, as Bank of America has done here, the Commission will give no weight to a possible advice of counsel defense in assessing the merits of the case or in making any particular charging decision. The burden remains on the Commission, however, to establish a *prima facie* case of a legal violation before charging any party. The Commission must allege facts supporting the legal charge that, at a minimum, are sufficient to survive a motion to dismiss. For the reasons set forth above, the Commission does not believe that the evidentiary record here supported individual charges or other charges against Bank of America under the applicable legal standards, but that record firmly supports the proxy violation charged in the Commission's complaint.

## CONCLUSION

For the foregoing reasons and those set forth in the Commission's prior memorandum,

the Commission respectfully requests that the Court enter the proposed final consent judgment.

Dated:    September 9, 2009
           New York, New York

                            Respectfully submitted,

                            By: _____

                                David Rosenfeld
                                Associate Regional Director
                                Attorney for Plaintiff
                                Securities and Exchange Commission
                                New York Regional Office
                                Three World Financial Center, Suite 400
                                New York, NY 10281
                                Tel: (212) 336-0153

Of Counsel:

    George N. Stepaniuk
    Maureen F. Lewis
    Joseph O. Boryshansky