**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------

|  |  |  |
|---|---|---|
|  | **:** |  |
| Securities and Exchange Commission, | **:** |  |
| Plaintiff, | **:** | **Filed Electronically** |
| v. | **:** | **No. 09 Civ. 6829 (JSR)** |
|  | **:** |  |
| Bank of America Corporation, | **:** |  |
| Defendant. | **:** |  |

--------------------------------------------------------

### REPLY MEMORANDUM OF LAW ON BEHALF OF BANK OF AMERICA CORPORATION

Lewis J. Liman
Shawn J. Chen
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York  10006-1470
Tel.: (212) 225-2000
Fax: (212) 225-3999

Attorneys for Defendant Bank of America
 Corporation

Dated: September 9, 2009

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION AND RESPONSE TO AUGUST 25 ORDER.................................... 1

ARGUMENT ................................................................................................................... 5

    A.    There Was No Misleading Statement Or Omission In
          The Proxy Statement.................................................................................... 5

          1.  The Proxy Statement Did Not State That Merrill
               Lynch Would Not Pay Incentive Compensation ............................ 5

          2.  The Proxy Statement, Read As A Whole, Left
               No Doubt That Merrill Lynch Employees
               Would Receive Incentive Compensation........................................ 6

          3.  The Proxy Statement Did Not Contain An
               Actionable Omission...................................................................... 11

          4.  There Are Substantial Grounds To Conclude
               The Remainder Of The SEC's Arguments Would Fail .................. 14

          5.  The Case Law Does Not Support The
               SEC's Arguments........................................................................... 16

    B.    Any Alleged Misstatement Or Omission Was Not Material ...................... 19

    C.    The SEC Asserts No Scienter-Based Claim, And Any
          Such Claim Would Have No Basis In Fact................................................. 26

CONCLUSION............................................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Rules**

17 C.F.R. § 229.601(b)(2)...................................................................................................... 14

**Cases**

GAF Corp. v. Heyman,
724 F.2d 727 (2d Cir. 1983)............................................................................................ 21

Glazer Capital Mgmt. v. Magistri,
549 F.3d 736 (9th Cir. 2008) ........................................................................... 16, 17, 18, 19

In re Keyspan Corp. Sec. Litig.,
383 F. Supp. 2d 358 (E.D.N.Y. 2003) ................................................................................ 20

In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,
289 F. Supp. 2d 416 (S.D.N.Y. 2003)................................................................................ 21

John Doe Co. v. United States,
350 F.3d 299 (2d Cir. 2003)............................................................................................. 2-3

Matsumura v. Benihana Nat'l Corp.,
542 F. Supp. 2d 245 (S.D.N.Y. 2008)................................................................................ 17

Miteva v. Third-Point Mgmt. Co.,
218 F.R.D. 397 (S.D.N.Y. 2003) ...................................................................................... 2

Murray v. Xerox Corp.,
811 F.2d 118 (2d Cir. 1987)............................................................................................. 17

Nat'l Educ. Corp. v. Martin,
No. 93 C 6247, 1994 WL 233661 (N.D. Ill. May 26, 1994) ............................................. 2

Olkey v. Hyperion 1999 Term Trust, Inc.,
98 F.3d 2 (2d Cir. 1996).................................................................................................. 6-7

Pritchard v. County of Erie (In re County of Erie),
546 F.3d 222 (2d Cir. 2008)............................................................................................ 2

Ravens v. Republic N.Y. Corp.,
No. 99-cv-4981, 2002 WL 1969651 (E.D. Pa. Apr. 24, 2002)......................................... 19

Rodman v. Grant Found.,
608 F.2d 64 (2d Cir. 1979)............................................................................................... 21

Rombach v. Chang,
355 F.3d 164 (2d Cir. 2004)................................................................. 17

Sayre Enters., Inc. v. Allstate Ins. Co.,
No. CIV50CV00036, 2006 WL 3613286 (W.D. Va. Dec. 11, 2006)................................ 2

SEC v. Adler,
137 F.3d 1325 (11th Cir. 1998)........................................................... 16

SEC v. Randolph,
736 F.2d 525 (9th Cir. 1984) ............................................................ 12

Shaev v. Hampel,
No. 99 Civ. 10578 (RMB), 2002 U.S. Dist. LEXIS 20497
(S.D.N.Y. Oct. 25, 2002) ................................................................ 6

United Paperworkers Int'l Union v. Int'l Paper Co.,
985 F.2d 1190 (2d Cir. 1993)............................................................. 24

United States v. Gasparik,
141 F. Supp. 2d 361 (S.D.N.Y. 2001).................................................... 2

**Other Authorities**

Barry J. Epstein, et al., GAAP Codification Enhanced 718 (Wiley 2009) ........................ 13

Classification of Current Liab. Fin., Statement of Fin. Accounting Standards
§ 210-10-45-6 (Fin. Accounting Standards Bd. 2009) ........................................ 13

Classification of Current Liab. Fin., Statement of Fin. Accounting Standards
§ 450-20-30-1 (Fin. Accounting Standards Bd. 2009) ........................................ 13

Proxy Rules – Comprehensive Review,
SEC Release No. 6592 (July 1, 1985)....................................................... 19

Richard Langan & Daniel McAvoy, The Integrated Disclosure System,
Registration and Periodic Reports Under the Securities Exchange Act of 1934,
1690 PLI/Corp 367 (2008)............................................................... 19-20

Securities and Exchange Commission Division of Enforcement, Enforcement
Manual (Oct. 6, 2008)................................................................... 2

Statement of Fin. Accounting Standards No. 5 ¶ 11 (1975) ............................... 13

U.S. Securities and Exchange Commission,
Report of the Advisory Committee on Enforcement
Policies and Practices 34 (June 1, 1972).................................................. 3-4

**Page(s)**

U.S. Securities and Exchange Commission,
<u>Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act
of 1934 and Commission Statement on potential Exchange Act Section 10(b) and
Section 14(a) Liability</u> 34-51283, 2005 WL 1074830 (Mar. 1, 2005) .............................  <u>passim</u>

# INTRODUCTION AND RESPONSE TO AUGUST 25 ORDER

Bank of America respectfully submits this reply memorandum pursuant to leave of the Court granted at the conference on August 10, 2009 and the Court's Order of August 25, 2009 (the "August 25 Order").[1]

Addressing the August 25 Order first, the Court directed the parties to address the SEC's statement that it decided not to bring charges against individuals based on an assertion of reliance on advice of counsel that the SEC, in turn, chose not to test. August 25 Order 2-4. Bank of America cannot speak for the SEC. It did not decide the nature of the charges, or who would be charged. It did not decide which witnesses the SEC would interview or take testimony from. It did not decide which questions to ask or not ask. It did not prevent any witnesses from testifying or ever invoke the attorney-client privilege in testimony regarding the subject of whether or how to disclose Merrill Lynch's incentive compensation.

Bank of America's position has been clear and consistent: the Proxy Statement was neither false nor materially misleading and there was no negligence. Accordingly, there is no individual liability in this case; there is no evidence that any individual is culpable. Indeed, even if there were any issue with the language in the Proxy Statement, the senior management of Bank of America and Merrill Lynch did not certify the Proxy Statement, as the SEC now admits, and did not draft the language at issue here.[2]

---

[1]    Unless otherwise indicated, capitalized terms used herein have the same meaning given them in the Memorandum of Law on Behalf of Bank of America ("Opening Mem.").

[2]    As the SEC noted in its memorandum, unlike Section 302 of the Sarbanes-Oxley Act of 2002, which applies only to annual and quarterly periodic reports, the proxy rules do not require any individual to certify the truthfulness of the information contained in the proxy materials.  SEC Mem. at 11.

In the August 25 Order, the Court also asked whether Bank of America had waived the attorney-client privilege by allegedly asserting that it relied on counsel. The answer is indisputably no for at least three reasons. First, no Bank of America or Merrill Lynch witnesses told the SEC that they relied on the advice of counsel with respect to the matter at issue here. At most, when asked, Bank of America and Merrill Lynch witnesses answered that they delegated to counsel the responsibility for preparing the Proxy Statement, including the section at issue here.[3] Second, no Bank of America or Merrill Lynch witnesses revealed the content of any confidential communication with counsel. Third, neither Bank of America nor Merrill Lynch has ever invoked reliance on advice of counsel as a defense to a claim by the SEC in litigation. See, e.g., Pritchard v. County of Erie (In re County of Erie), 546 F.3d 222, 230 (2d Cir. 2008) (under "at issue" theory of waiver, "party must *rely* on privileged advice from his counsel to make his claim or defense") (emphasis in original); John Doe Co. v. United States, 350 F.3d 299, 306 (2d Cir. 2003) (no waiver unless "in litigation circumstances . . . a party uses an

---

[3]        An affirmative answer in testimony to the question of whether an individual relied on advice of counsel – without more – would not constitute a waiver of privilege. See, e.g., Sayre Enters., Inc. v. Allstate Ins. Co., No. CIV 506CV00036, 2006 WL 3613286, at *4 (W.D.Va. Dec. 11, 2006) ("Advice of counsel . . . is not in issue simply because it is relevant or because the lawyer's advice affected the client's state of mind with respect to a relevant matter. Rather, advice of counsel is raised only when the client asserts a claim or defense and attempts to prove that claim or defense by disclosing or describing an attorney-client communication.") (quoting George v. Wausau Ins. Co., No. 99-cv-6130, 2000 U.S. Dist. LEXIS 16813, at *7 (E.D.Pa. Nov. 21, 2000)) (internal citation and quotation marks omitted); Miteva v. Third-Point Mgmt. Co., 218 F.R.D. 397, 398 (S.D.N.Y. 2003) (no waiver even though testimony disclosed as a fact that termination letter was written as it was on advice of counsel, because witness did not selectively reveal any of the substance of the communication itself); United States v. Gasparik, 141 F. Supp. 2d 361, 371 (S.D.N.Y. 2001) (testimonial statement that a party would not act without the advice of counsel is not a waiver); Nat'l Educ. Corp. v. Martin, No. 93C6247, 1994 WL 233661, at *2 (N.D. Ill. May 26, 1994) (statement made in litigation about the ultimate conclusions reached by counsel, but not revealing the specific content of the opinions is not a waiver). Further, SEC policy discourages intruding on the attorney-client privilege. See Securities and Exchange Commission Division of Enforcement, Enforcement Manual, pp. 98-99 (Oct. 6, 2008) ("The staff must respect legitimate assertions of the attorney-client privilege and attorney work product protection . . . . The staff should not ask a party to waive the attorney-client or work product privileges and is directed not to do so. . . . Waiver of a privilege is not a prerequisite to obtaining credit for cooperation.").

assertion of fact to influence the decisionmaker while denying its adversary access to privileged material potentially capable of rebutting the assertion.").[4]  Accordingly, there has been no waiver of privilege here.

The Court also asked Bank of America to explain why, if it had meritorious defenses, it agreed to settle.  The answer is simple:  the SEC presented Bank of America with the question whether to settle for $33 million or to litigate.  The SEC made clear that, in the absence of a settlement, the SEC was prepared to go forward with the Complaint.  Given the available options, and the prospect of facing a protracted and public dispute with one of its principal regulators at a time of uncertain and difficult market conditions, Bank of America determined that the $33 million penalty – while at the high end of the range – was not unacceptable.  There is nothing nefarious about that.  It is rational for a company in Bank of America's position to settle the SEC's allegations despite the substantial possibility it could prevail if the matter were litigated.  As Professor Grundfest noted, "it can be imprudent for regulated entities to engage in protracted litigation with their regulators."  See Grundfest Aff. ¶ 44.  As the SEC itself has noted, settlement is desirable from an adverse party's point of view, because, "apart from the costs and expenditures of time involved, a prolonged proceeding is likely to result in repeated adverse publicity and may have other undesirable and, possibly,

---

[4]      The SEC claims Bank of America "has asserted the privilege with respect to numerous documents as well as during testimony, and has provided the Commission with a 550-page privilege log."  SEC Mem. at 25 n.12.  The index in question, prepared at the demand of the NYAG and provided to the SEC at its request, reflects both privileged and non-privileged communications involving Bank of America or Merrill Lynch and in-house counsel or outside counsel relating to numerous matters.  None of the entries relate to the issue at hand:  whether the parties to the Merger Agreement had any obligation to disclose the imposition of a cap on Merrill Lynch's ability to award year-end incentive compensation in the Proxy Statement.

unintended effects."  U.S. Securities and Exchange Commission, Report of the Advisory Committee on Enforcement Policies and Practices 34 (June 1, 1972).

The settlement should be approved.  There is no basis for any scienter-based charge or the suggestion that anyone at Bank of America or Merrill Lynch sought to lie to shareholders regarding Merrill Lynch's intention to pay incentive compensation.  The SEC conducted an investigation that, by its own account, entailed the review of a "vast amount of documentary evidence" including "tens of thousands of emails" (SEC Mem. at 6) and nearly a dozen interviews of senior executives at Bank of America and Merrill Lynch.  SEC Mem. at 7.  At the conclusion of that investigation, it determined that "the investigative record did not support additional corporate charges against Bank of America or charges against individuals."  SEC Mem. at 4.  The SEC also concluded that "the investigative record did not support a finding of scienter."  SEC Mem. at 5.

The SEC determined that, at most, the record could support an allegation of negligence under Section 14(a) of the Exchange Act.  Even then, the SEC did not, and does not, dispute that the "method and format of disclosure was consistent with standard practice and undertaken in good faith."  SEC Mem. at 25.  Giving full measure to the SEC's assessment of its own case, the SEC describes its case as "solid" but admits with unsurprising reticence that the "proffered defenses . . . are not facially frivolous" and "[t]here is litigation risk on both sides."  SEC Mem. at 6.

Bank of America demonstrated in its opening memorandum and through the affidavit of Professor Joseph Grundfest that it has powerful and successful defenses to the SEC's claim:  the Proxy Statement did not make a false statement; there was no material omission; and there was no negligence.

Had the SEC not proposed a settlement that was acceptable, Bank of America would have presented these defenses in litigation, none of which involved the attorney-client privilege or anything other than the plain facts and the law. 8/10/09 Tr. at 37. If the settlement is not approved, Bank of America stands ready to litigate.

## ARGUMENT

### A.  There Was No Misleading Statement Or Omission In The Proxy Statement

The SEC's complaint claims, in essence, that the payment of incentive compensation that was properly and publicly accrued – and that historically had been paid in the ordinary course to some 40,000 Merrill Lynch employees as a significant part of their compensation – was somehow misleadingly concealed. In its opening memorandum and through the affidavit of Professor Grundfest, Bank of America demonstrated that the Proxy Statement – when (properly) read as a whole – contained no false or misleading statements. Opening Mem. at 20-26; Grundfest Aff. ¶¶ 34-41. The SEC's memorandum does not identify a single sentence in the Proxy Statement that would suggest otherwise.

1.   The Proxy Statement Did Not State That Merrill Lynch Would Not Pay Incentive Compensation

The SEC argues that the Proxy Statement contained a false and misleading statement "because it indicated to shareholders that Merrill would only make 'required' payments to its employees, such as salary and benefits, but would not pay discretionary year-end bonuses." SEC Mem. at 20. The Proxy Statement did no such thing.

The Proxy Statement stated that Merrill Lynch had "agreed that, with certain exceptions or except with Bank of America's prior written consent . . . [it would not] pay any current or former directors, officers or employees any amounts not required

5

by existing plans or agreements." Proxy Statement at 84 (Marler Decl. Ex. 11). The negative covenant in Section 5.2(c)(ii) of the Merger Agreement, which was attached to the Proxy Statement, stated: "except as set forth in . . . Section 5.2 of the Company Disclosure Schedule or . . . without the prior written consent of [Bank of America]," – Merrill Lynch would not "pay any amounts to Employees not required by any current plan or agreement (other than base salary in the ordinary course of business)." Merger Agreement § 5.2(c)(ii) at A-31 to A-32 (Marler Decl. Ex. 11).

The Proxy Statement truthfully and accurately described the terms of Section 5.2 of the Merger Agreement. Merrill Lynch had agreed not to pay year-end incentive compensation except as set forth in the Disclosure Schedule *or* with Bank of America's written consent. No fair reading of the Proxy Statement suggests that Merrill Lynch had unqualifiedly agreed not to pay incentive compensation or suggested that Bank of America would not provide consent.

2. The Proxy Statement, Read As A Whole, Left No Doubt That Merrill Lynch Employees Would Receive Incentive Compensation

The SEC does not read the Proxy Statement's description of the negative covenant either as it is written or, as the case law requires, in the context of the Proxy Statement as a whole. Courts "analyze[ ] allegedly misleading [proxy] materials in their entirety to determine whether a reasonable investor would have been misled. The touchstone of the inquiry is . . . whether defendants' representations or omissions, considered together and in context" are misleading. Shaev v. Hampel, No. 99 Civ. 10578 (RMB), 2002 U.S. Dist. LEXIS 20497, at *19 (S.D.N.Y. Oct. 25, 2002) (dismissing claims alleging violations of § 14(a) of the Exchange Act) (internal quotations marks omitted). See also Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 5 (2d Cir. 1996)

("It is further undisputed that the central issue . . . is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor . . . .").

Taken "together and in context," the description of the negative covenant in Section 5.2 of the Merger Agreement, and the remaining statements in the Proxy Statement, made clear beyond doubt that Merrill Lynch's employees would receive incentive compensation, as they had in the past. The SEC does not address or gives short shrift to each of the following disclosures contained in the Proxy Statement:

> (1)     the unequivocal statement that Merrill Lynch had "undertaken customary covenants . . . to (1) conduct its business in the ordinary course in all material respects, [and] (2) use reasonable best efforts to maintain and preserve intact its business organization and advantageous business relationships, *including retaining the services of key officers and employees*." Proxy Statement at 83 (Marler Decl. Ex. 11) (emphasis added);

> (2)     Merrill Lynch's quarterly reports for the first three quarters of 2008, which were incorporated into and made part of the Proxy Statement and which explained (in both their quarterly consolidated statements of income and in the accompanying text) that Merrill Lynch was accruing expenses for compensation and benefits through 2008 at a rate of approximately $3.5 billion per quarter – amounts consistent with its accruals for 2007, a year in which it was publicly known that Merrill Lynch had paid billions

of dollars in incentive compensation while at the same time suffering billions of dollars in losses.  Marler Decl. Exs. 4, 6 and 12;

(3)     the *pro forma* income statement in the Proxy Statement, which reflected that Merrill Lynch had accrued $7.687 billion in "personnel" expenses through the first six months of 2008.  Marler Decl. Ex. 11 at 40;[5]

(4)     Merrill Lynch's financial disclosures for the third quarter – a quarter that ended after the Merger Agreement was signed – which did not reflect any change in the rate at which Merrill Lynch was accruing expenses for compensation and benefits.  Marler Decl. Ex. 12;

(5)     the public disclosure by Merrill Lynch's then-Chief Financial Officer in an earnings conference call on October 16, 2008, that highlighted the fact that "compensation expenses for the [third] quarter . . . were $3.5 billion" and "on a year-to-date basis, comp expense is down slightly from comparable 2007 levels."  Final Transcript, MER-Q3 2008 Merrill Lynch Earnings Conference Call at 5 (Oct. 16, 2008) (Marler Decl. Ex. 10);

(6)     the Proxy Statement's clear indication that "the representations and warranties and other provisions of the Merger Agreement should not be read alone, but instead should be read only in conjunction

with the information provided elsewhere in this document and in the documents incorporated by reference into this document" – in other words, with reference to all of the incorporated information, including the quarterly accruals as reflected in the publicly filed financial statements.  Proxy Statement at 83 (Marler Decl. Ex. 11);[6]

(7)  the Proxy Statement's repeated warnings that shareholders should *not* read the Merger Agreement or the Proxy Statement's description thereof as a source of factual information (Proxy Statement at 83, 125) (Marler Decl. Ex. 11), including the statement that the Merger Agreement was described in and appended to the Proxy Statement "only to provide . . . information regarding its terms and conditions and *not to provide any other factual information regarding Merrill Lynch*, Bank of America or their respective businesses."  Proxy Statement at 83 (emphasis added); and

(8)  Merrill Lynch's Form 8-K pertaining to events on September 15 (filed on September 18), incorporated by reference into (and made part of) the Proxy Statement, which alerted shareholders that the "covenants" contained in the Merger Agreement "may be . . .

---

[5]    Compare Marler Decl. Ex. 11 at 40 (*pro forma* income statement showing $7.687 billion in "personnel" expenses through first six months of 2008) with Marler Decl. Ex. 6 at 5, 83 (second quarter 10-Q showing $7.687 billion in accrued "compensation and benefits" expense).

[6]    The Proxy Statement made clear – in a section titled "**WHERE YOU CAN FIND MORE INFORMATION**" (emphasis in original) – where shareholders should look for "important information

9

*qualified by confidential disclosures*" and should not be read as

"*establishing these matters as facts . . . .*"  Merrill Lynch & Co.,

Inc., Current Report (Form 8-K) at 2 (Sept. 18, 2008) (Marler

Decl. Ex. 7) (emphases added).

The Proxy Statement did not make an "express representation" (SEC

Mem. at 23) that Merrill Lynch would not pay *any* year-end incentive compensation.  The

disclosures in the Proxy Statement or the financial statements regarding compensation

were sufficient to convey that Merrill Lynch would pay incentive compensation as it

consistently had in the past.  Taking all of these statements together, the Proxy Statement

made clear that Merrill Lynch would conduct its business in the ordinary course and use

reasonable best efforts to maintain and preserve intact its business organization and retain

the services of key officers and employees; that it had already accrued and intended to

pay multi-billions of dollars in compensation expenses at a rate similar to 2007 (a year in

which it also paid multi-billions of dollars of incentive compensation); that the signing of

the Merger Agreement did not slow or change Merrill Lynch's plans with respect to its

incentive compensation; and that the description of the Merger Agreement was being

included only to inform shareholders of its terms and not to convey any information or

make any representation about Merrill Lynch's business.

In view of all this, no reasonable shareholder could have read the

description of Section 5.2 as a statement of fact that Merrill Lynch would pay only

"required" compensation.  And as set forth below, none did.

---

about the companies and their financial condition," *i.e.*, to specified SEC filings "incorporated by
reference" into the Proxy Statement.  Proxy Statement at 123 (Marler Decl. Ex. 11).

3.        The Proxy Statement Did Not Contain An Actionable Omission

The SEC admits that under Section 14 an omission is actionable only if the omitted item is required by SEC regulation or it is necessary to make other statements in the Proxy Statement not materially false or misleading.  SEC Mem. at 18 (citing Resnik v. Swartz, 303 F.3d 147, 151 (2d Cir. 2002)).  The SEC acknowledges that there is no line item disclosure requirement at issue here.  The SEC also acknowledges that no SEC rule or regulation requires companies to provide a breakdown of compensation and benefits figures distinguishing among base salary, incentive compensation, and other benefits and compensation-related expenses, other than for its most senior executive officers.  In fact, no comparable financial institution does so.[7]  Thus, the Proxy Statement was only required to include information regarding the cap on year-end incentive compensation if the omission of the fact or amount of the cap made other statements misleading.

The SEC argues that the Proxy Statement should have contained information about the cap because without it a reasonable shareholder would have believed that Merrill Lynch "would only make 'required' payments to its employees." SEC Mem. at 20.  However, as set forth above, the actual language in the Proxy Statement (whether read in isolation or in context) did not say that Merrill Lynch would limit its compensation expenses to "required" payments.  Rather, the Proxy Statement and the Merger Agreement annexed thereto stated that Merrill Lynch had agreed that it would not pay any compensation not required by a current plan or agreement "*except as*

---

[7]        See, e.g., Goldman Sachs Group Inc., Annual Report (Form 10-K) at 81, 131 (Jan. 27, 2009); Morgan Stanley, Annual Report (Form 10-K) at 34 (Jan. 29, 2009); Citigroup Inc., Annual Report (Form 10-K) at 116 (Feb. 27, 2009); JPMorgan Chase & Co., Annual Report (Form 10-K) at 36, 118 (Mar. 2,

set forth in . . . Section 5.2 of the Company Disclosure Schedule" *or* with Bank of America's "prior written consent." Merger Agreement § 5.2 at A-31; Proxy Statement at 83-84 (Marler Decl. Ex. 11) (emphases added). There was no basis for readers to assume that incentive compensation would not be paid. Indeed, in view of the disclosures included in the Proxy Statement, readers would have known – and did know – that Merrill Lynch could pay (and indeed intended to pay) year-end incentive compensation consistent with these exceptions.

The SEC contends that a reasonable shareholder could have reasonably thought that Merrill Lynch would pay no incentive compensation. Bank of America believes strongly that the SEC is simply wrong. This Court need not predict the winner of such a contest; it need only conclude, as it should, that the settlement constitutes a fair and reasonable resolution to a dispute between parties with firmly held beliefs that each contends is based in fact. See, e.g., SEC v. Randolph, 736 F.2d 525, 529 (9th Cir. 1984) ("Unless a consent decree is unfair, inadequate, or unreasonable, it ought to be approved.").

The Proxy Statement's industry-accepted reference to the additional "Disclosure Schedule" was not "meaningless" and did not render the description of the relevant provisions of the Merger Agreement "meaningless," as the SEC contends. SEC Mem. at 21. The industry-accepted reference to the "Disclosure Schedule" told shareholders that Bank of America had negotiated, and Merrill Lynch had agreed to, a series of provisions that protected Bank of America and its shareholders against Merrill Lynch's unilateral dissipation of value in the period prior to closing, including by

2009). See Exs. 1-4 to the Declaration of Jennifer A. Kennedy dated September 9, 2009. Unless otherwise indicated, exhibits referenced in this memorandum are attached to the Declaration of Jennifer A. Kennedy.

ensuring that Merrill Lynch did not pay year-end incentive compensation without Bank of America's written agreement or consent (either as set forth in the Disclosure Schedule or otherwise). Pierce Aff. ¶¶ 11-12.

Indeed, not only was disclosure of the precise "cap" in the Disclosure Schedule unnecessary for shareholders to understand that Merrill Lynch would pay year-end incentive compensation with Bank of America's agreement or consent, but it would not have provided information, much less accurate information, regarding the year-end incentive compensation that Merrill Lynch actually intended to pay. SEC Mem. at 20.

The amount of year-end incentive compensation that Merrill Lynch intended to pay was reflected in the accruals in its 2008 quarterly financial statements and the accompanying text, which were incorporated by reference into the very Proxy Statement the SEC is challenging here. That information was widely known to the investing public. The accruals reflected the amounts of year-end incentive compensation that Merrill Lynch intended to award (and actually did award).[8]

The $5.8 billion cap figure contained in the Disclosure Schedule was just that – a cap. It limited what Merrill Lynch could award without obtaining the further written consent of Bank of America. It was set before Merrill Lynch made its decisions

---

[8] Under GAAP standards, incentive compensation accruals are considered current liabilities for accounting purposes and thus the best estimate of such amounts must be disclosed. See Barry J. Epstein, et al., GAAP Codification Enhanced 718-19 (Wiley 2009); Statement of Fin. Accounting Standards § 210-10-45-6 (Fin. Accounting Standards Bd. 2009); see also Statement of Fin. Accounting Standards No. 5 ¶ 11 ("[T]he financial statements shall . . . give an estimate of the amount or range of loss or possible loss or state that such an estimate cannot be made."); Statement of Fin. Accounting Standards § 450-20-30-1 (Fin. Accounting Standards Bd. 2009) ("When no amount within the range is a better estimate than any other amount, however, the minimum amount in the range shall be accrued."). Thus, continued accruals for compensation throughout 2008 – and the lack of any reversal or reduction of such accruals – manifested Merrill Lynch's intent to pay such compensation. However, the actual year-end incentive compensation awards and accruals were billions of dollars less than the contractual cap.

regarding what to pay in incentive compensation[9] and it did not bear a relationship to the amount Merrill Lynch would award. Merrill Lynch ultimately paid $3.6 billion in incentive compensation, far less than the amount of the "undisclosed cap" of $5.8 billion. Of the $3.6 billion that Merrill Lynch actually paid, $695 million was contractually guaranteed, meaning that about $2.9 billion was actually *discretionary* year-end incentive compensation. Opening Mem. at 17-18.[10]

4.      There Are Substantial Grounds To Conclude The Remainder Of
The SEC's Arguments Would Fail

In evaluating the settlement, there are substantial grounds for the Court to conclude that the SEC's arguments would likely fail. The SEC claims the Proxy Statement and Merger Agreement "conveyed the false impression that Bank of America had not yet given its consent" to the payment of incentive compensation because it referred in the alternative to the Disclosure Schedule or Bank of America's consent. SEC Mem. at 21.[11] That is not the case. The language accurately described the contractual provision.

---

[9] There is no dispute that, at the time the Proxy Statement was mailed on November 3, 2008, Merrill Lynch's Compensation Committee had not yet set the incentive compensation that Merrill Lynch would award. As the SEC notes, Bank of America was not informed until November 12, 2008 that Merrill Lynch intended to award incentive compensation before year-end (SEC Mem. at 14), and Merrill Lynch's Compensation Committee did not determine the amount of incentive compensation to be awarded until after the shareholder vote. (Compl. ¶¶ 23-24).

[10] The SEC's opening brief makes a passing reference to the filing requirements under Item 601(b)(2) of Regulation S-K. SEC Mem. at 21. Under Item 601(b)(2) of Regulation S-K, the schedules to a "plan of acquisition" must be filed with the SEC only if "such schedules contain information which is material to an investment decision and which is not otherwise disclosed in the agreement or the disclosure document." 17 C.F.R. § 229.601(b)(2). The SEC's complaint does not plead this theory and for good reason. As set forth above, the information in the Disclosure Schedule bore no relationship to the amount of incentive compensation that Merrill Lynch actually intended to award and the disclosure of that figure thus would not have provided shareholders any information "material to an investment decision." Indeed, because the "cap" was so much higher than the incentive compensation reflected in Merrill Lynch's accruals, disclosure of the "cap" may well have been misleading.

[11] The SEC argues that shareholders could not tell whether Bank of America had consented in the Disclosure Schedule because the reference to exceptions was omnibus, but the Proxy Statement plainly told

14

The Proxy Statement plainly told readers that Merrill Lynch could award year-end incentive compensation if *either* (1) Bank of America had already so consented (in the Disclosure Schedule); *or* (2) Bank of America provided its written consent in some other form either before or after execution of the Merger Agreement. Nothing in that language would lead a shareholder to infer anything about the timing of *when* any exceptions were or would be granted.

In any event, the issue of the timing of Bank of America's consent is a red herring. The purpose of the negative covenant in Section 5.2(c)(ii) was to ensure that Merrill Lynch would not pay year-end incentive compensation without Bank of America's consent in the Disclosure Schedule or some other writing – it was not to prevent Merrill Lynch from paying *any* year-end incentive compensation at all. In fact, Merrill Lynch was required to use its reasonable best efforts to retain key employees. It would have been a matter of complete indifference to a reasonable Bank of America shareholder whether Bank of America's consent was granted on September 14, September 16, November 3 or any other date. The SEC does not claim otherwise.

Indeed, the Proxy Statement could not logically have conveyed the impression that no discretionary incentive compensation for 2008 would ever be paid to Merrill Lynch employees or that those employees would not receive compensation similar to what they have received in the past. The negative covenant contained in Section 5.2 of the Merger Agreement operated only in the period between signing and closing and had no operative effect on Merrill Lynch's *post*-merger conduct. Thus, even under the SEC's reading of Section 5.2 and the Proxy Statement's description thereof, no

shareholders that if Bank of America had not already consented it could do so in the future. SEC Mem. at 12-13.

shareholder could have understood there to be any restriction on Merrill Lynch's ability to pay year-end incentive compensation to its employees after the merger closed.

5. <u>The Case Law Does Not Support The SEC's Arguments</u>

The precedents cited by the SEC in support of its position serve only to highlight the extraordinary nature of its claims here. The SEC relies on two main "precedents": (1) its own report of an investigation – a statement issued without benefit of judicial review – regarding Titan Corporation;[12] and (2) the Ninth Circuit's decision in <u>Glazer Capital Management v. Magistri</u>, 549 F.3d 736, 741 (9th Cir. 2008).

<u>Titan</u> and <u>Glazer</u> are both inapposite. Both matters involved *affirmative*, *un*qualified representations of fact in a proxy statement and merger agreement that the respective companies were in full compliance with the Foreign Corrupt Practices Act, whereas in reality – as was reflected in confidential disclosure schedules – both companies knew otherwise. In <u>Titan</u>, the SEC expressed the concern that the repetition in a proxy statement of an unqualified representation or warranty of fact in a merger agreement could convey to a reasonable reader the understanding that the representation or warranty was true.

In contrast, putting aside that there was no misrepresentation here, this case does not even involve a representation of fact. The contractual provision at issue is not a representation or warranty that a specific fact is true but a negative covenant (*i.e.*, an agreement not to engage in certain conduct between signing and closing except as

---

[12] <u>See</u> SEC Mem. at 23 (citing Report of Investigation Pursuant to Section 21(a) of the Exchange Act of 1934 and Commission Statement on Potential Exchange Act Section 10(b) and Section 14(a) Liability, Exchange Act Rel. No. 34-51283, 2005 WL 1074830 (Mar. 1, 2005) ("<u>Titan</u>")). As noted, <u>Titan</u> was a report of investigation of a company and thus was not the product of adversarial litigation, received no imprimatur of judicial acceptance and was not the result of the SEC's standard rulemaking process. Such reports are entitled to little weight. <u>See</u> <u>SEC v. Adler</u>, 137 F.3d 1325, 1339 (11th Cir. 1998).

provided for in the Disclosure Schedule or with Bank of America's written consent). The Proxy Statement did not contain a factual representation that Merrill Lynch would not pay incentive compensation between signing and closing. The Proxy Statement instead summarized Merrill Lynch's agreement not to award incentive compensation before closing except as provided for in the Disclosure Schedule or with Bank of America's written consent – an accurate description of the parties' agreement – which was coupled with clear and repeated financial statements and other public disclosures that Merrill Lynch was planning on paying billions of dollars in such compensation.[13]

Moreover, the Proxy Statement here accurately stated that the negative covenant at issue was subject to exceptions. Thus, *un*like Titan and Glazer, where the proxy statements (and merger agreements) characterized the representations as unqualified, both the Merger Agreement provision and Proxy Statement summary at issue here included express references to *exceptions* to the negative covenant. There is thus no way that a reasonable shareholder could have taken the Proxy Statement to mean that no incentive compensation would be awarded at Merrill Lynch.[14]

Furthermore, the SEC's Titan report cautioned that issuers could face potential liability only where a reasonable shareholder "could conclude that the

---

[13] Courts have repeatedly recognized the distinction between a promise (including a contractual promise) and a factual representation and held that the former does not support a fraud claim. See, e.g., Rombach v. Chang, 355 F.3d 164, 173 (2d Cir. 2004) (holding that "optimistic statements" about future performance are "protected by the 'bespeaks caution' doctrine and the PSLRA's safe harbor"); Murray v. Xerox Corp., 811 F.2d 118, 123 (2d Cir. 1987) ("Promises of future conduct are not actionable as negligent misrepresentations."); Matsumura v. Benihana Nat'l Corp., 542 F. Supp. 2d 245, 253 (S.D.N.Y. 2008) ("Though misrepresentations of present or past fact have the potential to create liability for the speaker, '[m]ere unfulfilled promissory statements as to what will be done in the future are not actionable' as such.") (quoting Brown v. Lockwood, 432 N.Y.S.2d 186, 194 (2d Dep't 1980)).

[14] And indeed, as shown below, there is no evidence that anyone did read the Proxy Statement in the manner the SEC suggests; to the contrary, there is incontrovertible evidence that all of the media and stock analysts – and therefore presumptively investors – who focused on the issue understood that Merrill Lynch intended to pay billions of dollars in incentive compensation. See infra at 19-25.

statements made in the representation *describe the actual state of affairs*."  <u>Titan</u>, 2005

WL 1074830, at *2 (emphasis added).  Here, the Proxy Statement warned shareholders

that representations made in the Merger Agreement "may be subject to important

qualifications agreed to by the parties to allocate risk between Bank of America and

Merrill Lynch," and may have been included for that purpose "rather than to establish

matters as facts."  Proxy Statement at 83, 125 (Marler Decl. Ex. 11); <u>see also</u> Merrill

Lynch (Form 8-K) at 2 (Sept. 18, 2008) (incorporated by reference) (the "representations,

warranties, and covenants" contained in the Merger Agreement "may be subject to

limitations agreed upon by the contracting parties, *including being qualified by*

*confidential disclosures* made for the purposes of allocating contractual risk between the

parties to the Merger Agreement *instead of establishing these matters as facts*") (Marler

Decl. Ex. 7) (emphases added).

        Thus, the Proxy Statement explicitly told shareholders they should *not*

infer from the statements made about the contractual limitations on Merrill Lynch's right

to pay incentive compensation (or do a host of other things) between signing and closing

without consent that no such payments (or other things) would in fact occur. [15]  The

shareholders were told in plain English that the Merger Agreement covenants and their

---

[15]      In the wake of <u>Titan</u> and <u>Glazer</u>, it has become common practice – widely advocated by
practitioners from around the country – to include such cautionary language and exceptions to avoid any
conceivable issue of a description of a contractual provision being misunderstood as a statement of fact,
while still being able to provide shareholders with the form of the merger agreement – the attachment of
which is *not* required by the SEC's rules.  <u>See, e.g.</u>, Pierce Aff. ¶¶ 15-21; Donald Griffith & Yvette M.
VanRiper, *A "Titan"-ic Quandary: Can Contract Terms Disclosure Sink Your Company?*, Foley & Lardner
LLP Webinar (Mar. 29, 2005) available at <u>http://www.foley.com/home.aspx</u> (last visited Sept. 1, 2009)
(Ex. 5 at 24); Lyle G. Ganske & James P. Dougherty, *Merger Agreement Presentations Take on a Life of
Their Own*, Jones Day Commentary (July 2005) at 3-4 (Ex. 6); Marian N. Dawood Azib & Ronald H. Janis,
*A Repeated Call for Disclaimers When Filing Acquisition Documents on Edgar*, Day Pitney Alert (Mar. 17,
2009) at 2 (Ex. 7).  <u>See generally</u> Exs. 5-16.  The SEC's position here is directly contrary to that
commonplace nationwide practice, and would represent a significant new theory of liability – one that
ought not be pursued retroactively in an enforcement action.

description in the Proxy Statement were *not* to be taken as stating any set of facts or as describing the actual state of affairs. For this reason as well, <u>Titan</u> and <u>Glazer</u> are not on point.[16]

## B.     Any Alleged Misstatement Or Omission Was Not Material

Even if a fact finder were to conclude that there was a misstatement or omission in the Proxy Statement (notwithstanding the inclusion of the negative covenant and the existence of the accruals and the other information in the financial statements), there would still be no violation of Section 14, and the SEC's claim would also fail for lack of materiality.

It was widely acknowledged in the period leading up to the shareholder vote that Merrill Lynch intended to pay year-end incentive compensation – Merrill Lynch had disclosed its compensation expenses. There is no evidence that any reader of the Proxy Statement was mistaken on that point. Indeed, we have been unable to find any report from any source whatsoever reflecting the belief that Merrill Lynch would not pay year-end incentive compensation. The SEC has not cited to any such evidence.

Contrary to the SEC's assertion, there were not just "tidbits of information relevant to the issue of year-end compensation." SEC Mem. at 22.[17] Merrill Lynch

---

[16]     The SEC also cites <u>Ravens v. Republic New York Corp.</u>, No. 99-CV-4981, 2002 WL 1969651, at *7-10 (E.D. Pa. Apr. 24, 2002). <u>Ravens</u> is likewise plainly inapplicable because: (a) it involved representations of historical fact and not a negative covenant; (b) the Proxy Statement here accurately described the negative covenant at issue and expressly stated that it was subject to certain specified exceptions; and (c) the Proxy Statement expressly warned shareholders that the provisions of the Merger Agreement (and the Proxy Statement's description thereof) were intended solely to allocate risk between the contracting parties and did *not* represent an actual state of affairs.

[17]     The SEC claims that shareholders are entitled to full disclosure of material facts within the four corners of the Proxy Statement. This assertion is a misstatement of the law and ignores the SEC's own incorporation regime. <u>See</u> Proxy Rules – Comprehensive Review, SEC Release No. 6592, at *2 (July 1, 1985) ("applying *incorporation by reference* to the Proxy Statement context . . . *enhance[s] investor protection*"); Richard Langan & Daniel McAvoy, <u>The Integrated Disclosure System, Registration and Periodic Reports Under the Securities Exchange Act of 1934</u>, 1690 PLI/Corp 367, 370-71 (2008) ("By

disclosed in clarion terms its right and intention to award incentive compensation for 2008 in each of the quarterly reports filed publicly by Merrill Lynch for that year: it told shareholders in both its financial statements and the accompanying discussion and analysis that it was accruing compensation and benefits expenses averaging $3.5 billion per quarter. The investing public was clearly on notice of Merrill Lynch's intention. <u>See, e.g.</u>, <u>In re Keyspan Corp. Sec. Litig.</u>, 383 F. Supp. 2d 358, 373-74 & n.6 (E.D.N.Y. 2003) (shareholders charged with knowledge of information of a company's SEC filings, including "documents electronically available on the SEC website").

The SEC also does not dispute that the analyst community and the news media uniformly understood that Merrill Lynch was expected to pay, and was not prohibited from paying, year-end incentive compensation in the multi-billions of dollars. Stock market analysts forecasted that the company's annual 2008 expenses for compensation and benefits would be down only slightly from 2007, notwithstanding Merrill Lynch's significant losses. <u>See</u> Grundfest Aff. ¶ 31 & Exs. L-R thereto. *None* reported that Merrill Lynch would not pay any incentive compensation at the end of the year.

The expected incentive compensation numbers were regularly reported in multiple media outlets from the time Merrill Lynch filed its Form 10-Q on October 16, 2008 (before the Proxy Statement was mailed) through, until, and after December 5, 2008, the date of the shareholder meeting. These reports were part of the "total mix" of information available to shareholders and must be considered in assessing whether a

---

permitting the incorporation by reference of information into filings with the Commission under specified circumstances, the Commission *eliminated unnecessary duplication*, reduced issuer compliance expenses and *simplified reporting*.") (emphases added). It also ignores the SEC's own position in the <u>Titan</u> report

material misstatement or omission occurred.  See, e.g., GAF Corp. v. Heyman, 724 F.2d

727, 729 (2d Cir. 1983) ("total mix" of information available at time of proxy contest

"included the many news stories that the closely watched contest had generated");

Rodman v. Grant Found., 608 F.2d 64, 70 (2d Cir. 1979) (district court "properly took

into account information already in the public domain and facts known or reasonably

available to the shareholders"); In re Merrill Lynch & Co., Inc. Research Reports Sec.

Litig., 289 F. Supp. 2d 416, 419 (S.D.N.Y. 2003) (considering "overwhelming and

widely dispersed collection of press articles" in granting a motion to dismiss a securities

fraud class action based in part on the plaintiffs' knowledge of the alleged wrong).

     Those reports appeared in media of wide public distribution and great

repute:  they included The New York Times, the Financial Times, Bloomberg News,

CNN, Fox News Channel, NBC's Today Show and others.  See Grundfest Aff. Exs. B-K.

They were headline news.  Indeed, it was so evident that year-end incentive

compensation would be paid from what Merrill Lynch publicly disclosed that it was a

subject upon which even The New York Times and the Fox News Channel were able to

find complete accord.

     Thus:

- The Guardian reported on October 18 that Merrill Lynch had

    accrued $11.17 billion for staff salaries and bonuses through

    the first nine months of the year, that "[p]ay plans for bankers

    have been disclosed in recent corporate statements," and that

    for Merrill Lynch the "total accrued in the last quarter grew

---

that disclosure is to be judged based on "the total mix of information available to the investor."  Titan, 2005
WL 1074830, at *2.  See also Pierce Aff. ¶¶ 25-26.

76% to $3.49bn."  Grundfest Aff. Ex. B.

- CNN's <u>The Situation Room</u> reported on October 23 that Merrill Lynch had set aside $11.2 billion for compensation through the third quarter.  <u>Id.</u> Ex. C.

- <u>The New York Times</u> and <u>Bloomberg News</u> reported on October 27 that Merrill Lynch was "allocating about *$6.7 billion to pay bonuses*."  These reports included confirmation by a Merrill Lynch spokeswoman that "*the firm's accrued bonuses aren't down as much as those at Goldman and Morgan Stanley* because the firm reduced expenses last year." These reports added that "[t]he bonus figures are based on estimates that about 60 percent of the compensation and benefits expenses reported by the companies will be paid in year-end bonuses, as occurred in past years."  <u>Id.</u> Exs. D, E (emphases added).

- The next day, NBC's <u>Today Show</u> reported that "at Merrill Lynch, Bloomberg estimates *$6.7 billion* [was] *set aside for bonuses*."  <u>Id.</u> Ex. F (emphasis added).

- <u>Bloomberg News</u> reported on October 30 that Merrill Lynch and its competitors Goldman Sachs and Morgan Stanley had "already set aside $20 billion to pay for bonuses this year." That report noted that "industry veterans" had said that the Wall Street firms "will . . . pay bonuses this year;" that bonuses

"typically account for about two-thirds of compensation at the biggest Wall Street firms;" and that "bonuses are accrued throughout the year." The <u>Financial Times</u> similarly so reported the next day. <u>Id.</u> Exs. G, H.

- Fox News Channel on its 6 p.m. news show "<u>Fox Special Report with Brit Hume</u>" reported on November 13 that Merrill Lynch "has allocated *$6.7 billion*" for year-end bonuses. <u>Id.</u> Ex. I.

- Finally, on December 3 – just two days before the shareholder vote – <u>Bloomberg News</u> reported yet again that Merrill Lynch would be paying billions of dollars in year-end bonuses. This Bloomberg report specifically noted that Merrill Lynch was "plan[ning] to cut year end bonuses" by "about 50%" compared to the prior year, which would have equated to 2008 year-end incentive compensation payments of over $3 billion. <u>Id.</u> Ex. J. <u>Market Watch</u> issued a very similar report the same day. <u>Id.</u> Ex. K.

By contrast, not a single media outlet during that period reported that Merrill Lynch would not pay year-end incentive compensation. To say the least, they would have had a difficult time reaching that conclusion in light of the confirmation by a Merrill Lynch spokeswoman, as reported by <u>The New York Times</u> and <u>Bloomberg News</u> on October 27, that Merrill Lynch's 2008 "*accrued bonuses* aren't down as much as those at Goldman and Morgan Stanley." Grundfest Aff. ¶ 29 & Ex. E. (emphasis added).

Simply put, nobody misread the Proxy Statement (or the Merger Agreement) the way the SEC now claims that it could be read.

Although the SEC characterizes the above quoted news reports as "few," "sporadic," and "speculative" (SEC Mem. at 15, 23), the *evidence* demonstrates the contrary. The reports were widespread and appeared in the most widely available and popular media, and covered the entire period from mid-October through the shareholder vote in December.[18] And the SEC's argument (SEC Mem. at 16) that none of these reports "revealed" that Merrill Lynch was "authorized" to pay year-end bonuses is baseless: reports that Merrill Lynch had "set aside" or "allocated" or was "planning to" award billions in discretionary compensation necessarily implied that Merrill Lynch had the contractual right to make such payments. Major public companies do not routinely "set aside," "allocate" or "plan to" award billions of dollars in payments that they are not "authorized" to make.

Moreover, the widespread media reports on the subject did not arise in a vacuum. As was widely known and reported, Merrill Lynch, like all Wall Street investment banks, had traditionally paid a very large percentage of its employee compensation in the form of year-end incentive compensation – including from Merrill Lynch's own proxy statement of that very year. See, e.g., Merrill Lynch & Co., Inc. Definitive Proxy Statement (Schedule 14A) at 29-30 (Mar. 14, 2008) (Marler Decl. Ex. 3) ("[B]ase salary normally represents a small percentage of total compensation."); Jenny Anderson & Landon Thomas Jr., The Number Wall St. Crunches the Most, N.Y.

---

[18] By contrast, in United Paperworkers Int'l Union v. Int'l Paper Co., 985 F.2d 1190, 1200 (2d Cir. 1993) (cited at SEC Mem. at 23) news reports were deemed "sporadic" where they dealt with just a small subset of the company's environmental litigation problems, some of the articles were more than a year

TIMES, Nov. 29, 2004, at C1 (Marler Decl. Ex. 1) ("Bonuses typically make up the majority of compensation for professional employees.").  The news media were thus readily able to discern that Merrill Lynch would be paying multi-billions of dollars in year-end incentive compensation by applying simple arithmetic to Merrill Lynch's disclosed accruals.  See, e.g., Grundfest Aff. Exs. D, E (The New York Times and Bloomberg News report that "[t]he bonus figures are based on estimates that about 60 percent of the compensation and benefits expenses reported by the companies will be paid in year-end bonuses, *as occurred in past years*.") (emphasis added)).[19]

       In any event, shareholders do not make decisions regarding a proposed merger based on whether the target will or will not pay incentive compensation as an abstract matter.  The Proxy Statement was sent to shareholders for the purpose of obtaining approval of a merger between Bank of America and Merrill Lynch.  The vote concerned the strategic desirability of that business combination.  To the extent incentive compensation was germane to that decision, that would have been because, as explained above, the transaction involved the purchase of a company (Merrill Lynch) whose value consisted in significant part of human capital – hence the affirmative requirement in the Merger Agreement that Merrill Lynch "use reasonable best efforts to maintain and preserve intact its business organization and advantageous business relationships and

---

apart with the last article appearing over two months *before* the proxy statement there at issue, and all but one of the articles came more than six months before the proxy statement.

[19]      The SEC cites to testimony by Peter Stingi, Merrill Lynch's former Global Head of Human Resources, to try to support its hypothesis that compensation accrual is an inadequate indicator of a firm's year-end incentive compensation plans.  SEC Mem. at 15.  Mr. Stingi testified that he could not make a "very exact" estimate of incentive compensation that would be paid by Merrill Lynch's competitors because those competitors– unlike Merrill Lynch – reported aggregate compensation and benefit accruals.  But, it indisputably *can* be – and indeed, was – inferred from Merrill Lynch's accruals and accompanying textual disclosures that year-end incentive compensation at Merrill Lynch would be in the range of multi-billions of dollars.  That incontrovertible fact defeats entirely the SEC's claim in this case that the

retain the services of key officers and key employees." Merger Agreement § 5.1, at A-31 (Marler Decl. Ex. 11).

## C. The SEC Asserts No Scienter-Based Claim, And Any Such Claim Would Have No Basis In Fact

Nowhere in the Complaint is there an allegation of any intentional misconduct. The SEC had made no such allegation because it would have no basis in fact.

Not only is there no evidence that anyone at Bank of America or Merrill Lynch sought to deceive shareholders with respect to Merrill Lynch's intention to pay incentive compensation, but any such allegation would defy common sense. First, the merger's success depended largely on the human capital and talent of Merrill Lynch, which in turn obviously depended on the company's having the ability to maintain levels of compensation adequate to retain and incentivize that talent. The notion that Bank of America could have fooled shareholders into believing that it would be able to retain Merrill Lynch's human capital without paying incentive compensation that participants in the industry have traditionally received (and all of Merrill Lynch's competitors were continuing to pay despite themselves incurring billions of dollars in losses) is far-fetched.

Second, it would have been impossible for Bank of America to "conceal" that Merrill Lynch would be making year-end incentive compensation payments, since, as the record incontrovertibly demonstrates, the disclosures in Merrill Lynch's own financial statements – both on the very face of the Proxy Statement itself and in its Forms 10-Q incorporated therein – in conjunction with Merrill Lynch's other public disclosures

---

stockholders of Bank of America were misled into believing that Merrill Lynch had been "contractual[ly] prohibit[ed]" from paying *any* year-end incentive compensation. E.g., Compl. ¶ 3.

plainly disclosed Merrill Lynch's intention to pay the very incentive compensation that the SEC argues was falsely stated would not be paid.

## CONCLUSION

Despite what it believes to be significant weaknesses in the SEC's case, Bank of America remains committed to the proposed settlement, which it agreed to in the hopes of avoiding a very public dispute with one of its principal regulators and the negative publicity that such a dispute would entail. While the civil penalty agreed to in this settlement was indeed large – especially given the lack of merit of the SEC's case – the settlement would not unfairly harm innocent shareholders and was determined by Bank of America for the reasons stated to be preferable to litigating the case.[20]

For the foregoing reasons and those stated in the Opening Memorandum, the Court should enter the Consent Judgment.

Dated: New York, New York
September 9, 2009

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP


By: _____s/Lewis J. Liman_____
Lewis J. Liman
Shawn J. Chen

One Liberty Plaza
New York, New York 10006
212-225-2000

Attorneys for Defendant Bank of America
Corporation

---

[20] Bank of America was not given the option to settle or litigate for nothing. Because of the SEC's decision to bring charges, Bank of America would have to spend corporate funds whether or not it settled. Bank of America determined – for the reasons stated – that it was preferable to spend its money to settle this action than to incur additional litigation expenses.