UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
SECURITIES AND EXCHANGE COMMISSION, :
                                    :
              Plaintiff,            :         09 Civ. 6829 (JSR)
                                    :
            - v -                   :
                                    :         MEMORANDUM ORDER
BANK OF AMERICA CORPORATION,        :
                                    :
              Defendant.            :
-----------------------------------x

JED S. RAKOFF, U.S.D.J.

     In the Complaint in this case, filed August 3, 2009, the

Securities and Exchange Commission ("S.E.C.") alleges, in stark

terms, that defendant Bank of America Corporation materially lied

to its shareholders in the proxy statement of November 3, 2008

that solicited the shareholders' approval of the $50 billion

acquisition of Merrill Lynch & Co. ("Merrill").  The essence of

the lie, according to the Complaint, was that Bank of America

"represented that Merrill had agreed not to pay year-end

performance bonuses or other discretionary incentive compensation

to its executives prior to the closing of the merger without Bank

of America's consent [when] [i]n fact, contrary to the

representation ..., Bank of America had agreed that Merrill could

pay up to $5.8 billion -- nearly 12% of the total consideration

to be exchanged in the merger -- in discretionary year-end and

other bonuses to Merrill executives for 2008." Compl. ¶ 2. Along

1

with the filing of these very serious allegations, however, the parties, on the very same day, jointly sought this Court's approval of a proposed final Consent Judgment by which Bank of America, without admitting or denying the accusations, would be enjoined from making future false statements in proxy solicitations and would pay to the S.E.C. a fine of $33 million.

In other words, the parties were proposing that the management of Bank of America – having allegedly hidden from the Bank's shareholders that as much as $5.8 billion of their money would be given as bonuses to the executives of Merrill who had run that company nearly into bankruptcy – would now settle the legal consequences of their lying by paying the S.E.C. $33 million more of their shareholders' money.

This proposal to have the victims of the violation pay an additional penalty for their own victimization was enough to give the Court pause.  The Court therefore heard oral argument on August 10, 2009 and received extensive written submissions on August 24, 2009 and September 9, 2009.  Having now carefully reviewed all these materials, the Court concludes that the proposed Consent Judgment must be denied.

In reaching this conclusion, the Court is very mindful of the considerable deference it must accord the parties' proposal, since it would seemingly result in the consensual resolution of

the case.  Society greatly benefits when lawsuits are amicably resolved, and, for that reason, an ordinary civil settlement that includes dismissal of the underlying action is close to unreviewable.  See Hester Industries, Inc. v. Tyson Foods, Inc., 160 F.3d 911, 916 (2d Cir. 1998)(citing cases).  When, however, as in the case of a typical consent judgment, a federal agency such as the S.E.C. seeks to prospectively invoke the Court's own contempt power by having the Court impose injunctive prohibitions against the defendant, the resolution has aspects of a judicial decree and the Court is therefore obliged to review the proposal a little more closely, to ascertain whether it is within the bounds of fairness, reasonableness, and adequacy – and, in certain circumstances, whether it serves the public interest. See S.E.C. v. Randolph, 736 F.2d 525, 529 (9th Cir. 1984); see also S.E.C. v. Wang, 944 F.2d 80, 85 (2d Cir. 1991). See generally, United States v. ITT Continental Baking Co., 420 U.S. 223 (1975); United States v. North Carolina, 180 F.3d 574 (4th Cir. 1999). But even then, the review is highly deferential. S.E.C. v. Worldcom, Inc., 273 F. Supp. 2d 431, 436 (S.D.N.Y. 2003).

Here, however, the Court, even upon applying the most deferential standard of review for which the parties argue, is forced to conclude that the proposed Consent Judgment is neither fair, nor reasonable, nor adequate.

It is not fair, first and foremost, because it does not comport with the most elementary notions of justice and morality, in that it proposes that the shareholders who were the victims of the Bank's alleged misconduct now pay the penalty for that misconduct. The S.E.C. admits that the corporate penalties it here proposes will be "indirectly borne by [the] shareholders." Reply Memorandum of Plaintiff Securities and Exchange Commission in Support of Entry of the Proposed Consent Judgment ("S.E.C. Reply Mem.") at 13. But the S.E.C. argues that this is justified because "[a] corporate penalty ... sends a strong signal to shareholders that unsatisfactory corporate conduct has occurred and allows shareholders to better assess the quality and performance of management." Id. This hypothesis, however, makes no sense when applied to the facts here: for the notion that Bank of America shareholders, having been lied to blatantly in connection with the multi-billion-dollar purchase of a huge, nearly-bankrupt company, need to lose another $33 million of their money in order to "better assess the quality and performance of management" is absurd.

The S.E.C., while also conceding that its normal policy in such situations is to go after the company executives who were responsible for the lie, rather than innocent shareholders, says it cannot do so here because "[t]he uncontroverted evidence in

4

the investigative record is that lawyers for Bank of America and Merrill drafted the documents at issue and made the relevant decisions concerning disclosure of the bonuses." Id.  But if that is the case, why are the penalties not then sought from the lawyers?  And why, in any event, does that justify imposing penalties on the victims of the lie, the shareholders?

Bank of America, for its part, having originally agreed to remain silent in the face of these charges, now, at the Court's request that it provide the Court with the underlying facts, vigorously asserts that the proxy statement, when read carefully, is neither false nor misleading, see Reply Memorandum of Law on Behalf of Bank of America Corporation ("BoA Reply Mem.")at 5, or that, even if it is false or misleading, the misstatements were immaterial because "[it] was widely acknowledged in the period leading up to the shareholder vote that Merrill Lynch intended to pay year-end incentive compensation," id. at 19. The S.E.C. responds, however, that these arguments are hollow.  The Bank's argument that the proxy statement was not misleading rests in material part on reference to a schedule that was not even attached to the proxy statement, and "[s]hareholders are entitled to rely on the representations in the proxy itself, and are not required to puzzle out material information from a variety of external sources." S.E.C. Reply Mem. at 2.  As for the Bank's

argument that the investors were not materially misled because the press was already reporting the imminent payment of Merrill bonuses, "investors were not required to ignore Bank of America's express statements in the proxy materials and rely instead on media speculation that may have suggested that these statements were misleading." Id. at 9.

Moreover, it is noteworthy that, in all its voluminous papers protesting its innocence, Bank of America never actually provides the Court with the particularized facts that the Court requested, such as precisely how the proxy statement came to be prepared, exactly who made the relevant decisions as to what to include and not include so far as the Merrill bonuses were concerned, etc.

But all of this is beside the point because, if the Bank is innocent of lying to its shareholders, why is it prepared to pay $33 million of its shareholders' money as a penalty for lying to them?  All the Bank offers in response to this obvious question is the statement in the last footnote of its Reply Memorandum that "Because of the SEC's decision to bring charges, Bank of America would have to spend corporate funds whether or not it settled," BofA Reply Mem. at 28, n. 20 – the implication being that the payment was simply an exercise of business judgment as to which alternative would cost more: litigating or settling.

6

But, quite aside from the fact that it is difficult to believe
that litigating this simple case would cost anything like $33
million, it does not appear, so far as one can tell from this
single sentence in a footnote, that this decision was made by
disinterested parties.  It is one thing for management to
exercise its business judgment to determine how much of its
shareholders money should be used to settle a case brought by
former shareholders or third parties.  It is quite something else
for the very management that is accused of having lied to its
shareholders to determine how much of those victims' money should
be used to make the case against the management go away.[1]  And
even if this decision is arguably within their purview, it calls
for greater scrutiny by the Court than would otherwise be the
case.

---

[1] Undoubtedly, the decision to spend this money was made
even easier by the fact that the U.S. Government provided the
Bank of America with a $40 billion or so "bail out," of which $20
billion came after the merger. Since $3.6 billion of that money
had already been spent, indirectly, to compensate the Bank for
the Merrill bonuses – not to mention the $20 billion in taxpayer
funds that effectively compensated the Bank for the last-minute
revelations that Merrill's loss for 2008 was $27 billion instead
of $7 billion – what impediment could there be to paying a mere
$33 million (– or more than most people will see in their
lifetimes –) to get rid of a lawsuit saying that the bonuses had
been concealed from the shareholders approving the merger?  To
say, as the Bank now does, that the $33 million does not come
directly from U.S. funds is simply to ignore the overall
economics of the Bank's situation.

Overall, indeed, the parties' submissions, when carefully read, leave the distinct impression that the proposed Consent Judgment was a contrivance designed to provide the S.E.C. with the facade of enforcement and the management of the Bank with a quick resolution of an embarrassing inquiry – all at the expense of the sole alleged victims, the shareholders.  Even under the most deferential review, this proposed Consent Judgment cannot remotely be called fair.

Nor is the proposed Consent Judgment reasonable.  Obviously, a proposal that asks the victims to pay a fine for their having been victimized is, for all the reasons already given, as unreasonable as it is unfair.  But the proposed Consent Judgment is unreasonable in numerous other respects as well.

For example, the Consent Judgment would effectively close the case without the S.E.C. adequately accounting for why, in contravention of its own policy, see Order, 8/25/08 (quoting the policy), it did not pursue charges against either Bank management or the lawyers who allegedly were responsible for the false and misleading proxy statements.  The S.E.C. says this is because charges against individuals for making false proxy statements require, at a minimum, proof that they participated in the making of the false statements knowing the statements were false or recklessly disregarding the high probability the statements were

8

false.  But how can such knowledge be lacking when, as the
Complaint in effect alleges, executives at the Bank expressly
approved Merrill's making year-end bonuses before they issued the
proxy statement denying such approval?[2]  The S.E.C. states, as
noted, that culpable intent was nonetheless lacking because the
lawyers made all the relevant decisions.  But, if so, then how
can the lawyers be said to lack intent?  Under these
circumstances, how can a Court find reasonable a proposed Consent
Judgment that otherwise violates S.E.C. policy?[3]

_____

[2] Lurking in the background is the suggestion, affirmed by
the Bank's counsel at the August 10 hearing, that the highest
executives of Bank of America, upon learning that Merrill's loss
was $20 billion more than had been represented at the time the
merger was negotiated, were prepared to walk away from the merger
until "coerced" by the Government into going through with it,
following which the Government provided the Bank with an
additional $20 billion in bail-out funds.  But, quite aside from
the fact that none of this appears to have been revealed to the
shareholders prior to the merger, neither party suggests that any
such coercion played any role in the alleged decision not to
reveal the Merrill bonuses. The huge increase in Merrill's
losses, however, did arguably render the providing of the bonuses
more material, as well as more inexplicable.

[3] The S.E.C. also claims it was stymied in determining
individual liability because the Bank's executives said the
lawyers made all the decisions but the Bank refused to waive
attorney-client privilege.  But it appears that the S.E.C. never
seriously pursued whether the this constituted a waiver of the
privilege, let alone whether it fit within the crime/fraud
exception to the privilege.  And even on its face, such testimony
would seem to invite investigating the lawyers.  The Bank, for
its part, claims that it has not relied on a defense of advice of
counsel and so no waiver has occurred. But, as noted earlier, the
Bank has failed to provide its own particularized version of how
the proxies came to be and how the key decisions as to what to

To give a different example, the proposed Consent Judgment seeks injunctive relief forbidding the Bank, on pain of contempt of court, from issuing false or misleading statements in the future.  On its face, the proposed injunction appears too nebulous to comply with Rule 65(d) of the Federal Rules of Civil Procedure, which requires, among other things, that an injunction "describe in reasonable detail ... the act or acts restrained ...."  Moreover, since the Bank contends that it never made any false or misleading statements in the past, the Court at this point lacks a factual predicate for imposing such relief.

To be sure, the Bank's initial position was that it neither admitted nor denied the allegations, and such a position, when coupled with proof by the S.E.C. that the alleged violations have occurred, may often be sufficient to support certain forms of injunctive relief.  But here the further submissions of the Bank make clear its position that the proxy statement in issue was totally in accordance with the law: meaning that, notwithstanding the injunctive relief here sought by the S.E.C., the Bank would feel free to issue exactly the same kind of proxy statement in the future.  Under these circumstances, the broad but vague injunctive relief here sought would be a pointless exercise,

---

include or exclude were made, so its claim of not relying on an advice of counsel is simply an evasion.

since the sanction of contempt may only be imposed for violation of a particularized provision known and reasonably understood by the contemnor, all of which would be lacking here.  See, e.g., Int'l Longshoreman's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n, 389 U.S. 64, 76 (1967); Powell v. Ward, 643 F.2d 924, 931 (2d Cir. 1981).

Without multiplying examples further, the point is that the Court finds the proposed Consent Judgment not only unfair but also unreasonable.

Finally, the proposed Consent Judgment is inadequate.  The injunctive relief, as noted, is pointless.  The fine, if looked at from the standpoint of the violation, is also inadequate, in that $33 million is a trivial penalty for a false statement that materially infected a multi-billion-dollar merger.  But since the fine is imposed, not on the individuals putatively responsible, but on the shareholders, it is worse than pointless:  it further victimizes the victims.

Oscar Wilde once famously said that a cynic is someone "who knows the price of everything and the value of nothing."  Oscar Wilde, Lady Windermere's Fan (1892). The proposed Consent Judgment in this case suggests a rather cynical relationship between the parties: the S.E.C. gets to claim that it is exposing wrongdoing on the part of the Bank of America in a high-profile

11

merger; the Bank's management gets to claim that they have been coerced into an onerous settlement by overzealous regulators. And all this is done at the expense, not only of the shareholders, but also of the truth.

Yet the truth may still emerge. The Bank of America states unequivocally that if the Court disapproves the Consent Judgment, it is prepared to litigate the charges. BofA Reply Mem. at 5. The S.E.C., having brought the charges, presumably is not about to drop them. Accordingly, the Court, having hereby disapproved the Consent Judgment, directs the parties to file with the Court, no later than one week from today, a jointly proposed Case Management Plan that will have this case ready to be tried on February 1, 2010.[4]

SO ORDERED

Dated: New York, N.Y.

September 14, 2009                                    U.S.D.J.

---

[4] The trial would include both the application for permanent injunctive relief and the claim for monetary penalties.  If the parties cannot jointly agree on a schedule, they should submit to the Court their competing proposals, and the Court will then resolve the differences.

12