**DAVID ROSENFELD**
**ASSOCIATE REGIONAL DIRECTOR**
**Attorney for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**Three World Financial Center, Suite 400**
**New York, New York 10281**
**(212) 336-0153**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

RECEIVED
OCT 19 2009
U.S.D.C. S.D.N.Y.
CASHIERS

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | |
| | : | |
| **Plaintiff,** | : | **09-Civ.-6892 (JSR)** |
| | : | |
| -against- | : | **AMENDED COMPLAINT** |
| | : | |
| **BANK OF AMERICA CORPORATION,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

Plaintiff Securities and Exchange Commission ("Commission"), for its complaint against

defendant Bank of America Corporation ("Bank of America"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.     The Commission charges Bank of America with making materially false and

misleading statements, and omitting material information, in the joint proxy statement that it

filed with Merrill Lynch & Co, Inc. ("Merrill") in connection with Bank of America's $50

billion acquisition of Merrill on January 1, 2009.

2.     Spurred by Lehman Brothers' collapse and the calamitous repercussions in the

financial markets, Bank of America and Merrill negotiated a merger over the weekend of

September 13-14 and announced the merger agreement on September 15, 2008.  On November

3, 2008, in a joint proxy statement soliciting votes from the shareholders of both companies,

Bank of America represented that Merrill had agreed not to pay year-end performance bonuses

or other discretionary incentive compensation to its executives prior to the closing of the merger

without Bank of America's consent. In fact, contrary to the representation in the merger

agreement, Bank of America had agreed that Merrill could pay up to $5.8 billion -- nearly 12%

of the total consideration to be exchanged in the merger -- in discretionary year-end and other

bonuses to Merrill executives for 2008. The merger agreement was included as an exhibit and

summarized in the joint proxy statement that was distributed to all 283,000 shareholders of both

companies, but Bank of America's agreement to allow Merrill to pay these discretionary

bonuses was memorialized in a separate schedule that was omitted from the proxy statement and

whose contents were never disclosed before the shareholders' vote on the merger on December

5, 2008.

      3.      The omission of Bank of America's agreement authorizing Merrill to pay

discretionary year-end bonuses made the statements to the contrary in the joint proxy statement

and its several subsequent amendments materially false and misleading. Bank of America's

representations that Merrill was prohibited from making such payments were materially false

and misleading because the contractual prohibition on such payments was nullified by the

undisclosed contractual provision expressly permitting them. In addition, the omission of this

material information concerning the terms of the merger directly violated disclosure obligations

under the regulations governing proxy solicitation. Given the size of the discretionary bonuses

Bank of America had authorized in relation to the total value of the transaction, as well as the

deteriorating financial condition of Merrill and the financial markets as a whole, Bank of

2

America's repeated failure to disclose that authorization to shareholders voting on the merger was material. Merrill wound up paying $3.6 billion in bonuses to its executives despite the fact that Merrill ultimately lost $27.6 billion in 2008, a record loss for the firm and nearly $20 billion more than the $7.8 billion it had lost in 2007.

4.    By virtue of the foregoing conduct, Bank of America, directly or indirectly, violated Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78n(a)] and Rules 14a-3 and 14a-9 thereunder [17 C.F.R §§ 240.14a-3 and 240.14a-9]. Unless permanently restrained and enjoined, Bank of America will again engage in the acts and transactions set forth in this complaint or in acts and transactions of similar type and object.

## JURISDICTION AND VENUE

5.    The Commission brings this action pursuant to the authority conferred by Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] seeking to restrain and enjoin permanently Bank of America from violating Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rules 14a-3 and 14a-9 thereunder [17 C.F.R. § § 240.14a-3 and 240.14a-9]. The Commission also seeks a final judgment ordering Bank of America to pay a civil money penalty pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

6.    This Court has jurisdiction over this action, and venue lies in this District, pursuant to Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa]. Bank of America, directly or indirectly, has used the mails and the means and instrumentalities of interstate commerce in connection with the acts and transactions alleged herein, some of which occurred in this District. In addition, Bank of America transacted business and maintained an office in this District throughout the relevant period.

3

## THE DEFENDANT

7.      **Bank of America**, a Delaware corporation, is a bank holding company and a

financial holding company under the Gramm-Leach-Bliley Act.  Bank of America's common

stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and

trades on the New York Stock Exchange ("NYSE").  Bank of America's principal offices are

located in Charlotte, North Carolina.

## OTHER RELEVANT ENTITY

8.      **Merrill**, a Delaware corporation, is a wholly-owned subsidiary of Bank of

America.  Prior to its acquisition by Bank of America on January 1, 2009, Merrill's common

stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and

traded on the NYSE.  Merrill is a financial services company with a registered broker-dealer

subsidiary.

## THE VIOLATIONS

### The Merger Agreement

9.      In September 2008, in the wake of Lehman Brothers' rumored bankruptcy and the

shock waves that sent through the financial markets, senior management at Merrill began

exploring the possibility of Merrill being acquired by a commercial bank.  On September 13,

2008, initial discussions took place between the Chief Executive Officers of Merrill and Bank of

America.  Later that day, teams from both firms began negotiating the terms of a possible

merger between Merrill and Bank of America.

10.     The principal terms of the transaction were negotiated on September 13 and 14,

2009.  One of the key topics on which the negotiations focused was Merrill's ability to pay

4

discretionary year-end bonuses for 2008 to its officers and employees pursuant to its Variable

Incentive Compensation Program ("VICP"), the primary annual bonus program for Merrill

employees. With respect to the VICP bonuses, Bank of America specifically agreed to allow

Merrill to pay up to $5.8 billion in year-end bonuses, with a recorded current year (2008)

expense of up to $4.5 billion. Bank of America and Merrill also agreed that 60 percent of

Merrill's year-end bonuses would be paid in cash and 40 percent in stock, and that the bonus

allocations and final decisions about the form of the bonuses (*i.e.*, cash versus stock) would be

made by Merrill in consultation with Bank of America.

11.    On September 14, 2008, the terms of the proposed merger, including the

agreement on Merrill's VICP bonuses, were presented to the boards of directors of Bank of

America and Merrill. The merger was a stock-swap transaction in which, based on the price of

$29 per share of Merrill stock, Bank of America paid 0.8595 Bank of America shares to Merrill

shareholders for each of their shares. The $29 price per share represented a significant (70%)

premium to the trading price at that time (approximately $17 per share) and represented a total

value of approximately $50 billion. The two boards unanimously approved the proposed merger

transaction, which was publicly announced on September 15, 2008.

12.    Following the announcement, counsel for Bank of America and Merrill reduced

the terms of the merger agreement to writing, including the agreement regarding Merrill's year-

end VICP bonuses. The relevant provision governing payment of VICP bonuses was included

in a schedule appended to the merger agreement ("Schedule"), rather than the body of the

merger agreement, and provided as follows:

5

5.2(b)(iii), 5.2(c)(i), and 5.2(c)(ii) – Variable Incentive Compensation Program ("VICP") in respect of 2008 (including without limitation any guaranteed VICP awards for 2008 or any other pro rata or other 2008 VICP awards payable, paid or provided to terminating or former employees) may be awarded at levels that (i) do not exceed $5.8 billion in aggregate value (inclusive of cash bonuses and the grant date value of long-term incentive awards) … and (ii) do not result in 2008 VICP-related expense exceeding $4.5 billion … Sixty percent of the overall 2008 VICP shall be awarded as a current cash bonus and forty percent of the overall 2008 VICP shall be awarded as a long-term incentive award either in the form of equity or long-term cash awards. The form (i.e., equity v. long-term cash) and terms and conditions of the long-term incentive awards shall be determined by [Merrill] in consultation with [Bank of America] … The allocation of the 2008 VICP among eligible employees shall be determined by [Merrill] in consultation with [Bank of America].

13.     A provision in the body of the merger agreement, however, stated that Merrill had no authority to, and would not, pay discretionary bonuses to its employees. That provision is titled "Company Forbearances" and states that "except as set forth in this Section 5.2 of the Company Disclosure Schedule," Merrill "shall not, . . . without the prior written consent of [Bank of America,]" take any of over eighteen enumerated actions before the closing of the merger ("Forbearance Provision"). Among several other prohibited actions in the human resource category, Merrill agreed and represented that it would not "pay any amounts to [directors, officers or employees] not required by any current plan or agreement (other than base salary in the ordinary course of business)." Although the Forbearance Provision as a whole refers generically to exceptions in the Schedule, there is no disclosure at all of what those exceptions were or the contents of the Schedule anywhere in the merger agreement.

**The Proxy Statement**

14.     On October 2, 2008, Bank of America filed with the Commission a preliminary version of the proxy on Form S-4, and later filed two amendments on Forms S-4/A on October

6

22 and October 29, 2008. On November 3, 2008, Bank of America and Merrill filed a joint definitive proxy statement with the Commission on Form DEFM14A soliciting their respective shareholders' votes for approval of the merger transaction. Both firms mailed copies of the joint proxy statement to their respective shareholders. The shareholder meetings for the approval of the merger were scheduled for December 5, 2008 for both firms.

15.    The proxy statement provided information to shareholders about, among other things, the financial condition of the two companies and the details of the proposed merger. The proxy statement included, as an attachment, the full text of the merger agreement between Bank of America and Merrill, but it omitted the Schedule setting forth the firms' agreement about Merrill's payment of VICP bonuses. Neither the Schedule nor its contents was publicly disclosed at any time prior to the December 5 shareholder meetings.

16.    Not only did the proxy materials fail to include the Schedule or otherwise disclose that Bank of America had authorized Merrill to pay up to $5.8 billion in discretionary year-end bonuses, but the Forbearance Provision of the merger agreement, which was disclosed, stated the contrary -- that Merrill had no authority to, and would not, pay discretionary bonuses to its employees. Because there is no disclosure at all of the contents of the Schedule anywhere in the merger agreement or elsewhere in the proxy statement, shareholders would not have known that Bank of America had actually agreed to allow Merrill to pay up to $5.8 billion in discretionary bonuses -- payments "not required by any current plan or agreement."

17.    The text of the proxy statement, in a section describing the principal terms of the merger agreement, paraphrases the Forbearance Provision and lists the eighteen "extraordinary" actions Merrill had agreed not to take before the closing of the merger, including the payment of

7

discretionary compensation. The relevant text of the proxy statement qualifies the discussion of the Forbearance Provision only by referring to "certain exceptions," which are undisclosed, and stating that Merrill is prohibited from taking these "extraordinary" actions without "Bank of America's prior written consent."

18.    The foregoing statements in the joint proxy statement were materially false and misleading because, among other reasons:

(a)  The statements constituted a representation by Bank of America that, under the terms of the merger agreement, Merrill was only permitted to make "required" payments to its employees, such as salary and benefits, and was prohibited from paying discretionary year-end bonuses when, in fact, Bank of America had expressly authorized Merrill, as set forth in the undisclosed Schedule, to pay up to $5.8 billion in discretionary year-end bonuses -- a fact that a shareholder could not have known from reading the joint proxy statement or any other public source.

(b)  The statements create the impression that Bank of America had not given its written consent to the payment of discretionary year-end bonuses at Merrill -- which the proxy statement indicated "will not be unreasonably withheld or delayed" -- when, in fact, by the time the proxy statement was prepared and distributed to shareholders, Bank of America had already given its written consent, as set forth in the undisclosed Schedule, that Merrill could pay up to $5.8 billion in discretionary bonuses.

(c)  The $5.8 billion in discretionary bonuses that Bank of America authorized Merrill to pay constituted (i) nearly 12 percent of the $50 billion that Bank of America had agreed to pay to acquire Merrill; (ii) nearly 30 percent of Merrill's total stockholder equity; and

8

(iii) over 8 percent of Merrill's total cash and cash equivalents as of December 31, 2008.

19.     In addition, the omission from both the Forms S-4 and the joint proxy statement of the schedule containing the firms' agreement concerning Merrill's payment of VICP bonuses and of any description of that agreement directly violated proxy regulations that required the proxy: (i) to furnish any such schedules (or similar attachments) to the merger agreement that contain information material to an investment decision and not otherwise disclosed; and (ii) to provide a list briefly identifying the contents of any omitted schedules.  In violation of these legal requirements, neither the Forms S-4 nor the joint proxy statement contained such disclosures.

**Acceleration And Payment Of The Bonuses**

20.     Shortly after announcing the merger, Merrill's management began putting together the bonus payment schedule for 2008.  By the end of September 2008, Merrill's management had created an accelerated schedule for the approval of the bonus pool and the payment of the bonuses.  In prior years, Merrill had made final decisions on the bonus pool in January following the year for which bonuses were paid, in part to allow the firm to consider the full year's financial performance.  Under the accelerated schedule that Merrill's management prepared in September 2008, the compensation committee of Merrill's board of directors was scheduled to approve the final bonus pool in early December, more than three weeks before the end of the year for which the bonuses were to be paid and before the closing of the merger with Bank of America.

21.     On November 11, 2008, Merrill's compensation committee was presented with and approved an accelerated schedule under which final approval of the bonus pool would occur on December 8, bonus communications to employees would occur on December 22, and the

cash awards would be made on December 31, 2008. Stock awards were to be made in early 2009. Merrill kept Bank of America apprised of developments in Merrill's plans with respect to the payment of year-end bonuses throughout the fall of 2008 and specifically apprised Bank of America of the accelerated schedule on November 12, 2008.

22.     During the merger negotiations in September 2008, Bank of America and Merrill did not reach a specific agreement with respect to bonuses for Merrill's top five executives. As was disclosed in Merrill's annual proxy statement for 2007, Merrill's top five executives did not receive a year-end bonus in 2007 because of the firm's poor performance, which included $7.8 billion in losses. By September 2008, Merrill's performance in 2008 was already far worse than it had been in the entire year of 2007, as the firm had already sustained more than $12 billion in losses. Yet in the weeks following the merger announcement, Merrill's management proceeded with plans to pay a total of over $130 million in year-end performance bonuses to the top five executives under the VICP. Merrill made Bank of America aware of these plans and the firms' senior executives discussed the amount of these bonuses throughout the fall of 2008.

23.     In late November 2008, the size of Merrill's planned bonus pool was decreased due to a variety of factors, as were the bonuses planned for Merrill's top five executives. By late November, Merrill's VICP bonus pool was reduced to approximately $3.6 billion, with an expected current period expense of $3 billion. Concerned that it may not have enough stock to satisfy Merrill's stock awards, Bank of America asked Merrill to pay 70 percent of the bonuses in cash and 30 percent in stock, instead of the 60/40 cash-stock split set forth in the merger agreement. Merrill complied with the request, increasing the recorded current period expense of the bonuses to $3.2 billion.

24.    The shareholder meetings for Bank of America and Merrill took place, as scheduled, on December 5, 2008.  The shareholders of both firms voted to approve the merger. Aside from the materially false and misleading proxy materials that were disseminated to the shareholders in November 2008, neither Bank of America nor Merrill made any disclosures to their shareholders prior to the shareholder meetings concerning the firms' agreement that Merrill could pay up to $5.8 billion, or the revised plans to pay $3.6 billion, in discretionary year-end bonuses before the merger closed.

25.    On December 8, 2008, Merrill's compensation committee approved a VICP bonus pool of $3.6 billion.  The committee deferred the proposal to pay bonuses to Merrill's top five executives to the full board.  Later in the day, that proposal was withdrawn and in the end, none of Merrill's top five executives received a bonus for 2008.  Merrill's employees were notified of their 2008 VICP bonuses on December 19, 2008, and received the cash payments on December 31, 2008, a day before the merger with Bank of America closed.

## CLAIM FOR RELIEF

### Violations of Section 14(a)
### of the Exchange Act and Rules 14a-3 and 14a-9

26.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 25.

27.    Bank of America, directly or indirectly, by use of the means or instrumentalities of interstate commerce or of the mails, or the facilities of a national securities exchange, solicited or permitted the use of its name to solicit proxies, consents or authorizations in respect of non-exempt securities registered with the Commission pursuant to Section 12 of the Exchange Act

11

[15 U.S.C. § 78l]:

> (A)   While failing to furnish each person solicited, concurrently or previously, with a written proxy statement containing the information specified in Schedule 14A [17 C.F.R. § 14a-101] or with a written proxy statement included in a registration statement filed under the Securities Act on Form S-4 [17 C.F.R. § 239.25] and containing the information specified in such Form; and

> (B)   by means of a proxy statement, form of proxy statement, notice of meeting and other communications that contained statements which, at the time and in the light of the circumstances under which they were made, were false and misleading with respect to material facts or which omitted to state material facts necessary in order to make the statements made therein not false or misleading or necessary to correct statements in earlier communications with respect to the solicitation of a proxy for the same meeting or subject matter which became false or misleading;

in violation of Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rules 14a-3 and 14a-9 thereunder [17 C.F.R. §§ 240.14a-3 and 240.14a-9].

28.   Section 14(a) of the Exchange Act requires registrants that solicit any proxy or consent or authorization in connection with any security registered pursuant to Section 12 of the Exchange Act (other than an exempted security), to comply with such rules as the Commission may promulgate.  Rule 14a-3 provides that no solicitation of a proxy may occur unless each person solicited is concurrently furnished or has previously been furnished with a proxy statement

containing the information specified in Schedule 14A or in Form S-4. Rule 14a-9 prohibits, among

other things, the use of proxy statements which omit to state any material fact necessary in order to

make the statements therein not false or misleading.

29.    As more fully described above in paragraphs 1 through 25, Bank of America made

materially false and misleading statements, and omitted to disclose necessary material facts, in

the proxy statement that it filed in connection with its merger with Merrill concerning the terms

of the merger agreement governing Merrill's payment of discretionary incentive compensation

before the closing of the merger.

30.    By reason of the foregoing, Bank of America violated and, unless enjoined, will

again violate Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rules 14a-3 and 14a-9

thereunder [17 C.F.R. §§ 240.14a-3 and 240.14a-9].

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that this Court enter a final

judgment:

## I.

Permanently enjoining and restraining Bank of America, its agents, servants, employees

and attorneys and all persons in active concert or participation with Bank of America who

receive actual notice of the injunction by personal service or otherwise, from violating, directly

or indirectly, Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rules 14a-3 and 14a-9

thereunder [17 C.F.R. §§ 240.14a-3 and 240.14a-9].

## II.

Ordering Bank of America to pay a civil monetary penalty pursuant to Section 21(d)(3) of

the Exchange Act [15 U.S.C. § 78u(d)(3)].

## III.

Granting such other and further relief as the Court deems just and proper.

Dated: October 19, 2009
     New York, New York

By: _____
     David Rosenfeld
     Associate Regional Director
     New York Regional Office
     Attorney for Plaintiff
     SECURITIES AND EXCHANGE COMMISSION
     Three World Financial Center
     New York, New York 10281
     (212) 336-0153

Of Counsel:

George N. Stepaniuk
Alexander M. Vasilescu
Scott Black
Maureen F. Lewis
Wendy Griffin
Joseph O. Boryshansky

14