

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
NEW YORK REGIONAL OFFICE
THREE WORLD FINANCIAL CENTER
SUITE 400
NEW YORK, NEW YORK 10281-1022

December 23, 2009

**VIA FACSIMILE**

The Honorable Jed S. Rakoff
United States District Court
Southern District of New York
United States Courthouse, Room 1340
500 Pearl Street
New York, NY 10007

  Re: <u>SEC v. Bank of America Corp., 09-cv-06829 (JSR)</u>

Dear Judge Rakoff:

  On behalf of Plaintiff Securities and Exchange Commission ("Commission"), we submit this letter in accordance with Your Honor's instruction at the December 17, 2009 oral argument on the Commission's application to exclude Bank of America Corporation's ("BOA") proposed expert testimony. For the reasons provided below, we believe that the express warning to shareholders in BOA's Proxy Statement to refrain from relying on extrinsic materials warrants preclusion, at this stage, of certain of BOA's proposed expert testimony and that additional expert testimony should be excluded on other grounds.

**A.** **BOA's Expert Testimony Should Be Precluded To The Extent That It Is Contrary to The Proxy Statement's Express Warning to Shareholders**

  The Proxy Statement that BOA filed to solicit votes for approval of the merger with Merrill Lynch specifically warned BOA's shareholders – in bold typeface and in two separate sections – not to rely on information that was not included within the four corners of, or expressly incorporated by reference into, the Proxy Statement. Specifically, shareholders were warned as follows:

> **You should only rely on the information contained or incorporated by reference in this document. Neither Bank of America nor Merrill Lynch has authorized anyone to give any information or make any representation about the merger or our companies that is different from, or in addition to, that contained in this document or in any of the materials that have been incorporated in this document. Therefore, if anyone does give you information of this sort, you should not rely on it.**

See Proxy Statement at 124-25 (bold typeface in original). Similarly, in the cover pages of the Proxy Statement in a section entitled "References to Additional Information," a parallel warning instructed shareholders that they "should rely only on the information contained or incorporated by reference into this document. No one has been authorized to provide you with information that is different from that contained in, or incorporated by reference into, this document."

  Given these express instructions and warnings, it is improper for BOA to now seek to submit evidence relating to what shareholders could have learned or surmised from extrinsic sources, such as newspaper articles or analyst reports that were not described in, or incorporated

into, the Proxy Statement. In another case involving an alleged merger proxy violation, the district court for the District of Delaware found that a similar warning to the one contained in BOA's Proxy Statement "weighs against a finding of reasonable reliance on" information extrinsic to the proxy filing. See Tracinda Corp. v. DaimlerChrysler AG, 364 F. Supp. 2d 362, 402 n. 11 (D. Del. 2005) (dismissing claims premised on oral representations that were extraneous to proxy filing containing express warning to shareholders not to rely on extrinsic information). Significantly, the cases that BOA cited in its December 16 letter brief did not address whether extrinsic information may be considered in determining if shareholders were misled when the filing, as here, contained an express warning to shareholders not to rely on outside information. Nor is there any indication, in any of the decisions BOA cited, that the proxy filings at issue there had any language limiting shareholders' reliance, let alone the express, unambiguous warning that BOA's Proxy Statement contained. See TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976); United Paperworkers Int'l Union v. Int'l Paper Co., 985 F.2d 1190, 1198 (2d Cir. 1993); In re Keyspan Corp. Sec. Litig., 383 F. Supp. 2d 358, 375 (E.D.N.Y. 2003); Kahn v. Wein, 842 F. Supp. 667, 675 (E.D.N.Y. 1994); Gulf & W. Indus., Inc. v. Great Atl. & Pac. Tea Co.,Inc., 356 F. Supp. 1066, 1071 (S.D.N.Y. 1973). Accordingly, to the extent BOA's proposed expert testimony seeks to introduce to the fact finders extrinsic materials that were not part of the Proxy Statement, such expert testimony should be precluded.

At the December 17 argument, BOA's counsel contended that the Proxy Statement's warning was "very common" and "used so that the issuer can say we are not responsible for that other information, but that is different from trying to assess what a reasonable investor would use and analyze." Transcript of 12/17/09 Proceeding at 26. This purported interpretation of the Proxy Statement's express warning is, of course, flatly inconsistent with the unambiguous instruction to shareholders "not to rely" on extrinsic information. Further, the Proxy Statement was subject to the "plain English" requirement of Rule 421 under the Securities Act of 1933, which mandates that issuers use plain language in public filings. The strained, ex-post-facto interpretation of the Proxy Statement's warning that BOA's counsel has proposed flies in the face of both Rule 421 and the ordinary import of the warning. It should be rejected.

BOA's purported interpretation of its express warning to shareholders should be rejected for another reason: it in effect seeks to impose a standard of shareholder reliance that amounts, from the issuer's perspective, to "Heads You Lose, Tails I Win." BOA should not be permitted to use an express warning to immunize itself from liability stemming from representations that are extrinsic to the Proxy Statement, while at the same time point to such extraneous representations to defend itself against claims that its proxy disclosures were inadequate. Issuers cannot have it both ways. If they choose to warn shareholders not to rely on extrinsic information in order to limit their potential liability, they cannot also contend, as BOA now does, that such a warning doesn't mean what it says.

BOA's reliance on Union Paperworkers Int'l Union is similarly unavailing. Although the Second Circuit indicated there that widely-circulated news stories may, in certain circumstances, be admissible to the materiality analysis under Section 14(a) of the Securities Exchange Act of 1934, the Court also made clear that "the mere presence in the media of sporadic news reports does not give shareholders sufficient notice that proxy solicitation statements sent directly to them by the company may be misleading," and therefore such media reports "should not be considered to be part of the total mix of information" so as to "clarify or place in proper context the company's representations in its proxy materials." 985 F.2d at 1199 (affirming district court's rejection of news articles that, among other things, were not published in the "context of this proxy contest"). Significantly, the Court deemed it relevant that the press reports at issue in that case did not disclose all of the relevant facts pertinent to the shareholders vote. Id.

2

Similarly here, the news reports BOA seeks to introduce through its proposed expert testimony did not report actual facts, but only speculation about Merrill Lynch's possible, but unsubstantiated, bonus plans. The reliability and accuracy of press reports is an important consideration under the Second Circuit's analysis in United Paperworkers Int'l Union, and weighs against permitting any of BOA's experts to rely on and introduce press or analyst reports speculating about Merrill's bonus plans.

Thus, the quotes from news articles that Professor Grundfest summarizes in his report should be excluded. These articles make no mention of the Proxy Statement and, as such, do not "clarify or place in proper context" the language in the Proxy Statement that shareholders were provided with.[1] In particular, the articles quoted by Professor Grundfest could not reconcile for shareholders the express language in the Proxy Statement that Merrill will not, prior to the closing of the merger, "pay any current or former directors, officers or employees any amounts not required by existing plans or agreement" subject to "certain exceptions" or "except with Bank of America's prior written consent." Proxy Statement at 83-4. Shareholders could not have known from the news reports that the contrary was true – that BOA had in fact already given its approval to Merrill, before the Proxy Statement was filed, to pay discretionary bonuses of up to $5.8 billion. No news article stated that BOA gave permission to Merrill to pay discretionary bonuses of up to $5.8 billion, and that contrary to prior practice, Merrill was about to pay year-end bonuses before the fiscal year had ended. Unconfirmed and unsubstantiated press speculation in the news media about Merrill's bonus plans, which did not report facts or clarify the Proxy Statement in any way, should not be allowed to be presented to the fact-finders through the testimony of Professor Grundfest. See SEC v. Drucker, 528 F. Supp. 2d 450, 452 (S.D.N.Y. 2007) (company's confirmation of negative news relevant to assessing disgorgement in securities insider trading case), aff'd, 2009 WL 3004104 (2d Cir. Sept. 21, 2009).

It is also improper for BOA to use expert testimony to introduce newspaper articles and analyst reports as evidence of what purported conclusions shareholders could have reached on their own from reading the Proxy Statement regarding Merrill's authority to pay discretionary bonuses of up to $5.8 billion or Merrill's bonus plans for 2008. First, there is no evidence suggesting that the journalists and analysts were basing their conclusions solely on information obtained from the Proxy Statement, as shareholders were instructed to do by BOA. Second, even if the conclusions stated in the news articles and analyst reports were based solely on the information contained in, and incorporated into, the Proxy Statement, financial press journalists and securities analysts possess far greater analytical skills and insights than the average investor who does not devote the majority of his time to analyzing voluminous corporate filings. As the Second Circuit has observed, '[w]hile corporations are not required to address their stockholders as if they were children in kindergarten, it is not sufficient that overtones might have been picked up by the sensitive antennae of investment analysts." Gerstle v Gamble-Skogmo, Inc., 478 F.2d 1281, 1297 (2d Cir. 1973).

B. **The Court Should Exclude Expert Testimony Regarding Stock Price Movement As Such Analysis Is Inapposite and Prejudicial In a Proxy Violation Case**

The stock price analysis Professor Hubbard sets forth in pages 12 to 15 of his report is not probative of whether shareholders considered undisclosed bonus information "important" in evaluating the Proxy Statement, and such testimony is therefore prejudicial and should be

---

[1] Similarly, the Court should exclude testimony on analyst reports by Professors Grundfest and Hubbard since the analyst reports, which were available for a fee, were not widely available to BOA's large shareholder base.

3

stricken. Professor Hubbard's entire analysis is flawed because it stems from the faulty premise that the standard of materiality in the proxy voting context (which is governed by Section 14(a) of the Exchange Act) is the same as that applicable to securities fraud in connection with the purchase or sale of securities (which is governed by Section 17 of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act). In fact, the two contexts are distinct. The materiality analysis in the proxy context concerns the right of shareholders to make a fully informed vote whereas the materiality analysis in connection with the purchase or sale of securities in the open market concerns the economic harm caused by the alleged fraud. Movement (or lack thereof) in the market price of a security may be a relevant consideration in determining materiality in the purchase or sale context because, to the extent the misinformation did not have an impact on the stock price once disclosed, this could suggest under the so-called efficient capital markets hypothesis that the purchaser or seller of the security did not suffer any economic harm. However, under the efficient markets hypothesis, the price of a security is determined by the most sophisticated investors. An analysis of movement in stock price says nothing about whether the average shareholder may nonetheless have been deceived by misinformation in a proxy filing, and therefore deprived of his right to cast a fully informed vote. As one commentator has noted:

> Proxy statements are mailed to every individual shareholder, and each individual can be deceived by the statement in deciding how to vote a proxy. No professional investor intervenes when a shareholder decides how to vote, and no pricing mechanism exists to internalize all the relevant information on the individual investor's behalf.
>
> By contrast, professional investors play the key role in setting the market price of stocks. Although some individuals make their own investment decisions, the trades that set the market price of a security are made by professionals. Thus, although a definition of materiality taken from the proxy context may make sense when a single individual investor files a Rule 10b-5 claim on his own behalf (without seeking to invoke the fraud-on-the-market theory), the situation is entirely different when an investor seeks to invoke the Basic[, Inc. v. Levinson, 485 U.S. 224 (1988)] presumption of reliance. In a fraud-on-the-market case, an alleged misstatement is material only if it is sufficiently important to have changed the price makers' estimate of the value of the security.

John M. Newman, Jr. et al., Basic Truths: The Implications of The Fraud-On-The-Market Theory for Evaluating The 'Misleading' and 'Materiality' Elements of Securities Fraud Claims, 20 J. Corp. L. 571, 585 (1995).

The Supreme Court has implicitly recognized this distinction. In TSC Industries, the Court instructed that materiality in the proxy context "does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused a reasonable investor to change his vote." TSC Indus., 426 U.S. at 449. As selling stock is the ultimate "no" vote by shareholders, TSC Industries indicates that information could be material in the proxy context even if it had no impact on the market price of the security. This point is further reinforced by some of the cases BOA cited in its December 16 letter, in which information was deemed material in a proxy context without any indication whatsoever that it would have had any impact

on the stock price had it been disclosed. See United Paperworks, 985 F.2d 1190 (Section 14 violated by issuer's misstatements concerning record on environmental issues). Since Professor Hubbard's analysis of materiality is inapposite as a matter of law, his proposed testimony should be stricken.

C. **The Court Should Preclude BOA's Proposed Expert Testimony To The Extent That It Is Completely Redundant and Duplicative**

The Court should also, at this stage, strike duplicative experts that BOA has designated. During the argument on December 17, BOA's counsel indicated that it did not intend to necessarily call all six experts that BOA had designated and simply wanted to keep the experts in the "bullpen." By the logic of BOA's argument, a party could designate dozens of experts – most of whom it has no intention to call as trial witnesses – making it greatly expensive and time-consuming for the opposing party to conduct effective pre-trial discovery. Here, at least three of BOA's experts, including two CPAs, opine on the identical issue of the disclosure of Merrill's compensation and benefits expense in its quarterly filings. See Hubbard Report ¶¶ 10, 22, 24, 28; Holder Report at 9 to 13; Blum Report at 13 to 35. Similarly, two experts designated by BOA are opining on the contents of articles from the financial press and analyst reports. See Hubbard Report ¶¶ 25 to 30; Grundfest Report ¶¶ 5 to 12. To the extent expert testimony on these areas is appropriate at all, BOA should be limited to one expert on each area and should be required to identify now which expert it intends to use.

D. **The Court Should Strike Professor Grundfest's Proposed Testimony Because It Does Not Constitute Valid Expert Testimony**

As the Court is aware, Rule 702 of the Federal Rules of Evidence provides that a witness qualified by "knowledge, skill, experience, training, or education" may provide testimony based on "scientific, technical, or other specialized knowledge." Professor Grundfest's report does not contain any testimony that could be considered that of an "expert." His report is nothing more than a summary of news articles generated by Compass Lexicon from Bloomberg and Factiva databases, pursuant to search terms that Professor Grundfest contends were "reasonably designed to identify reports on this topic." Grundfest Report, ¶¶ 3, 11; Ex. C. Even if such summary information could somehow be classified as the product of expertise, Professor Grundfest does not claim to be an "expert" in conducting searches of public databases (assuming that he formulated the search parameters in the first instance, which is not clear from his report). If any of the news stories and analysts reports quoted in Professor Grundfest's report can be deemed admissible (and they are not), then BOA's attorneys can summarize them and point to relevant passages that they wish to use. Experts such as Professor Grundfest are not needed for such purposes.

Respectfully submitted,

Alexander Vasilescu
Scott Black
Joseph Boryshansky
Wendy Griffin

Cc: Lewis J. Liman, Esq.
Shawn J. Chen, Esq.
Victor L. Hou, Esq.
Melissa K. Marler, Esq.
Daniel J. Kramer, Esq.
Alex Young K. Oh, Esq.
Audra J. Soloway, Esq.