PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
TELEPHONE (212) 373-3000

NEW YORK, NEW YORK 10019-6064
FACSIMILE (212) 757-3990

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300
FACSIMILE (202) 223-7420

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101
FACSIMILE (81-3) 3597-8120

UNIT 3601, FORTUNE PLAZA OFFICE TOWER A
NO.7 DONG SANHUAN ZHONGLU
CHAO YANG DISTRICT
BEIJING 100020
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300
FACSIMILE (86-10) 6530-9070/9080

12TH FLOOR, HONG KONG CLUB BUILDING
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300
FACSIMILE (852) 2840-4300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, U.K
TELEPHONE (44 20) 7367 1600
FACSIMILE (44 20) 7367 1650

WRITER'S DIRECT DIAL NUMBER
(212) 373-3020

WRITER'S DIRECT E-MAIL ADDRESS
dkramer@paulweiss.com

WRITER'S DIRECT FACSIMILE
(212) 492-0020

December 30, 2009

**By Facsimile**
Honorable Jed S. Rakoff
United States District Court for the Southern District of New York
500 Pearl Street
New York, NY 10007-1312

*SEC v. Bank of America Corp.*, No. 09-Civ-6829 (JSR)

Dear Judge Rakoff:

        On behalf of defendant Bank of America Corporation ("BOA"), we respectfully submit this letter to respond to the SEC's December 23, 2009 letter and in further opposition to the SEC's demand that the Court exclude relevant evidence and strike certain of BOA's experts.

### A. BOA's Experts Should Be Permitted To Testify As To The Total Mix Of Information Available To Shareholders, Including Widely Distributed Media And Analyst Reports

        The SEC devotes most of its submission to arguing that the cautionary statement in BOA's Joint Proxy Statement requires this Court to ignore the "total mix" test for materiality set out in *TSC Indus., Inc.* v. *Northway, Inc.*, 426 U.S. 438, 449 (1976), and to exclude from the jury's consideration relevant media and analyst reports. In our letter, dated December 23, 2009, we explained why this position is flawed. In this letter we address directly the arguments the SEC presented in its December 23 letter.

        *First*, the one case the SEC cites where a court purportedly addressed "a similar warning" is *Tracinda Corp.* v. *DaimlerChrystler AG*, 364 F. Supp. 2d 362, 401 n.11 (D. Del. 2005). *Tracinda*, however, supports BOA's position because the court in that case (a) analyzed the "do not rely" warning as being relevant to the element of reliance, not the element of materiality and (b) did not exclude any evidence. Instead, the court considered both statements outside of the proxy material and the cautionary language, *id.* at 396-401 & n.11, and wrote that the caution merely "weighs against a finding of *reasonable reliance* on" information extrinsic to the proxy, *id.* at 401 n.11 (emphasis added). This is fully consistent with BOA's position that the cautionary statement relates to issues of reliance and does not affect the materiality analysis, which is an objective test. At most, the warning goes to the weight the jury should give the news and analyst reports in assessing the total mix of information, not to their admissibility. (BOA 12/23/09 Ltr. at 4-5.)

        *Second*, the SEC ridicules the notion that the "do not rely" phrase in the cautionary statement sought to get across the notion that the only information BOA and Merrill "authorized" was contained in and incorporated by reference by the proxy materials. It describes this explanation as "strained" and "ex-post-facto" and charges that it "flies in the face" of the "plain English" requirement set out in SEC Rule 421.

        These arguments ignore the actual language of the cautionary statement. The second sentence of the statement – which states that "[n]either Bank of America nor Merrill Lynch has

authorized anyone to give any information or make any representation about the merger or our companies that is different from, or in addition to, that contained in this document or in any of the materials that have been incorporated in this document" – is connected to the third sentence, which states: *"Therefore*, if anyone does give you information of this sort, you should not rely on it." (Proxy Stmt. at 124-25 (emphasis added).)

The SEC also ignores its own "plain English" guidance on this subject, which instructs issuers to express cautions regarding issuer authorized information by advising shareholders to "rely only" on information provided in the Joint Proxy Statement. (BOA 12/23/09 Ltr. at 3-4.) While the SEC accuses BOA of improperly advancing a "Heads You Lose, Tails I Win" approach, that criticism more aptly applies to the SEC, which advised issuers to express the concept of "authorization" in this way yet now argues that that very formulation violates the "plain English" rules and should subject the issuer to significant penalty.

***Third***, the SEC takes away the wrong lesson from the Second Circuit's decision in *United Paperworkers Int'l Union* v. *Int'l Paper Co.*, 985 F.2d 1190 (2d Cir. 1993). In *United Paperworkers*, the court held that widely distributed news articles are relevant to the materiality analysis, but rejected media reports that were "few in number, narrow in focus, and remote in time," finding them not part of the "total mix". *Id.* at 1199. That analysis does not apply to this case, where Professor Grundfest's search covered approximately 1,200 media reports from television, online and print sources and 47 analyst reports concerning one of the largest and most publicly discussed mergers of all time. Moreover, all of the reports Professor Grundfest identifies were issued between the date of the merger agreement on September 15, 2008, and the date of the shareholder vote on December 5, 2008.[1] (Grundfest Rpt. ¶ 11 & Ex. C.)

The SEC also makes the broad, and unsupported, argument that these reports should not be presented to the jury because they contain "[u]nconfirmed and unsubstantiated press speculation". This argument ignores the numerous cases where courts consider media and analyst reports as part of the *TSC* "total mix" test.[2] It also glosses over the fact that not a single article indicates that Merrill

---

[1] The one case the SEC cites – *SEC* v. *Drucker*, 528 F. Supp. 2d 450 (S.D.N.Y. 2007) – is wholly inapposite. *Drucker* was an SEC insider trading case where the parties disputed the proper amount to be disgorged. The SEC argued that defendants improperly avoided a 41% loss, noting that the issuer's stock price fell 19.6% in response to a rumor that its earnings were going to fall short, and by another 27.2% after the issuer publicly confirmed the rumor. Defendants argued that they were only liable for the 27.2% drop. Judge McMahon deemed the loss avoided to include the drops resulting from both the rumor and the confirmation. She did so because the "the entire drop was connected to the news (first rumored, then confirmed) about the shortfall in [the company's] earnings," *id.* at 452, not because losses caused by a rumor do not count unless the rumor is confirmed. The case does not suggest, let alone hold, that a news article must be confirmed to be admissible as part of the "total mix" of information available to shareholders.

[2] *See, e.g., California Public Employees' Retirement Sys.* v. *Chubb Corp.*, 394 F.3d 126, 156-57 (3d Cir. 2004) (in section 14(a) case, finding proxy statements not to be misleading where analyst report and Bloomberg News Interviews qualified these statements); *Polar Int'l Brokerage Corp.* v. *Reeve*, 108 F. Supp. 2d 225, 245-46 (S.D.N.Y. 2000) (holding in Rule 14a-9 case that there was no need to amend a fairness opinion to disclose a matter "widely reported in the media"); *In re Textainer Partnership Sec. Lit.*, No. C-05-0969 MMC, 2005 WL 3801596, at *6 (N.D. Cal. Dec. 12, 2005) (finding that 14a-9 claim did not meet the pleading standards of PSLRA where it failed to allege that omitted information was "not readily publicly available") (collecting cases); *see also In re Ames Dept. Stores Inc. Stock Lit.*, 991 F.2d 953, 968 (2d Cir. 1993) (reversing dismissal of complaint where the district court failed to consider "releases and documents [that] contributed to the total mix of information available to the investing public") (internal citations and quotation marks omitted). The SEC's argument that the Court should exclude testimony relating to analyst reports because they are available for a fee is likewise without merit as analyst reports are frequently considered part of the total mix of information relevant to materiality. *See, e.g., In re Bristol Myers Squibb Co Sec. Litig.*, 586 F. Supp. 2d 148, 161 n.7 (S.D.N.Y. 2008) (considering analyst reports as part of the total mix); *Jaroslawicz* v. *Engelhard Corp.*,

employees would fail to receive incentive compensation for 2008. Moreover, many of the articles indicate that the estimates for compensation are based upon Merrill's publicly disclosed accruals – information that was incorporated by reference in the Proxy Statement. (*See* Grundfest Rpt. ¶ 5(c).)[3]

Similarly, the SEC's contention that "[n]o news article stated that . . . Merrill was about to pay year-end bonuses before the fiscal year had ended" (SEC 12/23/09 Ltr. at 3) is wrong. As described by Professor Grundfest, there were articles published in Bloomberg, Wall Street Journal Deal Blog, Reuters, Dow Jones Newswire, and the Daily Mail stating that Merrill employees would find out how much they would receive in bonuses by the end of the year. (Grundfest Rpt. ¶ 5(m)-(o).)

These reports show that it was widely recognized that Merrill employees would receive significant year-end incentive compensation and are directly relevant to the SEC's claims in this case. Among other things, they place in context Merrill's agreement in the Proxy Statement to "conduct its business in the ordinary course" and to "use reasonable best efforts to . . . retain[] the services of key officers and employees." (Proxy Stmt. at 83.) And, contrary to the SEC's contention, the media and analyst reports show how the market understood the disclosures in the Joint Proxy Statement. *See Billhofer* v. *Flamel Techs., SA*, __ F. Supp. 2d __, No. 1:07-CV-09920 (CSH), 2009 WL 3241399, at *6-7 (S.D.N.Y. Oct. 5, 2009) (on motion to dismiss, treating manner in which securities analysts interpreted challenged press release as probative of how investors understood it); *see also United States* v. *Schiff*, 538 F. Supp. 2d 818, 844-45 (D.N.J. 2008) (allowing financial analyst to testify about "what information is important to a reasonable investor" and summarize "analyst reports for corroborating evidence of his opinions").

## B. Stock Price Movement Is Relevant To Materiality In This Case

In his expert report, Professor R. Glenn Hubbard, Dean of Columbia University's Graduate School of Business, opines that, from an economic perspective, rational BOA shareholders would consider whether a merger with Merrill would enhance the value of their BOA shares when deciding whether to vote to approve the merger. (Hubbard Rpt. ¶¶ 15-16.) After conducting an event study and finding no statistically significant reaction to the disclosure of the allegedly misrepresented and omitted information, Professor Hubbard concludes that either (a) the information was already known by the market and/or (b) the market did not perceive the information as material to the value of BOA's stock and that BOA shareholders would therefore not have considered the information important in deciding whether to vote to approve the merger. (*Id.* ¶¶ 34, 41(i)-(iii).)

The SEC contends—without citing a single case—that Professor Hubbard's testimony on this point should be excluded because stock price movement "says nothing" about whether information is material in voting on a merger. The SEC is wrong. In fact, in *TSC*, the Supreme Court considered stock price movement as part of its materiality analysis under section 14(a). In that case, plaintiff, a TSC shareholder, alleged that defendants had failed to disclose in their proxy statement information that made the proxy statement's description of a "substantial premium" for TSC shareholders materially misleading. In response, defendants argued that the exchange ratio for the deal was known by the market before the proxy was released and had, in fact, caused TSC's stock price to rise, thus demonstrating that the reference to a "substantial premium" was not materially misleading. In reversing the lower court's grant of summary judgment for plaintiff, the

---

CIV. No. 84-3641 (CSF), 1989 WL 32864, at *3 (D.N.J. Apr. 5, 1989) (holding that it is for the jury to weigh plaintiff's argument that analyst "reports could not have affected the 'total mix' of available information" because they are "'available only to a few subscribers'").

[3] The SEC cites *Gerstle* v. *Gamble-Skogmo, Inc.*, 478 F.2d 1281 (2d Cir. 1973), for the proposition that "it is not sufficient that overtones might have been picked up by the sensitive antennae of investment analysts" considering the proxy statement. *Id.* at 1297. Here, however, the information was not so esoteric, as numerous and widely available media and analyst reports all reported that Merrill employees would be receiving billions of dollars in incentive compensation.

Supreme Court held "if, as we must assume in considering the appropriateness of summary judgment, the increase in price of TSC's securities . . . reflected in large part the market's reaction to the terms of the proposed exchange, it was not materially misleading as a matter of law for the proxy statement to refer to the existence of a substantial premium." 426 U.S. at 459.

Following *TSC*, courts in section 14(a) cases often consider stock price movement as relevant to the materiality analysis. *See, e.g.*, *Hecco Ventures* v. *Avalon Energy Corp.*, 606 F. Supp. 512, 516-17 (S.D.N.Y. 1985) (holding in section 14(a) case that plaintiffs failed to show materiality of allegedly undisclosed purchases of acquirer's shares because plaintiffs' expert conceded that he was "unable to attribute any effect on the price of [the acquirer's] common shares to [the] purchases"); *SEC* v. *Parklane Hosiery Co., Inc.*, 422 F. Supp. 477, 485 (S.D.N.Y. 1976) (considering information's affect on stock price in weighing its materiality under Section 14(a)), *aff'd on other grounds*, 558 F.2d 1083 (2d Cir. 1977); *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330-31 (3d Cir. 2002) (concluding that omitted information was immaterial under section 14(a) because its subsequent "disclosure had no negative effect whatsoever on the price of [the issuer's] stock"). In short, stock price movement clearly "is a factor the jury may consider relevant" to its analysis of materiality. *United States* v. *Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991) (applying materiality standard set forth in *TSC* in section 10(b) case).

Stock price is particularly relevant in this case because the merger of BOA and Merrill was a stock-for-stock transaction. As the Third Circuit explained in *In re Penn Cent. Sec. Litig.*:

> In [a stock-for-stock] merger between two corporations, the original shareholders of each corporation end up with stock in a substantially different company with substantially different assets and prospects. The decision to vote in favor of the merger is therefore little different from the decision to sell shares in the original corporation and, with the cash received for those shares, buy shares in the merged corporation.

494 F.2d 528, 534 (3d Cir. 1974). That is in accord with Professor Hubbard's opinion. He explains: "[W]hen investors are presented with opportunities to vote on issues that affect the value of their investment, rational investors will vote for the outcome that maximizes the value of their investment. In this sense, the voting decision is akin to an investment decision." (Hubbard Rpt. ¶ 15.)

The one authority the SEC cites, a law review article, is inapposite. In the article, the author advocates a heightened materiality test in section 10(b) cases. Newman et al., *Basic Truths: The Implications of The Fraud-On-The-Market Theory for Evaluating The 'Misleading' and 'Materiality' Elements of Securities Fraud Claims*, 20 J. Corp. L. 571, 584 (1995). The article does not address—let alone reject—the view that stock price movement is an appropriate factor for a jury to consider in a section 14(a) case.

## C. BOA's Experts Should Not Be Excluded As Redundant Or Duplicative

The SEC complains that Professors Hubbard and Holder and Mr. Blum "opine on the identical issue of the disclosure of Merrill's compensation and benefits expense in its quarterly filing" and that Professors Hubbard and Grundfest are "opining on the contents of articles . . . and analyst reports." Professor Hubbard, however, performed an event study and an economic analysis of the significance of the allegedly misstated and omitted information, while Professor Holder and Mr. Blum address accounting issues (one from the perspective of an academic and the other as a practitioner) and Professor Grundfest addresses the mix of information. The fact that their reports rely on or refer to some of the same information does not render them duplicative. *See AUSA Life Ins. Co.* v. *Dwyer*, 899 F. Supp. 1200, 1203 & n.4 (S.D.N.Y. 1995) (finding that expert reports prepared by a securities and corporate law professor and by a CPA were not duplicative where they merely touched upon the same underlying information); *see also Goldkrantz* v. *Griffin*, No. 97 Civ.

9075 (DLC), 1999 WL 191540, at *4 (S.D.N.Y. Apr. 6, 1999) (discussing analyst reports, newspaper and industry articles and magazines as part of expert's event study).

Moreover, to the extent that the proposed testimony of Professor Holder and Mr. Blum (who have separate areas of expertise and background, one more academic and the other more practice oriented) overlap, there still is no reason to strike either expert's testimony at this time. As we explained at the December 17, 2009 oral argument, it is unlikely that both experts will be offered to testify on the same subjects at trial. BOA is simply reserving its right to put on the most relevant testimony to assist the jury based on the way the SEC prosecutes its case. (Tr. at 21:1.) The SEC's motion is thus premature. *See United States* v. *Mermelstein*, 487 F. Supp. 2d 242, 266 (E.D.N.Y. 2007) (denying defendant's motion *in limine* to exclude expert testimony offered by the government as duplicative, where the government had not decided which expert to call at trial, noting that the defendant would have the opportunity to object at trial if the duplicative testimony was offered then); *United States* v. *Stein*, No. S1 05 Crim. 0888, 2007 WL 3009650, at *5 (S.D.N.Y. Oct. 15, 2007) (at the government's request, deferring judgment on a motion to preclude expert testimony as duplicative until "a more appropriate point during the trial").

Finally, the SEC complains that deposing both Professor Holder and Mr. Blum will be unfairly time-consuming and expensive. However, having raised serious issues regarding the disclosures in the multi-billion dollar BOA/Merrill merger, and subjected dozens of BOA witnesses to deposition, it hardly behooves the SEC to complain that it must expend the marginal additional effort of taking two depositions on accounting issues rather than one.

### D. Professor Grundfest Is Qualified To Offer Expert Testimony

The SEC's challenge to Professor Grundfest's qualifications to opine about the mix of information in the marketplace also should be rejected. Professor Grundfest's report reflected a survey of 1,200 news articles and 47 analyst reports, which were identified through a calculated methodology. (Grundfest Rpt. ¶¶ 4, 11.) He not only is prepared to testify that the "total mix" included numerous reports indicating that Merrill employees would receive year-end bonuses for 2008, but that there were no articles or analyst reports indicating that Merrill would *not* pay bonuses for 2008. (*Id.* ¶ 11.) The SEC provides absolutely no basis for its position that the survey is inappropriate or that Professor Grundfest lacked the "knowledge, skill, experience, training or education" to supervise and report on this survey. In fact, his experience as a Commissioner of the SEC, including his participation in the review and authorization of hundreds of enforcement proceedings and settlements, many of which called for a determination of materiality, as well as his experience as a law professor, makes him exceptionally well qualified for this role. Alternatively, the SEC's motion is premature, as it has not taken Professor Grundfest's deposition or explored his qualifications.[4] Finally, Professor Grundfest's testimony responds, in part, to the report of the SEC's proposed expert Robert M. Daines, who opined on the content of news reports during the period leading up to the shareholder vote.

For all of these reasons, and the reasons set out in BOA's December 23 letter, the SEC's demand to exclude evidence and strike certain of BOA's experts should be rejected.

Respectfully submitted,

Daniel J. Kramer

cc:     Alexander Vasilescu (via email)

---

[4] *See Assicurazioni Generali S.p.A.* v. *Distribution Unlimited, Inc.*, No. 03 Civ. 0122, 2005 WL 3531458, at *3 (N.D.N.Y. Dec. 22, 2005) ("This request [to exclude an expert], more properly brought as a motion *in limine* before trial, is premature at this juncture.").