

UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
NEW YORK REGIONAL OFFICE
THREE WORLD FINANCIAL CENTER
SUITE 400
NEW YORK, NEW YORK 10281-1022

December 31, 2009

**VIA FACSIMILE & FEDERAL EXPRESS**

The Honorable Jed S. Rakoff
United States District Court
Southern District of New York
United States Courthouse, Room 1340
500 Pearl Street
New York, NY 10007

>    Re:    **SEC v. Bank of America Corp., 09-cv-06829 (JSR)**

Dear Judge Rakoff:

In accordance with the Court's instruction, we respectfully submit this letter on behalf of Plaintiff Securities and Exchange Commission ("Commission") to seek leave, pursuant to Fed. R. Civ. P. 15(a), to file a Second Amended Complaint ("SAC"). The SAC, a copy of which is enclosed for the Court's reference, adds a count under Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 14a-9 thereunder based on the failure of Bank of America Corporation ("BOA") to update the merger proxy statement, before the December 5, 2008 shareholder vote, concerning extraordinary losses that were sustained by Merrill Lynch & Co., Inc. ("Merrill") prior to the vote.

## I.    Background

The Commission commenced this action on August 3, 2008, when it filed a complaint charging BOA with violating Section 14(a) of the Exchange Act and Rule 14a-9 based on BOA's failure to disclose, in the proxy statement soliciting votes for approval of its merger with Merrill, that BOA had previously authorized Merrill to pay discretionary year-end bonuses of up to $5.8 billion.[1]  Concurrently, the parties submitted a proposed final consent judgment for the Court's consideration and approval. Before executing the proposed consent, BOA was advised by the Commission's staff that the proposed settlement would relate only to the nondisclosure of the bonus agreement and that the Commission would proceed with its ongoing investigation into disclosure issues relating to Merrill's mounting losses prior to the December 5 shareholder vote.[2]

On September 14, 2009, the Court rejected the proposed consent judgment and ordered the parties to proceed with discovery and prepare for trial. Immediately following the Court's ruling, the Commission commenced discovery, first negotiating the proposed terms of a case management plan with BOA, and then issuing its first set of document requests and interrogatories on September 28. Approximately three weeks after the commencement of discovery, BOA informed the Commission that it agreed to extend discovery to various

---

[1]    On October 16, 2009, the Commission filed an amended complaint that added a charge against BOA for violating Exchange Act Rule 14a-3 based upon the same facts alleged in the original complaint.

[2]    Had the initial settlement been approved, the Commission would have brought any charges based on the Merrill losses as a separate action, and BOA, which agreed to settle the bonus claim on the understanding that additional charges on the Merrill losses could be brought subsequently, would have had no basis for objection. Given the current posture of this case, judicial economy weighs in favor of allowing the proposed amendment as part of the instant action.

The Hon. Jed S. Rakoff
December 31, 2009
Page 2

categories of information that BOA claimed were protected by the attorney-client privilege or work-product doctrine. On October 14, 2008, the Court entered a stipulated protective order to that effect. As part of the stipulated order, BOA expressly waived privilege with respect to information relating to "[t]he public disclosure or non-disclosure, at any time prior to the closing of the Merger, of the financial performance, forecasts, and/or preliminary and interim result of Merrill Lynch for its fourth quarter of FY 2008." SEC v. Bank of America, 09-cv-6829 (S.D.N.Y.) (Docket Entry #33) (Oct. 14, 2009 Order).

Accordingly, from mid-September through late December 2009, the Commission took substantial discovery concerning Merrill's fourth-quarter losses, including numerous depositions in the last days before the December 24, 2009 cutoff for fact depositions set forth in the case management plan. These depositions have covered both privileged information relating to BOA's consideration of disclosure in connection with Merrill's fourth-quarter losses, as well as other information pertaining to BOA's precise knowledge of the scope of known and estimated losses at Merrill prior to the December 5 shareholder vote. As part of the discovery into Merrill's fourth-quarter losses, the Commission deposed numerous witnesses, including: Chris Hayward (Merrill's former director of finance; deposed on Dec. 22); Joe Price (BOA's Chief Financial Officer; deposed on Dec. 18); Neil Cotty (BOA's Chief Accounting Officer; deposed on Dec. 16); Greg Curl (senior BOA executive; deposed on Dec. 11); Rosemary Berkery (Merrill's former General Counsel; deposed on Dec. 9); Timothy Mayopoulos (BOA's former General Counsel; deposed on Dec. 1); Edward Herlihy (BOA's outside counsel; deposed on Nov. 17); Nicholas Demmo (BOA's outside counsel; deposed on Nov. 16); John Thain (Merrill's former Chief Executive Officer; deposed on Nov. 4); and Ken Lewis (BOA's Chief Executive Officer; deposed on Oct. 30). BOA's counsel was present at all of these depositions.

## II.   The Commission Should Be Granted Leave To Amend The Complaint

### A.   Leave to amend is liberally granted.

Rule 15(a) of the Federal Rules of Civil Procedure provides that a motion to amend the complaint "shall be freely granted when justice so requires." As the Supreme Court has instructed, this mandate must be liberally construed by the courts:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. – the leave sought should, as the rules require, be "freely given."

Forman v. Davis, 371 U.S. 178, 182 (1962). Under this standard, courts have frequently permitted the Commission to amend complaints, provided that there was no excessive delay or other indicia of bad faith or malice on the part of the Commission. See, e.g., SEC v. DCI Telecom., Inc., 207 F.R.D. 32 (S.D.N.Y. 2002) (no undue delay where Commission sought leave to amend complaint six years after the start of its investigation and 21 months after commencement of the action); SEC v. Cavanagh, 98 Civ. 1818 (DLC), 1998 WL 440029 (S.D.N.Y. July 27, 1998) (leave to amend complaint adding three new defendants and ten new relief defendants). The liberal granting of motions to amend pleadings is consistent with Second

The Hon. Jed S. Rakoff
December 31, 2009
Page 3

Circuit precedent. See Block v. First Blood Assocs., 988 F.2d 344 (2d Cir. 1993) (upholding amendment of answer nine days before discovery cutoff and four years after filing of complaint); Richardson Greenshields Sec., Inc. v. Lau, 825 F.2d 647, 653 n. 6 (2d Cir. 1987) ("parties … have been permitted to amend their pleadings long after they acquired the facts necessary to support those claims."). This Court has similarly expressed its willingness to entertain pleading amendments prior to the close of discovery in this case. See SEC v. Bank of America, 09 Civ. 6829 (S.D.N.Y.) (Docket Entry #26) (confirming rulings made on Sept. 21, 2009 conference call).

### B.    The proposed amendment.

The SAC alleges that BOA committed an additional violation, in connection with the proxy statement that it filed to solicit shareholder approval for the merger, of Section 14(a) and Rule 14a-9 by failing to update the proxy statement to disclose Merrill's mounting fourth-quarter losses prior to the December 5 shareholder vote. As alleged in the SAC, in October 2008, to register shares for the merger, BOA filed a registration statement that incorporated the proxy statement, and that represented that BOA would update shareholders to reflect any fundamental change to the information that had been disclosed.

By December 5, BOA had become aware of $4.5 billion in net losses at Merrill for October and estimated an additional multi-billion loss for November – performance that represented a fundamental change to the financial information previously provided to shareholders about Merrill. These losses alone constituted more than one third of the merger value as of December 5, and approximately 60 percent of Merrill's entire losses in the preceding three quarters of the year. Nevertheless, despite its representation that it would update shareholders, BOA kept them in the dark as they were asked to vote on the proposed merger at the end of a quarter of nearly unprecedented volatility and uncertainty. As alleged in the SAC, BOA's failure to make any disclosure concerning the massive losses Merrill sustained in October and November violated BOA's express undertaking to update shareholders of fundamental changes to previously disclosed information and rendered its proxy disclosures materially false and misleading.

### C.    The Commission has proceeded diligently in pursuing discovery relating to the proposed new charge.

The Commission has proceeded with full speed in pursuing the proposed new charge. Prior to the filing of the original complaint in August 2008, the Commission's investigation of BOA's merger-related disclosures focused on issues relating to the bonus agreement with Merrill. After the Court declined to approve the proposed settlement, as part of the litigation the Commission proceeded to take substantial discovery on Merrill fourth-quarter losses, along with discovery on the nondisclosure of the bonus agreement. Since then, discovery has proceeded on an expedited schedule. Beginning in mid-September, the staff has served BOA with numerous document requests, interrogatories and requests for admission, has obtained tens of thousands of pages of documents in response to those requests, has taken nearly 25 depositions, exchanged expert reports, briefed multiple discovery disputes, and served various third-party subpoenas for documents – all within the span of three months (and conducted by a four-member litigation team, compared with the scores of lawyers BOA has engaged to work on this action).

Much of the discovery to date has focused on the subject of disclosures relating to Merrill's fourth-quarter losses. As a result of, among other things, scheduling conflicts and

The Hon. Jed S. Rakoff
December 31, 2009
Page 4

witness availability, depositions of certain individuals who provided important testimony on that subject matter were taken in December. The Commission efficiently utilized the short period for fact depositions (which ended on December 24) to accumulate evidence on the disclosure of Merrill's losses, and only reached a considered conclusion that the proposed new charge should be brought after examining the full factual record developed in discovery. That decision was informed, in large part, by evidence obtained after BOA waived privilege with respect to the loss disclosure issue (which occurred only two months ago), especially testimony that was taken in mid-December. That testimony, some of which was provided by BOA's legal counsel, was important to the Commission's decision as to what kind of charge, if any, was appropriate to bring in relation to the nondisclosure of Merrill's losses. Given the expedited discovery schedule, the Commission cannot be said to have engaged in any undue delay in bringing the proposed new charge.

> **D.    The proposed amendment would require no additional discovery that could interfere with or delay the trial schedule.**

During the December 30 call with the parties, the Court inquired whether the proposed amendment would create the need for additional discovery. The Commission is not seeking additional discovery based on the proposed amendment, and can therefore meet all the deadlines set forth in the case management plan and be ready for trial as scheduled. In addition, BOA should not require any further substantial discovery, for several reasons.

First, the Commission has already deposed the key individuals with relevant information concerning Merrill's fourth-quarter losses and covered this area with them in great detail. BOA's counsel, who was present at the depositions and aware of the subject matter of inquiry, had a full opportunity to explore any issues on cross examination (and in some cases, did so). Further, all or nearly all of the witnesses with knowledge relating to the Merrill losses are current BOA employees and therefore within BOA's control. To the extent former senior employees have relevant information, BOA likely has access to them, too, pursuant to their severance arrangements. If BOA wishes to depose additional individuals who have not previously been deposed and who are not within its control, the Commission would consent to depositions taking place at any time before the March 1 trial date.

Second, BOA has already served the Commission with extremely broad requests for documents that encompass the subject of Merrill's fourth-quarter losses. By way of example, BOA's first document request in the case, which was served on September 28, called for the production of:

> All Documents or other information gathered by the SEC from any Person, including but not limited to all Documents or other information gathered pursuant to the Formal Order, concerning the allegations made in the Complaint, the Merger, the Merger Agreement, the Company Disclosure Schedule, the Joint Proxy Statement, or the Shareholder Votes.

BOA similarly referred to this broad universe of subject matters (i.e., "the Complaint, the Merger, the Merger Agreement, the Company Disclosure Schedule, the Joint Proxy Statement, or the Shareholder Votes") throughout many of its subsequent document requests. BOA's request for any documents relating to the "Merger" and the "Joint Proxy Statement" encompassed materials relating to the Merrill losses, and the staff has produced such materials in response. Indeed, the Commission has already produced in response to BOA's broad document requests its

4

The Hon. Jed S. Rakoff
December 31, 2009
Page 5

staff's investigative file, which includes all of the materials gathered in the course of the staff's investigation of both the bonus agreement and Merrill's fourth-quarter losses. Given BOA's extremely broad requests, it is hard to imagine what additional documents on the Merrill losses BOA could obtain through additional discovery. Similarly, since most, if not all, relevant witnesses with knowledge on Merrill's fourth-quarter losses are within BOA's control, BOA is already in possession of their documents, further obviating the need for additional discovery.

Third, since substantially all of the relevant information concerning disclosures of the Merrill losses is within BOA's possession and control, any additional interrogatories or requests for admission would be largely unnecessary. If BOA nonetheless wants to serve additional interrogatories or requests for admission on the subject of Merrill's fourth-quarter losses, the Commission will promptly provide responses within five days, which would ensure that the trial schedule would not be delayed.

Finally, to the extent BOA would seek to offer expert testimony on the Merrill losses, the Court has already indicated that the parties are free to continue with expert discovery up until the trial upon mutual consent. The Commission would consent to BOA serving any additional expert reports as late as mid-February, which would permit sufficient time for deposition preparation and testimony without interfering with the trial schedule.

### E.　　BOA would not otherwise be prejudiced by the amendment.

An important consideration in determining whether to grant leave for a pleading amendment is whether the defendant was given sufficient notice of the proposed additional claims. See DCI Telecom., 207 F.R.D. at 34 (citing Monahan v. New York City Dep't of Corr., 214 F.3d 275, 283 (2d Cir. 2000)); C. A. Wright & A R. Miller, 6 FEDERAL PRACTICE & PROCEDURE § 1487 ("[C]ourts have allowed amendments when … the opponent could not claim surprise, but effectively should have recognized that the new matter included in the amendment would be at issue."). As explained more fully above, BOA has been on notice of the Commission's inquiry into the Merrill fourth-quarter losses since earlier in 2009, was aware that this was a topic of discovery in this action since at least mid-October (when it waived privilege over it), and could therefore hardly claim any surprise at the new charge. In addition, BOA has been on notice of numerous other regulatory investigations into this same subject during the course of the past year, including investigations of the Department of Justice, the Office of the New York State Attorney General and the Office of the Special Inspector General for the Troubled Assets Relief Program at the U.S. Treasury Department. Finally, although the SAC adds a new charge, it does not seek any additional relief, name new parties to those set forth in the current complaint, or assert causes of action under new statutes or based on facts unrelated to BOA's deficient disclosures in connection with the merger proxy statement.

For the reasons set forth above, we respectfully submit that the Commission should be granted leave to amend the complaint.

Respectfully submitted,

Scott L. Black
Joseph Boryshansky

Encl.

The Hon. Jed S. Rakoff
December 31, 2009
Page 6

cc:    Lewis J. Liman, Esq.
       Shawn J. Chen, Esq.
       Victor L. Hou, Esq.
       Melissa K. Marler, Esq.
       Daniel J. Kramer, Esq.
       Alex Young K. Oh, Esq.
       Audra J. Soloway, Esq.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : | |
| : | |
| Plaintiff, : | 09-Civ.-6829 (JSR) |
| : | ECF Case |
| -against- : | |
| : | SECOND AMENDED |
| BANK OF AMERICA CORPORATION, : | COMPLAINT |
| : | |
| Defendant. : | |
| : | |

Plaintiff Securities and Exchange Commission ("Commission"), for its complaint against

defendant Bank of America Corporation ("Bank of America"), alleges as follows:

### SUMMARY OF ALLEGATIONS

1.      The Commission charges Bank of America with making materially false and

misleading statements, and with omitting material information, in the joint proxy statement that

it filed with Merrill Lynch & Co, Inc. ("Merrill") in connection with Bank of America's

acquisition of Merrill on January 1, 2009.

2.      Spurred by Lehman Brothers' collapse and the calamitous repercussions in the

financial markets, Bank of America and Merrill negotiated a merger over the weekend of

September 13-14 and announced the merger agreement on September 15, 2008.  To solicit

shareholder votes for approval of the merger, Bank of America and Merrill filed a joint proxy

statement on November 3 scheduling the meetings of their respective shareholders for December

5, 2008.  To register the issuance of shares to be exchanged in the merger, Bank of America also

filed a registration statement on Form S-4 that incorporated the proxy statement as part of the

prospectus.  The rules governing the use of Form S-4 required Bank of America to disclose any

material changes to Merrill's affairs that were not reflected in certain other filings.  Bank of

America was also required by law to include in the registration statement an express undertaking

to provide an update to shareholders, prior to the December 5 shareholder meeting, to reflect any

fundamental changes to the information that had been provided to them.  Accordingly, Bank of

America represented that it would update the registration statement to reflect any fundamental

change to the information already disclosed.

3.      The proxy statement described to shareholders Merrill's financial condition,

including its balance sheet and capital position, as of the end of September 2008.  By the time of

the December 5 shareholder meeting, however, Bank of America had become aware of $4.5

billion in net losses that Merrill had sustained in October, and estimated approximately $4 billion

in additional losses in November — a disastrous performance that represented a fundamental

change to the financial information previously provided to shareholders.  Combined, the October

results and November estimates constituted approximately one third of the total value of the

merger at the time of the shareholder vote and more than 60 percent of the aggregate losses that

Merrill experienced in the preceding three quarters of the year.

4.      Despite its representation that it would update shareholders about fundamental

changes to the information previously disclosed, Bank of America kept shareholders in the dark

as they were called upon to vote on the proposed merger at the end of a quarter of nearly

unprecedented volatility and uncertainty.  The absence of any disclosure concerning Merrill's

tremendous losses deprived shareholders of up-to-date information that was critical to their

ability to evaluate whether to approve the merger upon the terms presented to them.  Bank of

America's failure to make any disclosure concerning the October and November losses violated

2

its express undertaking to apprise investors of fundamental changes and rendered Bank of

America's representations false and misleading in violation of the federal securities laws.

5.    Bank of America also withheld material information from, and misled, its

shareholders about an agreement it had reached with Merrill in September concerning the

payment of discretionary year-end bonuses.  In the proxy statement, Bank of America

represented that Merrill had agreed not to pay year-end bonuses or other discretionary

compensation to its employees and executives prior to the closing of the merger without Bank of

America's consent.  In fact, contrary to that representation, Bank of America had already

previously agreed that Merrill could pay up to $5.8 billion — nearly twelve percent of the

merger consideration as of the time the parties entered into the merger agreement — in

discretionary year-end bonuses.  The merger agreement was included as an exhibit and

summarized in the proxy statement, but Bank of America's authorization to Merrill to pay these

discretionary bonuses was memorialized in a separate schedule that was omitted from the proxy

statement and whose contents were never disclosed before the shareholder vote on December 5,

2008.

6.    The omission of Bank of America's agreement authorizing Merrill to pay

discretionary year-end bonuses made the statements to the contrary in the proxy statement

materially false and misleading.  Bank of America's representations that Merrill was prohibited

from making discretionary payments were materially false and misleading because the

contractual prohibition on such payments was nullified by the undisclosed agreement expressly

permitting them.  In addition, the omission of this material information concerning the terms of

the merger directly violated disclosure obligations under the regulations governing proxy

solicitation.  Given the amount of the discretionary bonuses that Bank of America had authorized

in relation to the total value of the transaction, as well as the dramatic deterioration in Merrill's

condition and the turmoil in the financial markets, Bank of America's failure to disclose that

authorization to shareholders was material.  Merrill wound up paying $3.6 billion in bonuses to

its employees despite the fact that Merrill ultimately lost over $27 billion in 2008, a record loss

for the firm and nearly $20 billion more than the approximately $8 billion it had lost in 2007.

7.      By virtue of the foregoing conduct, Bank of America, directly or indirectly,

violated Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §

78n(a)] and Rules 14a-3 and 14a-9 thereunder [17 C.F.R §§ 240.14a-3 and 240.14a-9].  Unless

permanently restrained and enjoined, Bank of America will again engage in the acts and

transactions set forth in this complaint or in acts and transactions of similar type and object.

## JURISDICTION AND VENUE

8.      The Commission brings this action pursuant to the authority conferred by Section

21(d) of the Exchange Act [15 U.S.C. § 78u(d)] seeking to restrain and enjoin permanently Bank

of America from violating Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rules

14a-3 and 14a-9  thereunder [17 C.F.R. § § 240.14a-3 and 240.14a-9].  The Commission also

seeks a final judgment ordering Bank of America to pay a civil money penalty pursuant to

Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

9.      This Court has jurisdiction over this action, and venue lies in this District,

pursuant to Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].  Bank of

America, directly or indirectly, has used the mails and the means and instrumentalities of

interstate commerce in connection with the acts and transactions alleged herein, some of which

occurred in this District.  In addition, Bank of America transacted business and maintained an office in this District throughout the relevant period.

## THE DEFENDANT

10.    **Bank of America**, a Delaware corporation, is a bank holding company and a financial holding company under the Gramm-Leach-Bliley Act.  Bank of America's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and trades on the New York Stock Exchange ("NYSE").  Bank of America's principal offices are located in Charlotte, North Carolina.

## OTHER RELEVANT ENTITY

11.    **Merrill**, a Delaware corporation, is a wholly-owned subsidiary of Bank of America.  Prior to its acquisition by Bank of America on January 1, 2009, Merrill's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NYSE, and Merrill met the requirements for use of the Commission's Form S-3 for the registration of securities offered in certain transactions under the Securities Act of 1933.

## THE VIOLATIONS

**I.    The Merger Transaction and Related Filings**

12.    In September 2008, in the wake of Lehman Brothers' rumored bankruptcy and the shock waves it sent through the financial markets, senior management at Merrill began exploring the possibility of Merrill being acquired by a commercial bank.  On September 13, 2008, initial discussions took place between the Chief Executive Officers of Merrill and Bank of America. Later that day, teams from both firms began negotiating the terms of a possible merger.

13.     The principal terms of the transaction were negotiated on September 13 and 14, 2008. On the evening of September 14, 2008, the terms of the proposed merger were presented to the boards of directors of Bank of America and Merrill. Both boards unanimously approved the transaction.

14.     The merger agreement was signed in the early hours of September 15, 2008 and publicly announced before the opening of the stock market on that day. Under the terms of the merger agreement, Bank of America agreed to provide Merrill shareholders with 0.8595 shares of Bank of America common stock for each share of Merrill common stock. At the time the merger agreement was signed, this exchange ratio represented a price of $29 for each Merrill share — a 70 percent premium to Merrill's stock price on the prior trading day — and a total deal value of approximately $50 billion.

15.     In October 2008, to register the issuance of new shares of stock to Merrill shareholders in connection with the merger, Bank of America filed a registration statement on Form S-4 and two amendments on Form S-4/A. The registration statement incorporated a proxy statement jointly prepared by Bank of America and Merrill as part of the prospectus, and became effective on October 30, 2008.

16.     To solicit the approval of their shareholders for the merger, Bank of America and Merrill also filed the joint proxy statement with the Commission on November 3, 2008 and mailed copies of the proxy statement to their respective shareholders. The shareholder meetings for both firms were scheduled for December 5, 2008.

17.     As set forth below, the proxy statement was false and misleading in two separate ways. First, Bank of America failed to update the registration statement and proxy statement,

6

prior to the shareholder vote, to disclose information concerning the losses that Merrill had

incurred during the fourth quarter of 2008.  Second, Bank of America failed to disclose an

agreement it had reached with Merrill in September concerning the payment of discretionary

year-end bonuses.  By failing to disclose the agreement concerning the bonuses, Bank of

America also violated its affirmative obligation under the proxy disclosure rules to disclose all of

the material features of the merger agreement as well as all information that was material to its

shareholders' investment decision.

## II.    Bank of America's Failure to Disclose Merrill's Fourth Quarter Losses

18.    Under Form S-4, Bank of America was required to describe "any and all material

changes in [Merrill's] affairs that have occurred since the end of the last fiscal year … and that

have not been described in a report on Form 10-Q or Form 8-K."  Bank of America did not

describe any such material changes in Merrill's affairs.

19.    In the registration statement that it filed to register the issuance of new shares for

the merger, Bank of America undertook, among other things, to "reflect in the prospectus any

facts or events arising after the effective date of the registration statement . . . which, individually

or in the aggregate, represent a fundamental change in the information set forth in the

registration statement."  In a section of the proxy statement entitled "WHERE YOU CAN FIND

MORE INFORMATION," Bank of America referred shareholders to the registration statement for

additional relevant information that it said was not included in the proxy statement.

20.    The proxy statement and registration statement, and the documents incorporated

by reference into them, provided information to shareholders concerning the financial condition

of the two companies and the details of the proposed merger, among other matters.  They

described Merrill's financial condition, including its balance sheet and capital position, as of the end of September 2008. By the time of the shareholder vote on December 5, however, Bank of America had become aware that Merrill had sustained monumental losses in October and November. Nevertheless, Bank of America failed to make any disclosure to shareholders concerning those losses before they voted to approve the merger. Shareholders therefore were left to conclude that no fundamental changes existed following September 2008.

### A.    Merrill's Third Quarter Results

21.    On October 16, 2008, two weeks before the proxy statement was mailed to shareholders, Merrill released its results for the third quarter of the year. These results were subsequently reported on Form 10-Q, which Merrill filed with the Commission on November 5, 2008 and which was prospectively incorporated by reference into the proxy statement. The third quarter results were the most up-to-date information about Merrill's financial condition that was available to shareholders before the December 5 vote on the merger.

22.    In its October 16 release, Merrill announced a net loss of $5.2 billion in the third quarter. That loss reflected a $5.7 billion write-down from the sale of collateralized debt obligations ("CDOs") that were backed by subprime and other non-prime residential mortgages, and the termination and settlement of guarantees on those securities. In prior quarters, Merrill's CDOs were responsible for multi-billion dollar losses and their sale in the third quarter was touted by Merrill's management as a significant step in "de-leverag[ing] the balance sheet." Earlier in the third quarter of 2008, Merrill's management had described the expected sale of the CDOs as a "significant milestone in our risk reduction efforts" that "will materially enhance the company's capital position and financial flexibility going forward."

8

23.     After Merrill released its third quarter results, the price of its publicly-traded stock rose, reflecting the market's assessment that Merrill's prospects had improved.  In addition, analysts who covered Merrill forecasted that Merrill's net income in the fourth quarter of 2008 would range from a gain of $1 billion to a loss of $1.8 billion — echoing the market's view that Merrill's fourth quarter performance would be a substantial improvement over its $5.2 billion loss in the third quarter.

24.     Consistent with the market's reaction to Merrill's third quarter results, senior management at Bank of America expected that Merrill would break even in the fourth quarter of 2008 and would finally put an end to a series of losses that it had sustained since the third quarter of 2007.  Nevertheless, when Bank of America learned of monumental losses at Merrill in October and November that were inconsistent with its own management's expectations, it did not attempt to correct in any way, prior to the shareholder vote on December 5, the prevailing view that Merrill's performance would recover in the fourth quarter.

**B.    Merrill's Losses Preceding the Shareholder Vote**

25.     After the announcement of the merger, and consistent with its rights to information under the merger agreement, Bank of America was regularly kept apprised of Merrill's financial performance.  By the second week of November, Bank of America was advised that Merrill had closed its books for the month of October with a net loss of $4.5 billion, an enormous monthly loss for the firm.  The October loss almost equaled the losses that Merrill had sustained in the entire third quarter and represented more than one-third of all losses sustained by Merrill in the first nine months of 2008.

26.     In the weeks following the closing of the books for October, Bank of America received additional reports and forecasts from Merrill indicating that Merrill was continuing to sustain massive additional losses in November.

27.     On November 12, 2008, Merrill provided Bank of America with an internal report that forecasted a fourth quarter net loss of approximately $5.4 billion.  As Bank of America was aware, the forecast did not include either present valuations or forward-looking projections for some of Merrill's most troubled assets, such as Merrill's distressed correlation trading book and credit valuation adjustments ("CVA").  Earlier in 2008, Merrill's management had concluded that, because of the turmoil in the financial markets, such valuations could only be made with sufficient integrity during the month-end closing process.  After receiving the forecast, Bank of America's management made certain revisions to it to account for estimated losses from Merrill's distressed correlation book and CVA, as well as an expected tax benefit, resulting in a projected quarterly loss of approximately $5 billion.

28.     Based on the revised forecast, Bank of America's management sought advice from the company's in-house counsel on its disclosure obligations with respect to Merrill's performance.  In addition, a senior Bank of America executive approached senior executives of Merrill to alert them that a disclosure may be required.  The Merrill executives dismissed the suggestion on the ground that Merrill ordinarily did not preannounce results or otherwise provide shareholders with intra-quarter results.

29.     Between November 12 and November 20, Bank of America's in-house and outside counsel conferred on whether a disclosure had to be made in light of the forecasted $5 billion quarterly loss at Merrill.  On November 20, the lawyers erroneously concluded that no

disclosure was necessary because the projected quarterly loss was within the range of losses that Merrill had sustained in the preceding five quarters.  In addition, the lawyers concluded that the proxy statement and incorporated filings, which described the challenging market environment and the adverse impact that Merrill could experience as a result, provided adequate warning to shareholders.  Although Bank of America and its attorneys determined that disclosing Merrill's forecasted quarterly performance would be risky and speculative, they did not consider disclosing solely the enormous $4.5 billion monthly loss that Merrill had sustained in October, which was known.  Nor did Bank of America or its attorneys seek any additional financial data from Merrill to better ascertain the extent of known, as opposed to merely projected, losses as of mid-November, or to learn of any updates as of November 20 (the day they determined that no disclosure was necessary) to the forecasted net loss of $5 billion.

30.    On December 3, two days before the shareholder vote, Bank of America received an updated report reflecting an estimated net loss of $6.4 billion at Merrill for October and November, and forecasting a quarterly net loss of over $7 billion.  After receiving the forecast, Bank of America's management revised it to add a $2 billion "placeholder" to the November results, on a pre-tax basis, to reflect additional estimated losses from marks on Merrill's distressed correlation book and CVA based upon Merrill's representation that substantial losses associated with these marks should be expected.  In addition to the November placeholder, Bank of America added $1 billion to the quarterly forecast for anticipated losses in December.  After receiving the December 3 report, Bank of America's management again consulted the company's in-house counsel and was erroneously advised that no disclosure was necessary because the forecasted quarterly loss, though larger than before, was still within the range of losses that Merrill had sustained in prior quarters.

11

31.     The following day, December 4, Bank of America was informed that approximately $800 million of the $2 billion November placeholder had been recorded in losses on Merrill's distressed correlation book.  Although Merrill's books for November were not yet finally closed, this update (which included certain other additional losses) brought the estimated net loss in November to $3 billion, leaving $1.2 billion in the placeholder for additional estimated losses in CVA in November.  While this update increased the estimated net losses in October and November to over $7.5 billion, Bank of America did not consider whether these losses warranted disclosure or whether they affected its prior conclusion that no disclosure was necessary.

32.     Bank of America held its shareholder meeting on December 5, 2008.  Contrary to its representation that it would update the registration statement to reflect a fundamental change in the information previously provided, Bank of America failed to supplement it with any information concerning Merrill's massive losses in October and November and the diminution in value to Merrill's assets caused by these losses.  Unaware of the diminished value of Merrill, Bank of America's shareholders voted to approve the merger on the terms originally negotiated in September.   The merger closed on January 1, 2009.  Several days after the December 5 shareholder meeting, Bank of America received an updated report reflecting a forecasted net loss of over $12 billion at Merrill for the fourth quarter of 2008.  After receiving this forecast, Bank of America's management considered terminating the merger agreement with Merrill on the ground that a material change in Merrill's financial condition had occurred.

33.     On January 16, 2009, nearly six weeks after the shareholder vote and two weeks after the merger had closed, Bank of America finally disclosed Merrill's performance in the

fourth quarter. It issued a release reporting that Merrill had sustained a net loss of $15.3 billion for the fourth quarter of 2008 and that Bank of America had obtained $20 billion in funds under the Treasury Department's Troubled Asset Relief Program to assist in the acquisition. On the next trading day, Bank of America's stock price dropped by nearly 30 percent.

III.    **Bank of America's Failure to Disclose Merrill's Year-End Bonuses**

34.     During the merger negotiations in September, one of a handful of issues addressed by the lead negotiators for Bank of America and Merrill was Merrill's ability to pay discretionary year-end bonuses for 2008 to its executives and employees pursuant to its Variable Incentive Compensation Program ("VICP"), the firm's primary annual bonus program. On that issue, Bank of America specifically agreed to allow Merrill to pay up to $5.8 billion in year-end bonuses with a recorded 2008 expense of up to $4.5 billion. Bank of America and Merrill also agreed that 60 percent of Merrill's year-end bonuses would be paid in cash and 40 percent in stock, and that the bonus allocations and final decisions about the form of the bonuses (*i.e.*, cash versus stock) would be made by Merrill in consultation with Bank of America.

A.    **The False and Misleading Proxy Statement**

35.     The contractual provision governing the payment of VICP bonuses by Merrill was included in a schedule to the merger agreement ("Schedule") rather than the body of the merger agreement, and provided as follows:

> 5.2(b)(iii), 5.2(c)(i), and 5.2(c)(ii) – Variable Incentive Compensation Program ("VICP") in respect of 2008 (including without limitation any guaranteed VICP awards for 2008 or any other pro rata or other 2008 VICP awards payable, paid or provided to terminating or former employees) may be awarded at levels that (i) do not exceed $5.8 billion in aggregate value (inclusive of cash bonuses and the grant date value of long-term incentive awards) … and (ii) do not result in 2008 VICP-related expense exceeding $4.5 billion … Sixty percent of the overall 2008 VICP shall be awarded as a

13

current cash bonus and forty percent of the overall 2008 VICP shall be awarded as a long-term incentive award either in the form of equity or long-term cash awards. The form (i.e., equity v. long-term cash) and terms and conditions of the long-term incentive awards shall be determined by [Merrill] in consultation with [Bank of America] … The allocation of the 2008 VICP among eligible employees shall be determined by [Merrill] in consultation with [Bank of America].

36.      A provision in the body of the merger agreement, however, indicated that Merrill had no authority to, and would not, pay discretionary bonuses to its employees. That provision was entitled "Company Forbearances" and stated that "except as set forth in this Section 5.2 of the Company Disclosure Schedule," Merrill "shall not . . . without the prior written consent of [Bank of America]" take any of a number of enumerated actions before the closing of the merger ("Forbearance Provision"). Among several other prohibited actions in the human resource category, Merrill agreed and represented that it would not "pay any amounts to [directors, officers or employees] not required by any current plan or agreement (other than base salary in the ordinary course of business)." Although the Forbearance Provision as a whole referred generically to exceptions in the Schedule, there was no disclosure at all anywhere in the merger agreement of what those exceptions were, which of the various prohibited actions were subject to those exceptions, or what the contents of the Schedule were.

37.      The joint proxy statement that Bank of America and Merrill filed on November 3, 2008 included, as an attachment, the full text of the merger agreement but it omitted the Schedule setting forth the firms' agreement about Merrill's payment of VICP bonuses. Neither the Schedule nor its contents were publicly disclosed prior to the December 5 shareholder vote.

38.      Not only did the proxy materials fail to include the Schedule or otherwise disclose that Bank of America had authorized Merrill to pay up to $5.8 billion in discretionary year-end

14

bonuses, but the Forbearance Provision of the merger agreement, which was disclosed, suggested

the contrary — that Merrill had no authority to, and would not, pay discretionary bonuses to its

employees.  Because there was no disclosure at all of the contents of the Schedule anywhere in

the merger agreement or elsewhere in the proxy statement, shareholders would not have known

that Bank of America had already agreed to allow Merrill to pay up to $5.8 billion in

discretionary bonuses, *i.e.*, payments "not required by any current plan or agreement."

     39.    The text of the proxy statement, in a section describing the principal terms of the

merger agreement, paraphrased the Forbearance Provision and listed seventeen "extraordinary"

prohibited actions that Merrill had agreed not to take before the closing of the merger, including

the payment of discretionary compensation.  The relevant text of the proxy statement qualified

the discussion of the Forbearance Provision only by referring to "certain exceptions," which

were undisclosed, and stated that Merrill was prohibited from taking any of the "extraordinary"

actions without "Bank of America's prior written consent."

     40.    The foregoing statements in the joint proxy statement were materially false and

misleading because, among other reasons:

        (a)  The statements constituted a representation by Bank of America that, under

the terms of the merger agreement, Merrill was only permitted to make "required" payments to

its employees, such as salary and benefits, and was prohibited from paying discretionary year-

end bonuses when, in fact, Bank of America had already expressly authorized Merrill, as set

forth in the undisclosed Schedule, to pay up to $5.8 billion in discretionary year-end bonuses —

a fact that a shareholder could not have known from reading the joint proxy statement or any

other public source.

(b)  The statements created the impression that Bank of America had not given its written consent to the payment of discretionary year-end bonuses at Merrill — which the proxy statement indicated "will not be unreasonably withheld or delayed" — when, in fact, by the time the proxy statement was prepared and distributed to shareholders, Bank of America had already given its written consent, as set forth in the undisclosed Schedule, that Merrill could pay up to $5.8 billion in discretionary bonuses.

(c)  The $5.8 billion in discretionary bonuses that Bank of America authorized Merrill to pay constituted (i) nearly 12 percent of the $50 billion that Bank of America had agreed to pay to acquire Merrill; (ii) nearly 30 percent of Merrill's total stockholder equity; (iii) around 25 percent of the value of the deal as of the time of the shareholder vote, and (iv) over 8 percent of Merrill's total cash and cash equivalents as of December 31, 2008.

41.    In addition, the omission from both the registration statement and the joint proxy statement of either the schedule containing the firms' agreement concerning Merrill's payment of VICP bonuses or of any description of that agreement directly violated proxy regulations that required Bank of America, among other things:  (i) to furnish any such schedules (or similar attachments) to the merger agreement that contained information material to an investment decision and that was not otherwise disclosed; and (ii) to provide a list briefly identifying the contents of any omitted schedules.  In violation of these legal requirements, neither the registration statement nor the joint proxy statement contained such disclosures.

16

### B.     Acceleration and Payment of the Bonuses

42.     Shortly after announcing the merger, Merrill's management began putting together the bonus payment schedule for 2008.  By the end of September, Merrill's management had created an accelerated schedule for the approval of the bonus pool and the payment of the bonuses.  In prior years, Merrill had made final decisions on the bonus pool in January following the year for which bonuses were paid, in part to allow the firm to consider the full year's financial performance.  Under the accelerated schedule that Merrill's management prepared, the compensation committee of Merrill's board of directors was scheduled to approve the final bonus pool in early December, more than three weeks before the end of the year for which the bonuses were to be paid and before the closing of the merger with Bank of America.

43.     On November 11, 2008, Merrill's compensation committee was presented with and approved an accelerated schedule under which final approval of the bonus pool would occur on December 8, bonus communications to employees would occur on December 22, and the cash awards would be made on December 31, 2008.  Stock awards were to be made in early 2009.  Merrill kept Bank of America apprised of developments in Merrill's plans with respect to the payment of year-end bonuses throughout the fall of 2008 and specifically apprised Bank of America of the accelerated schedule on November 12, 2008.

44.     During the merger negotiations in September 2008, Bank of America and Merrill did not reach a specific agreement with respect to bonuses for Merrill's top five executives.  As was disclosed in Merrill's annual proxy statement for 2007, Merrill's top five executives did not receive a year-end bonus in 2007 because of the firm's poor performance, which included $7.8 billion in losses.  By September 2008, Merrill's performance in 2008 was already far worse than

it had been in the entire year of 2007, as the firm had already sustained approximately $12 billion in losses.  Yet in the weeks following the merger announcement, Merrill's management proceeded with plans to pay a total of over $130 million in year-end performance bonuses to the top five executives.  Merrill made Bank of America aware of these plans and the firms' senior executives discussed the amount of these bonuses throughout the fall of 2008.

45.    In November 2008, the size of Merrill's planned bonus pool was decreased due to a variety of factors, as were the bonuses planned for Merrill's top five executives.  By late November, Merrill's VICP bonus pool was reduced to approximately $3.6 billion, with an expected current period expense of approximately $3 billion.  Concerned that it may not have enough stock to satisfy Merrill's stock awards, Bank of America asked Merrill to pay 70 percent of the bonuses in cash and 30 percent in stock, instead of the 60/40 cash-stock split set forth in the Schedule to the merger agreement.  Merrill complied with the request, increasing the recorded current year expense of the bonuses to $3.2 billion.

46.    Aside from the materially false and misleading proxy materials that were disseminated to the shareholders in November 2008, neither Bank of America nor Merrill made any disclosures to their shareholders prior to the December 5 shareholder vote concerning the firms' agreement that Merrill could pay up to $5.8 billion, or the revised plans to pay $3.6 billion, in discretionary and other year-end bonuses before the merger closed.

47.    On December 8, 2008, Merrill's compensation committee approved a VICP bonus pool of approximately $3.6 billion.  The committee deferred the proposal to pay bonuses to Merrill's top five executives to the full board.  Later in the day, that proposal was withdrawn and in the end, none of Merrill's top five executives received a bonus for 2008.  Merrill's employees

18

were notified of their 2008 VICP bonuses on December 19, 2008, and received the cash

payments on December 31, 2008, a day before the merger with Bank of America closed.

### CLAIMS FOR RELIEF

### COUNT I
**Violation of Section 14(a)
of the Exchange Act and Rule 14a-9
(Failure to Disclose Merrill Losses)**

48.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 33.

49.     As set forth more fully above, to register the issuance of new shares of stock to

Merrill shareholders in connection with the merger, in October 2008 Bank of America filed a

registration statement on Form S-4 and two amendments on Form S-4/A.  The registration

statement incorporated the joint proxy statement as part of the prospectus and became effective

on October 30, 2008.

50.     Under the rules governing Form S-4, Bank of America was required to describe

"any and all material changes in [Merrill's] affairs that have occurred since the end of the latest

fiscal year … and that have not been described in a report on Form 10-Q or Form 8-K . . ."  In

addition, as required by the rules, Bank of America included in the registration statement an

undertaking that it would "reflect in the prospectus any facts or events arising after the effective

date of the registration statement . . . which, individually or in the aggregate, represent a

fundamental change in the information set forth in the registration statement."  This undertaking

required Bank of America to update the registration statement, of which the proxy statement was

part, to include any fundamental change in Merrill's financial condition that occurred after the

registration statement was effective and the proxy statement was originally distributed to

shareholders and before the December 5 shareholder vote.

19

51.    The losses that Merrill was known to have suffered in October and November 2008, combined with the very substantial additional losses that Bank of America estimated that Merrill had suffered prior to the shareholder vote, constituted a fundamental change to Merrill's financial condition.  Merrill's known losses in this two-month period represented nearly a third of the total value of the transaction as of the time of the vote, and nearly 60 percent of Merrill's total losses for the first nine months of the year.  In addition, as of the time of the shareholder vote, Bank of America estimated that by the time Merrill closed its books for the month of November, Merrill would have incurred over $1 billion in additional losses.  This undisclosed information was highly material to shareholders' evaluation of whether to approve the merger with Merrill on the terms negotiated more than eleven weeks earlier.

52.    Despite the magnitude of the losses at Merrill, Bank of America failed to update the registration statement and proxy statement to reflect this information, thereby violating its express undertaking to update shareholders with regard to fundamental changes and rendering its representations in the proxy statement and registration statement materially false and misleading.

53.    Through these acts, Bank of America, directly or indirectly, by use of the means or instrumentalities of interstate commerce or of the mails, or the facilities of a national securities exchange, solicited or permitted the use of its name to solicit proxies, consents or authorizations in respect of non-exempt securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] by means of a proxy statement, form of proxy statement, notice of meeting and other communications that contained statements which, at the time and in the light of the circumstances under which they were made, were false and misleading with respect to material facts or which omitted to state material facts necessary in order to make the statements made therein not false or misleading or necessary to correct

20

statements in earlier communications with respect to the solicitation of a proxy for the same
meeting or subject matter which became false or misleading, in violation of Section 14(a) of the
Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9].

54.     By reason of the foregoing, Bank of America violated and, unless enjoined, will
again violate Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder
[17 C.F.R. § 240.14a-9].

**COUNT II**
**Violations of Section 14(a)**
**of the Exchange Act and Rules 14a-3 and 14a-9**
**(Failure to Disclose Bonus Agreement)**

55.     The Commission realleges and incorporates by reference herein each and every
allegation contained in paragraphs 1 through 47.

56.     As set forth more fully above, the proxy statement contained a section describing
the principal terms of the merger agreement between Bank of America and Merrill, which
paraphrased the Forbearance Provision of the merger agreement and listed seventeen
"extraordinary" prohibited actions that Merrill had agreed not to take before the closing of the
merger, including the payment of discretionary compensation.  The relevant text of the proxy
statement qualified the discussion of the Forbearance Provision only by referring to "certain
exceptions," which were undisclosed, and stated that Merrill was prohibited from taking any of
the "extraordinary" actions without "Bank of America's prior written consent."  Neither the
proxy statement, nor any attachment to the proxy statement disclosed that Bank of America had
already given its written consent, as set forth in the undisclosed Schedule, that Merrill could pay
up to $5.8 billion in discretionary bonuses.

57.     The agreement between Bank of America and Merrill concerning Merrill's
ability to pay up to $5.8 billion in discretionary bonuses was a material feature of the agreement

21

reached between the parties and a material fact to shareholders' investment decision on whether to approve the merger.

58.    By failing to disclose the agreement concerning Merrill's ability to pay up to $5.8 billion in discretionary bonuses, Bank of America, directly or indirectly, by use of the means or instrumentalities of interstate commerce or of the mails, or the facilities of a national securities exchange, solicited or permitted the use of its name to solicit proxies, consents or authorizations in respect of non-exempt securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l]:

> (A)    While failing to furnish each person solicited, concurrently or previously, with a written proxy statement containing the information specified in Schedule 14A [17 C.F.R. § 14a-101] or with a written proxy statement included in a registration statement filed under the Securities Act on Form S-4 [17 C.F.R. § 239.25] and containing the information specified in such Form; and

> (B)    by means of a proxy statement, form of proxy statement, notice of meeting and other communications that contained statements which, at the time and in the light of the circumstances under which they were made, were false and misleading with respect to material facts or which omitted to state material facts necessary in order to make the statements made therein not false or misleading or necessary to correct statements in earlier communications with respect to the solicitation of a proxy for the same meeting or subject matter which became false or misleading;

in violation of Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rules 14a-3 and 14a-

22

9 thereunder [17 C.F.R. §§ 240.14a-3 and 240.14a-9].

59.     Section 14(a) of the Exchange Act requires registrants that solicit any proxy or consent or authorization in connection with any security registered pursuant to Section 12 of the Exchange Act (other than an exempted security), to comply with such rules as the Commission may promulgate.  Rule 14a-3 provides that no solicitation of a proxy may occur unless each person solicited is concurrently furnished or has previously been furnished with a proxy statement containing the information specified in Schedule 14A or in Form S-4.  Rule 14a-9 prohibits, among other things, the use of proxy statements which omit to state any material fact necessary in order to make the statements therein not false or misleading.

60.     As more fully described above in paragraphs 1 through 47 and 56 through 58, Bank of America made materially false and misleading statements, and omitted to disclose necessary material facts, in the proxy statement that it filed in connection with its merger with Merrill concerning the terms of the merger agreement governing Merrill's payment of discretionary incentive compensation before the closing of the merger.

61.     By reason of the foregoing, Bank of America violated and, unless enjoined, will again violate Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rules 14a-3 and 14a-9 thereunder [17 C.F.R. §§ 240.14a-3 and 240.14a-9].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a final judgment:

## I.

Permanently enjoining and restraining Bank of America, its agents, servants, employees and attorneys and all persons in active concert or participation with Bank of America who

23

receive actual notice of the injunction by personal service or otherwise, from violating, directly

or indirectly, Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rules 14a-3 and 14a-9

thereunder [17 C.F.R. §§ 240.14a-3 and 240.14a-9].

## II.

Ordering Bank of America to pay a civil monetary penalty pursuant to Section 21(d)(3)

of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## III.

Granting such other and further relief as the Court deems just and proper.

Dated: December __, 2009
        New York, New York


                                        By: _____
                                        David Rosenfeld
                                        Associate Regional Director
                                        New York Regional Office
                                        Attorney for Plaintiff
                                        SECURITIES AND EXCHANGE COMMISSION
                                        Three World Financial Center
                                        New York, New York 10281
                                        (212) 336-0153

Of Counsel:
  Alexander M. Vasilescu
  Scott L. Black
  Joseph O. Boryshansky
  Wendy Griffin