# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : | |
| : | |
| Plaintiff,  : | 09 Civ. 6829 (JSR) |
| : | 10 Civ. 0215 (JSR) |
| -against-  : | ECF Cases |
| : | |
| BANK OF AMERICA CORPORATION, : | |
| : | |
| Defendant.  : | |
| : | |

## FINAL CONSENT JUDGMENT AS TO DEFENDANT
## BANK OF AMERICA CORPORATION

WHEREAS the Securities and Exchange Commission ("Commission") filed an Amended Complaint on October 19, 2009 in the civil action 09 Civ. 6829 (JSR) alleging that defendant Bank of America Corporation ("BAC") violated Section 14 of the Securities Exchange Act of 1934 ("Exchange Act"), and Rules 14a-3 and 14a-9 promulgated thereunder, as a result of its failure adequately to disclose, in connection with the proxy solicitation for the acquisition of Merrill Lynch & Co., Inc. ("Merrill"), information concerning Merrill's payment of year-end bonuses (the "Bonus Case");

WHEREAS the Commission subsequently filed a Complaint on January 12, 2010 in the civil action 10 Civ. 0215 (JSR) alleging that BAC violated Section 14 of the Exchange Act and Rule 14a-9 thereunder as a result of its failure adequately to disclose, in connection with the proxy solicitation for the acquisition of Merrill, information concerning Merrill's losses in the fourth quarter of 2008 (the "Q4 Loss Case") (together with the Bonus Case, the "Actions");

WHEREAS BAC has executed the Consent annexed hereto and incorporated herein for the purpose of settling the Actions before the Court; and

1

WHEREAS BAC has entered a general appearance in the Actions, consented to the Court's jurisdiction over it and the subject matter of the Actions, consented to the entry of this Final Consent Judgment as to Defendant Bank of America Corporation ("Final Judgment"), and waived any right to appeal from this Final Judgment in the Actions:

I.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that defendant BAC shall, for the years ending December 31, 2010, 2011 and 2012, engage an independent individual or entity ("Independent Auditor") to assess BAC's disclosure controls and procedures (as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934 ("Exchange Act") [17 C.F.R. § 240.13a-15(e)]) and to issue an attestation report, in a form acceptable to the Commission, based on its examination to obtain reasonable assurance on whether BAC's conclusion regarding the effectiveness of such disclosure controls and procedures is fairly stated, in all material respects, based on criteria established in *Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission* (COSO). In performing its examination in accordance with applicable attestation standards, the Independent Auditor will consider elements of Auditing Standard No. 5 issued by the Public Company Accounting Oversight Board (governing attestations under Section 404 of the Sarbanes-Oxley Act of 2002) that the Independent Auditor deems relevant to its examination and in evaluating BAC's conclusion based on COSO. The Independent Auditor shall, among other things: (i) inspect documentation of BAC's disclosure controls and procedures in testing whether they are designed effectively; (ii) test whether such disclosure controls and procedures have been implemented; (iii) test whether such disclosure controls and procedures are operating effectively; (iv) in testing the design and operating effectiveness of BAC's disclosure controls and procedures based on

2

COSO, consider control environment elements, including, among others, the knowledge and skills of the employees and officers who are part of the disclosure controls, such as the members of BAC's Disclosure Committee, necessary to perform the roles in the disclosure controls and procedures that they have been assigned; and (v) based on the results of the Independent Auditor's procedures issue an attestation report expressing an opinion on BAC's assertion as to whether its disclosure controls and procedures as of the applicable year-end date are effective in recording, processing, summarizing, and reporting within the Company, on a timely basis, information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act, and that information is accumulated and communicated to the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. BAC shall provide the Independent Auditor's attestation report in its annual report to shareholders and in its reports on Form 10-K. BAC shall use its best efforts to retain the public accounting firm that audits the financial statements included in BAC's periodic reports to serve as the Independent Auditor. If, despite its best efforts, BAC is unable to retain the public accounting firm that audits its financial statements to serve as the Independent Auditor, BAC shall select an Independent Auditor in consultation with the Commission's staff.

## II.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that defendant BAC shall, for a period of three (3) years after entry of this Final Judgment, with respect to each proxy statement filed pursuant to Section 14(a) of the Exchange Act, include certifications substantially in the form specified in Item 601(b)(31)(i) of Regulation S-K [17 C.F.R. § 229.601(b)(31)(i)], and file or otherwise include such certifications as an appendix to

3

such proxy statement. BAC shall require that its principal executive officer and principal financial officer, or persons performing similar functions at the time of the filing of the proxy statement, each sign such certification.

.

## III.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that within forty-five (45) days of the entry of this Final Judgment, the Audit Committee of BAC's Board of Directors ("Audit Committee") shall retain disclosure counsel with expertise in disclosure issues ("Disclosure Counsel") for a period of three (3) years after entry of this Final Judgment. The Disclosure Counsel shall report solely to the Audit Committee. BAC shall require that the Disclosure Counsel: (i) review drafts of all of BAC's public disclosure statements, including all quarterly reports, annual reports, proxy statements, and current reports containing financial information; and (ii) confer, in executive session, with members of the Audit Committee at all regularly scheduled meetings of the Audit Committee, separate and apart from the non-independent members of BAC's Board of Directors, to discuss the adequacy of BAC's disclosures in its public disclosure statements. BAC shall also require that the Disclosure Counsel, for the period of engagement, not enter into, directly or indirectly, any other employment, consulting, or other professional relationship with BAC or its affiliates, directors, officers, employees, or agents without obtaining the consent of the Commission's staff.

## IV.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that defendant BAC shall adopt an independence requirement for members of the Compensation Committee of BAC's Board of Directors ("Compensation Committee") according to the independence standards set forth in Section 10A(m)(3)(B) of the Exchange Act [15 U.S.C. §78j-

4

1(m)(3)(B)]. Such independence standards shall require BAC to include as members of the

Compensation Committee only those members who will not, directly or indirectly, accept any

consulting, advisory or other compensatory fee from BAC or any affiliate or subsidiary of BAC,

irrespective of the size or materiality of such fee, other than compensation in the member's

capacity as a member of BAC's Board of Directors or be an affiliated person of BAC or any of

BAC's subsidiaries. BAC shall maintain such a requirement for a period of three (3) years

following entry of this Final Judgment.

V.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that

defendant BAC shall continue to retain, for a period of three (3) years after entry of this Final

Judgment, a compensation consultant ("Compensation Consultant"). BAC shall require that the

Compensation Consultant be engaged by, and report solely to, the Compensation Committee and

that during the three (3) year period of engagement, the Compensation Consultant not enter into,

directly or indirectly, any other employment, consulting, or other professional relationship with

BAC or its affiliates, directors, officers, employees, or agents.

VI.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that

defendant BAC shall, within thirty (30) days of the entry of this Final Judgment, institute and

implement formal, written incentive compensation principles and processes and post such

principles and processes in a prominent location on BAC's website at www.bankofamerica.com.

For a period of three (3) years after entry of this Final Judgment, BAC shall maintain and comply

with such written principles and processes as posted on BAC's website unless and until BAC

informs its shareholders of any proposal to change such principles and processes, and provides

5

for a separate advisory shareholder vote regarding such proposed changes. Any such shareholder vote shall not be binding on the BAC Board of Directors and shall not be construed as overruling a decision by such Board, nor will it create or imply any additional fiduciary duty by such Board or be construed to restrict or limit the ability of shareholders to make proposals for inclusion in proxy materials related to executive compensation.

## VII.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that, if during the three (3) years following the date of the entry of this Final Judgment BAC conducts an annual meeting of security holders (or a special meeting in lieu of an annual meeting) for which proxies will be solicited for the election of directors, BAC shall provide a separate advisory shareholder vote ("Vote") regarding the compensation of executives, as disclosed pursuant to Item 402 of Regulation S-K [17 C.F.R. § 229.402], including the compensation discussion and analysis, the compensation tables, and any related materials. Any such Vote shall not be binding on the BAC Board of Directors and shall not be construed as overruling a decision by such Board, nor will it create or imply any additional fiduciary duty by such Board or be construed to restrict or limit the ability of shareholders to make proposals for inclusion in proxy materials related to executive compensation.

## VIII.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that, in the event that, after entry of this Final Judgment, the Commission or other regulatory agency or regulator (or legislation) provides for a new regulation or requirement that is applicable to BAC with respect to the same subject matter as is addressed by one or more of the remedial components of this Final Judgment, BAC shall consult with the Commission's staff concerning

6

the interaction of such new regulation or requirement and the remedial component provided for in this Final Judgment, and BAC may propose to amend or modify any term of this Final Judgment, with the Court's approval. The sole purpose for any such amendment or modification shall be to avoid a circumstance in which BAC may be subject to conflicting, overlapping or duplicative regulations or requirements in whole or in part, or remain subject to a term of this Final Judgment when the purpose thereof has been superseded or fulfilled by such a new regulation or requirement.

## IX.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that defendant BAC is liable for disgorgement of $1 and a civil penalty in the amount of $150,000,000 pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]. BAC shall satisfy this obligation by paying $150,000,001 within fourteen (14) days after entry of this Final Judgment to the Clerk of this Court, together with a cover letter identifying BAC as a defendant in the Actions; setting forth the titles and civil action numbers of the Actions and the name of this Court; and specifying that payment is made pursuant to this Final Judgment. BAC shall simultaneously transmit photocopies of such payment and letter to the Commission's counsel in this action. By making this payment, BAC relinquishes all legal and equitable right, title, and interest in such funds, and no part of the funds shall be returned to BAC. BAC shall pay post-judgment interest on any delinquent amounts pursuant to 28 U.S.C. § 1961.

The Clerk shall deposit the funds into an interest bearing account with the Court Registry Investment System ("CRIS") or any other type of interest bearing account that is utilized by the Court. These funds, together with any interest and income earned thereon (collectively, the "Fund"), shall be held in the interest bearing account until further order of the Court. In

7

accordance with 28 U.S.C. § 1914 and the guidelines set by the Director of the Administrative Office of the United States Courts, the Clerk is directed, without further order of this Court, to deduct from the income earned on the money in the Fund a fee not to exceed ten percent of the income earned on the Fund. Such fee shall not exceed that authorized by the Judicial Conference of the United States.

The Fund shall be distributed at a later date pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002 and in accordance with further order of the Court. The Commission may by motion propose a plan to distribute the Fund subject to the Court's approval. Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, BAC shall not, after offset or reduction of any award of compensatory damages in any Related Investor Action based on BAC's payment of disgorgement in the Actions, argue that it is entitled to, nor shall it further benefit by, offset or reduction of such compensatory damages award by the amount of any part of BAC's payment of a civil penalty in the Actions ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, BAC shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this Judgment. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against BAC by or on behalf of one or more investors based on substantially the same facts as alleged in the complaints in the Actions.

8

## X.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that the provisions of the annexed Consent of Defendant Bank of America Corporation be, and the same hereby are, incorporated in this Final Judgment with the same force and effect as if fully set forth herein, and that defendant BAC shall comply with all of the undertakings and agreements set forth therein.

## XI.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

## XII.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Final Judgment forthwith and without further notice.

## CONSENT OF DEFENDANT BANK OF AMERICA CORPORATION

1.     Defendant Bank of America Corporation ("BAC") acknowledges having been served with the Amended Complaint in the civil action 09 Civ. 6829 (JSR) and the Complaint in the civil action 10 Civ. 0215 (JSR) (collectively, the "Actions"), enters a general appearance in the Actions, and admits the Court's jurisdiction over it and over the subject matter of the Actions.

2.     Defendant BAC hereby consents to the entry of the annexed Final Consent Judgment As To Defendant Bank of America Corporation ("Final Judgment") in the Actions, in the form annexed hereto and incorporated by reference herein (prior to any adjudication of any issue of law or fact), which, among other things:

>    (a)     orders BAC to pay disgorgement in the amount of $1;
>
>    (b)     orders BAC to pay a civil penalty in the amount of $150,000,000 pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and
>
>    (c)     orders Defendant to perform the actions and comply with the measures specified in the Final Judgment, including but not limited to, retaining an independent auditor to perform an assessment and provide an attestation report on the effectiveness of BAC's disclosure controls and procedures, furnishing management certifications for proxy statements, retaining disclosure counsel to the Audit Committee of BAC's Board of Directors, adopting an independence requirement for all members of the Compensation Committee of BAC's Board of Directors ("Compensation Committee") according to the independence standards set forth in Section

10

10A(m)(3)(B) of the Exchange Act [15 U.S.C. §78j-1(m)(3)(B)], retaining

an independent compensation consultant to the Compensation Committee,

providing BAC shareholders with an annual "say on pay" advisory vote,

and establishing, disclosing, and maintaining written incentive

compensation principles.

3.    Defendant BAC acknowledges that the civil penalty paid pursuant to the Final

Judgment may be distributed pursuant to the Fair Fund provisions of Section 308(a) of the

Sarbanes-Oxley Act of 2002. Regardless of whether any such Fair Fund distribution is made, the

civil penalty shall be treated as a penalty paid to the government for all purposes, including all

tax purposes. To preserve the deterrent effect of the civil penalty, BAC agrees that it shall not,

after offset or reduction of any award of compensatory damages in any Related Investor Action

based on BAC's payment of disgorgement in the Actions, argue that it is entitled to, nor shall it

further benefit by, offset or reduction of such compensatory damages award by the amount of

any part of BAC's payment of a civil penalty in the Actions ("Penalty Offset"). If the court in

any Related Investor Action grants such a Penalty Offset, BAC agrees that it shall, within 30

days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in

this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair

Fund, as the Commission directs. Such a payment shall not be deemed an additional civil

penalty and shall not be deemed to change the amount of the civil penalty imposed in this action.

For purposes of this paragraph, a "Related Investor Action" means a private damages action

brought against BAC by or on behalf of one or more investors based on substantially the same

facts as alleged in the complaints in this Actions.

11

4.      Defendant BAC agrees that it shall not seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made pursuant to any insurance policy, with regard to any civil penalty amounts that BAC pays pursuant to the Final Judgment, regardless of whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors. BAC further agrees that it shall not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, or local tax for any penalty amounts that BAC pays pursuant to the Final Judgment, regardless of whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors.

5.      Defendant BAC waives the entry of findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

6.      Defendant BAC waives the right, if any, to a jury trial and to appeal from the entry of the Final Judgment.

7.      Defendant BAC enters into this Consent voluntarily and represents that no threats, offers, promises, or inducements of any kind have been made by the Commission or any member, officer, employee, agent, or representative of the Commission to induce BAC to enter into this Consent.

8.      Defendant BAC agrees that this Consent shall be incorporated into the Final Judgment with the same force and effect as if fully set forth therein.

9.      Defendant BAC will not oppose the enforcement of the Final Judgment on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure, and hereby waives any objection based thereon.

12

10.     Defendant BAC waives service of the Final Judgment and agrees that entry of the

Final Judgment by the Court and filing with the Clerk of the Court will constitute notice to BAC

of its terms and conditions.  BAC further agrees to provide counsel for the Commission, within

thirty days after the Final Judgment is filed with the Clerk of the Court, with an affidavit or

declaration stating that BAC has received and read a copy of the Final Judgment.

11.     Defendant BAC acknowledges that any violation of any of the terms of the Final

Judgment may place it in contempt of this Court and subject it to civil or criminal sanctions.

12.     Defendant BAC acknowledges that it has been informed and understands that the

Commission, at its sole and exclusive discretion, may refer, or grant access to, this matter or any

information or evidence gathered in connection therewith or derived therefrom, to any person or

entity having appropriate administrative, civil, or criminal jurisdiction, if the Commission has

not already done so.

13.     Consistent with 17 C.F.R. § 202.5(f), this Consent resolves only the claims

asserted against defendant BAC in the Actions.  BAC acknowledges that no promise or

representation has been made by the Commission or any member, officer, employee, agent, or

representative of the Commission with regard to any criminal liability that may have arisen or

may arise from the facts underlying this action or immunity from any such criminal liability.

BAC waives any claim of Double Jeopardy based upon the settlement of this proceeding,

including the imposition of any remedy or civil penalty herein.  BAC further acknowledges that

the Court's entry of a final consent judgment and order may have collateral consequences under

federal or state law and the rules and regulations of self-regulatory organizations, licensing

boards, and other regulatory organizations.  Such collateral consequences include, but are not

13

limited to, a statutory disqualification with respect to membership or participation in, or association with a member of, a self-regulatory organization. This statutory disqualification has consequences that are separate from any sanction imposed in an administrative proceeding.

14.    Defendant BAC acknowledges that there is an evidentiary basis for the statements in the Statement of Facts, prepared by the SEC based on discovery in the action 09 Civ. 6829, that is attached as Exhibit A to this Consent. BAC further agrees that it understands and will comply with the Commission's policy "not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegation in the complaint or order for proceedings." 17 C.F.R. § 202.5. Consistent with this policy, BAC agrees not to take any action or to make or permit to be made any public statement denying, directly or indirectly, the statements in the Statement of Facts or any allegation in the complaints filed in the Actions or creating the impression that the statements in the Statement of Facts or the allegations in the complaints are without factual basis. If BAC breaches this agreement, the Commission may petition the Court to vacate the Final Judgment and restore the Actions to its active docket. Nothing in this paragraph affects BAC's: (i) testimonial obligations; or (ii) right to take legal or factual positions in litigation or other legal inquiries, investigations or proceedings in which the Commission is not a party. BAC's acknowledgement in this paragraph that there is an evidentiary basis for the statements in the Statement of Facts is not an admission as to the truth of any such statements or any inferences or legal conclusions based on such statements. BAC's acknowledgement does not bind BAC to such statements or any inferences or legal conclusions based on such statements in any other litigation or proceeding.

14

15.    Defendant BAC hereby waives any rights under the Equal Access to Justice Act, the Small Business Regulatory Enforcement Fairness Act of 1996, or any other provision of law to seek from the United States, or any agency, or any official of the United States acting in his or her official capacity, directly or indirectly, reimbursement of attorney's fees or other fees, expenses, or costs expended by BAC to defend against this action. For these purposes, BAC agrees that it is not the prevailing party in this action since the parties have reached a good faith settlement.

16.    Defendant BAC agrees that the Commission may present the Final Judgment to the Court for signature and entry without further notice.

17.    Defendant BAC agrees that this Court shall retain jurisdiction over this matter for the purpose of enforcing the terms of the Final Judgment.


Dated: _February 1_ , 2010


BANK OF AMERICA CORPORATION

By: _____

Title: _General Counsel_

Address:


On _____, 2010, _____, a person known to me, personally appeared before me and acknowledged executing the foregoing Consent with full authority to do so on behalf of Bank of America Corporation as its _____.


_____

Notary Public
Commission expires:


15

Approved as to form:

CLEARY GOTTLIEB STEEN &
HAMILTON LLP

By: _____
    Lewis J. Liman
    Mitchell A. Lowenthal
    Shawn J. Chen
    Victor L. Hou
      One Liberty Plaza
      New York, New York 10006
      Tel: (212) 225-2000
      Fax: (212) 225-3999

-and-

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP


By: _____
    Brad S. Karp
    Theodore V. Wells, Jr.
    Mark F. Pomerantz
    Daniel J. Kramer
      1285 Avenue of the Americas
      New York, New York 10019-6064
      Tel: (212) 373-3000
      Fax: (212) 757-3990
Attorneys for Defendant Bank of America
Corporation


Dated: _____, 2010


_____
**JED S. RAKOFF, U.S.D.J.**

16

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _SAN FRANCISCO_ }

On _FEBRUARY 1, 2010_ before me, _LILIBETH S. MENDOZA   NOTARY PUBLIC_
    *Date*            *Here Insert Name and Title of the Officer*

personally appeared _EDWARD P. O'KEEFE_
                     *Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Lilibeth P. Mendoza_
                     *Signature of Notary Public*

*Place Notary Seal Above*

LILIBETH S. MENDOZA
Commission # 1777142
Notary Public - California
San Francisco County
My Comm. Expires Oct 30, 2011

---

**OPTIONAL**

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: _FINAL CONSENT JUDGMENT AS TO DEFENDANT BANK OF AMERICA CORPORATION_

Document Date: _FEBRUARY 1, 2010_      Number of Pages: _16_

Signer(s) Other Than Named Above: _NONE_

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _EDWARD P. O'KEEFE_
[ ] Individual
[✓] Corporate Officer — Title(s): _GENERAL COUNSEL_
[ ] Partner — [ ] Limited [ ] General
[ ] Attorney in Fact
[ ] Trustee
[ ] Guardian or Conservator
[ ] Other: _____

*RIGHT THUMBPRINT OF SIGNER*
*Top of thumb here*

Signer Is Representing: _____
_BANK OF AMERICA CORPORATION_

Signer's Name: _____
[ ] Individual
[ ] Corporate Officer — Title(s): _____
[ ] Partner — [ ] Limited [ ] General
[ ] Attorney in Fact
[ ] Trustee
[ ] Guardian or Conservator
[ ] Other: _____

*RIGHT THUMBPRINT OF SIGNER*
*Top of thumb here*

Signer Is Representing: _____

©2007 National Notary Association • 9350 De Soto Ave., P.O.Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org   Item #5907   Reorder: Call Toll-Free 1-800-876-6827

Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | |
| | : | |
| **Plaintiff,** | : | **09 Civ. 6829 (JSR)** |
| | : | **10 Civ. 0215 (JSR)** |
| **-against-** | : | **ECF Cases** |
| | : | |
| **BANK OF AMERICA CORPORATION,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## STATEMENT OF FACTS

**I.     The Bank of America-Merrill Merger**

1.     On Friday, September 12, 2008, in the wake of Lehman Brothers' rumored bankruptcy and the shockwaves that were sent throughout the financial markets, the senior management of Merrill Lynch & Co., Inc. ("Merrill") began exploring the possibility of being acquired, in whole or in part, by a commercial bank.  (Transcript of deposition of Gregory J. Fleming (Oct. 22, 2009) ("Fleming Tr.") at 74-75, 102-103, 108-114; Transcript of deposition of John A. Thain (Nov. 4, 2009) ("Thain Tr.") at 58, 65-66.)  Among the candidates considered by Merrill's management was Bank of America, which Merrill's former Chief Executive Officer, Stanley O'Neal, had previously approached about the possibility of a combination between the two companies.  (Fleming Tr. at 112; Thain Tr. at 65-66; Transcript of deposition of Kenneth Lewis (Oct. 30, 2009) ("Lewis Tr.") at 28-30.)

2.     The following day, Saturday, September 13, John Thain, Merrill's then-Chairman and Chief Executive Officer, called Kenneth Lewis, then-Chairman, President, and Chief

Executive Officer of Bank of America, to discuss the possibility of a strategic combination

between the two companies in light of the extremely distressed conditions in the financial

services industry. (Lewis Tr. at 39; Thain Tr. at 67; Defendant Bank of America Corporation's

Responses and Objections to Plaintiff Securities and Exchange Commission's Requests for

Admission (Jan. 4, 2010) ("BOA's RFA Response") No. 2.) On the afternoon of that day, Thain

and Lewis met in person at Bank of America's corporate apartment in New York City to discuss

the outlines of a possible transaction. (Lewis Tr. at 41-43; Thain Tr. at 68-70.) Thain proposed

that Bank of America purchase an approximately 9.9 percent stake in Merrill; in response, Lewis

expressed an interest in acquiring Merrill in its entirety, a transaction that Lewis deemed

strategically important to Bank of America for several reasons, including that it would

significantly enhance the Bank's investment banking and investment management capabilities

and global reach. (Thain Tr. at 68-69; Lewis Tr. at 43-47; BOA's RFA Response No. 3.) At the

conclusion of their meeting, Lewis and Thain agreed that teams from Bank of America and

Merrill would meet in order to begin the due diligence process. (Lewis Tr. at 49; Thain Tr. at

69-70.)

       3.      Representatives from Bank of America and Merrill began conducting due

diligence on Saturday, September 13, and continued the process throughout the night and into the

next day. (Lewis Tr. at 49, 54, 61, 71; Transcript of deposition of Gregory L. Curl (Dec. 11,

2009) ("Curl Tr.") at 65, 74; Fleming Tr. at 72.) On the morning of Sunday, September 14,

Lewis and Thain met again to discuss the results of due diligence and the strategic rationale for a

merger between the two companies. (Plaintiff's Exhibit ("P-Exh.") 46 (Bank of America Corp.,

Proxy Statement (Schedule 14A) (Nov. 3, 2008) ("Proxy Statement"), at 50).)  At the conclusion

of their meeting, Lewis and Thain agreed that representatives of Bank of America and Merrill

would pursue the negotiation of the terms of a merger transaction.  (Id.)  Lewis assigned Greg

Curl, Bank of America's Vice Chairman of Corporate Development, the responsibility of leading

the negotiations on behalf of Bank of America.  (Lewis Tr. at 48, 51; Curl Tr. at 66-67; Fleming

Tr. at 119-121.)  Thain assigned Greg Fleming, Merrill's then-President, the responsibility of

leading the negotiations on behalf of Merrill.  (Thain Tr. at 69-70; Fleming Tr. at 119-121; Curl

Tr. at 71.)  Bank of America retained financial advisers to assist in the due diligence of Merrill

Lynch.  (Proxy Statement at 49.)

        4.      Given the uncertain impact of Lehman Brothers' rumored bankruptcy, senior

executives of both Merrill and Bank of America considered it important that the two companies

negotiate and agree on a transaction before the opening of the stock market on Monday,

September 15, 2008.  (Fleming Tr. at 111-112; Thain Tr. at 66; Lewis Tr. at 94-95; BOA's RFA

Response No. 7.)  In the week leading to the merger negotiations with Bank of America,

Merrill's share price had declined by approximately 36 percent.  (Proxy Statement at 49.)  In

addition, according to Fleming, certain members of Merrill's management had concerns about a

possible downgrade of the company's ratings after having been advised by Moody's Investors

Service that, in view of Lehman Brothers' collapse and the volatility in the financial markets, the

rating agency had doubts about the business model of independent investment banks.  (Fleming

Tr. at 78-79; P-Exh. 3 (e-mail from Greg Fleming to John Thain (Sept. 11, 2008), at BAC-ML-

NYAG 10176510).)  Merrill's management was also informed, after negotiations with Bank of

America had begun, that another rating agency, Standard & Poor's, was considering placing

Merrill's ratings on credit watch.  (P-Exh. 4 (e-mail from Eric Heaton (Sept. 14, 2008), at BAC-

ML-NYAG 10176776).)  In addition, on Friday, September 12, Merrill was asked by J.P.

Morgan and Citibank to pledge billions of dollars in additional collateral to cover intraday

exposure, similar to rumored requests that had been made to Lehman Brothers by counterparty

banks.  (Fleming Tr. at 90; Thain Tr. at 117; P-Exh. 5 (e-mail from John Thurlow (Sept. 13,

2008), at BAC-ML-NYAG 10177086).)  According to Lewis, Bank of America was concerned

that if the deal was not announced before Lehman declared bankruptcy, another suitor could

acquire Merrill or that there would be a significant loss in Merrill's franchise value due to

increased liquidity pressure.  (Lewis Tr. at 94-95.)

     5.      The negotiations of the business terms of the merger transaction took place on

Sunday, September 14, 2008, at the offices of Wachtell, Lipton, Rosen & Katz ("Wachtell

Lipton"), the law firm Bank of America retained for purposes of the merger transaction.

(Fleming Tr. at 126-131; Curl Tr. at 73-75.)  On Sunday evening, after the agreement on the

principal business terms had been reached, the proposed merger transaction was presented to the

Boards of Directors of Bank of America and Merrill.[1]  (Fleming Tr. at 193-194; Lewis Tr. at 73-

---

     [1]  Each Board of Directors met separately to consider the merger.  For Bank of America,
the directors present at the Board meeting were William Barnet, Frank Bramble, John Collins,
Gary Countryman, Tommy Franks, Charles Gifford, Ken Lewis, Walter Massey, Thomas May,
Thomas Ryan, O. Temple Sloan, Robert Tillman, Monica Lozano, Patricia Mitchell, Meredith
Spangler, and Jackie Ward.  (P-Exh. 35 (Minutes of Special Meeting of Board of Directors of

(continued on the next page)

74; P. Exhs. 10 (Merrill Lynch & Co., Inc., Minutes of Special Meeting of Board of Directors

(Sept. 14, 2008), at BAC-ML-NYAG-502-00001718-1728), 35 (Minutes of Special Meeting of

Board of Directors of Bank of America Corp. (Sept. 14, 2008), at BAC-ML-NYAG 00003747-

3761).)  The respective Boards unanimously approved the merger.  (Id.)

      6.     Lewis and Thain each signed the merger agreement on behalf of their respective

companies in the early hours of September 15, 2008, and the merger was publicly announced

before the opening of the stock market on that day.  (Thain Tr. at 108; Lewis Tr. at 93; Proxy

Statement, Appendix A (Agreement and Plan of Merger by and between Merrill Lynch & Co.,

Inc. and Bank of America Corp., dated as of Sept. 15, 2008 ("Merger Agreement")); Bank of

America Corp., Press Release, Bank of America Buys Merrill Lynch Creating Unique Financial

Services Firm (Sept. 15, 2008).)  Under the Merger Agreement, Bank of America agreed to

provide Merrill shareholders with 0.8595 shares of Bank of America common stock for each

share of Merrill common stock.  (Merger Agreement, Section 1.4.)  At the time the Merger

Agreement was signed, this exchange ratio represented a $29 share price for each Merrill share --

a 70% premium to Merrill's stock price on the prior trading day, September 12, 2008 -- and a

---

Bank of America Corp. (Sept. 14, 2008), at BAC-ML-NYAG 00003747).)  For Merrill, the
directors present at the Board meeting were John Thain, Carol Christ, Virgis Colbert, Armando
Codina, John Finnegan, Judith Mayhew Jonas, Aulana Peters, Joseph Prueher, Ann Reese, and
Charles Rossotti.  (P-Exh. 10 (Merrill Lynch & Co., Inc., Minutes of Special Meeting of Board
of Directors (Sept. 14, 2008), at BAC-ML-NYAG-502-00001718).)

total deal value of approximately $50 billion.  (Proxy Statement at 50; Fleming Tr. at 141; Curl

Tr. at 225.)

## II.    Bank of America's Merger-Related Public Filings

7.    To solicit shareholder votes for approval of the merger, on November 3, 2008

Bank of America and Merrill each filed with the Securities and Exchange Commission ("SEC"

or "Commission"), and sent to their respective shareholders, a proxy statement scheduling the

respective shareholder meetings to vote on the merger for December 5, 2008.  (Proxy Statement,

Notice of Special Meeting of Stockholders; Merrill Lynch & Co., Inc. Proxy Statement

(Schedule 14A) (Nov. 3, 2008), Notice of Special Meeting of Stockholders.)  Lewis and Thain

each signed a cover letter accompanying the proxy statements, stating, among other things, that

the Boards of Directors of both companies unanimously recommended that shareholders vote in

favor of the merger.  (Proxy Statement, Letter to Stockholders.)

8.    In October 2008, in order to register the shares of stock to be exchanged in the

merger, Bank of America also filed with the Commission a registration statement on Form S-4

and two amendments on Form S-4/A.  (P-Exhs. 39 (Bank of America Corp., Registration

Statement (Form S-4) (Oct. 2, 2008)), 44 (Bank of America Corp., Amendment No. 1 to

Registration Statement (Form S-4/A) (Oct. 22, 2008)), 45 (Bank of America Corp. Amendment

No. 2 to Registration Statement (Form S-4/A) (Oct. 29, 2008)) (collectively, "Registration

6

Statement").)[2]  The Registration Statement, which incorporated the proxy statements prepared by

Bank of America and Merrill as part of the prospectus, became effective on October 30, 2008.[3]

9.      Bank of America also included in the Registration Statement an express

undertaking to "reflect in the prospectus any facts or events arising after the effective date of the

registration statement . . . which, individually or in the aggregate, represent a fundamental

change in the information set forth in the registration statement."  (Registration Statement, at II-

4.)  In a section of the Proxy Statement entitled "WHERE YOU CAN FIND MORE

INFORMATION," Bank of America referred shareholders to the Registration Statement for

additional relevant information about Bank of America and its stock.  (Proxy Statement at 123.)

10.     The Proxy Statement and Registration Statement, and the documents incorporated

by reference into those filings, provided information about, among other matters, the terms of the

proposed merger transaction that had been agreed to in September, as well as the financial

---

[2]  The Registration Statement was signed by Lewis, Joe Price, then-Bank of America's Chief Financial Officer, Neil Cotty, then-Bank of America's Chief Accounting Officer, as well as all of the members of the Board of Directors of Bank of America.  (Registration Statement at II-6 – II-7.)

[3]  By letter dated October 30, 2008, Bank of America requested that the SEC's Division of Corporation Finance accelerate the effectiveness of the Registration Statement to October 30, 2008, and acknowledged, among other matters, that "[t]he action of the Commission or staff . . . in declaring the filing effective, does not relieve [Bank of America] from its full responsibility for the adequacy and accuracy of the disclosure in the filing."  (P-Exh. 117 (letter from Teresa M. Brenner to Division of Corporation Finance, Securities and Exchange Commission (Oct. 30, 2008)).)  The Commission declared the Registration Statement effective at 5:00 p.m. on October 30, 2008.  In addition to the disclosures made in the Registration Statement, Bank of America was responsible at all times for the accuracy and adequacy of the disclosures made in the Proxy Statement.  (BOA's RFA Response No. 129.)

condition of the two companies, including balance sheet and capital position, as of the end of

September 2008.  (Proxy Statement at 5-22, 34-51, 76-90; Merrill Lynch & Co., Inc., Third

Quarter Report 2008 (Form 10-Q) (Nov. 5, 2008) ("Merrill's Q3/08 Report"), at 4-7

(incorporated by reference in Proxy Statement at 124).)  The proxy and registration statement

rules required Bank of America and Merrill to describe "material changes" in Merrill's affairs, if

any, that were not described in Merrill's most recent annual, quarterly, or current reports.

(Securities Act Form S-4; Exchange Act Rule 14a-101 (Schedule 14A).)  With respect to Merrill,

neither the Registration Statement nor the Proxy Statement, as of October 30, 2008, referenced

or described any material changes in Merrill's financial performance that had occurred since the

most recent reports on Forms 10-K, 10-Q or 8-K that Merrill had filed with the Commission.

III.    **Nondisclosure of Merrill's Fourth Quarter Losses**

     A.    **Merrill's Third Quarter 2008 Results**

     11.    On October 16, 2008, approximately two weeks before the Proxy Statement was

sent to shareholders, Merrill announced its results for the third quarter of the year.  (P-Exh. 28

(Merrill Lynch & Co., Inc. Press Release, Merrill Lynch Reports Third-Quarter 2008 Net Loss

From Continuing Operations of $5.1 Billion (Oct. 16, 2008) ("Merrill Q3/08 Release")); Merrill

Lynch & Co., Inc., Current Report (Form 8-K) (Oct. 16, 2008) (incorporated by reference in

Proxy Statement at 124).)  These results were subsequently reported on Form 10-Q, which

Merrill filed with the Commission on November 5, 2008 and which was prospectively

incorporated by reference into the Proxy Statement.  (Merrill's Q3/08 Report; Proxy Statement at

124.)  The third quarter financial results described in the Form 10-Q was the most up-to-date

information Merrill publicly released about its financial results before the December 5

shareholder meetings to vote on the merger.

12.     Merrill's October 16 release reported a net loss of $5.2 billion in the third quarter

of 2008, reflecting, among other things, a $5.7 billion write-down from the sale of collateralized

debt obligations ("CDOs") backed by subprime and other non-prime residential mortgages and

the termination and settlement of guarantees associated with those securities, as well as a $4.3

billion gain from Merrill's sale of its interest in Bloomberg, L.P.  (Merrill Q3/08 Release.)  In

prior quarters, the CDOs on Merrill's balance sheet were responsible for billion-dollar losses and

their sale in the third quarter was described by John Thain as one of the steps Merrill undertook

in order to "reduce exposures and de-leverage the balance sheet."  (Id.)  In July 2008, John Thain

described the expected sale of the CDOs as a "significant milestone in our risk reduction efforts"

that "will materially enhance the company's capital position and financial flexibility going

forward."  (Merrill Lynch & Co., Inc. Press Release, Merrill Lynch Announces Substantial Sale

of U.S. ABS CDOs Exposure Reduction of $11.1 Billion (Jul. 28, 2008); Merrill Lynch & Co.,

Inc., Current Report (Form 8-K) (Jul. 29, 2008) (incorporated by reference in Proxy Statement at

124).)

13.     After Merrill released its third-quarter results, the price of its publicly-traded

stock rose slightly.  In the days that followed, analysts covering Merrill issued reports estimating

that Merrill's fourth-quarter performance would be an improvement over the firm's $5.2 billion

loss in the third quarter.  According to a summary of analyst reports that was available to Bank

of America, Sanford C. Bernstein analyst Bradley Hintz issued a report on October 17 estimating

that Merrill would have a net gain of approximately $900 million in the fourth quarter;

Oppenheimer analyst Meredith Whitney estimated on October 20 that Merrill's net income in the

fourth quarter would exceed $500 million; and UBS analyst Glenn Schorr estimated that Merrill

would have a quarterly net gain of approximately $400 million.  (P-Exh. 123 (e-mail from David

Belk to Nicholas Demmo and Timothy Mayopoulos (Nov. 18, 2008), at BAC-ML-NYAG-502-

00000884).)  Other analysts forecasted a loss at Merrill in the fourth quarter of 2008, but on a

smaller scale than the $5.2 billion loss sustained in the third quarter.  For example, Kenneth

Worthington of J.P. Morgan estimated a net loss of $280 million; James Mitchell of Buckingham

Research estimated a loss of approximately $875 million; and Douglas Sipkin of Wachovia

Capital estimated a net loss of approximately $1.85 billion.  (Id.)  As of the end of the third

quarter of 2008, Lewis expected Merrill to approximately break even -- i.e., neither lose money

nor make a profit -- in the fourth quarter of 2008.  (Lewis Tr. at 250.)  Joe Price, Bank of

America's then-Chief Financial Officer, expected at the time the merger was negotiated that

Merrill would "close to break even" in the fourth quarter of 2008.  (Transcript of deposition of

Joe L. Price (Dec. 18, 2009) ("Price Tr.") at 62.)

### B.    Merrill's Losses Preceding the December 5 Shareholder Meeting

14.    After the merger was announced on September 15, 2008, Neil Cotty, Bank of

America's then-Chief Accounting Officer, received certain information concerning Merrill's

financial performance consistent with Bank of America's right to information under the terms of

the Merger Agreement.  (Transcript of deposition of Neil A. Cotty (Dec. 16, 2009) ("Cotty Tr.")

at 64-66; Merger Agreement, Section 6.2.)  Cotty was the principal liaison between Merrill and

10

Bank of America with respect to information about Merrill's financial performance. (Price Tr. at 19.)

15.     By the second week of November 2008, Cotty and Price were informed that Merrill had closed its books for the month of October with a net loss of $4.5 billion driven by, among other things, losses in the distressed part of Merrill's correlation book and corporate loans and by credit valuation adjustments ("CVA") -- accounting entries reflecting the firm's credit exposure to certain of its counterparties. (Cotty Tr. at 94-95, 106; Curl Tr. at 199-200; Transcript of deposition of Christopher B. Hayward (Dec. 22, 2009) ("Hayward Tr.") at 134; P-Exh. 240 (e-mail from Neil Cotty to Joe Price (Nov. 5, 2008), at BAC-ML-NYAG 10003554).) The $4.5 billion monthly loss almost equaled the $5.2 billion loss that Merrill had reported for the entire preceding quarter and represented more than one-third of the $11.7 billion in losses that Merrill had reported for the first nine months of 2008. (Merrill Q3/08 Release.) After receiving an e-mail attaching an earlier estimate of the October results, which reflected a $3.8 billion loss, Cotty forwarded the e-mail to Price and noted: "Read and weep." (P-Exh. 240 (e-mail from Neil Cotty to Joe Price (Nov. 5, 2008), at BAC-ML-NYAG 10003552).)

16.     As set forth below, in the weeks that followed, Bank of America received further forecasts estimating that Merrill sustained additional multi-billion dollar losses in the month of November. On November 12, 2008, Merrill's finance department provided Cotty with an internal document that forecasted a fourth-quarter net loss of approximately $5.4 billion. (P-Exh. 271 (e-mail from Nancy Meloth to Neil Cotty (Nov. 12, 2008), at BAC-ML-NYAG 00005737).) Cotty was aware that the forecast did not include either present valuations or forward-looking

11

projections for some of Merrill's most illiquid assets, such as the distressed part of Merrill's

correlation trading book and CVA.  (Cotty Tr. at 67-69; Hayward Tr. at 34-36.)  The e-mail

transmitting the forecast to Cotty stated that the forecast did not include "additional marks CVA,

FVA ("Fair Value Adjustment") or other significant market dislocation items" for the balance of

the fourth quarter.  (P-Exh. 271 (e-mail from Nancy Meloth to Neil Cotty (Nov. 12, 2008), at

BAC-ML-NYAG 00005736).)  According to Christopher Hayward, Merrill's former Director of

Finance, Merrill's management had concluded earlier in 2008 that, because of the turmoil in the

financial markets, valuations for such distressed assets could only be made with sufficient

integrity during the month-end closing process.  (Hayward Tr. at 34-36, 52-54.)  After receiving

the November 12 forecast, Cotty noted certain adjustments to add, including, among other items,

an estimated pre-tax loss of $1 billion in November in potential markdowns (identified as the

"neil gut") from, among other things, the distressed part of Merrill's correlation book and CVA,

as well as an expected $1.7 billion tax benefit, resulting in a projected quarterly loss of

approximately $5 billion; Cotty shared the adjusted forecast with Price.  (Cotty Tr. at 110-111;

P-Exh. 160 (Merrill Lynch & Co. 2008 4Q & FY Forecast (Nov. 12, 2008), at BAC-ML-NYAG-

502-00001093).)[4]

---

[4] Bank of America was also advised in mid-November that Merrill would be undertaking
a goodwill impairment analysis at the end of the quarter and that, given market conditions, a
potential goodwill writedown of approximately $2 billion might result.  At the time, Merrill had
not reached any final conclusion that goodwill was to be impaired and, according to Cotty, Bank
of America's finance management did not view this item as significant because any goodwill on
Merrill's balance sheet would be eliminated upon the close of the transaction and the application

(continued on the next page)

17.     Based on the revisions to the forecast for Merrill's fourth-quarter performance,

Price sought the advice of Bank of America's then-General Counsel, Timothy Mayopoulos, on

Bank of America's disclosure obligations.  (Price Tr. at 119; Transcript of deposition of Timothy

J. Mayopoulos (Dec. 10, 2009) ("Mayopoulos Tr.") at 149-152.)  Price also approached Thain

and Nelson Chai, Merrill's then-Chief Financial Officer, to suggest that a disclosure may be

required.  Thain and Chai rejected the suggestion, saying that Merrill ordinarily did not provide

shareholders with interim disclosures in the middle of a quarterly period.  (Price Tr. at 120-121;

Cotty Tr. at 128-129; Thain Tr. at 233.)  Merrill's outside auditors, Deloitte & Touche, also

suggested that Merrill should consider the possibility of disclosure to David Moser, Merrill's

Director of Accounting Policy, who then consulted with Merrill's in-house lawyer, Richard

Alsop, on that issue; after considering the matter, Alsop and other in-house attorneys at Merrill

determined that no disclosure of the interim results should be made because, among other

reasons, such disclosure could be misleading given that the results were "estimates and

preliminary," and in light of disclosure in Merrill's public filings regarding the nature of its

assets and the market conditions.  (Transcript of deposition of Rosemary Berkery (Dec. 9, 2009)

("Berkery Tr.") at 144-146.)

---

to the merger of purchase accounting principles, which provide that "[a]n acquiring entity shall
not recognize the goodwill previously recoded by an acquired entity."  (Statement of Financial
Accounting Standards No. 141, ¶ 38; e-mail from Nancy Meloth to Gary Carlin (Nov. 20, 2008),
at BAC-ML-NYAG 00011976.)

18.    Over the next several days, Mayopoulos, Price, and other executives and in-house attorneys at Bank of America conferred amongst themselves as well as with Edward Herlihy, Nicholas Demmo and other attorneys at Wachtell Lipton to determine whether a disclosure was required in light of the forecasted $5 billion quarterly loss at Merrill.  (Mayopoulos Tr. at 152, 157, 160, 164; Price Tr. at 126; Transcript of deposition of Nicholas Demmo (Nov. 16, 2009) ("Demmo Tr.") at 212-214; Transcript of deposition of Edward D. Herlihy (Nov. 17, 2009) ("Herlihy Tr.") at 155-157.)  Notes of a Wachtell Lipton attorney reflect that the initial view of the lawyers on November 13 was that there should be some additional disclosure.  (P-Exh. 161 (handwritten notes of Eric Roth (Nov. 13, 2008), at HOGR-WLRK-502-00000924.)  Thereafter, the attorneys and executives reviewed and analyzed, among other materials, Merrill's results in the preceding six quarters, analyst estimates for Merrill's results in the fourth quarter, as well as the Proxy Statement and other recent Bank of America and Merrill public filings that were available to shareholders.  (Mayopoulos Tr. at 166-167; Price Tr. at 126.)  On November 20, the lawyers concluded that no additional disclosure was required.  (Mayopoulos Tr. at 169, 191-192; Price 126-130; Herlihy Tr. at 156-157.)  Price informed Lewis of the conclusion reached by the lawyers.[5]  (Lewis Tr. at 263-264.)

---

[5] Price was also approached, in or around late November, by Jeffrey Brown, Bank of America's then-Treasurer, who raised the possibility of disclosing Merrill's fourth quarter losses; after Price advised Brown that he had consulted the Bank's attorneys on the issue, Brown suggested that, as a practical matter, disclosure may be advisable.  Bank of America did not make any disclosure of Merrill's October losses or estimated November losses before the December 5 shareholder vote.

19.    An important reason for the lawyers' conclusion that no additional disclosure was necessary was that the forecasted $5 billion quarterly loss at Merrill was within the range of losses that Merrill had sustained in prior quarters. (Mayopoulos Tr. at 191-192; Merrill's Q3/08 Report at 76-77; Merrill Lynch & Co., Inc., Second Quarter Report 2008 (Form 10-Q) (Aug. 5, 2008), at 73-74; Merrill Lynch & Co., Inc., First Quarter Report 2008 (Form 10-Q) (May 6, 2008), at 66-67; Merrill Lynch & Co., Inc., Press Release, Merrill Lynch Reports Full-Year 2007 Net Loss From Continuing Operations of $8.6 Billion (Jan. 17, 2008); Merrill Lynch & Co., Inc., Third Quarter Report 2007 (Form 10-Q) (Nov. 7, 2007), at 71-72.) In the five quarters preceding the fourth quarter of 2008, Merrill's results ranged from a net loss of approximately $10 billion (in the fourth quarter of 2007) to a net loss of approximately $2 billion (in the first quarter of 2008). (Id.; P-Exh. 162 (e-mail from David Belk to Greg Curl, Joe Price and Timothy Mayopoulos (Nov. 19, 2008), at BAC-ML-NYAG-502-00000896).) Before the third quarter of 2007, however, Merrill had not sustained a quarterly loss in six years. In the second quarter of 2007, Merrill reported net earnings of $2.1 billion, and in the quarter before that, net earnings of $2.2 billion. (Merrill Lynch & Co., Inc., Second Quarter Report 2007 (Form 10-Q) (Aug. 3, 2007), at 59-61; Merrill Lynch & Co., Inc., First Quarter Report 2007 (Form 10-Q) (May 7, 2007), at 57-59.) Similarly, in 2006, Merrill reported record annual net earnings of approximately $7.5 billion, with quarterly net gains ranging from $475 million (in the first quarter of 2007) to $3 billion (in the third quarter of 2007). (Merrill Lynch & Co., Inc., Annual Report 2006 (Form 10-K) (Feb. 26, 2007), at 28; Merrill Lynch & Co., Inc., Third Quarter

Report 2006 (Form 10-Q) (Nov. 3, 2006), at 46-48; Merrill Lynch & Co., Inc., First Quarter
Report 2006 (Form 10-Q) (May 5, 2006), at 40-42.)

20.    In addition to looking to Merrill's prior quarterly results, the lawyers concluded
that the Proxy Statement and related filings, which described the challenging market
environment and the adverse impact that Merrill could experience as a result, provided sufficient
warning to shareholders, as did the distressed condition of the financial markets at the time.
(Mayopoulos Tr. at 170-171, 191-192; Price Tr. at 130; Herlihy Tr. at 156-157; Transcript of
deposition of Teresa Brenner (Dec. 4, 2009) ("Brenner Tr.") at 285-286.)  Merrill's Form 10-Q
for the third quarter of 2008 stated that "[t]urbulent market conditions in the short- and medium-
term will continue to have an adverse impact on our core businesses."  (Merrill's Q3/08 Report
at 83.)

21.    According to Mayopoulos, the lawyers considered the disclosure of Merrill's
forecasted quarterly performance trend to be unreliable and risky, but he did not recall
considering disclosing solely the $4.5 billion loss that Merrill had sustained in the month of
October, for which the books had been closed.  (Mayopoulos Tr. at 163-164, 185-188, 192-193.)
According to Mayopoulos, the lawyers working for him also did not ask for updates concerning
Merrill's situation as of November 20, the day they determined that no disclosure was necessary.
(Mayopoulos Tr. at 196-197; Price Tr. at 138; P-Exh. 160 (Merrill Lynch & Co. 2008 4Q & FY
Forecast (Nov. 12, 2008), at BAC-ML-NYAG-502-00001092).)

22.    On December 1, in an e-mail to Price concerning Merrill's fourth quarter forecast,
Cotty reported that Merrill was "still not done with the[] November close," and noted that he had

16

"put a place holder of $1.0B loss for incremental marks," including CVA, in the month of

November, as well as an additional $1 billion for forecasted losses in December.  (P-Exh. 243 (e-

mail from Neil Cotty to Joe Price (Dec. 1, 2008), at BAC-ML-NYAG 00005952).)  With the

November placeholder and December forecast, Cotty estimated that Merrill's fourth-quarter net

loss would be $7.4 billion, and Cotty added that "you could easily take another $1.0 billion off

on an after tax basis."  (Id.)

23.     On December 3, two days before the shareholder meeting, Cotty and Price

received an updated report from Merrill's finance department reflecting an estimated net loss of

$6.4 billion for the months of October and November, and forecasting an overall quarterly net

loss of over $7 billion.  (Cotty Tr. at 145-147; Price Tr. at 173-174; P-Exh. 47 (Merrill Lynch &

Co., 2008 4Q Pacing & FY Forecast Scenario (Dec. 3, 2008), at BAC-ML-NYAG 10016113).)

In an afternoon meeting with Lewis, Thain, and Price, at which Merrill's quarterly forecast was

discussed, Cotty suggested adding a $3 billion "plug" for additional possible markdowns for

estimated losses in November and for potential losses in the balance of the quarter.  (Cotty Tr. at

152-153, 158, 160-161; Price Tr. at 182-183; Lewis Tr. at 261-262.)  Of that plug, a $2 billion

placeholder, on a pre-tax basis, was allocated to the November results to reflect estimated losses

from marks on Merrill's distressed correlation book and CVA, which were not included in the

forecast provided by Merrill.  (Cotty Tr. at 158, 160-161; P-Exh. 53 (Merrill Lynch & Co., 2008

4Q Pacing & FY Forecast Scenario (Revised 6PM) (Dec. 3, 2008), at BAC-ML-NYAG

00006334.)  Before the afternoon meeting, Merrill informed Cotty that losses associated with

these marks should be expected.  (Cotty Tr. at 160-161.)  The remaining $1 billion from the plug

17

was allocated to the forecast to reflect potential losses in the month of December.  (Cotty Tr. at

153, 158.)  Lewis and Thain agreed that the $3 billion in losses should be added to the forecast

and, later that day, Merrill's finance department generated a revised forecast that projected a

quarterly net loss at Merrill of $8.9 billion.  (Lewis Tr. at 263; Cotty Tr. at 164; P-Exh. 53

(Merrill Lynch & Co., 2008 4Q Pacing & FY Forecast Scenario (Revised 6PM) (Dec. 3, 2008),

at BAC-ML-NYAG 00006334.)

24.     After receiving the December 3 forecast, Price again consulted Mayopoulos to

determine if the updated forecast required additional disclosure to investors.  (Price Tr. at 175-

178; Mayopoulos Tr. at 205-206.)  Mayopoulos advised that no disclosure was required because,

in his view, the fundamental facts on which the analysis was based had not changed, including

the rationale that the forecasted quarterly loss, although larger than the loss he had previously

been consulted upon, was still within the $2 billion to $10 billion range of net losses that Merrill

had sustained in prior quarters.[6]  (Price Tr. at 176-179; Mayopoulos Tr. at 210-211.)

25.     The following day, December 4, Cotty was informed that approximately $800

million of the $2 billion November placeholder had been recorded, as part of the book closing

process for November, in losses on Merrill's distressed correlation book.  (Cotty Tr. at 177; Price

---

[6]  According to Price, he provided Mayopoulos with the forecast number after the plug
had been included, that is, approximately $9 billion after tax; however, Mayopoulos recalled
being given a forecast number of $7 billion after tax, which would have corresponded with the
forecast number before the $3 billion pre-tax plug for November and December was added.
(Price Tr. at 175-176; Mayopoulos Tr. at 205-206.)

Tr. at 186-187; P-Exh. 245 (e-mail from Neil Cotty to Joe Price and Craig Rosato (Dec. 4, 2008), at BAC-ML-NYAG 10007358).)  Although Merrill's books for November were not yet finalized, this update, which included certain other losses, brought the estimated net loss in the month of November to approximately $3 billion, leaving $1.2 billion in the placeholder for that month for additional estimated losses from CVA.  (Price Tr. at 187; Cotty Tr. at 178.)  With this update, the known and estimated losses at Merrill in October and November were over $7.5 billion.  After receiving this update, Bank of America did not consider, or seek the advice of counsel to determine, whether the updated losses affected the previous conclusion that no additional disclosure was necessary.  (Price Tr. at 191-193; Mayopoulos Tr. at 213-214.)

26.    The actual November results, which were finalized after the December 5, 2008 shareholder meeting, turned out to be worse than forecasted.  On the evening of December 5, Hayward e-mailed Cotty to inform him that his "best guess" for the November CVA marks was $950 million more than the remaining $1.2 billion in the placeholder that was added to Merrill's forecast on December 3 for estimated losses from CVA in November.  (E-mail from Christopher Hayward to Neil Cotty (Dec. 6, 2008), at BAC-ML-NYAG 00010040.)  Bank of America received this information after the shareholder vote on December 5 as part of Merrill's normal month-end closing process, which was not accelerated in anticipation of the shareholder vote. (Id.; Cotty Tr. at 185-188.)  On December 7, 2008, Gary Carlin, Merrill's then-Controller, forwarded a report providing an update on the November results to Cotty showing a pre-tax monthly loss of $5.8 billion, and noted: "What a disaster!"  (Lewis Tr. at 54; Cotty Tr. at 179-180; P-Exh. 54 (e-mail from Gary Carlin to Neil Cotty (Dec. 7, 2008), at BAC-ML-NYAG

19

00028113).)  The $2 billion placeholder for incremental marks in November, which was added to

the forecast on December 3, was ultimately surpassed by $980 million.  (P-Exh. 274 (e-mail

from Nancy Meloth to Neil Cotty (Dec. 12, 2008), at BAC-ML-NYAG 00005790).)

### C.    Shareholder Meetings and Subsequent Disclosure of Merrill's Losses

27.    Bank of America and Merrill held their shareholder meetings on December 5,

2008; the shareholders of both companies voted to approve the merger.  (Bank of America Corp.,

Current Report (Form 8-K) (Dec. 5, 2008); Merrill Lynch & Co., Inc., Current Report (Form 8-

K) (Dec. 5, 2008); Bank of America Corp., Press Release, Bank of America Shareholders

Approve Merrill Lynch Purchase (Dec. 5, 2008); Merrill Lynch & Co., Inc., Press Release,

Merrill Lynch Stockholders Approve Transaction With Bank of America (Dec. 5, 2008)

(collectively, "12/5 Releases").)  Prior to the shareholder meetings, Bank of America did not

make any disclosure, or otherwise update the information previously provided to shareholders,

concerning Merrill's losses in October and estimated losses in November.

28.    By the time of the shareholder meeting, as a result of Bank of America's

declining stock price, the total value of the merger transaction had diminished to approximately

$21.5 billion.  (Curl Tr. at 225.)  Without Bank of America having made any disclosure of the

October losses and estimated November losses, Bank of America's shareholders voted to

approve the merger on terms that had been originally negotiated in September.  (12/5 Releases.)

The merger between Bank of America and Merrill closed on January 1, 2009.  (Bank of America

Corp., Current Report (Form 8-K) (Jan. 2, 2009), at 1; Bank of America Corp., Press Release,

Bank of America Completes Merrill Lynch Purchase (Jan. 1, 2009).)

20

29.    On December 12, 2008, Bank of America received an updated report forecasting a net loss of $12.5 billion at Merrill in the fourth quarter of 2008. (Price Tr. at 204-207; Curl Tr. at 207; P-Exh. 227 (Merrill Lynch & Co. 4Q08F Walkdown as of close of business Dec. 10, 2008, at BAC-ML-NYAG 00003669).) The December 12 forecast included updated estimates for potential markdowns and, among other things, replaced the $1 billion portion of the plug that had been allocated for December with estimated markdowns on various portfolios that totaled $2.8 billion. (P-Exh. 227 (Merrill Lynch & Co. 4Q08F Walkdown as of close of business Dec. 10, 2008, at BAC-ML-NYAG 00003669).) Shortly after receiving this update, Bank of America's senior management, including Lewis, Curl, and Price consulted outside counsel about the possibility of terminating the Merger Agreement with Merrill on the ground that a material adverse effect under the Merger Agreement had occurred in Merrill's financial condition since September 15, 2008. (Price Tr. at 204-207; Curl Tr. at 207-208; Demmo Tr. at 217-18; Herlihy Tr. at 182.)

30.    On January 16, 2009, two weeks after the merger closed, Bank of America disclosed Merrill's performance in the fourth quarter of 2008. The Bank issued a release reporting that Merrill had sustained a net loss of $15.3 billion in the fourth quarter of 2008, the largest quarterly loss in the firm's history, and that the Bank had obtained $20 billion in funds under the U.S. Treasury Department's Troubled Asset Relief Program to assist in the acquisition of Merrill. (Bank of America Corp., Press Release, Bank of America Earns $4 Billion in 2008 (Jan. 16, 2009); BOA's RFA Response No. 78.) On the next trading day, Bank of America's stock price dropped by 29 percent, although it recovered some of its value in the following days.

21

IV.    **Nondisclosure of the Agreement on Year-End Bonuses**

    A.    **Negotiation and Agreement on VICP Bonuses**

31.    During the merger negotiations, one issue addressed by the lead negotiators for

Bank of America and Merrill was Merrill's ability to pay discretionary year-end bonuses to its

employees and executives for the fiscal year 2008.  The first business issue Fleming and Curl

focused on was the price that Bank of America would pay to acquire Merrill.  (Fleming Tr. at

125-126; Curl. Tr. at 72-73, 75-76.)  The discussions on the afternoon of Sunday, September 14,

resulted in the parties' agreement to present to their respective Boards an agreement reflecting an

0.8595 exchange ratio of Bank of America to Merrill shares, which equated to a $29 price for

each Merrill share based on the closing price for shares of Bank of America common stock on

the New York Stock Exchange on September 12, 2008.  (Proxy Statement at 50; Merger

Agreement, Section 1.4.)

32.    After reaching agreement on the acquisition price, Fleming and Curl proceeded to

negotiate other business terms.  (Fleming Tr. at 146-147; Curl Tr. at 91-106.)  According to

Thain and Fleming, aside from price, the negotiation focused on the scope of the Merger

Agreement's material adverse change clause, a retention package for Merrill's financial advisors,

and Merrill's right to pay discretionary year-end awards pursuant to its Variable Incentive

Compensation Program ("VICP"), the firm's annual bonus program for executives, professional

associates, and administrative employees.  (Fleming Tr. at 126-127, 130-131; P-Exh. 175 (John

Thain remarks, Wharton School of Business (Sept. 17, 2009)).)  Fleming and Curl also

negotiated and agreed on several other matters, including the number of directors that Bank of

22

America would allocate to Merrill, the location of headquarters, remedies for breach of the

Merger Agreement, and certain closing conditions.  (Curl Tr. at 91-106; Fleming Tr. at 155-156;

P-Exh. 8 (e-mail from Seth Heaton to John Thain (Sept. 14, 2008), at BAC-ML-NYAG

00006022).)

  33. With respect to VICP, Fleming and Curl agreed that Merrill would have the

authority to pay year-end VICP awards for 2008 up to the same amount Merrill had paid for

2007.  (Curl Tr. at 94-96; Fleming Tr. at 161; Transcript of deposition of Jeannemarie O'Brien

(Nov. 20, 2009) ("O'Brien Tr.") at 111-112.)  This agreement was reflected in the initial draft of

a schedule to the Merger Agreement as "VICP for 2008 (at 2007 levels) on terms agreed by the

parties."  (P-Exh. 143 (e-mail from Nicholas Demmo (Sept. 15, 2008), at BAC-ML-NYAG-502-

00001365).)  In dollar terms, this agreement provided that Merrill's VICP awards for 2008 may

be awarded at levels of up to $5.8 billion in aggregate value and with a current year expense of

up to $4.5 billion.  (Curl Tr. at 160; Fleming Tr. at 220; P-Exh. 14 (e-mail from Nicholas

Demmo to Teresa Brenner (Nov. 20, 2008), at BAC-ML-NYAG-502-00000913).)  According to

draft minutes, at the meeting of Merrill's Board of Directors on the evening of Sunday,

September 14, Thain informed the Board members that Bank of America had agreed to grant

Merrill the right to maintain the 2008 VICP pool at the same level as that of 2007.  (P-Exh. 141

(e-mail from Adam Hakki (Oct. 2, 2008), at BAC-502-SS 00002800).)

  **B.** **The Drafting of the VICP Provision and Proxy Statement**

  34. On Sunday, September 14, 2008, the Wachtell Lipton attorneys representing Bank

of America in the merger provided an initial draft of the Merger Agreement to John Madden,

John Marzulli, and other attorneys from Shearman & Sterling LLP ("Shearman"), the law firm

retained to represent Merrill in the merger.  (Demmo Tr. at 37-38, 62; O'Brien Tr. at 130-31;

Transcript of deposition of John A. Marzulli, Jr. (Nov. 24, 2009) ("Marzulli Tr.") at 16-17;

Transcript of deposition of Jeffrey P. Crandall (Nov. 30, 2009) ("Crandall Tr.") at 136.)  The

initial draft of Section 5.2 of the Merger Agreement, entitled "Company Forbearances"

("Forbearance Provision"), provided, in the introductory paragraph, that "except as set forth in

Section 5.2 of the Company Disclosure Schedule and except as expressly contemplated or

permitted by this Agreement," Merrill "shall not . . . without the prior written consent of [Bank

of America]" take any of a number of enumerated actions before the closing of the merger.  (P-

Exh. 143 (e-mail from Nicholas Demmo (Sept. 15, 2008), at BAC-ML-NYAG-502-00001336-

1337).)  Among the list of actions that followed, clause 5.2(c)(ii) of the proposed Forbearance

Provision prohibited Merrill from paying, without Bank of America's consent, "any amounts to

Employees not required by any current plan or agreement (other than base salary in the ordinary

course of business)."  (Id.)

     35.     After receiving the initial draft from Wachtell Lipton, Jeffrey Crandall, a

Shearman attorney responsible for negotiating employee benefits matters, deleted clause

5.2(c)(ii).  (Crandall Tr. at 78-83.)  According to Crandall, he objected to the clause because

"Merrill Lynch had a business to run and basically this provision would require [Merrill] to go

back to Bank of America for consent on everything including, for example, de minimis things

like expense reimbursements and the like."  (Crandall Tr. at 108.)  Crandall also found the

Forbearance Provision to be confusing with respect to Merrill's ability to pay incentive

24

compensation.  (Crandall Tr. at 111-112.)  After Crandall, Marzulli, and other attorneys from

Shearman reviewed the initial draft of the Merger Agreement, they provided a handwritten

markup to Wachtell Lipton reflecting Crandall's deletion of clause 5.2(c)(ii).  (P-Exh. 143 (e-

mail from Nicholas Demmo (Sept. 15, 2008), at BAC-ML-NYAG-502-00001337, BAC-ML-

NYAG-502-00001365).)  Concurrently, Shearman provided Wachtell Lipton with a draft

disclosure schedule to the Merger Agreement ("Schedule"),[7] which provided in Section 5.2 as

follows:  "VICP for 2008 (at 2007 levels) on terms agreed by the parties."  (Id.)

36.     Wachtell Lipton rejected Crandall's proposed deletion and struck out the

proposed provision in the Schedule.  (Demmo Tr. at 74; O'Brien Tr. at 119-120; Transcript of

deposition of Jonathan Santelli, December 18, 2009 ("Santelli Tr.") at 67; P-Exhs. 106 (e-mail

from Mark Veblen to Teresa Brenner (Sept. 15, 2008), at BAC-ML-NYAG-502-00000010), 248

(e-mail from Joanne Tsung to Michael Rubinoff (Sept. 16, 2008), at BAC-ML-NYAG-502-

00005668).)  According to Jeannemarie O'Brien, the Wachtell Lipton attorney responsible for

---

[7] Disclosure schedules have been used in corporate practice as a means of, among other things, protecting the business interests of the parties to a transaction and allocating the risk of non-consummation between them.  (Crandall Tr. at 22-26; O'Brien Tr. at 18-19; Transcript of deposition of Patricia Kuhn (Dec. 21, 2009) at 19.)  Wachtell Lipton, Shearman, and other law firms have in the past placed certain confidential compensation-related information in disclosure schedules to merger agreements.  (Crandall Tr. at 23; O'Brien Tr. at 40; Marzulli Tr. at 92-93.)  The full text of disclosure schedules are rarely included in proxy materials that are distributed to shareholders but, as the attorneys from Wachtell Lipton and Shearman acknowledge, the federal proxy rules require that "[s]chedules (or similar attachments) to [merger agreements] shall not be filed unless such schedules contain information which is material to an investment decision and which is not otherwise disclosed in the agreement or the disclosure document."  (Regulation S-K Item 601(b)(2); Crandall Tr. at 54-55; Herlihy Tr. at 114-115.)

negotiating the documentation of employee benefits provisions, Bank of America wanted to

retain clause 5.2(c)(ii) in the Forbearance Provision of the Merger Agreement because the Bank

wanted to "be involved in the process" of Merrill's determination of overall incentive

compensation for 2008.  (O'Brien Tr. at 95-96.)  In addition, Wachtell Lipton struck out

Shearman's proposed provision in the Schedule.  According to Curl and O'Brien, Bank of

America originally expected to work this issue out over the interim period as an integration

matter.  (Curl Tr. at 95, 100, 104, 129, 140; O'Brien Tr. at 52, 97, 134; P-Exhs. 108 (email from

Greg Curl to Timothy Mayopoulos (Sept. 17, 2008), at BAC-ML-NYAG-502-00001122), 134

(e-mail from Michael Krasnovsky to Lester Ranson and Raleigh Shoemaker (Sept. 17, 2008), at

BAC-502-WLRK 00008484).)

   37.  After further negotiations, Merrill's counsel agreed to keep clause 5.2(c)(ii) in the

Forbearance Provision of the Merger Agreement, and Bank of America's counsel agreed, in turn,

to include a provision concerning Merrill's VICP awards for 2008 in the Schedule.  (Crandall Tr.

at 117-118, 123, 145; P-Exh. 148 (e-mail from Margaret Nelson (Sept. 15, 2008), BAC-ML-

NYAG-502-00000001).)  The final version of the Forbearance Provision thus provided, in the

introductory paragraph, that "except as set forth in this Section 5.2 of the Company Disclosure

Schedule or except as expressly contemplated or permitted by this Agreement," Merrill "shall

not . . . without the prior written consent of [Bank of America]" take any of seventeen

enumerated actions before the closing of the merger, including "pay any amounts to [directors,

officers or employees] not required by any current plan or agreement (other than base salary in

the ordinary course of business)."  (Merger Agreement, Section 5.2.)  Although the Forbearance

Provision as a whole referred to exceptions in Section 5.2 of the Schedule, there was no

disclosure in the Merger Agreement concerning the specific language of those exceptions or

which of the seventeen enumerated actions were subject to those exceptions.  (BOA's RFA

Responses Nos. 51, 52.)[8]

      38.      The text of the Proxy Statement, in a section describing the principal terms of the

Merger Agreement, paraphrased the Forbearance Provision, and described as "extraordinary

actions" the seventeen prohibited actions that Merrill had agreed not to take before the closing of

the merger, including the payment of discretionary compensation.  (Proxy Statement at 83-85.)[9]

The proxy statement collectively qualified all seventeen "extraordinary actions" by referring to

"certain exceptions," without specifying the language of those exceptions, and stated that Merrill

was prohibited from taking any of those actions without "Bank of America's prior written

consent (which consent will not be unreasonably withheld or delayed with respect to certain of

---

[8]   The final version of the Merger Agreement also contained Section 5.1, which provided that: "Company and Parent shall . . . (a) conduct its business in the ordinary course in all material respects, (b) use reasonable best efforts to maintain and preserve intact its business organization and advantageous business relationships and retain the services of its key officers and key employees and (c) take no action that would reasonably be expected to adversely affect or materially delay the ability of Company . . . to perform its covenants and agreements under this Agreement or to consummate the transactions contemplated hereby or thereby."  (Merger Agreement, Section 5.1.)

[9]   Immediately before this language, the Proxy Statement paraphrased Section 5.1 of the Merger Agreement as follows:  "In general . . . Merrill Lynch agree[s] to (1) conduct its business in the ordinary course in all material respects, [and] (2) use reasonable best efforts to maintain and preserve intact its business organization and advantageous business relationships, including retaining the services of key officers and employees."  (Proxy Statement at 83.)

the actions described below)."  (Proxy Statement at 83.)

       39.    The language of the provision in the Schedule relating to VICP awards for 2008 continued to be negotiated through October 21, 2008.  (Crandall Tr. at 145-146.)  On October 4, after an issue arose concerning the understanding reached on September 14 with respect to VICP for 2008, Curl confirmed to Fleming in a telephone conversation that Merrill had the authority to pay up to $5.8 billion in year-end VICP awards with a recorded expense of up to $4.5 billion. (Fleming Tr. at 200-201; Curl Tr. at 160; P.-Exh. 12 (e-mail from Greg Fleming to John Thain et al. (Oct. 4, 2008), at BAC-ML-NYAG-502-00000844).)  The governing Schedule provision, which was finalized on October 21, 2008, provided as follows:

> 5.2(b)(iii), 5.2(c)(i), and 5.2(c)(ii) – Variable Incentive Compensation Program ("VICP") in respect of 2008 (including without limitation any guaranteed VICP awards for 2008 or any other pro rata or other 2008 VICP awards payable, paid or provided to terminating or former employees) may be awarded at levels that (i) do not exceed $5.8 billion in aggregate value (inclusive of cash bonuses and the grant date value of long-term incentive awards) …  and (ii) do not result in 2008 VICP-related expense exceeding $4.5 billion … Sixty percent of the overall 2008 VICP shall be awarded as a current cash bonus and forty percent of the overall 2008 VICP shall be awarded as a long-term incentive award either in the form of equity or long-term cash awards. The form (i.e., equity v. long-term cash) and terms and conditions of the long-term incentive awards shall be determined by [Merrill] in consultation with [Bank of America] … The allocation of the 2008 VICP among eligible employees shall be determined by [Merrill] in consultation with [Bank of America].

(Demmo Tr. at 130; O'Brien Tr. at 169-170; P-Exh. 138 (e-mail from Ross Fieldston to Gaurav Sud and James Cuneo (Nov. 19, 2008), at BAC-ML-WLRK 00023488).)

40.     Although the Proxy Statement included the full text of the Merger Agreement as an attachment, it did not include as an exhibit the Schedule setting forth, among other things, the provision concerning VICP awards for 2008.  (Proxy Statement, Appendix A; BOA's RFA Response No. 44.)  Neither the Schedule nor the provision concerning VICP were publicly disclosed prior to the December 5 meeting of Bank of America's shareholders to approve the merger.  (BOA's RFA Response No. 40.)  According to O'Brien, the provision in the Schedule did not have to be disclosed because, she believed, the VICP awards that Merrill was authorized to pay under Section 5.2 of the Schedule were not special transactional bonuses and were regular year-end bonuses consistent with the prior year.  (O'Brien Tr. at 174-175.)  However, although Wachtell Lipton attorneys provided drafts of the Proxy Statement and Schedule to Bank of America's management and in-house lawyers, they did not actually discuss this question with the Bank's executives and in-house counsel as no one expressly raised the question during the preparation of the Bank's proxy disclosures.  (O'Brien Tr. at 185; Demmo Tr. at 123-124.)  Lewis, Mayopoulos and certain other members of Bank of America's management, Board, and in-house legal department asserted that they generally relied on Wachtell Lipton for the accuracy, completeness, and legal compliance of the Bank's proxy disclosures.  (Lewis Tr. at 189, 197-198, 245, 256-258; Mayopoulos Tr. at 62-64; Transcript of deposition of Jana Litsey (Dec. 23, 2009) at 24; Transcript of deposition of Thomas J. May (Dec. 18, 2009) at 66-67; Transcript of deposition of Charles K. Gifford (Dec. 18, 2009) at 38; BOA's RFA Response No. 119.)

29

### C.    Acceleration of the Bonuses

41.    Shortly after the September 15 announcement of the merger, Merrill's

management began working on a schedule for the payment of year-end VICP awards for 2008.

By late September, Peter Stingi, Merrill's then-Global Head of Human Resources, had prepared

an accelerated schedule for the approval of the VICP bonus pool.  (Stingi Tr. at 126-128; P-Exhs.

16 (e-mail from Greg Fleming to John Thain (Oct. 2, 2008), at BAC-ML-NYAG 00006044), 17

(e-mail from Peter Stingi (Sept. 29, 2008), at BAC-ML-NYAG 00007580).)  In prior years,

Merrill customarily made final decisions on the size of the bonus pool in January following the

year for which bonuses were paid, in part to allow the Management Development and

Compensation Committee of Merrill's Board of Directors ("MDCC")[10] to consider the firm's

full-year financial performance.  (Stingi Tr. at 54-55, 58; Fleming Tr. at 44-50; Finnegan Tr. at

16-17; BOA's RFA Response No. 69-70.)  Under the accelerated schedule that Stingi prepared

for VICP 2008, the MDCC was scheduled to authorize the VICP pool on December 8, more than

three weeks before the end of the year for which the bonuses were to be paid and before the

closing of the merger with Bank of America.  (Fleming Tr. at 242-245; P-Exh. 16 (e-mail from

Greg Fleming to John Thain (Oct. 2, 2008), at BAC-ML-NYAG 00006044).)

---

[10]  In 2008, the MDCC was chaired by John Finnegan and included as members Armando
Codina, Virgis Colbert, Alberto Cribiore, and Aulana Peters.  (Transcript of deposition of John
Finnegan (Dec. 10, 2009) ("Finnegan Tr.") at 19; Merrill Lynch & Co., Inc., Definitive Proxy
Statement 2007 (Schedule 14A) (Mar. 14, 2008), at 6-8, 17-18.)

42.    The acceleration of the schedule meant that the MDCC, which was to be disbanded together with Merrill's Board of Directors after the merger closed, would make final decisions on the VICP pool rather than the Board of Bank of America, even though the MDCC did not necessarily have the same compensation philosophy as Bank of America.  (Stingi Tr. at 128-131; Transcript of deposition of John Steele Alphin (Nov. 13, 2009) ("Alphin Tr.") at 56-64.)  According to Steele Alphin, Bank of America's Chief Administrative Officer, Bank of America's Board historically had been more conservative in determining incentive compensation for employees and, as a predominantly commercial bank, focused on company-wide earnings as its primary consideration in determining incentive compensation.  (Alphin Tr. at 57.)  According to Stingi, investment banks such as Merrill typically placed greater emphasis on overall revenues in setting bonuses, often allocating a flat percentage of overall revenues towards the bonus pool.  (Stingi Tr. at 36-37.)  Merrill typically paid, according to Alphin, more than Bank of America to employees in comparable positions, including investment bankers.  (Alphin Tr. at 62-64.)[11]

---

[11]  For example, for 2008, Bank of America paid bonuses of $1 million or more to less than 200 employees, $5 million or more to approximately 10 employees, and $10 million or more to less than 5 employees.  (BOA's RFA Responses Nos. 88-90.)  By comparison, Merrill paid $1 million or more in year-end bonuses to nearly 700 employees, $5 million or more to over 50 employees, and $10 million or more to over 10 employees.  (BOA's RFA Responses Nos. 85-87.)  The two companies also had differences in their practices concerning executive compensation, with Merrill typically paying its senior executives more than Bank of America paid its executives officers.  (Alphin Tr. at 60-61.)  For example, although Bank of America had never paid Lewis annually more than $30 million, in the fiscal years 2005 and 2006, Merrill paid Stanley O'Neal, its former Chairman and Chief Executive Officer, $37 million and $48 million respectively, and at the time O'Neal departed in late 2007, the value of his stock holdings awarded by the MDCC was in excess of $161 million.  (Alphin Tr. at 60-61; Finnegan Tr. at 20-

(continued on the next page)

43.     In the fall of 2008, following the announcement of the merger with Merrill, Lewis publicly criticized the levels of executive and staff pay on Wall Street as being too high, and stated that Wall Street executive compensation should be "cut back."  (P-Exhs. 42 (<u>CBS '60 Minutes'</u> (Oct. 19, 2008), Under New Ownership: Bank of America, CEO of the Nation's Largest Bank Talks About the Treasury Department's Plans for Buying Into Financial Firms), 43 (<u>Fortune Magazine</u> (Sept. 29, 2008), The Golden Age for Financial Services is Over: The New Most Powerful Man in Finance, Bank of America CEO Ken Lewis, Talks About the Future of Wall Street and the Economy.)

44.     On November 11, 2008, Thain, Stingi, and other Merrill executives presented to the MDCC an accelerated schedule under which final approval of the bonus pool would occur on December 8, bonus communications would occur on December 22, cash awards would be made on December 31, and stock awards in early 2009.  (Finnegan Tr. at 100-102; Thain Tr. at 161-162; Transcript of deposition of Michael P. Ross (Dec. 16, 2009) ("Ross Tr.") at 66-70; P-Exh. 61 (memorandum from John Thain (Nov. 10, 2008), at BAC-ML-NYAG 00000055).)   The members of the MDCC consented to the schedule, and Bank of America was advised the following day.  (Transcript of deposition of Andrea B. Smith (Nov. 9, 2009) ("Smith Tr.") at 100-101, 109; P-Exh. 68 (e-mail from Michael Ross to Greg Fleming (Nov. 12, 2008), at BAC-ML-NYAG 00005717, BAC-ML-NYAG 00005721).)

---

24; P-Exhs. 192 (Merrill Lynch & Co., Inc., Definitive Proxy Statement 2005 (Schedule 14A) (Mar. 10, 2006) at 42, 193 (Merrill Lynch & Co., Inc., Definitive Proxy Statement 2006 (Schedule 14A) (Mar. 16, 2007) at 46, 194 (Merrill Lynch & Co., Inc., Definitive Proxy Statement 2007 (Schedule 14A) (Mar. 14, 2008) at 33.)

45.     Under the schedule approved by the MDCC, Merrill planned to make final bonus

determinations, and approve the VICP bonus pool, in early December 2008, before the full

year's results were known and before the merger with Bank of America was scheduled to close.

(P-Exh. 61 (memorandum from John Thain (Nov. 10, 2008), at BAC-ML-NYAG 00000055).

This timeline, which represented a departure from Merrill's typical VICP schedule in previous

years, was not disclosed to shareholders prior to the December 5, 2008 meeting to approve the

merger.

### D.     Payment of the Bonuses

46.     On October 15, 2008, Stingi sent an email to Fleming with a proposal under

which Merrill would "spend the full $5.8 billion" permitted under Section 5.2 of the Schedule.

(P-Exh. 85 (e-mail from Peter Stingi to Michael Ross (Oct. 15, 2008), at BAC-ML-NYAG

00007720).)  Stingi also noted that John Finnegan, the Chairman of Merrill's MDCC, "would

like to see less."  (Id.)  Stingi's proposal was not provided to the MDCC.  (Stingi Tr. at 171.)

47.     In the following weeks, Merrill's management decreased the size of the proposed

VICP pool due to Merrill's deteriorating financial performance and information about

competitors' pay plans.  (Stingi Tr. at 175; Finnegan Tr. at 96-97.)  On October 27, 2008, the

MDCC met for the first time since the Merger Agreement was signed to review a proposed VICP

pool of approximately $4.7 billion with an associated expense of approximately $3.7 billion.

(Finnegan Tr. at 78-90; P-Exh. 21 (Merrill Lynch Management Development & Compensation

Committee, Review of Firm-wide VICP Pool and Expense (Oct. 27, 2008), at BAC-ML-NYAG

00000032).)  By November, Merrill's proposed VICP bonus pool had decreased to

33

approximately $3.9 billion, with an associated expense of approximately $3.2 billion. (Finnegan

Tr. at 101; Ross. Tr. at 66-67; P-Exh. 61 (memorandum from John Thain (Nov. 10, 2008), at

BAC-ML-NYAG 00000053).) Concerned that it may not have enough stock to satisfy Merrill's

VICP stock awards, Bank of America's management asked Merrill to pay 70 percent of the

VICP awards in cash and 30 percent in stock, instead of the 60/40 cash-stock split previously

agreed to; Merrill complied with the request, ultimately increasing the recorded current year

expense of the bonuses to approximately $3.37 billion. (Thain Tr. at 240; P-Exh. 207 (Merrill

Lynch Management Development and Compensation Committee, 2008 Final VICP Pools and

MP Recommendations, at BAC-ML-NYAG00000114).) In the weeks leading to the MDCC

December 8 meeting, executives from Bank of America consulted with Merrill about the

allocation of VICP awards for specific employees and suggested that awards for certain

employees be reduced. (Smith Tr. at 101-102; BOA's RFA Responses Nos. 81-83.)

      48.     On December 8, 2008, Merrill's MDCC met and approved a VICP bonus pool of

approximately $3.62 billion and $3.37 billion in expense. (Finnegan Tr. at 123; P-Exhs. 206

(Minutes of Regular Meeting of Management Development and Compensation Committee (Dec.

8, 2008)), at BAC-ML-NYAG00000182-183), 207 (Merrill Lynch Management Development

and Compensation Committee, 2008 Final VICP Pools and MP Recommendations (Dec. 8,

2008), at BAC-ML-NYAG00000128).) The VICP pool approved by the MDCC included

approximately $695 million in guaranteed year-end bonuses that Merrill was contractually

obligated to pay, and nearly $3 billion in discretionary awards. (Plaintiff Securities and

Exchange Commission's Responses and Objections to Defendant Bank of America

34

Corporation's First Request for Admissions (Jan. 4, 2010) ("SEC's RFA Response") No. 206)

49.    Merrill's employees were notified of their 2008 VICP bonuses on December 19, 2008, and received the cash awards on December 31, 2008, a day before the merger with Bank of America closed.  (SEC's RFA Responses Nos. 200-202.)  Approximately 39,400 employees at Merrill Lynch received VICP awards.  (SEC's RFA Response No. 203.)  Merrill paid year-end bonuses for 2008 of $1 million or more to nearly 700 employees, $5 million or more to over 50 employees, and $10 million or more to over 10 employees.  (BOA's RFA Responses Nos. 85-87.)  Among those who received year-end bonuses for 2008 at Merrill were employees who were not retained after the closing of the merger.  (Ross Tr. at 109, 111-112; BOA's RFA Response No. 92.)

50.    The agreement between Bank of America and Merrill as reflected in the Schedule, under which Merrill could pay up to $5.8 billion in VICP awards for 2008 with an expense of up to $4.5 billion, was not publicly disclosed prior to the meeting of the shareholders of Bank of America on December 5, 2008 to vote on the proposed merger.  (BOA's RFA Responses Nos. 40, 44.)