UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : | |
| : | |
| Plaintiff, : | 09 Civ. 6829 (JSR) |
| : | 10 Civ. 0215 (JSR) |
| -against- : | ECF Cases |
| : | |
| BANK OF AMERICA CORPORATION, : | |
| : | |
| Defendant. : | |
| : | |

## SUPPLEMENTAL STATEMENT OF FACTS

1.  Between November 12 and December 3, 2008, Timothy Mayopoulos, then-General Counsel of Bank of America Corporation ("Bank of America" or the "Bank"), advised the Bank's senior management that Bank of America was not required to make additional disclosure concerning the forecasted fourth-quarter losses at Merrill Lynch & Co., Inc. ("Merrill") before December 5, the date Bank of America's shareholders met to vote on the merger with Merrill. In rendering this advice, Mayopoulos relied on advice rendered by the Bank's outside law firm, Wachtell, Lipton, Rosen & Katz ("Wachtell Lipton"). In addition, Mayopoulos recalls that, on December 1, he advised certain Bank of America executives on the legal standard governing the material adverse change ("MAC") clause in the merger agreement ("Merger Agreement") and expressed his view that, at the time, Bank of America would not be able to terminate the merger with Merrill by exercising the MAC clause. Mayopoulos does not recall providing Bank of America with legal advice concerning the disclosure of the agreement between Bank of America and Merrill regarding Merrill's right to pay discretionary year-end awards for the year 2008. Mayopoulos testified that Wachtell Lipton prepared the November 3

proxy statement ("Proxy Statement") that Bank of America sent to its shareholders to solicit votes for approval of the merger, and that he relied on Wachtell Lipton to do so in accordance with applicable law.

2. As set forth below, on December 10, 2008, five days after Bank of America's shareholders approved the merger, Bank of America terminated Mayopoulos's employment. According to the Bank's then-Chief Executive Officer, Kenneth Lewis, Mayopoulos was terminated for reasons having no connection to his legal advice or any other aspect of his job performance. Rather, Mayopoulos was terminated in an attempt by Lewis to avert the imminent departure of the Bank's then-head of global corporate and investment banking, Brian Moynihan, by offering Moynihan the position occupied by Mayopoulos and upgrading the position to one that directly reported to the Chief Executive Officer. Lewis's account is corroborated by the testimony of several other senior officers and directors of Bank of America as well as contemporaneous emails and other communications. His account is not contradicted by any evidence. There is no evidence that Joe Price, Bank of America's then-Chief Financial Officer who had consulted Mayopoulos on disclosure in November and December, had any knowledge of, or participation in, the decision to terminate Mayopoulos.

**The Advice From Mayopoulos and Wachtell Lipton That No Disclosure Was Required**

3. On or about November 12, 2008, Joe Price approached Mayopoulos for the first time to obtain advice on whether Bank of America should make additional disclosure concerning Merrill's fourth-quarter losses. (Transcript of deposition of Timothy J. Mayopoulos (Dec. 10, 2009) ("Mayopoulos Tr.") at 149-152; Transcript of deposition of Joe L. Price (Dec. 18, 2009) ("Price Tr.") at 118-119, 122-126.) At the time, Merrill's forecasted quarterly loss, including a

2

$1 billion placeholder for November losses added by Neil Cotty, was approximately $5 billion after tax. (Plaintiff's Exhibit ("P-Exh.") 160 (Merrill Lynch & Co. 2008 4Q & FY Forecast (Nov. 12, 2008), at BAC-ML-NYAG-502-00001093); Transcript of deposition of Neil A. Cotty (Dec. 16, 2009) ("Cotty Tr.") at 110-111.) A copy of the November 12 forecast was also provided to Mayopoulos. (Mayopoulos Tr. at 150.) After talking to Price, Mayopoulos contacted Edward Herlihy, a partner at Wachtell Lipton, to obtain advice on disclosure from the firm. (Mayopoulos Tr. at 152-153; e-mail from Timothy Mayopoulos to Joe Price (Nov. 13, 2008), at BAC-ML-NYAG-502-00000857.) Information about the forecasted losses, including the actual losses for the month of October, was provided to Wachtell Lipton. (Mayopoulos Tr. at 165; P-Exh. 161 (notes of Eric Roth (Nov. 13, 2008), at HOGR-WLRK-502-00000924).)

4. On November 13, Mayopoulos and Teresa Brenner, a senior in-house attorney at Bank of America with experience handling corporate and disclosure matters, participated in a call with partners Herlihy, Nicholas Demmo and Eric Roth of Wachtell Lipton. (Mayopoulos Tr. at 157-158; P-Exh. 161 at HOGR-WLRK-502-00000924.) Mayopoulos's initial reaction was that "disclosure might be well warranted," and on the call the lawyers' preliminary view was that some disclosure should be made. (Mayopoulos Tr. at 153, 161-162; Transcript of deposition of Nicholas Demmo (Nov. 16, 2008) ("Demmo Tr.") at 187; P-Exh. 161 at HOGR-WLRK-502-00000924.) According to Mayopoulos, Herlihy mentioned the possibility of "trend disclosure" but no one, including Mayopoulos or Wachtell Lipton, had done the analysis to determine whether such disclosure was necessary; accordingly, Mayopoulos determined that he would gather relevant information and told the Wachtell Lipton lawyers that he and they needed to give "serious consideration to [a] possible disclosure." (Mayopoulos Tr. at 160-165; Price Tr. at

3

127.)[1] Mayopoulos instructed the Wachtell Lipton attorneys to "do some work on [the matter] and to think about it and do whatever they thought was necessary" so that they could provide "an informed opinion about what we should do." (Mayopoulos Tr. at 164.)

5.  On November 13 and continuing over the following days, Bank of America's attorneys and executives reviewed materials that they deemed relevant to the question of disclosure, including Merrill's results in the preceding six quarters, the disclosures concerning adverse financial conditions and their likely impact on results contained in Bank of America's and Merrill's recent public filings, the November 3 Proxy Statement, analyst projections for Merrill's fourth quarter results, public statements announcing the merger, and data about the possible impact of Merrill's forecasted quarterly losses on the capital ratio of the combined company. (Mayopoulos Tr. at 166-172; Price Tr. at 126-134, 152-153; Demmo Tr. at 212-214;

---

[1] In addition to Mayopoulos, Price raised the possibility of disclosing Merrill's forecasted quarterly losses with John Thain, Merrill's then-Chairman and Chief Executive Officer, and Nelson Chai, Merrill's then-Chief Financial Officer, but Thain and Chai rejected the suggestion on the ground that Merrill did not ordinarily disclose interim results. (Price Tr. at 120-122; Cotty Tr. at 126-134; Transcript of deposition of John Thain (Nov. 4, 2009) at 233; Deposition of Christopher B. Hayward (Dec. 22, 2009) ("Hayward Tr.") at 130-132.) Neil Cotty, Bank of America's then-Chief Accounting Officer, who was present at the conversations with Thain and Chai, asked Price whether Bank of America had "to do anything on our end"; Price replied that he was consulting with in-house and outside counsel on the matter. (Cotty Tr. at 130-134.) Also, around November 13, 2008, at a meeting of Bank of America and Merrill finance executives, Gary Carlin, Merrill's then-Controller, advised Price that he was consulting with Merrill's in-house counsel on whether disclosure of Merrill's losses would be warranted. (Hayward Tr. at 130-136.) After considering the matter, Merrill's in-house lawyers determined that no disclosure should be made. (Transcript of deposition of Rosemary Berkery (Dec. 9, 2009) at 142-150.) According to Curl, on or about December 1 he also raised the issue of disclosure with Price and asked whether Price was obtaining appropriate legal advice on the matter. (Curl Tr. at 224-229.)

4

P-Exhs. 162 (e-mail from David Belk to Gregory Curl, Joe Price and Timothy Mayopoulos (Nov. 19, 2008), at BAC-ML-NYAG-502-00000896), 123 (e-mail from David Belk to Nicholas Demmo and Timothy Mayopoulos (Nov. 18, 2008), at BAC-ML-NYAG-502-00000884); Merrill Lynch & Co., Inc. Third Quarter Report 2008 (Form 10-Q) (Nov. 5, 2008), at BAC-ML-NYAG-HC-502-000001-187; Transcript of Bank of America Corp. Earnings Conference Call (Oct. 6, 2008), at BAC-ML-NYAG-HC-502-0000342-363; e-mail from Chris Lynch to Teresa Brenner (Nov. 20, 2008), at BAC-ML-NYAG-502-00064612; e-mail from Teresa Brenner to Susan Halsey (Nov. 20, 2008), at BAC-ML-NYAG-502-00064706.) Wachtell Lipton attorneys also reviewed legal principles that were deemed relevant. (Demmo Tr. at 185-186; Transcript of deposition of Edward Herlihy (Nov. 17, 2008) ("Herlihy Tr.") at 150-154; P-Exhs. 118 (e-mail from Eric Roth to Edward Herlihy (Nov. 13, 2008), at BAC-502-WLRK 00006873-881), 119 (e-mail from Jonathan Goldin to Eric Roth (Nov. 13, 2008), at BAC-502-WLRK 00006872).) Mayopoulos held additional conference calls with Herlihy and Demmo during this period. (Mayopoulos Tr. at 157-158, 190-192; Herlihy Tr. at 155-157; P-Exhs. 163 (notes of Timothy Mayopoulos (Nov. 18-20, 2008), at BAC-ML-NYAG-502-00001102-1103), 156 (Statement of Timothy J. Mayopoulos before the U.S. House of Representatives Committee on Oversight and Government Reform and Subcommittee on Domestic Policy (Nov. 17, 2009), at 5-6).)

6. On November 20, Herlihy and Demmo of Wachtell Lipton and Mayopoulos, Price, Brenner, and other executives of Bank of America participated in a conference call to discuss whether disclosure might be required; by the end of the call, all participants, including Mayopoulos, Price, Brenner and the Wachtell Lipton attorneys, concluded that no additional disclosure was necessary. (Mayopoulos Tr. at 169, 191-194; Herlihy 155-157; Demmo Tr. at 187-188; Price Tr. at 126-130, 135; Transcript of deposition of Teresa Brenner (Dec. 4, 2009) at

5

284-286; P-Exhs. 156 at 6, 160 (Merrill Lynch & Co. 2008 4Q & FY Forecast (Nov. 12, 2008), at BAC-ML-NYAG-502-00001092); notes of Timothy Mayopoulos (Nov. 20, 2008), at BAC-ML-NYAG-502-00001104-6; Price appointment calendar (Nov. 20, 2008), at BAC-ML-NYAG-502-00064674.) According to Mayopoulos, that conclusion rested on several grounds. First, the lawyers concluded that because the proxy statement, public filings, and materials announcing the merger did not contain "projections or estimates of Merrill Lynch's future performance," Bank of America "had no legal duty to update past disclosures"; in addition, the lawyers concluded that "a reasonable investor would have been on notice" of Merrill's "multi-billion dollar losses" because the firm's after-tax losses in the prior five quarters ranged from $2 billion to nearly $10 billion; further, the lawyers believed that the Proxy Statement and public filings contained cautionary language that "unambiguously disclosed to investors that adverse business and market conditions could continue to impact Merrill Lynch negatively"; and finally, according to Mayopoulos, "numerous highly publicized events throughout 2008," including major bank failures, the announcement of the Troubled Asset Relief Program, and Lehman Brothers' bankruptcy, warned investors that financial firms were "under great stress and might continue to incur significant losses." (P-Exh. 156 at 6-9; Mayopoulos Tr. at 168-197; Demmo Tr. at 187-188; Herlihy Tr. at 155-156; P-Exhs. 123, 162, 163; Transcript of Hearing of House of Representatives Committee on Oversight and Government Reform (Nov. 17, 2009) ("Nov. 17 Congr. Tr.") at 18-19.) According to Mayopoulos, the lawyers were also concerned that an unwarranted disclosure could expose Bank of America to liability if the disclosure turned out to be inaccurate. (Mayopoulos Tr. at 184-188.) There is no evidence that any Wachtell attorneys were excluded from participating on the November 20 conference call, and, during the call, Herlihy and Demmo participated and expressed their views and concurred that no additional

disclosure was necessary. (Mayopoulos Tr. at 191-194; Price Tr. at 134-135; Demmo Tr. at 186-188; Herlihy Tr. at 155-156.) None of the participants on the call suggested making any additional disclosure. (Mayopoulos Tr. at 173-174; P-Exh. 156 at 9; Price Tr. at 127-128; Herlihy Tr. at 156.)[2]

7.    The next time Price consulted Mayopoulos on disclosure was on December 3, 2008, after Price received updated information concerning additional losses at Merrill. (Price Tr. at 172-178.) Earlier that day, Price had received a report forecasting $7 billion in after-tax quarterly losses at Merrill. (Id.; P-Exh. 47 (Merrill Lynch & Co., 2008 4Q Pacing & FY Forecast Scenario (Dec. 3, 2008), at BAC-ML-NYAG 10016113).)[3] After receiving the report, Price participated in a discussion with Lewis, Thain, and Cotty (but not Mayopoulos) to, among other things, review Merrill's quarterly forecast. (Price Tr. at 172-174; Transcript of deposition of Kenneth Lewis (Oct. 30, 2009) ("Lewis Tr.") at 259-261; P-Exh. 33 (Lewis appointment calendar (Sept. 1, 2008 to Feb. 15, 2009), at BAC-ML-NYAG00003724).) During this discussion, Cotty suggested that Merrill could potentially incur another $1 billion to $3 billion in additional losses beyond what was reflected in the forecast, and the executives adjusted the forecast by adding an additional $3 billion pretax "placeholder" for estimated losses in

---

[2] After the November 20 call, Price advised Lewis of the lawyers' conclusion that no additional disclosure was required. (Lewis Tr. at 263-264.) On his copy of Merrill's November 12 quarterly forecast, Price noted: "concluded with Tim and Ed that no pre-meeting disclosure necessary." (Price Tr. at 126-127; P-Exh. 160 at BAC-ML-NYAG-502-00001092.)

[3] There is no evidence that Mayopoulos received a copy of this document from Merrill or that he was sent any documents containing financial information from Merrill after November 20, 2008.

7

November and potential losses in December, which raised the after-tax forecasted loss to $8.988 billion, and a revised report was prepared in the evening. (Price Tr. at 181-184; Lewis Tr. at 261-263; Cotty Tr. at 152-158, 163-164; P-Exh. 53 (Merrill Lynch & Co., 2008 4Q Pacing & FY Forecast Scenario (Revised 6PM) (Dec. 3, 2008), at BAC-ML-NYAG 00006334).) Price's recollection is that he had a "short face-to-face discussion" with Mayopoulos on December 3, in which Price informed Mayopoulos "[t]hat the numbers had changed" and that the forecasted losses were now $14 billion pretax (approximately $9 billion after tax), which included the "$3 billion contingency." (Price Tr. at 175-178.)[4] Mayopoulos recalls that Price informed him on December 3 of the $7 billion forecasted after tax loss, and he has no recollection of learning of the nearly $9 billion forecasted after tax loss — which included the placeholder — until a December 9 meeting of the Bank's Board of Directors. (Mayopoulos Tr. at 205-206, 213-216; P-Exh. 156 at 9-10.)

8. During their discussion on December 3, Mayopoulos advised Price that, in his view, there was still no need for additional disclosure because "the fundamental facts on which our analysis was based had not changed and the rationale hadn't changed" given that "the 7 billion dollar number was still well within the historical experience of Merrill over the prior five quarters and the prior disclosures [in the Proxy Statement and public filings] were still the same prior disclosures that we had talked about on November the 20th." (Mayopoulos Tr. at 210-211;

---

[4] There is no evidence that Price provided Mayopoulos with a copy of the adjusted forecast. (Mayopoulos Tr. at 206-207; Price 176-177.)

Price Tr. at 176-179, 185-186.)[5] Mayopoulos also told Price that he would reach out to Wachtell to discuss the matter further but there is no record that he did so.[6] (Mayopoulos Tr. at 210; Price Tr. at 179-180, 185-186; P-Exh. 53 at BAC-ML-NYAG-502-00001108.)[7] According to Mayopoulos, he first learned of the forecasted after tax loss of nearly $9 billion on December 9. (P-Exh. 156 at 10.) While he did not recall receiving or reviewing the report containing the forecasted $9 billion loss, he stated that if the increase from $7 billion was in fact attributable in large part to a "wild ass guess" of estimated November and potential December results, his "legal advice would have been that such a guess was not an appropriate basis for a public disclosure"; Mayopoulos recognized, however, that "the closer you got to $10 billion" in after-tax forecasted losses, "or once you got to a point where you exceeded $10 billion … I think the disclosure question became much more difficult. There was a more compelling case to make a disclosure. So obviously $9 billion was closer to 10 than $7 billion and I wanted to understand this and …

---

[5] Lewis testified that Price informed him of Mayopoulos's conclusion. (Lewis Tr. at 262-266.) According to the evidence, Mayopoulos was consulted with respect to the disclosure of Merrill's forecasted losses only in the November 12 to 20 timeframe and on December 3. Mayopoulos was not consulted about disclosure at any point after December 3, 2008.

[6] According to Wachtell Lipton, the last forecasted loss that Wachtell Lipton was informed of before the December 5 shareholder meeting was the approximately $5 billion quarterly loss that was discussed with Wachtell Lipton attorneys in November. (Herlihy Tr. 155-156; Demmo Tr. at 187-188.)

[7] Price did not speak with anyone from Wachtell Lipton, including Herlihy, on December 3. Price's notation on his copy of the adjusted forecast that reflected the $8.988 billion loss after tax, which stated "per Tim M. still same views plus with Ed," indicated that Mayopoulos had mentioned to Price that he would reach out to Wachtell. (Price Tr. at 176; P-Exh. 53 at BAC-ML-NYAG-502-00001108.)

9

think about the implications of a possible disclosure." (Mayopoulos Tr. at 216-218; P-Exh. 156 at 10.)

**The Dec. 1, 2008 Meeting to Review the MAC Clause**

9. On December 1, Mayopoulos met with Price and Curl to review the MAC clause in the Merger Agreement.[8] (Mayopoulos Tr. at 198-199, 201, 204; Transcript of deposition of Gregory Curl (Dec. 11, 2009) ("Curl Tr.") at 235-238; 157-161; P-Exh. 164 (notes of Timothy Mayopoulos (Dec. 1, 2008), at BAC-ML-NYAG-502-00001107).) According to Curl, he was concerned that Merrill might seek to terminate the merger because the value its shareholders would receive had diminished since September: an October 2008 equity offering by Bank of America had diluted the share in the combined company that Merrill shareholders would obtain from nearly 25 percent to approximately 21 percent, and the nominal value of the transaction had diminished considerably from $50 billion to approximately $20 billion as a result of Bank of America's declining stock price. (Curl Tr. at 224-225, 231.) Although Mayopoulos stated that he was not told why Price and Curl wished to discuss the MAC, he did not find the meeting unusual since he had been asked in the past to provide advice to Curl on whether a material

---

[8] While Price's calendar reflects an entry on December 1 for a meeting with Mayopoulos and Curl, he did not recall that meeting and did not recall discussing the MAC clause with Mayopoulos at any point. (Price Tr. at 157.) According to Price, several days before December 1, an institutional investor in Bank of America, Cap World, inquired if Bank of America could renegotiate the deal by invoking the MAC clause. (Price Tr. at 157-159.)

10

adverse change had occurred in prior deals.[9] (Mayopoulos Tr. at 204; P-Exh. 156 at 4.)

10. At the meeting, Mayopoulos reviewed the terms of the MAC clause and discussed how, in his view, a court was likely to interpret it. (Mayopoulos Tr. at 198-200.) Mayopoulos recalls expressing the view that, based on what he knew at the time, he believed there was no material adverse change in Merrill's performance because it did not appear disproportionate to Bank of America's own performance in the fourth quarter of 2008. (Mayopoulos Tr. at 200; Nov. 17 Congr. Tr. at 18.) According to Mayopoulos, Price and Curl did not suggest that they thought a material adverse change had occurred, and the Bank's management testified that it was not considering whether to invoke the MAC at that time. (Mayopoulos Tr. at 202-203; P-Exh. 156 at 4; Price Tr. at 16; Lewis 258-259.) After the meeting, Mayopoulos provided no further advice on the MAC clause prior to his termination on December 10. (Mayopoulos Tr. at 203.)

**Mayopoulos's Dec. 10, 2008 Termination**

11. On December 9, 2008, Lewis informed the Board of Directors of Bank of America in an executive session that Brian Moynihan, then-head of Bank of America's investment banking division, would be leaving the Bank. (Transcript of deposition of Charles Gifford (Dec. 18, 2009) ("Gifford Tr.") at 73.) As a result of the merger, Moynihan's position was going to be eliminated, and Thain was going to take over the combined entity's investment banking operations. (Lewis Tr. at 286-287; Transcript of deposition of Thomas May (Dec. 18,

---

[9] Curl, who had negotiated the MAC clause in the Merger Agreement with Merrill's then-President, Greg Fleming, had been involved in two prior merger transactions in which MAC clauses were invoked. (Curl Tr. at 231-236.)

2009) ("May Tr."), at 139-140; e-mail from Graceann Sullivan to Anne Gifford (Oct. 2, 2008), at DIR-BAC-NYAG 00003327-328.)  Lewis had proposed to Moynihan an alternative position in Wilmington, Delaware, but Moynihan, who did not want to move his family there, declined.  (Gifford Tr. at 73.)  The Bank's management had prepared a draft press release announcing Moynihan's departure.  (Bank of America Corp. Press Release, Bank of America Planning to Reduce Workforce, Brian Moynihan leaving the company (Draft 2) (for release on Dec. 12, 2008), at BAC-ML-NYAG 10120405-407.)

12.  After certain Board members expressed disappointment about Moynihan's departure and urged Lewis to find a suitable position to retain Moynihan, Lewis, in consultation with Steele Alphin, Bank of America's then-Chief Administrative Officer, who had talked with other executives, decided to place Moynihan in the General Counsel's position, and on the afternoon of December 9, Lewis wrote to the Board that "[w]e have come up with a solution for Brian Moynihan.  He will become general counsel and report to me directly.  He can stay in Boston for sometime [sic] and eventually will move to Charlotte."  (Lewis Tr. at 286-290; P-Exh. 58 (e-mail from Thomas May to Ken Lewis (Dec. 9, 2008), at BAC-ML-NYAG-10053993); Nov. 17 Congr. Tr. at 26-27, 42-43, 50-54, 74-77.)  Charles Gifford, a director of Bank of America and the former Chief Executive Officer of Fleet Boston, where Moynihan had worked, responded to Lewis:  "that's great news for our company…good for you and good for [B]rian and it's good for our shareholders."  (E-mail from Charles Gifford to Kenneth Lewis (Dec. 9, 2008), at BAC-ML-NYAG 10054233.)  Also reacting to Lewis's message, William Barnett, one of the Bank's directors, wrote to Gifford:  "glad ... Brian got saved ... last of the Fleet guys and good person and team player ... not sure what it does to Tim M..." (P-Exh. 57 (e-

mail from Charles Gifford to William Barnett at BAC-ML-NYAG-00288299).) Another director, Thomas May, wrote to Gifford that Lewis "listened and decided to pick the more versatile (valuable) player." (E-mail from Thomas May to Charles Gifford (Dec. 11, 2008), at DIR-BAC-NYAG 00003493.)

13. Following the Bank's December 9 Board meeting, Mayopoulos walked to Price's office with the intention of talking to Price, if he were present, about Merrill's forecasted $9 billion fourth-quarter loss that was discussed at the meeting. (Mayopoulos Tr. at 217; P-Exh. 156 at 11.) However, Mayopoulos did not find Price in his office and learned from Price's administrative assistant that he was in a meeting with Lewis and other senior business executives that was expected to last until the end of the day. (Mayopoulos Tr. at 217-219; P-Exh. 156 at 11.) Mayopoulos, who had to leave early that day, decided that he would try to meet with Price the next day, December 10. (Mayopoulos Tr. at 217.) There is no evidence that Price was aware that Mayopoulos was looking for him on the afternoon of December 9.

14. On the morning of December 10, 2008, Mayopoulos held meetings with two Bank of America employees and one Merrill employee concerning personnel changes that were to take place as a result of the pending merger. (Mayopoulos Tr. at 219.) Shortly before noon, Mayopoulos was asked to meet with Amy Brinkley, Bank of America's then-Chief Risk Officer, to whom Mayopoulos previously reported. (Mayopoulos Tr. at 219-220.) Brinkley informed Mayopoulos that his employment was terminated effective immediately because Lewis had made a recent decision to replace him with Brian Moynihan. (Mayopoulos Tr. at 220.) Mayopoulos was asked to leave the Bank's premises immediately. (P-Exh. 156 at 11-13.) According to Price and Curl, they had no role in the decision to terminate Mayopoulos's employment and there is no evidence to the contrary. (Price Tr. at 219-221; Curl Tr. at 294-297; Lewis Tr. at 286-290.)