# SECTION II

# TAB 22

Teresa Brenner                                    December 4, 2009

CONFIDENTIAL

Confidential - Brenner

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK
-----------------------------x
SECURITIES AND EXCHANGE COMMISSION,

            Plaintiff,

     vs.              09-CV-6829

BANK OF AMERICA,

            Defendant.
-----------------------------x


            CONFIDENTIAL


        TERESA BRENNER

      New York, New York

    Friday, December 4, 2009




Reported by:  Steven Neil Cohen, RPR

Job No. 305520

Teresa Brenner                              December 4, 2009
                    CONFIDENTIAL

1                    Confidential - Brenner
2           expected losses for Merrill Lynch could
3           be in the fourth quarter.
4     BY MR. VASILESCU:
5           Q.    Did you start getting a sense of
6     that in November of 2008?
7           A.    I recall discussing that issue in
8     the middle of November until before
9     Thanksgiving of 2008.
10          Q.    Did that issue prompt an inquiry
11    to Wachtell, the outside counsel, regarding
12    what the duties to update disclosures would
13    be?
14                MS. OH:  Objection.  Form.
15                You can answer.
16                THE WITNESS:  My recollection of
17          that time period is a discussion between
18          myself and Tim Mayopoulos, and I have
19          again another recollection of a
20          discussion during that time period with
21          myself and Tim and Ed Herlihy and
22          perhaps some other attorneys at
23          Wachtell.
24                I don't know -- I can't remember
25          exactly which days, which discussions

Teresa Brenner                                December 4, 2009
                        CONFIDENTIAL

1                    Confidential - Brenner
2           occurred, but that was the general time
3           frame.
4                 And I also recall our belief that
5           after looking at that, that that fact
6           and the current disclosure in the proxy
7           statement as well as the documents
8           incorporated by reference and the ones I
9           specifically recall collecting are the
10          Merrill Lynch 10-Qs and the Bank of
11          America 10-Qs, that the ultimate
12          conclusion was that no further
13          disclosure was necessary or warranted.
14    BY MR. VASILESCU:
15          Q.    Do you know if that analysis
16    concerned Rule 14A9 of the federal
17    securities laws?
18          A.    The analysis was, just my
19    understanding again, is just as securities
20    and a generalist, just the general
21    disclosure rules.
22                I don't recall specifically
23    looking at rule -- schedule 14A or generally
24    the proxy rules but I don't specifically
25    looking at 14A9 or having a-- or I don't

# TAB 23

Gregory Curl                                    December 11, 2009
CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------------

SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,
                                   Case No.
          vs.                      09-CV-6829

BANK OF AMERICA CORP.,

                    Defendants.

----------------------------------------

              CONFIDENTIAL VIDEOTAPE DEPOSITION OF

GREGORY CURL, taken by Plaintiff, at the offices

of the Securities and Exchange Commission, Three

World Financial Center, New York, New York, on

Friday, December 11, 2009, commencing at 9:40

a.m., before Debra Stevens, a Registered

Professional Reporter and notary public, within

and for the State of New York.

a9a298e0-6b56-4508-bb4a-e16fc66c51aa

Gregory Curl                                      December 11, 2009
                           CONFIDENTIAL

1              G.Curl - Confidential
2    was.  There was -- I was in a conference room in
3    Wachtell sometime around Thanksgiving, but I
4    can't recall exactly when.  And there was a phone
5    conversation occurring in which I was not
6    directly involved between some people in
7    Charlotte -- and I can't recall who it was -- and
8    Ed Herlihy and Nick Demmo in which I heard some
9    mention of disclosure.
10           Q.   What did you hear more specifically?
11           A.   I can't recall other than the fact I
12   do remember there was some conversation about
13   disclosure.  But disclosure is not something that
14   I am involved in or have any real knowledge of so
15   I just wasn't paying attention.
16           Q.   Did you discuss with Mr. Demmo or
17   Mr. Herlihy what they had discussed with people
18   from Charlotte?
19           A.   Not that I recall.
20           Q.   Aside from that conversation where you
21   were in the room and Mr. Herlihy and Mr. Demmo
22   were discussing disclosure with someone from
23   Charlotte, did you have any discussions at any
24   point after learning of the projected loss of
25   5.3 billion and before your next conversation in

a9a298e0-6b56-4508-bb4a-e16fc66c51aa

Gregory Curl                                    December 11, 2009
                          CONFIDENTIAL

1              G.Curl - Confidential
2     early December with Mr. Price about Merrill
3     losses?
4              MR. LIMAN:  Objection to form.
5         A.   Not that I recall.
6         Q.   Did you have any discussions during
7     that time frame, the second half of
8     November 2008, concerning the disclosure of
9     Merrill's projected losses?
10             MR. LIMAN:  Objection to form.
11        A.   Not that I recall other than the two
12    instances.
13        Q.   Let me show you, Mr. Curl, what I have
14    marked as Exhibit 222.
15             (Plaintiff's Exhibit 222,
16             Document, Bates BAC-502-WLRK 4641
17             through 4642, 2 pages, was marked for
18             identification.)
19             MR. BORYSHANSKY:   This exhibit has
20        two pages to it.  The front page has an
21        e-mail at the top from Mr. Curl to Ed Herlihy
22        and it is Bates numbered BAC-502-WLRK 4641
23        through 4642.
24        Q.   Mr. Curl, let me direct your attention
25    to the e-mail that you had sent to Ed Herlihy on

# TAB 24

1

C O N F I D E N T I A L

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

      -against-               09-CV-6829

BANK OF AMERICA CORP.,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

                November 16, 2009
                9:39 a.m.

Deposition of NICHOLAS DEMMO, taken by Plaintiff,

pursuant to Subpoena, held at Securities and

Exchange Commission, Three World Financial

Center, New York, New York, before Lisa

Rosenfeld, a Shorthand Reporter and Notary

Public within and for the State of New York.

185

```
 1                Demmo - Confidential
 2    there was a problem with shareholders and bonuses
 3    as a result of government scrutiny that related
 4    to the Merrill Lynch merger certainly.
 5              MR. VASILESCU:   Let's mark as
 6         Plaintiff's 118 an e-mail from Eric Roth
 7         to Ed Herlihy dated November 13th, 2008.
 8         And Exhibit 119 an e-mail from Jonathan
 9         Golden to Eric Roth.
10              (Plaintiff's Exhibit 118, e-mail from
11         Eric Roth to Ed Herlihy dated
12         November 13th, 2008, was so marked for
13         identification.)
14              (Plaintiff's Exhibit 119, e-mail from
15         Jonathan Golden to Eric Roth, was so
16         marked for identification.)
17         Q.    118 is the one from Eric Roth to Ed
18    Herlihy.  Now you didn't get these e-mails, but
19    did you have an understanding there was any sort
20    of research or query done regarding a duty to
21    update filings?
22         A.    In November related to this matter?
23         Q.    That's right.
24         A.    I don't remember any of this, no.
25         Q.    Was there a -- do you have any
```

                                                        186

 1                Demmo - Confidential
 2    understanding of -- who is Jonathan Golden?
 3           A.    He is an associate at Wachtell.
 4           Q.    Who is Eric Roth?
 5           A.    Litigation partner at the firm.
 6           Q.    And was he working on the Bank of
 7    America matter?
 8           A.    He was working on -- yes, litigation
 9    related to Bank of America matter.
10           Q.    But is that the private -- the other
11    actions that were already filed or was he working
12    at all in relation to the disclosures that were
13    being made by Bank of America?
14           A.    The only overlap that he had on
15    disclosure matters relating to Bank of America
16    outside of the Merrill Lynch litigation was on
17    the 12th, 13th of November when we involved him
18    in a disclosure question that came up.
19           Q.    What disclosure issue was that?
20           A.    It was the question had arose as a
21    result of Bank of America -- Merrill Lynch
22    reported to Bank of America that as a result
23    of -- primarily as a result of adjustments in the
24    value of certain assets that it had on its books
25    between the end of September and end of October

187

1              Demmo - Confidential

2    was they had a 7 billion dollar pre-tax loss.

3         Q.    Was there a discussion whether or not

4    B of A or Merrill Lynch needed to disclose that

5    loss?

6         A.    Yes.

7         Q.    What was the analysis if you can

8    recall?

9         A.    Well, it was over a period of a week

10   and a half.  The question to my recollection

11   originally arose as a question of whether we

12   needed to make any additional disclosure, I think

13   that call was a relatively short call.  The next

14   day we had a call where Tim Mayopoulos, the

15   general counsel of Bank of America, rather than

16   trying to figure out whether we should make

17   disclosure, determined that we simply would make

18   disclosures.

19              So we talked about the type of

20   disclosure that we would make thinking along the

21   lines of trend disclosure talking about factors

22   like changes in credit spreads and whatnot, but

23   types of factors that had driven the 7 billion

24   dollar pre-tax mark, and then eventually over the

25   course of I believe it was November 20th came to

CONFIDENTIAL

```
                    Demmo - Confidential
 1
 2      realize that in fact the type of disclosure we
 3      were talking about making on the 13th was exactly
 4      the sort of disclosure that both Merrill Lynch
 5      and Bank of America had previously made in their
 6      most recent filings.
 7              MR. MIRVIS:  If I could just
 8          interject one thing so people who might
 9          look at this one day don't get confused.
10          The Exhibit PX 118 is a memorandum dated
11          August 25, 1999, but you'll notice if you
12          happen to look up in the upper right-hand
13          corner it says WLRK draft 10/28/09, and
14          the reason for that is --
15              MR. ANDERS:  Are you qualified to
16          answer this?
17              MR. MIRVIS:  If I make a mistake
18          you'll tell me.
19              MR. VASILESCU:  I think I know why.
20              MR. MIRVIS:  The attachment to the
21          memo is an NRL, so when you recreate the
22          document the machine changes the date to
23          the current date.  You know more about
24          that than I do.
25              MR. ANDERS:  We had to reprint out
```

CONFIDENTIAL

212

1                    Demmo - Confidential

2       where that was discussed.

3            Q.    And what was discussed?

4            A.    I don't remember clearly at this

5       point, but in I believe Mr. Curl -- I'm trying to

6       remember whether -- there was a call two days

7       after this which I don't remember whether Mr.

8       Curl was on but Mr. Joe Price was on the call,

9       and he talked to Merrill Lynch's financial

10      position and their expectations at the time.

11           Q.    And did Mr. Curl or anyone at Bank of

12      America communicate to you or anyone at Wachtell

13      that you know of a dollar amount of the projected

14      losses for the fourth quarter for Merrill Lynch?

15           A.    I believe on -- a week earlier we

16      understood that they -- sorry, Merrill Lynch had

17      lost again, I say lost, they had had assets that

18      didn't go anywhere but had been written down by

19      $7 billion on a pre-tax basis and, you know, and

20      but so far November had been essentially flat.

21                 Two days after this there was another

22      call where I don't believe the information was

23      new information but there was more detailed

24      information regarding Merrill's financial

25      position.  I think at that point although

213

Demmo - Confidential

obviously there was uncertain times, I believe
that the expectation for the quarter was wound up
being about the same as it had been a week
earlier, just looking at the -- if you had just
looked at the loss in the portfolio.

Q.   And did that number as time went on
and the fourth quarter progressed, did that
number grow in terms of what you understood it to
be?

A.   The final number I believe was
$15.8 billion after tax, 20 something pre-tax.

Q.   And prior to the shareholders vote,
what was your recollection of the largest amount
of losses that you had an understanding of at
Merrill Lynch?

A.   I think people were talking about
something around a $5 billion, slightly higher
maybe after tax loss.

Q.   And that communication in terms of
the number of -- where did it come from generally
within Bank of America?

A.   We first learned about the October
losses from Tim Mayopoulos and it was Joe Price
who I remember giving detail, at least most of

214

                    Demmo - Confidential
1
2   the details on the number around November 20th.
3           Q.   And then subsequent to the
4   shareholder vote, when did you learn that it was
5   $15 billion?
6           A.   After the call on the 20th I heard on
7   December 12th, I believe it was a Friday evening,
8   that they were at a $14 billion number, which
9   I -- which was a pre-tax number.
10          Q.   The shareholder vote was on
11  December 5th?
12          A.   The shareholder vote was on
13  December 5th.
14          Q.   Did anybody from Wachtell go to it?
15          A.   Yes, I did along with one of my
16  associates.
17          Q.   And did you any understanding prior
18  to then as to whether Merrill was consulting with
19  Bank of America on the VICP in terms of
20  implementing the VICP for 2008?
21          A.   Well, obviously there are those
22  e-mails we looked at a little bit ago in
23  mid-November where the Bank of America people
24  were at least talking about that possibility --
25  talking about VICP.

# TAB 25

Edward D. Herlihy                        November 17, 2009

CONFIDENTIAL

Page 1

C O N F I D E N T I A L

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------

SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

       -against-                    09-CV-6829

BANK OF AMERICA CORP.,

                Defendant.

---------------------------------------

                November 17, 2009
                10:45 a.m.

Deposition of EDWARD D. HERLIHY, taken by

Plaintiff, pursuant to Subpoena, held at

Securities and Exchange Commission, Three

World Financial Center, New York, New York,

before Lisa Rosenfeld, a Shorthand Reporter

and Notary Public within and for the State

of New York.

Edward D. Herlihy                    November 17, 2009

CONFIDENTIAL

Page 150

1              Herlihy - Confidential
2     time -- were you asked -- did you ask any
3     attorneys at Wachtell to look into what is the
4     law on duty to update statements in filings with
5     the SEC, particularly proxy statements?
6              A.   No, I did not.
7              Q.   Why don't you take a look at Exhibit
8     118 and 119, and 118 is an exhibit -- is an
9     e-mail with an attachment from Eric Roth to Ed
10    Herlihy dated November 13th, 2008 and it's
11    forwarding an e-mail from Warren Stern dated
12    November 13th in which he writes "Here's my
13    memo," and attached is a memo dated August 25th,
14    1999 from Warren Stern to file, re Bank of
15    America affirmative disclosure duties under Rule
16    14a-9.
17              Why did Mr. Roth send you this
18    document?
19              A.   I think he sent it to me, which I've
20    never read it by the way, I think he sent it to
21    me because he was going to participate in a
22    conference call, we had to discuss disclosure
23    issues with Bank of America.
24              Q.   Who was that conference call with at
25    Bank of America?

Edward D. Herlihy                        November 17, 2009

CONFIDENTIAL

Page 151

1                    Herlihy - Confidential

2            A.    I think it was with Tim Mayopoulos,

3     Teresa Brenner, Joe Price and someone else that

4     used to work for Joe Price or two different

5     people that worked for Joe Price.

6            Q.    Now, the attached memo written by Mr.

7     Stern, and Mr. Stern -- let me rephrase the

8     question.  Mr. Stern is one of your partners, is

9     that right?

10           A.    Correct.

11           Q.    And he has a lot of experience in

12    litigation, isn't that right?

13           A.    Yes.

14           Q.    You wrote this memo in 1999, and

15    since that time did you ever read this memo?

16           A.    I never read it.

17           Q.    Do you have any understanding of

18    what's in this memo?

19           A.    I never looked at it.

20           Q.    Now, do you have any understanding of

21    what requirements are there under the law to a

22    duty to update under Rule 14a-9?

23           A.    That's a hypothetical I can't answer.

24    There's generally -- I don't know about 14a-9,

25    there's generally duties to update if you have

Edward D. Herlihy                        November 17, 2009

CONFIDENTIAL

1              Herlihy - Confidential

2    prior inconsistent statements out there.

3         Q.   But in doing your work as a corporate

4    lawyer, Rule 14a-9 is something that you often

5    have to consider, isn't that right?

6         A.   14a-9 deals with material

7    misstatements or representations and warranties

8    or omissions and statements of facts.  So it's an

9    anti-fraud provision that applies to disclosure

10   documents.

11        Q.   If you look at the second page of

12   this document, in the conclusion section of Mr.

13   Stern's memorandum, which is number point 2, he

14   says "Although not directly supported by the

15   language of Rule 14a-9 or any case, a court would

16   likely construe Rule 14a-9 to create such a duty.

17   Nevertheless we should preserve the point for

18   appeal."  Then the question presented was "Is

19   there a duty under the proxy rules to disclose a

20   material event occurring between the mailing of

21   the proxy statement and the meeting when the

22   proxy statement makes no statement that is

23   rendered false or misleading by the event."

24              Have you ever formed a view regarding

25   that question presented?

Edward D. Herlihy                    November 17, 2009
                    CONFIDENTIAL

---

Page 153

1               Herlihy - Confidential
2          A.   Look, I have never read this memo, I
3    haven't read it now, I didn't read what you just
4    said there.  There is a highly technical area, I
5    was not the author, I was not the recipient.
6    There are experts in our firm on there and I
7    think that's who the question should be addressed
8    to.  I'd like to be helpful but I don't think I
9    have anything of relevance to add on this.
10         Q.   But is it fair to say that in your
11   area of practice, one of the things that you do
12   is advise clients such as Bank of America on how
13   to comply with the federal securities laws when
14   doing corporate filings with the SEC?
15         A.   Yes, that's fair to say.
16         Q.   And is it fair to say that Bank of
17   America relies on Wachtell in terms of
18   understanding how to comply with Rule 14a-9 in
19   that transaction, the merger with Merrill Lynch?
20         A.   I don't know.  I mean of course if
21   they've come to us with questions or were
22   generally given advice, obviously they're
23   entitled to rely on us, and we would -- if we'd
24   give advice we'd stand behind them, and that's a
25   hypothetical I'm answering in a hypothetical way.

Edward D. Herlihy                           November 17, 2009
                      CONFIDENTIAL

                                                    Page 154
1              Herlihy - Confidential
2         Q.   Do you know did Wachtell give Tim
3    Mayopoulos or anyone else at Bank of America this
4    memorandum written by Warren Stern?
5         A.   I have no idea but I'll speculate and
6    I doubt it.  And as I was told about this
7    memorandum which I've never read, it was about
8    ten years old and related to a different matter
9    and different facts and circumstances.
10        Q.   Who told you that?
11        A.   I think Roth told me at the time that
12   there was -- that he was trying to find research
13   and he found some old dated, probably irrelevant
14   memorandum.
15        Q.   Have you seen any memorandums on the
16   duty to update a material event occurring between
17   the mailing of the proxy statement and the
18   meeting when the proxy statement makes no
19   statement that is rendered false or misleading by
20   the event?
21        A.   Have I seen such a memorandum related
22   to the Bank of America and Merrill situation?
23        Q.   Or any proxy statement.
24        A.   I certainly didn't with respect to
25   Bank of America/Merrill situation.  I have no

Edward D. Herlihy                    November 17, 2009
                    CONFIDENTIAL

1              Herlihy - Confidential
2     recollection of any other time.
3              Q.   In the period between when the proxy
4     statement went out and the Bank of America
5     shareholders voted, how much time approximately
6     passed?
7              A.   When was the proxy mailed?
8              Q.   The 14a filing is November 3rd and
9     the election.
10             A.   Everything was on the 5th so it was
11    about a month.
12             Q.   And during that period did you
13    consider if there were any material events that
14    needed to be updated to update the proxy?
15             MR. LIMAN:  Objection to form.
16             A.   Well, the question was raised with us
17    with respect to Mr. Mayopoulos and others in
18    mid-December related to forecasted loss for
19    October whether that required some special
20    disclosure.
21             MR. MALLOY:  I think you meant
22             mid-November.
23             A.   I meant mid-November, I keep
24    misstating the dates, I apologize.
25             Q.   Who worked on that analysis?

Edward D. Herlihy                                    November 17, 2009

CONFIDENTIAL

Page 156

```
 1              Herlihy - Confidential
 2         A.   I don't know if anyone worked on that
 3    analysis, the question was raised.
 4         Q.   Was it raised directly to you or to
 5    others at Wachtell?
 6         A.   The question came up, Mayopoulos --
 7    Mr. Mayopoulos called me and raised the question
 8    with respect to it and I think a decision was
 9    made to have a conference call where it would be
10    explained, and there was a conference call with
11    the people I mentioned and there was a discussion
12    at that time, and then about a week later there
13    was another call discussing the same subject.
14         Q.   And what advice did you guys give to
15    Bank of America on that issue?  What advice did
16    you give to Bank of America?
17         A.   I think our conclusion was, based on
18    everything we heard and presented, was that there
19    was no obligation to disclose the interim
20    forecast for the month of October.
21         Q.   Why was there no obligation?
22         A.   Well, I can't exactly recall, but
23    basically it was several factors.  One is that
24    Merrill Lynch had been losing money for like five
25    quarters, this was a projection for the month of
```

Edward D. Herlihy                           November 17, 2009
                        CONFIDENTIAL

Page 157

1              Herlihy - Confidential
2     October, I can't remember if it was a 4 to
3     5 billion dollar range, and the rest of the
4     quarter was forecasted to be flat, and Bank of
5     America had done sort of a detailed examination
6     of filings that had recently been made by both
7     them and -- by both Bank America and Merrill
8     shortly before they send their 10-Qs, and there
9     was a very strong cautionary language and trend
10    disclosure which gave everyone comfort that
11    investors and people were alerted to the current
12    market conditions and the plight that were facing
13    the company.
14              Q.   Were you at the shareholder vote on
15    December 5th?
16              A.   No.
17              Q.   Was anybody from Wachtell there?
18              A.   I believe Mr. Demmo went to the
19    meeting.
20              Q.   Did he report back to you on the
21    shareholder vote?
22              A.   I was away during that period of
23    time, I don't recall.  I know the vote was
24    received.
25              Q.   Now prior to December 5th, did you

# TAB 26

Ken Lewis                                    October 30, 2009

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------)
                              )
SECURITIES and EXCHANGE       )
COMMISSION,                   )
                              )
              Plaintiff,      )
                              )
         VS.                  )
                              )
BANK OF AMERICA,              )
                              )
              Defendant.      )
                              )
------------------------------)


VIDEOTAPED DEPOSITION OF KEN LEWIS

New York, New York

Friday, October 30, 2009


Reported by:
Robert X. Shaw, CSR
CSR NO. 817
JOB NO. 304938

Ken Lewis                                    October 30, 2009

1                     Ken Lewis

2          Q.   And how was that $3 billion

3     allocated?

4                That $3 billion was for the fourth

5     quarter?

6          A.   Correct.

7          Q.   And how was that allocated as

8     between the months?

9          A.   I don't recall the different, the

10    months, I just recall the quoted forecast.

11         Q.   Did Tim Mayopoulos receive this

12    handout?

13         A.   I don't know.

14         Q.   P-53.

15               (Plaintiff's Exhibit 53, documents

16         Bates Nos. 6332 to 37 , marked for

17         identification as of this date.)

18         Q.   This document is entitled Merrill

19    Lynch & Co. 2008 fourth quarter Pacing & FY

20    Forecast -- and four-year forecast Scenario

21    dated 12/3/2008, revised 6 p.m.

22         A.   Okay.

23         Q.   Mr. Lewis, did you receive a

24    revised version of the previous document that

25    we looked at with the numbers in it?

Ken Lewis                                October 30, 2009

Page 263

1                  Ken Lewis

2        A.    I can't recall if I received it or

3    heard about it, but I did know that it had

4    been revised.

5        Q.    Okay.  If you turn to the page that

6    says page 2 at the bottom, I believe you have

7    that.

8        A.    Yes.

9        Q.    Do you see that the revised fourth

10   quarter forecast there is $14 billion --

11       A.    Yes.

12       Q.    -- pre-tax and $8.9 billion post

13   tax --

14       A.    Yes.

15       Q.    -- and $4.8 billion for November?

16       A.    Correct.

17       Q.    Did Mr. Mayopoulos receive this

18   document?

19       A.    I don't know.

20       Q.    Did you have any discussions in

21   December, 2008, prior to the shareholder

22   vote, as to whether the proxy statement

23   should be updated to disclose these

24   additional losses?

25       A.    Yes.  Joe Price came to me two

Ken Lewis                                    October 30, 2009

1                    Ken Lewis
2    different times and said he had met with Tim
3    Mayopoulos, and they had discussed the issue
4    with, ah, with Wachtel Lipton, and that the,
5    and that the issue was, should these be in
6    the disclosure, should these be disclosed,
7    and Joe said that the, ah, that they said
8    there was not a disclosable item.
9         Q.   Who is the "they" in the "they
10   said"?
11        A.   They, the lawyers.
12        Q.   Tim Mayopoulos and Wachtel Lipton?
13        A.   Yes, and Wachtel Lipton.
14        Q.   And you said Mr. Price came to you
15   two times?
16        A.   Yes.
17        Q.   When were the two times?
18        A.   I can't recall the time of the
19   first one, but sometime around this time he
20   came to me a second time.
21        Q.   So, "this time" meaning December
22   3rd?
23        A.   Correct.  Sometime around here he
24   came again and said he had gone through the
25   same process and that the, ah, the same

Ken Lewis                                    October 30, 2009

1                    Ken Lewis

2      answer came back, it was not a disclosable

3      item.

4           Q.    The first time that he came to you,

5      was that before you had these specific

6      numbers?

7           A.    Um, yes.

8           Q.    And was that in November?

9           A.    I can't remember.

10          Q.    He indicated that the analysis was

11     -- was the analysis the same?

12          A.    Yes.

13          Q.    And what factors went into that

14     analysis?

15          A.    I had subsequently learned

16     probably, I can't remember if I knew then or

17     not, but there were a number of things that

18     Tim had done and Wachtel had done, and they

19     had reviewed the proxy to see if there was

20     disclosure around volatile instruments that

21     would be subject to price fluctuations.

22               They had gone back and looked at

23     the losses that had occurred prior to that,

24     of that year.

25               And there was the comment about the

705f152f-4975-4132-b529-6195faa3b4ec

Ken Lewis                                    October 30, 2009

Page 266

1                    Ken Lewis

2    fact that it was generally known in the

3    marketplace that there is a credit meltdown

4    going on.

5               I think there was a fourth one, and

6    I can't remember.

7         Q.   Did you have any direct

8    conversation with Mr. Mayopoulos on this

9    topic?

10        A.   No.

11        Q.   Did you have any direct

12   conversation with Wachtel Lipton?

13        A.   Not that I recall.

14        Q.   Did you, yourself, express any

15   position as to whether you thought this

16   information should be disclosed to

17   shareholders?

18        A.   No.  After that extensive ah --

19   dive into it, I would not think that I would

20   be qualified to say what was or what was not.

21        Q.   During the course of that

22   discussion, did you have any input as to what

23   your view was?

24        A.   No.  He gave me the results of

25   their analysis.

# TAB 27

Timothy J. Mayopoulos                    December 1, 2009

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------

SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,

          -against-                09-CV-6829

BANK OF AMERICA CORP.,

                    Defendant.

--------------------------------------

                    December 1, 2009
                    10:21 a.m.

Videotaped deposition of TIMOTHY J. MAYOPOULOS,

taken by Plaintiff, pursuant to Subpoena, held

at Securities and Exchange Commission, Three

World Financial Center, New York, New York,

before Lisa Rosenfeld, a Shorthand Reporter and

Notary Public within and for the State of New

York.

6c6dfb9e-c65b-45c6-a987-df67fbd49214

Timothy J. Mayopoulos                    December 1, 2009

Page 149

1                         Mayopoulos
2      to the direct report meeting notes on the front
3      page.
4              Q.   Mr. Mayopoulos, on the front page,
5      the list of names, you said the last one is
6      Grimes, is that right?
7              A.   That's right.
8              Q.   Would that be Brenner or could I be
9      misreading it?
10             A.   My handwriting is bad but it's not
11     that bad.  It's Grimes, not Brenner.
12             Q.   You should see mine.  Did there come
13     a time in the fourth quarter of 2008 where you
14     were advised of Merrill Lynch's financial
15     performance for the quarter?
16             A.   Yes.
17             Q.   When was that?
18             A.   Sometime around November the 12th I
19     was invited to a meeting with Joe Price and other
20     people, at which time I was advised that Merrill
21     Lynch was forecasted to have a 5 billion dollar
22     after-tax loss for the quarter, and at that -- my
23     recollection is that meeting, whether it was on
24     November 12th or sometime shortly after that, I
25     received a written forecast from Mr. Price.

Timothy J. Mayopoulos                    December 1, 2009

                    Mayopoulos

1

2         Q.    Did you seek out Mr. Price in

3    connection with that meeting or did he come to

4    you?

5         A.    I was asked to attend the meeting.

6         Q.    By him?

7         A.    I don't recall.

8         Q.    Do you recall specifically what he

9    told you about Merrill Lynch's financial

10   performance?

11        A.    What I remember is that he gave me a

12   copy of the forecast dated November 12th, walked

13   through the numbers, and it was summarized with

14   the statement that Merrill Lynch was forecasted

15   to have a 5 billion dollar after-tax loss for the

16   fourth quarter.

17        Q.    At the time were you aware of any

18   expectations within Bank of America for Merrill

19   Lynch's performance in the fourth quarter of

20   2008?

21        A.    I don't know what expectations people

22   had.

23        Q.    Were you told by Mr. Price or anybody

24   else that they expected Merrill Lynch on Merrill

25   Lynch's performance in the fourth quarter of 2008

6c6dfb9e-c65b-45c6-a987-df67fbd49214

Timothy J. Mayopoulos                December 1, 2009

1                        Mayopoulos

2    to be flat?

3          A.   Flat to what?

4          Q.   Meaning no losses, no earnings.

5          A.   I don't recall being told that.

6          Q.   Were you told that either Mr. Price,

7    Mr. Lewis or anybody else expected Merrill Lynch

8    to break even?

9          A.   I don't recall that.

10         Q.   You had mentioned that you received a

11   copy of a forecast after the November 12th

12   meeting, is that right?

13         A.   No, I said it was at the

14   November 12th meeting.

15         Q.   Who gave you that forecast?

16         A.   I believe Mr. Price did.

17         Q.   Did he explain to you what was in

18   that forecast?

19         A.   He walked through the numbers,

20   discussed it, yes.

21         Q.   Did he explain to you what the

22   drivers of Merrill's financial performance were?

23         A.   I don't recall.

24         Q.   Aside from the 5 billion dollar

25   figure that you had mentioned, do you recall

Timothy J. Mayopoulos                    December 1, 2009

Page 152

1                        Mayopoulos

2    anything else about the information given to you

3    by Mr. Price?

4          A.    I recall that the document had some

5    reference to losses for October, losses for -- or

6    results for November and then a forecast for the

7    entire quarter.

8          Q.    Was Mr. Price alarmed by the

9    situation at Merrill, so far as you could tell?

10         A.    He didn't seem to be alarmed.

11         Q.    Did he ask you whether or not --

12    strike that.  Did he tell you why he sought your

13    counsel in connection with Merrill's performance?

14         A.    He asked a question of me as to

15    whether there needed to be disclosure of these

16    projected losses in connection with the

17    disclosure to shareholders and the shareholder

18    vote on December the 5th.

19         Q.    What was your response at that

20    meeting?

21         A.    I don't think I gave him an answer at

22    the meeting.  I said I wanted to think about it

23    and talk with Wachtell Lipton about it, and I

24    subsequently had conferences with Wachtell.

25         Q.    Was there a reason that you wanted to

Timothy J. Mayopoulos                    December 1, 2009

Page 153

1                        Mayopoulos
2    consult Wachtell on it?
3          A.    I wanted their advice.
4          Q.    Was it because Wachtell was the firm
5    retained to work in connection -- on the merger
6    transaction?
7          A.    Well, that was one of the reasons.
8    They're also expert on these issues and I wanted
9    their advice, they were involved, they were
10   counsel to us in the transaction and they were
11   highly regarded securities lawyers.  So I wanted
12   their opinions.
13         Q.    Did Bank of America at the time have
14   regular disclosure counsel?
15         A.    Not that I recall.
16         Q.    Did you have any -- strike that.
17   Were you leaning in favor of disclosures as an
18   initial reaction after that meeting?
19         A.    I think my initial impression was
20   that $5 billion was a pretty big number and that
21   it warranted careful consideration of a
22   disclosure.
23         Q.    Anybody else attended the meeting
24   besides Mr. Price?
25         A.    Yes, it was Mr. Price, I think Mr.

Timothy J. Mayopoulos                    December 1, 2009

1                          Mayopoulos

2     number?

3               A.    Net after what?

4               Q.    After taxes.

5               A.    Net after taxes.

6               Q.    So your recollection is that on

7     November 12th you had been advised that Merrill

8     Lynch had $5 billion in net losses after taxes?

9               A.    It was forecasted to have $5 billion

10    in losses after taxes for the quarter.

11              Q.    Were you told how much of the

12    forecast of the $5 billion was actual losses for

13    the month of October 2008 and the first few days

14    of November 2008?

15              MR. BRESNAN:  Objection to the form.

16              A.    I don't recall a discussion about

17    that.  The document has some information that

18    refers to October and November, but as I sit here

19    I don't recall any discussion about that.

20              Q.    After the meeting with Mr. Price what

21    did you do next?

22              A.    With respect to this issue, my

23    recollection is that I had conversations with

24    Wachtell Lipton.  I had several conversations

25    with them, I'm not sure at this point I can

Timothy J. Mayopoulos                    December 1, 2009

Page 158

1                       Mayopoulos

2    really differentiate among them, but the couple

3    of days after this meeting I had conversations

4    with Wachtell Lipton to tell them -- with Ed

5    Herlihy and Nick Demmo to tell them that I wanted

6    their advice on this issue and we had discussions

7    about that.

8         Q.    Who did you talk to at Wachtell

9    besides Mr. Herlihy?

10        A.    Mr. Herlihy and Mr. Demmo and I think

11   Eric Roth, the litigation partner, may have been

12   involved in at least one of the discussions.

13        Q.    At the time did you know Mr. Roth?

14        A.    I think I had dealt with him on

15   something else.  We had litigated in the

16   Netherlands with respect to our acquisition of

17   LaSalle and I think he was involved with that.

18   So I had some familiarity with him.  And I think

19   he was also handling some litigation that had

20   been kind of inevitable litigation that comes

21   after the announcement of any major merger that

22   had been filed in Delaware Chancery Court, so he

23   was handling that on the Merrill Lynch

24   transaction.

25        Q.    Let me show you what I marked as

Timothy J. Mayopoulos                December 1, 2009

Page 159

1                          Mayopoulos
2       Plaintiff's Exhibit 161.
3                    (Plaintiff's Exhibit 161, Set of
4              notes, first page bearing Bates number
5              HOGR-WLRK 502919, was so marked for
6              identification.)
7                    MR. BORYSHANSKY:  This is a set of
8              notes and it doesn't -- the Bates number
9              on these is not consecutive.  These are
10             not necessarily consecutive notes.  The
11             front page is Bates stamped HOGR-WLRK 502
12             and the number is 919.  The second page
13             has the same Bates stamp but the number on
14             it is 924.
15                   Q.   Mr. Mayopoulos, let me direct your
16      attention to the first page of the exhibit.  Is
17      that your handwriting?
18                   A.   No, it's not.
19                   Q.   On the top of the page there's
20      handwritten notes of a meeting that took place on
21      November 13th, and the attendees appear to be Mr.
22      Herlihy, Mr. Demmo and other people.  At the
23      bottom of that in the middle of the page there's
24      a notation at the bottom of the meeting notes
25      that reads "Tim Mayopoulos assumed November

Timothy J. Mayopoulos                    December 1, 2009

Page 160

1                          Mayopoulos

2      better worry about not disclosing," do you see

3      that?

4          A.    Yes.   I see it's also in the little

5      box over there on the right.

6          Q.    Which is not our tampering with the

7      document.   Do you recall conversations with

8      Wachtell attorneys on November 13th where you

9      expressed a concern about not disclosing the

10     Merrill Lynch's -- the Merrill Lynch projected

11     losses that you had been advised of?

12         A.    Well, I don't recall any discussion

13     that involved Mr. Wasserman and I don't know who

14     Shapiro is, so I don't know if this is notes of a

15     conversation that these folks had with me because

16     I don't recall having a conversation with this

17     group of people.

18               I do recall having discussions around

19     November the 13th with Wachtell Lipton in which,

20     as I say, I expressed to them that I thought that

21     we needed to give very serious consideration to

22     whether we needed to make a disclosure or not.

23         Q.    Did you have a particular concern

24     about the ramifications of not making a

25     disclosure?

6c6dfb9e-c65b-45c6-a987-df67fbd49214

Timothy J. Mayopoulos                    December 1, 2009

1                          Mayopoulos
2          A.    Well, I certainly thought about the
3     issue of if we had something that should be
4     disclosed and we shouldn't disclose it, that that
5     wouldn't be the appropriate thing to do, and
6     beyond that, the company could have potential
7     legal liability.
8          Q.    If you look at the second page at the
9     bottom, are those your handwritten notes on this
10    page?
11         A.    No.
12         Q.    This page refers also to another
13    meeting on November 13th and it lists your name
14    as well as Ed Herlihy's, Nick Demmo's and I think
15    it's Teresa Brenner.  On the bottom there's a
16    notation "Tim all agree there must be" -- "all
17    agree, must be some disclosure," do you see that?
18         A.    If you tell me that's what it says,
19    I'll accept your representation.  I personally
20    can't make out the words.
21         Q.    Do you recall telling Wachtell
22    attorneys that you thought there must be some
23    disclosure of Merrill Lynch's losses or projected
24    losses as you had been advising them?
25         A.    No, I don't recall doing that.  I

Timothy J. Mayopoulos                    December 1, 2009

Page 162

1                        Mayopoulos
2    recall telling the Wachtell lawyers that I
3    thought we needed to give serious consideration
4    to possible disclosure.
5            Q.   Did you at any point after the
6    meeting with Mr. Price reach a tentative
7    conclusion that there must be some form of
8    disclosure?
9            A.   No.   I had an initial reaction that I
10   thought disclosure might be well warranted, but
11   at that point I hadn't done any analysis to sort
12   of reach a conclusion.   There was no point after
13   I did the analysis that I had the conclusion that
14   there should be a disclosure.
15           Q.   Aside from the size of the projected
16   losses that you had been advised of, was there
17   any other reason that prompted you to think that
18   disclosure might be appropriate initially?
19           A.   No, I think I was really focused on
20   the size of the losses.   But at that time I
21   hadn't gathered any more information to know how
22   that number related to Merrill Lynch's prior
23   experience.
24           Q.   In your conversations with the
25   Wachtell attorneys, did anyone express a view

Timothy J. Mayopoulos                    December 1, 2009

1                         Mayopoulos
2     that there must be some form of disclosure?
3          A.    Not that I recall.  I recall that
4     there was some discussion about potential types
5     of disclosure that could be made, but I don't
6     recall anybody reaching a conclusion that there
7     needed to be disclosure.
8          Q.    What types of disclosure were being
9     discussed?
10          A.    I think Mr. Herlihy might have
11     mentioned the possibility of some sort of trend
12     disclosure, but to my knowledge none of us had
13     actually done the analysis necessary to figure
14     out whether that would make sense or not and
15     nobody had actually sat down, as far as I knew,
16     prepared what that kind of disclosure might look
17     like.
18          Q.    What is that kind of disclosure, a
19     trend analysis?
20          A.    Well, I guess it depends who you're
21     talking about, but, you know, some lawyers would
22     use that to refer to describe a trend of events
23     or likely direction of market events.  So in this
24     context I understood Mr. Herlihy to be suggesting
25     the possibility of perhaps disclosing that

Timothy J. Mayopoulos                    December 1, 2009

1                    Mayopoulos
2     Merrill Lynch was having a particular trend with
3     respect to its experience on its earnings or
4     losses.
5          Q.    Did you agree in your discussions
6     with Wachtell attorneys that you would do
7     additional analysis into whether or not
8     disclosure was required?
9          A.    I don't remember reaching agreement
10    with them that I would do additional analysis.
11    What I remember is that I told them that I wanted
12    them to do some work on it and to think about it
13    and do whatever they thought was necessary and
14    that we needed to have further discussions about
15    it.  And I decided myself that I was going to
16    look at this issue and gather up information that
17    I thought was relevant and important.
18         Q.    What work did you want Wachtell
19    attorneys to do?
20         A.    I wanted them to do whatever they
21    needed to do to be able to give me an informed
22    opinion about what we should do.
23         Q.    Did they ask you for any information
24    about Merrill's financial situation?
25         A.    Did they ask me?