Timothy J. Mayopoulos                    December 1, 2009

1                        Mayopoulos

2          Q.    Yes.

3          A.    Not that I recall.

4          Q.    Who conveyed the information about

5    Merrill's projected losses to the Wachtell

6    attorneys at the time?

7          A.    I don't remember.  There's some of

8    the notes I've seen suggested that perhaps I gave

9    them some of the information orally but I don't

10   remember it.

11         Q.    Was Mr. Price present at any of the

12   conversations you've had with Wachtell attorneys?

13         A.    Not in this time period.  There was a

14   discussion he was a part of on November the 20th.

15         Q.    Was anybody else from Bank of America

16   who was not a lawyer or a businessperson who was

17   present in your conversations with Wachtell

18   attorneys on November 12th and 13th.

19         A.    I recall at some point in here there

20   was a discussion that Greg Curl and I had with Ed

21   Herlihy and I don't recall all the specifics of

22   that.  But there was at least that conversation

23   where there was a businessperson participating in

24   the discussion with Mr. Herlihy.

25         Q.    Do you recall what Mr. Curl said in

Timothy J. Mayopoulos                    December 1, 2009

1                      Mayopoulos

2    that conversation?

3         A.   No, as I said, I don't -- I recall

4    sitting in his office and talking to Herlihy but

5    I don't remember specifically what we talked

6    about.

7         Q.   What did you do between -- after

8    November 13th and the conversations you've had

9    with Wachtell?

10        A.   What did I do after that?

11        Q.   Next, right.

12        A.   Next, well, I asked Teresa Brenner

13   and some other people to gather up some

14   information for me.  I wanted to see what Merrill

15   Lynch's earnings had looked like for the last

16   four or five quarters, I wanted to see the proxy

17   statement, I wanted to see the disclosure

18   documents that were incorporated by reference

19   into the proxy statement.  I wanted to look at

20   those to see what kinds of disclosures had

21   previously been made to shareholders.

22             And I recall asking Ms. Brenner I

23   think to look specifically at the materials

24   announcing the merger and to see whether we or

25   Merrill Lynch had made any projections in the

Timothy J. Mayopoulos                December 1, 2009

1                       Mayopoulos

2    announcement about Merrill's possible future

3    performance.

4         Q.    Did you ask Ms. Brenner or anybody

5    else to collect any additional materials for you?

6         A.    Those are the ones I remember.

7         Q.    Why did you ask Ms. Brenner to

8    collect prior earnings of Merrill Lynch for you?

9         A.    Because I wanted to understand how

10   this 5 billion dollar number related to what

11   Merrill Lynch's historical experience had been.

12   I knew just as a matter of knowledge about the

13   industry that Merrill had had significant losses

14   but I didn't remember what those losses were.  So

15   I wanted to know going back to the time, the

16   financial crisis had started in August 2007, what

17   Merrill's performance had been because I wanted

18   to see how this 5 billion dollar number had

19   related to its experience before this financial

20   crisis had started.

21        Q.    Did Ms. Brenner collect that

22   financial information for you?

23        A.    I don't remember whether she did or

24   somebody else did but I remember receiving that

25   information.

6c6dfb9e-c65b-45c6-a987-df67fbd49214

Timothy J. Mayopoulos                    December 1, 2009

1                          Mayopoulos
2                  (Plaintiff's Exhibit 162, Document
3              bearing Bates numbers BAC-ML-NYAG 502896
4              through 97, was so marked for
5              identification.)
6          Q.    Let me show you what I've marked as
7     Plaintiff's Exhibit 162.  It's a two-page
8     document, the Bates number on it is BAC-ML-NYAG
9     502896 through 97.  The front page is an e-mail
10    from David Belk to Greg Curl, Joe Price and Tim
11    Mayopoulos dated November 19, 2008.
12                  Mr. Mayopoulos, do you recall
13    receiving this e-mail?
14         A.    I don't specifically recall this
15    e-mail but this was the information that I had
16    asked for and I recall that I did receive it.
17         Q.    Did you review this information when
18    you got it?
19         A.    Yes.
20         Q.    And did you do that in connection
21    with your assessment as to whether or not
22    Merrill's projected financial performance had to
23    be disclosed?
24         A.    Yes.
25         Q.    And what was your reaction to the

Timothy J. Mayopoulos                    December 1, 2009

Page 169

1                        Mayopoulos

2      information that is attached to Mr. Belk's

3      e-mail?

4           A.    My reaction was that Merrill Lynch

5      had suffered multibillion dollar losses for every

6      quarter for the last five quarters going back to

7      the third quarter of 2007.  That those losses had

8      ranged from anywhere from about $2 billion to

9      $10 billion.  My reaction when I saw this was

10     while $5 billion is a big number in the context

11     of the trend of Merrill Lynch's past performance,

12     it was par for the course.

13          Q.    You mentioned that you also asked Ms.

14     Brenner to collect for you disclosure documents

15     that were incorporated by reference in the proxy

16     filing.  Do you recall which documents those were

17     in particular?

18          A.    I don't know that I recall exactly.

19     My recollection is that it included the quarterly

20     filings and went back to the last 10-K that each

21     company had filed as well as the Qs for the

22     first, second and third quarters.

23          Q.    Those were the filings for both

24     Merrill Lynch and Bank of America?

25          A.    Yes.

Timothy J. Mayopoulos                    December 1, 2009

1                          Mayopoulos

2          Q.    And you reviewed both?

3          A.    I believe so.

4          Q.    And what was your reaction to the

5    information contained in those filings?

6          A.    I thought that the disclosures made

7    by both companies made it very clear that

8    financial institutions, including Merrill Lynch,

9    were facing extremely difficult circumstances,

10   that these were really unprecedented times, that

11   Merrill and other institutions had suffered very

12   significant losses, and that there was absolutely

13   no suggestion that things were getting better.

14   If anything, things were getting worse.

15          And so my reaction was that investors

16   reading these disclosures would conclude that

17   there was no reason to think that Merrill's

18   financial performance in the fourth quarter of

19   2008 would be any better and might actually be

20   worse than it had been over the prior four or

21   five quarters.

22          Q.    Do you recall if any of the filings

23   you had reviewed contained forward looking

24   statements about Merrill Lynch's financial

25   performance?

Timothy J. Mayopoulos                    December 1, 2009

1                          Mayopoulos
2          A.    My recollection is that I asked Ms.
3      Brenner to look at whether Bank of America or
4      Merrill had made any statements about or
5      projections about Merrill's possible future
6      financial performance such that there might be
7      some duty to correct those, and I believe her
8      conclusion was there were no such statements, and
9      as I reviewed the materials I did not conclude
10     that there were any such statements.
11         Q.    Did you -- strike that.  In any of
12     the filings that you had reviewed do you recall
13     seeing information about -- projections about the
14     capital ratios of the combined companies?
15         A.    I recall that one of the things we
16     ended up looking at as part of this discussion
17     was issues about tier 1 capital, and I think
18     there were some statements about what tier 1
19     capital ratio of the combined company was likely
20     to be following the merger.  And I recall that we
21     asked, I asked and I think Mr. Price asked the
22     finance department to take a look at and do some
23     analysis around that issue, and I don't -- my
24     recollection about this isn't as clear as the
25     earnings issues but I think we ended up

Timothy J. Mayopoulos                    December 1, 2009

1                         Mayopoulos
2      concluding that on the capital ratio issue that
3      we didn't think that there was additional
4      information that should be disclosed.  Based on
5      that analysis that was done by the finance
6      department.
7              Q.   Who in the finance department did
8      that analysis, do you know?
9              A.   My recollection is Craig Rosato and
10     Randy Shearer were involved with that.
11             Q.   Was the purpose of their analysis to
12     see whether Merrill's projected losses would have
13     an impact on the tier 1 capital for the combined
14     companies?
15             A.   I don't remember if it was just the
16     projected losses or whether there were other
17     factors involved, but I remember they looked at
18     the question of tier 1 capital.
19             Q.   Did Mr. Rosato and other people in
20     the finance department conclude that the
21     projected losses would have no impact on the
22     capital ratio for the combined company?
23             A.   I don't remember exactly what they
24     concluded.  I remember that I think we concluded
25     that the result was such that we didn't think we

Timothy J. Mayopoulos                    December 1, 2009

Page 173

1                           Mayopoulos
2    needed to make an additional disclosure.
3          Q.   Do you recall what specifically they
4    had -- after conducting their analysis they had
5    conveyed either to you or to Mr. Price?
6          A.   I don't remember the numbers.  I
7    remember we talked about the numbers and I recall
8    that I think they may have actually reviewed
9    their analysis with us, but I don't remember
10   specifically what was said about it.
11         Q.   Who concluded that -- after they
12   conducted their analysis, who concluded that no
13   disclosure was required, was it them or was it
14   somebody else?
15         A.   I think it was all of us
16   collectively.
17         Q.   When you say all of us, you mean
18   yourself, Mr. Price and Craig Rosato and anybody
19   else?
20         A.   Yes.  And my recollection is that we
21   also discussed this issue with Wachtell Lipton.
22         Q.   Specifically the issue of whether or
23   not there was some duty to correct prior
24   statements concerning the combined company's
25   tier 1 capital ratio?

Timothy J. Mayopoulos                    December 1, 2009

Page 174

1                          Mayopoulos

2          A.    That's my recollection.

3          Q.    Who from Wachtell, do you recall?

4          A.    It was Mr. Herlihy and Mr. Demmo who

5    were involved in these discussions.

6          Q.    As part of those discussions about

7    that particular topic, did anyone express a view

8    that the company should come out and disclose

9    Merrill's projected losses for the fourth quarter

10   because of a possible impact on the tier 1

11   capital ratio?

12         A.    No.

13         Q.    What was the reason that it was

14   concluded that no disclosure had to be made in

15   connection with the capital ratio for the

16   combined companies?

17         A.    As I said, I don't remember the

18   specifics of the results of the analysis but my

19   recollection is that the analysis showed that it

20   wasn't an impact that was sufficient to change

21   the result.

22         Q.    You also mentioned that you had

23   reviewed the materials announcing the merger as

24   part of your analysis in determining whether or

25   not Merrill's projected losses had to be

6c6dfb9e-c65b-45c6-a987-df67fbd49214

Timothy J. Mayopoulos                    December 1, 2009

1                         Mayopoulos

2    disclosed.

3         A.    Yes.

4         Q.    What was -- did you review those

5    materials?

6         A.    I think so.

7         Q.    And what was the reaction to those?

8         A.    They were brief and my recollection

9    is that the lawyers who had reviewed the

10   materials had been careful that there would not

11   be any statements about possible future

12   performance of the combined company or Merrill

13   Lynch, and that my review of the materials showed

14   that there wasn't anything in those materials

15   such that we had a duty to correct it or update

16   it.

17        Q.    Let me show you what I previously

18   marked as -- what has been previously marked as

19   Plaintiff's Exhibit 123.  The top e-mail, Mr.

20   Mayopoulos, is from David Belk to you, do you see

21   that?

22        A.    Yes.

23        Q.    Who is David Belk?

24        A.    David Belk is a person who worked for

25   Mr. Curl in the corporate strategy group.

Timothy J. Mayopoulos                    December 1, 2009

Page 176

1                          Mayopoulos
2          Q.    He's forwarding to you an e-mail from
3    Harrison Thurston, do you know who that is?
4          A.    Yes.  He was the junior member of Mr.
5    Curl's team, he worked for -- he worked with Mr.
6    Belk.
7          Q.    Mr. Thurston wrote "Attached is the
8    spreadsheet showing analysis EPS estimates for
9    Merrill, Goldman Sachs and Morgan Stanley."
10         A.    Yes.
11         Q.    And Mr. Belk forwarded that
12   information to you.  Did you ask for that
13   information?
14         A.    Yes, I think I did.
15         Q.    And did you ask for it as part of
16   your analysis as to whether or not a disclosure
17   had to be made on Merrill Lynch's financial
18   performance for the fourth quarter?
19         A.    I was interested in seeing --
20         Q.    Let me ask that question again.  Did
21   you ask for this information, Mr. Mayopoulos, as
22   part of your analysis into whether or not a
23   disclosure had to be made of Merrill Lynch's
24   projected financial performance for the quarter?
25         A.    Yes, I wanted to see what the

Timothy J. Mayopoulos                    December 1, 2009

1                         Mayopoulos
2      analysts were estimating for these companies.
3           Q.    Why did you want to get that
4      information?
5           A.    I thought it might help inform me as
6      to whether investors would think that disclosure
7      about a 5 billion dollar loss for the quarter
8      would change the mix of information available to
9      them.
10          Q.    Do you recall if you reviewed that
11     information after you got it?
12          A.    I think I look at it but I don't
13     think I could draw any conclusions from it.
14          Q.    Why not?
15          A.    It seems the analysts were all over
16     the lot and didn't really lead me to any
17     particular conclusions.
18          Q.    If you'll turn to the page with the
19     Bates ending 884.  It appears to describe analyst
20     estimates for Merrill Lynch with the measure
21     being net income, do you see that?  It's the
22     second line from the top.
23          A.    I see measure as net income, yes.
24          Q.    What does the period quarter 1 mean,
25     do you know?

Timothy J. Mayopoulos                    December 1, 2009

Page 178

1                         Mayopoulos
2          A.    It might mean quarter 1, 2009.
3          Q.    There's a list of brokers in the
4    middle of the page on the left side, UBS,
5    Oppenheimer, Buckingham Research, J.P. Morgan, do
6    you see that?
7          A.    Yes.
8          Q.    Are those the analysts whose reports
9    about Merrill were being summarized in this
10   document?
11         A.    I think so.
12         Q.    Am I reading this correctly to
13   suggest that the analyst -- the average analyst
14   estimate for Merrill Lynch's net income in the
15   first quarter of 2009 was a positive gain of
16   $55 million?
17         A.    Where are you seeing that?  Where it
18   says average?
19         Q.    Right, where it says average, just
20   below the current column.
21         A.    Yes.
22         Q.    And the median 391 million, do you
23   see that?
24         A.    Uh-huh.
25         Q.    Am I reading this correctly?

Timothy J. Mayopoulos                    December 1, 2009

1                        Mayopoulos

2        A.    I think that's what it says, but you

3    also see that there's a very wide range of

4    projections there from, you know, some

5    significant positive numbers, some significant

6    negative numbers.

7        Q.    Do you recall if the fact that some

8    analysts who estimated Merrill Lynch is going to

9    make a profit in the fourth quarter of 2008 were

10   discussed in any of the meetings you had after

11   November 12th concerning Merrill Lynch's

12   financial performance for the quarter?

13       A.    The only discussion I recall about

14   this is a discussion that the analyst reports

15   didn't seem to link to any particular conclusion.

16       Q.    Who did you have that discussion

17   with?

18       A.    It was one of these discussions that

19   in this week between the 12th and the 20th but I

20   don't remember specifically.

21       Q.    In addition to the document that is

22   attached to Mr. Belk's e-mail, did you review any

23   additional information relating to analyst

24   testaments from Merrill Lynch?

25       A.    No, I think at the time I realized

Timothy J. Mayopoulos                    December 1, 2009

1                       Mayopoulos
2      that analysts might be all over the map to where
3      in the world we might be going, and when I looked
4      at what the historical disclosures had been and
5      when I looked at what the disclosures had been
6      that had went to shareholders, it seemed to me
7      that in many ways analysts were being more
8      optimistic than anybody had any reasonable right
9      to be, given what past experience had been given
10     and what the disclosures were.  I guess in
11     hindsight it turns out they were wrong.
12             Q.   It's not the first time.  Let me show
13     you, Mr. Mayopoulos, what I'm going to mark as
14     Plaintiff's Exhibit 163.
15                  (Plaintiff's Exhibit 163, Set of
16                  handwritten notes, was so marked for
17                  identification.)
18             Q.   Which is a set of handwritten notes.
19     I am going to represent to you, Mr. Mayopoulos,
20     that the note on the top of the first, third and
21     I think it's the fifth page where it says
22     "Mayopoulos" is mine and not come to us with the
23     document.
24             A.   I don't see those on my copy.
25                  MR. BRESNAN:  It's on some but not

Timothy J. Mayopoulos                    December 1, 2009

1                    Mayopoulos

2          others.

3                    MR. LIMAN:  I think you've

4          distributed both types.

5          A.    The one that's marked as an exhibit

6    doesn't have that on it.

7          Q.    That's the important version and

8    that's clean.  The three sets of notes in this

9    package or four sets of notes for meetings on

10   November 18th, let me just identify this document

11   for the record and then I'll ask you questions

12   about some of these notes.  It's multipage, the

13   Bates on it is BAC-ML-NYAG 5021097 through 1103.

14                    Mr. Mayopoulos, the notes on the

15   front page of this document, are those yours?

16         A.    I think all of these notes in this

17   exhibit are in my handwriting.

18         Q.    The first page has an entry on I

19   think it's like it's the second paragraph from

20   the top that reads I think "Comp," am I

21   misreading that, it's in the middle of the page

22   just a little above the middle.

23         A.    Yes, I think it says c-o-m-p, yes.

24         Q.    And can you read to me what comes

25   after that?

Timothy J. Mayopoulos                    December 1, 2009

1                         Mayopoulos
2           A.    "Call RB regarding data for others.
3    Guidance to others."
4           Q.    What is the reference to RB about?
5           A.    I'm trying to remember.  I don't
6    remember.  I have a vague recollection that there
7    was a consultant that did some work for Bank of
8    America's investment bank on compensation issues,
9    that Bill Caccamise, who is a senior lawyer for
10   that group, had told me about, and had encouraged
11   me to call that person to see if I couldn't get
12   some marketing intelligence as to what
13   compensation levels were likely to be for legal
14   department personnel in 2008.
15           This might refer to that but I can't
16   remember what RB is.  I don't think this has
17   anything to do with Merrill Lynch.  I think this
18   has to do with Bank of America compensation for
19   the legal department.
20           Q.    You answered my next question.  If
21   you'll go to paragraphs below that or two items
22   below that, there's an item entitled
23   "Disclosure," do you see that?
24           A.    Yes.
25           Q.    The first line below that reads is

Timothy J. Mayopoulos                    December 1, 2009

1                          Mayopoulos

2      that "DTA issue"?

3           A.    Yes.

4           Q.    Do you know what that refers to?

5           A.    I think it refers to deferred tax

6      asset issue, which was some issue that related to

7      Merrill Lynch that was part of the discussion

8      that Mr. Price had had with me and others as you

9      walked through this projected fourth quarter

10     loss, and somehow this deferred tax asset had an

11     impact on that analysis.  I don't remember today

12     what the impact was or how it impacted it.  But I

13     think that's what that refers to.

14          Q.    Can you read to me what the line

15     below that reads.  Is it "Earnings" and

16     "Capital"?

17          A.    "Earnings, Capital," underneath that

18     it says "Consensus, Historical, '34 Act Filings,

19     Litigation Exposure."

20          Q.    What is the reference to litigation

21     exposure about?

22          A.    I think that was -- this is a to-do

23     list that I wrote to myself and I think these

24     all, including the litigation exposure reference,

25     are things for me to consider and think about as

Timothy J. Mayopoulos                    December 1, 2009

1                           Mayopoulos
2       I considered the disclosure issue.  Litigation
3       exposure in particular would be what was the
4       litigation risk of making a disclosure, and if
5       you got it wrong and what was the risk of not
6       making a disclosure.
7               Q.    What do you mean litigation exposure
8       if you get it wrong?
9               A.    In the context of this particular
10      matter if we had, for example, disclosed that we
11      were projecting a fourth quarter loss for Merrill
12      Lynch at $5 billion after taxes and it turns out
13      that, just to pick a number, if the number was
14      $15.1 billion, you would likely get sued because
15      shareholders would say you misled them as to what
16      the extent of the losses was likely to be.
17              Q.    Would there be any litigation
18      exposure with a disclosure of a trend analysis?
19              A.    Could there be, plaintiff's lawyers
20      are creative people, they can bring lawsuits
21      based on lots of things.  I do think that if you
22      put out a trend disclosure and you said we think
23      the trend is that we're going to have a loss of
24      $5 billion and it turns out you had a loss of
25      $15 billion, somebody would say you misled us in

Timothy J. Mayopoulos                    December 1, 2009

1                    Mayopoulos
2    describing what the trend was.
3         Q.    Did you consider putting out a
4    disclosure that would say the losses are going to
5    be no less than what you had been advised by Mr.
6    Price or other people at Bank of America's
7    finance department?
8         A.    I don't recall specifically
9    considering that but I don't frankly know how we
10   would have made that disclosure considering that
11   we still would have had a substantial portion of
12   the quarter left to go, and I don't think you
13   could say that you knew for certain that the
14   losses would not be less than a particular amount
15   of money.
16        Q.    But is it fair to say that as of
17   November 12th you were informed -- advised that
18   Merrill Lynch had sustained a -- actual losses in
19   the month of October of certain -- of
20   multibillion dollars?
21        A.    Yes.
22        Q.    Did you consider putting out a
23   disclosure about that?
24        A.    I don't recall specifically
25   considering that, I think the focus was around

Timothy J. Mayopoulos                    December 1, 2009

1                         Mayopoulos

2     the projection for the entire quarter, but I

3     guess from my perspective from a trend analysis

4     the last five quarters showed what the trend was.

5     I mean it wasn't like you needed a new report

6     about what October was.  You had five quarters of

7     multibillion dollar losses.  What was reporting

8     on October going to tell you that the last five

9     quarters didn't tell you that ranged anywhere

10    from 2 to $10 billion.

11            Q.    Mr. Mayopoulos, if you can turn to

12    the page that ends with Bates number 1101.

13            A.    By the way, on this issue I think as

14    a practical matter, and we always try to be very

15    practical as we thought about these issues, if

16    you put out a disclosure that says we think that

17    we will have a loss of no less than, pick a

18    number, $5 billion, the fact that you framed the

19    disclosure in the context of $5 billion,

20    investors will say that you were signaling to us

21    that the loss would be in that ballpark.  That it

22    wouldn't be in some very different zip code like

23    $15 billion.  So in the practical world of

24    disclosure, I think that's an important

25    consideration.

6c6dfb9e-c65b-45c6-a987-df67fbd49214

Timothy J. Mayopoulos                                    December 1, 2009

1                            Mayopoulos
2                 I think the other practical
3     consideration you have to think about is if you
4     put out a disclosure that says the losses will be
5     no less than $15 billion, the first thing you're
6     going to get asked by analysts is, well, you
7     think it's going to be at least $5 billion, if I
8     said 15 I meant 5.  If you think the loss is
9     going to be at least $5 billion, how much bigger
10    than that do you think it can get.  I mean it
11    doesn't just stop with putting out a statement
12    and saying we're not going to answer any
13    questions about this.  It provokes or instigates
14    inquiries from the marketplace, and you have to
15    be prepared for that and decide what you're going
16    to do.
17                 And I think for that reason many
18    companies make a judgment that unless they have
19    something specific and reliable that they can
20    make a disclosure to the marketplace, they don't
21    think that what they're disclosing is going to
22    change the mix of information, they choose to be
23    silent rather than to put out something that they
24    then assume a duty to correct and update as
25    circumstances change.  That's why companies

Timothy J. Mayopoulos                    December 1, 2009

Page 188

```
1                       Mayopoulos
2     report on a quarterly basis.
3          Q.    Were any of those considerations part
4     of your analysis back in November 2008?
5          A.    Yes.
6          Q.    Did you discuss any of them with
7     anyone at the bank or at Wachtell?
8          A.    I think we discussed some issues with
9     Wachtell and I think we specifically discussed in
10    one of our conversations just what do we think
11    this disclosure would look like, and I think we
12    all wrestled with what does the disclosure look
13    like, just what would we say, and I don't think
14    we came to any resolution that was particularly
15    satisfying.
16         Q.    If you turn to the last page of the
17    document, Mr. Mayopoulos, actually the
18    second to the last, there are notes of a meeting
19    that appears to have included Greg Curl, Ed
20    Herlihy and Nick Demmo.  Do you see that?
21         A.    Yes, I do.
22         Q.    Do you recall this meeting?
23         A.    Not specifically.  I think this is
24    the meeting I was thinking about that I mentioned
25    earlier where I said I think I had some
```

Timothy J. Mayopoulos                    December 1, 2009

1                    Mayopoulos

2    discussions with Mr. Curl and Mr. Herlihy.  You

3    asked whether any businesspeople had been

4    involved and I have a vague recollection of this

5    meeting in terms of Mr. Curl kind of running

6    through some of these numbers, which I'm not sure

7    I actually had in front of me because I think

8    this is my effort to take down some numbers, but

9    judging by my notes, I don't think I was being

10   very effective at that.  But I don't -- other

11   than my notes here, I don't have a specific

12   recollection of the conversation.

13        Q.    We discussed earlier the analyst

14   estimates that you had asked to review as part of

15   your analysis, do you recall that?

16        A.    Yes.

17        Q.    There's a reference at the top of the

18   page to consensus, is that through the analyst

19   estimates?

20        A.    I think so, but I'm not sure where

21   these numbers came from.  I think this is Mr.

22   Curl kind of rattling off some numbers but I

23   can't tell you that I remember that specifically.

24        Q.    Do you recall any conversations with

25   Mr. Curl or anybody else at that meeting

Timothy J. Mayopoulos                    December 1, 2009

1                        Mayopoulos

2      concerning the fact that Merrill Lynch's analyst

3      consensus was positive?

4           A.    I don't remember that.

5                MR. BORYSHANSKY:  Why don't we take a

6           quick break so the videographer can change

7           the tapes.

8                THE VIDEOGRAPHER:  The time is 3:27.

9           This ends tape number four of the

10          videotaped deposition of Tim Mayopoulos.

11               (Recess taken)

12               THE VIDEOGRAPHER:  The time is 3:47.

13          This begins tape number five of the

14          videotaped deposition of Mr. Tim

15          Mayopoulos.

16     BY MR. BORYSHANSKY:

17          Q.    Mr. Mayopoulos, before we took a

18     break you had testified about a number of

19     meetings that you had with Wachtell attorneys to

20     discuss Merrill Lynch's projected losses in the

21     fourth quarter of 2008 and whether or not a

22     disclosure had to be made concerning those

23     losses, do you remember that?

24          A.    Yes.

25          Q.    What was the conclusion that was

Timothy J. Mayopoulos                    December 1, 2009

1                          Mayopoulos

2      arrived at as a result of these meetings?

3           A.    Well, we ultimately had a discussion

4      on November the 20th with Mr. Price, myself, Ms.

5      Brenner, Wachtell Lipton lawyers, perhaps some

6      others, and we concluded in that discussion that

7      no further disclosure was warranted.

8           Q.    What were the reasons that you had

9      reached that conclusion?

10          A.    There were several reasons, one was

11     that, as I mentioned earlier, we didn't believe

12     there were any prior statements about Merrill

13     Lynch's projected or future performance that

14     required a further disclosure to update them or

15     to correct them.

16               Second, the past five quarters of

17     earnings at Merrill Lynch should have revealed to

18     investors that Merrill Lynch had a long history

19     of multibillion dollar losses anywhere from 2 to

20     $10 billion in a quarter, and that that was -- it

21     was not unreasonable to think that that was going

22     to continue in the future.

23               Third, the disclosures that were put

24     out to investors in the form of the 10-Ks and

25     10-Qs, that they were incorporated by reference

6c6dfb9e-c65b-45c6-a987-df67fbd49214

1                     Mayopoulos

2     into the proxy statement, it was made clear that

3     these were extremely difficult and challenging

4     times indicated that Merrill Lynch's financial

5     performance was not likely to get better and

6     might in fact get worse.

7                And then fourth, there were a number

8     of other public events, very public events that

9     were occurring in the marketplace such as the

10    failure at Bear Stearns and Lehman Brothers and

11    AIG and the takeover of Fannie Mae and Freddie

12    Mac and all these events that were occurring that

13    were clear signals to investors that the

14    marketplace was very difficult and very

15    challenging and that financial institutions such

16    as Merrill Lynch were likely to continue to face

17    very difficult circumstances.

18                I think finally there was an aspect

19    of this that it was not a high degree of

20    confidence in the reliability of the projections

21    that had been created, and from my own

22    perspective I thought it was important that

23    whatever information we put out to the

24    marketplace needed to be reliable such that

25    investors could make investment decisions based

Timothy J. Mayopoulos                    December 1, 2009

1                          Mayopoulos

2      on it.

3              So those were -- in my mind those

4      were the principal reasons for the conclusion.

5              Q.   Why was there no high degree of

6      confidence in the Merrill projections?

7              A.   There was an element of it that was

8      clearly in terms of the forecast essentially a

9      guess as to what was going to happen for the

10     balance of the quarter.  And it didn't seem to me

11     that something that was basically a rough guess

12     as to what was going to happen, it didn't seem to

13     me that was a reasonable basis to put out a

14     disclosure to investors.  That we should have --

15     we should be basing our disclosure on something

16     that was actually reliable and something that

17     management had confidence in.

18             Q.   Was it your understanding that a

19     component in the projection that you had been

20     given was a rough guess based on what you had

21     been told by Mr. Price?

22             A.   Yes, I mean Mr. Price had told me

23     that there was a contingency base built into the

24     number, and when you look into the spreadsheet

25     it's got some notations to that effect.

Timothy J. Mayopoulos                     December 1, 2009

1                      Mayopoulos

2          Q.    When you say contingency, what do you

3     mean?

4          A.    That there was a billion dollar plug

5     factor or guess as to what additional losses

6     might -- what Merrill Lynch might suffer for the

7     balance of the quarter.

8          Q.    Of the people who looked into the

9     disclosure issue, did anybody dissent from the

10    conclusion that no disclosure was necessary?

11         A.    No.

12         Q.    Everybody agreed?

13         A.    To my knowledge everybody agreed.

14         Q.    You just walked me through the

15    reasoning for why disclosure was not necessary,

16    was that ever spelled out in a conversation or a

17    meeting?

18         A.    I don't think that it got expressed

19    in the narrative form that I just gave, but I

20    think all those facts were discussed in this

21    discussion that we had on November the 20th.

22         Q.    What was the decision -- strike that.

23    In addition to concluding that no disclosure was

24    necessary, was there anything else that was

25    agreed to in that meeting?

Timothy J. Mayopoulos                    December 1, 2009

1                        Mayopoulos
2            A.    I don't know.  I mean I know that I
3    myself had a couple of things I wanted to follow
4    up on, but including finishing reviewing the
5    Merrill Lynch disclosure documents which I don't
6    think I had done by the time the meeting had
7    happened on the 20th, but I don't remember any
8    particular agreement coming out of the meeting.
9            Q.    What was the other item you wanted to
10   follow up on, do you remember?
11           A.    I don't remember offhand.
12           Q.    Did you finish the review of the
13   Merrill Lynch filings?
14           A.    Yes.
15           Q.    Did you change your conclusion?
16           A.    No.
17           Q.    Did either you or anybody else at the
18   meeting suggest that you continue to monitor
19   Merrill Lynch's financial situation and reconvene
20   any change that occurred?
21           A.    I don't know if we specifically
22   discussed that, I thought that was -- I mean it
23   seemed to be implicit in the nature of the
24   conversation that we were having.
25           Q.    Why do you say that?

Timothy J. Mayopoulos                    December 1, 2009

Page 196

1                        Mayopoulos

2              THE VIDEOGRAPHER:    The time is 3:53

3         and we're going off the record.

4              (Discussion off the record)

5              THE VIDEOGRAPHER:    The time is 3:54

6         and we are back on the record.

7         Q.   Mr. Mayopoulos, I think my last

8    question to you was why did you believe it was

9    implicit in your conversation where the Wachtell

10   attorneys and the executives of the bank that you

11   would continue to monitor Merrill Lynch's

12   situation?

13        A.   I don't know, I don't recall a

14   specific discussion about it.

15        Q.   In a minute I'm going to ask you

16   about a conversation that you had with Mr. Price

17   and Mr. Curl on December 1 concerning the MAC

18   clause.

19        A.   Yes.

20        Q.   In the almost two weeks after the

21   meeting -- strike that.  In the days after you

22   had concluded that no disclosure was necessary of

23   the projected performance of Merrill Lynch, did

24   you ask Mr. Price or Mr. Curl or anybody else for

25   updates on Merrill Lynch's situation?

Timothy J. Mayopoulos                    December 1, 2009

1                           Mayopoulos
2          A.    No, except for a conversation that I
3     had with Mr. Price on December the 3rd, I didn't
4     get any further updates.
5          Q.    Did anybody else who worked for you
6     ask for that information to your knowledge?
7          A.    Not that I'm aware of.  While you're
8     doing that, let me make a clarification before I
9     forget to do it because I had forgotten once
10    before to do it.  That is early on we were
11    talking about testimony I had given to others and
12    I think I testified that I gave testimony to the
13    New York Attorney General's Office in August.
14         Q.    You said twice.
15         A.    I did twice.  And I think I said the
16    second time was before that, before August.  I
17    was wrong about that, I think the first time was
18    in August and the second time was in October.
19         Q.    After the privilege had been waived?
20         A.    Right.  So I just wanted to clarify
21    that.
22         Q.    Let me put in front of you what I
23    just marked as Plaintiff's Exhibit 164.
24               (Plaintiff's Exhibit 164, Document
25               bearing Bates number BAC-ML-NYAG 5021107,

Timothy J. Mayopoulos                    December 1, 2009

Page 210

1                      Mayopoulos
2           A.    No.
3           Q.    What was your reaction to Mr. Price
4    after he had told you that the projected losses
5    had increased to $7 billion?
6           A.    I thought that what I told him was
7    that based on the factors we had discussed with
8    Wachtell on the November 20 call and that I
9    didn't believe that it changed the conclusion
10   that no further disclosure warranted.
11          Q.    Did you say anything else?
12          A.    There might have been some discussion
13   about my reaching out to Wachtell to talk with
14   them.  I have a vague recollection that we talked
15   about that.
16          Q.    To get an additional confirmation as
17   to whether or not the change would justify making
18   a disclosure?
19          A.    Yes.
20          Q.    Did you reach out to Wachtell?
21          A.    I had a vague recollection that I had
22   but I don't have any record that I did.
23          Q.    We've talked previously, you've
24   testified previously about the analysis and the
25   work that you have done in the middle of November

6c6dfb9e-c65b-45c6-a987-df67fbd49214

Timothy J. Mayopoulos                    December 1, 2009

1                          Mayopoulos

2       to satisfy yourself whether or not a disclosure

3       had to be made of Merrill's projected losses for

4       the quarter, do you remember that?

5            A.    Yes.

6            Q.    Did you do any work or research after

7       your meeting with Mr. Price?

8            A.    On December 3?

9            Q.    Yes.

10           A.    No.

11           Q.    Why not?

12           A.    I didn't think that any further work

13      or research was warranted based on what I had

14      been told.  The fundamental facts on which our

15      analysis was based had not changed and the

16      rationale hadn't changed.  The 7 billion dollar

17      number was still well within the historical

18      experience of Merrill over the prior five

19      quarters and the prior disclosures were still the

20      same prior disclosures that we had talked about

21      on November the 20th, and I didn't think any

22      further analysis was warranted.

23           Q.    Did you attend the shareholder

24      meeting on December 5th?

25           A.    Yes, I did.

# TAB 28

Joe Lee Price                              December 18, 2009
                        CONFIDENTIAL

Page 1

                    Confidential - Price

        UNITED STATES DISTRICT COURT

        SOUTHERN DISTRICT OF NEW YORK
        ----------------------------x
        SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,

            vs.            09-CV-6829

        BANK OF AMERICA,

                    Defendant.
        ----------------------------x


                    CONFIDENTIAL


                JOE LEE PRICE

            New York, New York

        Friday, December 18, 2009


        Reported by:  Steven Neil Cohen, RPR

        Job No. 306225

476f2c3e-8275-44e6-b3d2-f0c949d0b246

Joe Lee Price                          December 18, 2009
                    CONFIDENTIAL

                                              Page 118
1                Confidential - Price
2         Q.    Did you -- did Mr. Cotty tell you
3    that this forecast reflected the best
4    information that he had at the time?
5         A.    As adjusted, you know, as we just
6    talked about for these items was my
7    impression, yes.
8         Q.    Did Mr. Cotty tell you that this
9    forecast was incomplete in any way?
10        A.    Mr. Cotty, my recollection is, he
11   represented this was the best forecast we
12   had, again as adjusted for these items.
13        Q.    Did he tell you that he felt that
14   this was -- this forecast was incomplete?
15        A.    I don't recollect that, no.
16        Q.    Was it your understanding that
17   this forecast was complete?
18        A.    Yes.  That this was our best
19   estimate at that time or their best estimate
20   at that time.
21        Q.    You testified earlier, Mr. Price,
22   about -- that after you received this
23   forecast it prompted you to consider
24   disclosures, is that fair to say?
25        A.    Yes.  I believe this was the base

Joe Lee Price                          December 18, 2009

CONFIDENTIAL

1            Confidential - Price

2     forecast that did that, yes.

3         Q.    What specifically are you

4     referring to?

5             MR. JEFFRESS:  Specifically

6         referring to about what?

7     BY MR. BORYSHANSKY:

8         Q.    Did you raise the question of

9     whether -- strike that.

10            Did you have a concern as to

11     whether the Merrill's forecast for the

12     quarter should be disclosed?

13         A.    The forecast made me raise the

14     question of should there be anything

15     disclosed.

16         Q.    Did you raise that question with

17     anyone in particular?

18         A.    Yes.  Tim Mayopoulos, our general

19     counsel, among others.

20         Q.    When did you first raise it with

21     Mr. Mayopoulos?

22         A.    I don't recollect the exact date

23     but it was on or around -- soon after I got

24     the forecast.

25         Q.    Did you also raise it with

Joe Lee Price                           December 18, 2009
                    CONFIDENTIAL

                                              Page 122
1                    Confidential - Price
2              When you raised the issue of
3     disclosure with Mr. Thain and Mr. Chai was
4     there any discussion about what form of
5     disclosure?
6          A.    I am not saying there wasn't.  I
7     don't recollect that.
8              I recollect them having a view
9     that there shouldn't be disclosure was the
10    principal point that I recollect.
11         Q.    Did you consider whether -- what
12    the form of disclosure would be?
13         A.    No.  My question at that point
14    was, do we need to disclose.
15         Q.    Disclosure where, in the proxy
16    statement?
17         A.    Or in some form that would
18    therefore end up in a proxy statement,
19    incorporation or something.
20         Q.    Did you consider whether a form
21    8-K was required?
22         A.    I was not thinking about the
23    particular -- as I recollect, I wasn't into
24    the particular.  I was asking kind of a
25    basic question at that point.

476f2c3e-8275-44e6-b3d2-f0c949d0b246

Joe Lee Price                                    December 18, 2009
                          CONFIDENTIAL

                                                    Page 123
1                     Confidential - Price
2              Q.    What did you tell Mr. Mayopoulos?
3              A.    Well, as I recollect I asked him
4        the same question and then I did tell him I
5        was going to ask the same question to John
6        and Nelson, and provided him -- and that
7        started a process, I guess is a better way
8        of saying it, of providing him information.
9

10             Q.    Did you provide a copy of the
11       forecast to Mr. Mayopoulos?
12             A.    I believe I did.
13             Q.    Is it a copy of this forecast?
14             A.    Yes.  I think so.  I am not
15       remembering the exact thing but I think so,
16       yes.
17             Q.    Did you explain to Mr. Mayopoulos
18       anything about the forecast?
19             A.    I mean, there was a general
20       discussion about the forecast as I
21       recollect, including, you know, the
22       adjustments to it, if you want call it that
23       as I recollect.
24             Q.    What was that general discussion?
25             A.    This was the best view, the best

Joe Lee Price                                    December 18, 2009
                           CONFIDENTIAL

Page 124

1                     Confidential - Price
2     view of the fourth quarter estimate or the
3     fourth quarter forecast.
4          Q.    Did you explain to Mr. Mayopoulos
5     that there was an expected gain from a tax
6     asset?
7          A.    As I recollect I went through all
8     of the -- all of this with Tim.
9          Q.    Was there any discussion with Tim
10    Mayopoulos about whether the forecast for
11    Merrill's quarterly performance was
12    incomplete?
13         A.    No.  Again I think that -- well, I
14    think the same points I was making to you
15    earlier.  I may have reiterated in that that
16    this was the best view that the team had
17    given me.
18         Q.    What was Mr. Mayopoulos' initial
19    reaction when you first told him about the
20    forecast?
21         A.    You know, this is dating.  My
22    recollection is he said, why.  I mean, why
23    would you think that or why -- that was
24    my -- that is my recollection of it.
25         Q.    Did you explain why?

Joe Lee Price                                December 18, 2009
                        CONFIDENTIAL

1                    Confidential - Price
2          A.    I simply said, I am calling the
3     question, they have an X dollar, you know,
4     number and I am asking the question.
5          Q.    What prompted you to ask the
6     question?
7          A.    These numbers, the results.
8          Q.    The magnitude of the number?
9          A.    Yes.  I guess -- I don't know that
10    I thought about it that hard.  I mean, it
11    was the numbers, yes, that prompted me to
12    ask it.
13         Q.    Because it was a large loss?
14         A.    Yes.
15         Q.    What did Mr. Mayopoulos tell you
16    he will do?  Strike that.
17               What was Mr. Mayopoulos' advice to
18    you?
19               MR. JEFFRESS:  At that time or --
20    BY MR. BORYSHANSKY:
21         Q.    At that time?
22         A.    Right when I first communicated
23    that to him?
24         Q.    Yes.
25         A.    I don't recollect there being

Joe Lee Price                                    December 18, 2009

CONFIDENTIAL

Page 126

1                    Confidential - Price
2       advice as much as we need to go through the
3       mechanics -- we need to go through the
4       details and get a better understanding.
5           Q.    What details did Mr. Mayopoulos
6       tell you he -- you needed to go through?
7           A.    At that time again?
8           Q.    Yes.
9           A.    I don't recollect us going into a
10      lot of details at that time.
11               We subsequently had other
12      conversations where we went through it but
13      at that particular time I think that was
14      pretty much the discussion.
15          Q.    In the course of the following
16      week you reviewed additional information and
17      had additional meetings; is that right?
18          A.    Correct.
19          Q.    You have a notation on the
20      forecast on the front page it reads,
21      "Concluded with Tim and Ed that no
22      premeeting," is that "disclosure?"
23          A.    "Disclosure necessary."
24          Q.    "Disclosure necessary."
25               Is that your handwriting?

Joe Lee Price                                    December 18, 2009
CONFIDENTIAL

Page 127

1                    Confidential - Price

2          A.    Yes, sir.

3          Q.    When was that notation added to

4    the forecast, do you remember?

5          A.    I think it was on or around the

6    time we concluded -- reached that

7    conclusion.

8          Q.    Who was involved in reaching that

9    conclusion?

10         A.    Tim Mayopoulos, our general

11   counsel, and there were a number of people

12   that did work to support the analysis,

13   attorneys from Wachtell, Lipton, myself,

14   were the principal, our chief accounting

15   officer, I think Craig Rosato was in the

16   kind of conclusion meeting.

17              Those are the main principals I

18   remember.

19         Q.    Was -- would it be fair to say

20   that the starting point of those discussions

21   was that some form of disclosure had to be

22   made?

23         A.    No.  I was asking the question,

24   not that I knew the answer.  I was asking

25   the question.

Joe Lee Price                                December 18, 2009
                        CONFIDENTIAL

1                    Confidential - Price
2          Q.    Did any one of the participants in
3     those discussions suggest at any point that
4     some disclosure had to be made?
5          A.    No.  I don't recollect that.
6                It was more of a kind of a
7     fact-based process that we went through to
8     make a determination.
9          Q.    Did you review any information in
10    the course of those discussions or outside
11    of those discussions concerning the
12    disclosure question?
13               MR. LIMAN:  Go ahead if you can
14          answer.
15               THE WITNESS:  As I recollect, my
16          reviews were part of those discussions.
17          That was in essence the review, part of
18          those discussions and review of material
19          that Tim had prepared for that.
20    BY MR. BORYSHANSKY:
21         Q.    What materials were those?
22         A.    Well, that -- you want me to --
23               MR. JEFFRESS:  Just go through.
24               THE WITNESS:  -- go through the
25          process that we -- yes.  So the first --

Joe Lee Price                                    December 18, 2009
                          CONFIDENTIAL

1                     Confidential - Price
2          the things I recollect the most
3          pertinent to me were, you know, what was
4          driving the losses and was there
5          anything in the losses that suggested
6          that the franchise -- you know, there
7          was something about the franchise we
8          didn't recognize and as I recollect, the
9          determination was, you know, the losses
10         were coming from known asset classes
11         generally that we had identified before
12         and the market was horrendous, as we all
13         knew, and it was having a more
14         significant impact on those asset
15         classes as opposed to there was some
16         dramatic change in the franchise
17         operation from that.
18              We also looked, as I recollect, at
19         historical losses of Merrill Lynch
20         including, you know, the third quarter
21         and other periods prior to that where
22         they had like the large gain on
23         Bloomberg, I believe, that, you know, so
24         some of the big items that were in them.
25              We also looked at, was there

Joe Lee Price                                    December 18, 2009

CONFIDENTIAL

Page 130

1                    Confidential - Price

2          anything to update in the system per se

3          or in the public record or whatever and

4          concluded there wasn't.

5               We also looked at the existing

6          disclosures, the proxy, but probably as

7          importantly, the incorporated documents

8          that included the 10-Qs that had just

9          been filed that had all the recent

10         market event kind of language in them

11         and all the disruption and the fact that

12         it was impacting businesses.

13              And then, obviously, you know,

14         asked the advice of counsel, you know,

15         from that standpoint.

16              Those are the things that stick in

17         my mind as the main points that we

18         looked at and reviewed and talked about.

19    BY MR. BORYSHANSKY:

20         Q.    Which asset classes were known

21    and -- that you concluded were the drivers

22    of the losses?

23         A.    Again, it was more of a, is there

24    a component of the losses that we have

25    identified that is coming from an asset

476f2c3e-8275-44e6-b3d2-f0c949d0b246

Joe Lee Price                              December 18, 2009

CONFIDENTIAL

1                    Confidential - Price

2          class that we hadn't, you know, evaluated in

3          due diligence.

4                    And the only thing that I can

5          recollect was that we came across and it was

6          not any significant losses, it was actually

7          quite small and, you know, on this stuff was

8          an asset-based lending portfolio that we had

9          not looked at in due diligence but again it

10         was not, it was not and has not been a

11         driver of, you know, of any of the, you

12         know, market disruption losses.

13              Q.   The majority of the other losses

14         were driven by asset classes that you had

15         become familiar with during due diligence?

16              A.   That the due diligence team had

17         evaluated, yes.

18              Q.   Did that include -- did that --

19         did those asset classes include the

20         correlation book at Merrill?

21              A.   I believe so, yes.

22              Q.   Any other asset classes?

23              A.   Leveraged loans at the time.

24         Probably insurance wraps which would have

25         credit spread component.

Joe Lee Price                              December 18, 2009

CONFIDENTIAL

Page 132

1                    Confidential - Price
2              So it was all of those core basic
3       asset classes as I recollect.
4          Q.    Did you yourself review Merrill's
5       historical performance as part of the
6       analysis as to whether disclosure had to be
7       made?
8          A.    I recollect having a schedule that
9       someone had summarized it, you know, and so
10      the answer is, I saw the schedule but I
11      didn't go back and get the actual results.
12         Q.    In addition to what you have
13      mentioned, the historical performance, the
14      existing disclosures and the other items you
15      testified to, did you also review analyst
16      estimates about Merrill?
17         A.    I don't recollect looking at those
18      because you know, back when -- even when I
19      first brought this up to John and Nelson
20      they were like, no one is following us
21      anymore, they are irrelevant, so no one is
22      updating their estimates.
23              And I don't recollect that being a
24      pertinent item I was thinking about at that
25      time because nobody was updating.